FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Aug 17, 2020, 10:23am
Michelle Rynne, Clerk of Court

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
Deputy Director, Election Crimes
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. **20-00068 JAO** |
| ) | |
| Plaintiff, ) | INFORMATION |
| ) | |
| vs. ) | [18 U.S.C. § 2 and 22 U.S.C. §§ |
| ) | 612 and 618(a)] |
| NICKIE MALI LUM DAVIS, ) | |
| ) | |
| Defendant. ) | |

The United States of America charges:

### INTRODUCTION

1.    At all times relevant to this Information:

2.    From no later than March 2017 to at least in or about January 2018,

NICKIE LUM DAVIS agreed with Persons A and B to act as agents of Foreign

National A in exchange for millions of dollars in undisclosed wire transfers originating from foreign accounts associated with Foreign National A. DAVIS specifically agreed to facilitate Person B's lobbying of the President of the United States ("the President"), his Administration, and the United States Department of Justice ("DOJ") to drop the investigation of Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia. As part of their efforts, the defendant and Person B willfully failed to disclose to the Administration and DOJ officials that Person B was acting on behalf of Foreign National A. Ultimately, DAVIS and Persons A and B were unsuccessful in their efforts to have the 1MDB investigation dropped.

3.      During the same approximate period, DAVIS also agreed with Persons A and B to aid their efforts to lobby the Administration and the DOJ to arrange for the removal and return of People's Republic of China ("PRC") National A—a dissident of the PRC living in the United States—at the request of Foreign National A and PRC Minister A. Here too, DAVIS and Persons A and B were ultimately unsuccessful.

4.      To further the interests of Foreign National A, DAVIS aided Person B in facilitating a meeting between Malaysian Prime Minister A and the President in

September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5.     DAVIS, Person A, and Person B also met with PRC Minister A in the PRC and agreed that Person B, assisted by DAVIS, would lobby the Administration to return PRC National A to the PRC.  DAVIS, Person A, and Person B, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials at DOJ and the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

6.     The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal.  Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ.  It is a crime to knowingly and willfully fail to register, and to make false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

3

7.    The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals.  Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

## RELEVANT PARTIES & ENTITIES

8.    The defendant, NICKIE MALI LUM DAVIS, was and is a United States citizen, businesswoman, and consultant with personal and business relationships with Persons A and B.

9.    Person A was a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

10.    Person B served as Deputy Finance Chair of a national political committee from approximately April 2016 to April 2018.  In that capacity, Person B raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle.  After

4

the election, Person B continued in his role as Deputy Finance Chair and maintained access to, and contact with, high-ranking officials in the Administration of the President, including the President.  Over the same period, Person B owned and operated several domestic and international businesses and worked as a political consultant.

11.     Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12.     Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A to pay Person B for his lobbying efforts.

13.     George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ.  On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14.     Law Firm A was a law firm operated by Person B's spouse, Person C.

15.     PRC National A was a dissident of the PRC, living in the United States on a temporary visa.  The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16.     In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme.  In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds.   On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices Act by paying bribes to various Malaysian and Abu Dhabi officials.

## I.     Campaign to Resolve 1MDB Civil Forfeiture Cases

### A.     Person B Agrees to Lobby for Foreign National A for $8 Million Retainer

17.     In or about March 2017, DAVIS told Person B that she had a possible client in Malaysia who could "use help with the forfeiture."

18.     On or about March 5, 2017, at the request of Person B, DAVIS emailed Person B a copy of a civil forfeiture complaint related to 1MDB.  That same day, DAVIS emailed Person B a Bloomberg article titled "[Foreign National A] Trusts Ask to File Late Claims in Forfeiture Lawsuits," and texted Person B, "Your email has the court filing[.]"  Person B responded, "Thx.  Will review."  DAVIS replied, "Call me when u can- thank you[.]"  Person B responded again, "Yes. 5 min[.]"

19.     Person A requested that DAVIS send him Person B's biography describing Person B's relationship with high-level officials in the Administration

6

and photographs of Person B and the President.  On or about March 7, 2017, Person B's assistant, at DAVIS's request, emailed photographs to DAVIS featuring Person B and the President.  Person A said that he wanted the photographs so that Person A could highlight Person B's close access to the Administration.

20.     On or about March 8, 2017, DAVIS texted Person B, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?"  Person B responded, "I think so.  Let's speak later."  Later that same day, DAVIS sent Person B additional text messages to set up the meeting among Person B, Person A, and DAVIS.

21.     At the direction of Person B, on or about March 13, 2017, DAVIS forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A.  The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days.  The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings.  In actuality, Person A, Person B, Law Firm A, DAVIS, and Person C provided no litigation services or legal advice to Foreign National A.  The true purpose of the retention agreement was to secure Person B's services to lobby the

Administration and DOJ on Foreign National A's behalf based on Person B's political connections.

22.    On or about March 13, 2017, Person B met with Person A and DAVIS to discuss Foreign National A and his legal issues.  At the meeting, Person A described his relationship with Foreign National A to Person B, and asked if Person B could help with the civil forfeiture cases involving Foreign National A.  Person A said he would speak with Foreign National A about the possibility of Person B helping with the civil forfeiture cases.  That same day, Person B texted DAVIS in part, "I'm excited about our business prospects."

23.    On or about March 15, 2017, in reference to Foreign National A, Person B texted DAVIS, "Anything new on . . . [Person A's] Associate?"  That same day, DAVIS responded, "[Person A] mtg in person tomorrow w the 'promoter' and they hope to travel within the next few week[.]"

24.    On or about March 22, 2017, DAVIS emailed Person B and his assistant about setting up another meeting among Person B, Person A, and DAVIS.

25.    At all relevant times, DAVIS, Person A, and Person B were aware of FARA and its prohibition on unregistered representation of foreign principals.

26.    Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did DAVIS, Person A, or Person B register with the FARA Unit in DOJ regarding their work as agents of Foreign National A.

**B.      Person A, Person B, and DAVIS Meet Foreign National A in Bangkok**

27.      In or about April 2017, Person A asked Person B to travel to Bangkok, Thailand to meet with Foreign National A.  Person B said he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds.

28.      On or about April 28, 2017, Person B texted DAVIS advising, "I would like the funds to go to [Law Firm A.]"  That same day, DAVIS responded, "Ok[.]"

29.      On or about April 29, 2017, Person B and DAVIS exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, Person B asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?"  DAVIS responded, "Call me when u can talk[.]"

30.      On or about April 30, 2017, DAVIS emailed Person B's assistant regarding a flight itinerary for travel to Bangkok.  In the email, DAVIS wrote in part: "Please call me if you have questions -- It's 2 one way tickets – since we need to leave from a different country[.]  We don't need to worry about hotels yet . . . "

31.      On or about May 1, 2017, DAVIS emailed Person B and his assistant a link to the Shangri-La Hotel in Bangkok.  That same day, DAVIS emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed

up with, "Also send me [Person B's] wire info."  DAVIS replied by providing the wire information for an account in the name of Law Firm A.  The same day, in response to a question from Person B's assistant about whether she should cancel Person B's hotel room reservation, DAVIS emailed Person B's assistant, "Yes all rooms are booked by [Person A] already."

32.    On or about May 2, 2017, DAVIS emailed Person B stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

33.    On or about May 2, 2017, DAVIS, Person A, and Person B arrived in Bangkok.  During the trip, DAVIS, Person A, and Person B met with Foreign National A in a hotel suite.  Person B and Foreign National A spoke about the 1MDB investigation and civil forfeiture actions.  Person B agreed to help Foreign National A attempt to resolve the matter.  Foreign National A agreed to pay Person B an $8 million retainer and wanted Person B to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter.  Person B agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf.  With respect to payment, Person B stated that the money should not come directly from Foreign National A and should be "clean."  Foreign National A identified a friend who could pay Person B and others.  Person B, Person A, and DAVIS agreed that

the money would first be routed through Person A and then be paid to Person B through Law Firm A.  Person B and DAVIS agreed that Person B would pay DAVIS thirty percent of what Person B received.  Person A also agreed to pay DAVIS a percentage of the funds that Person A received.  Person A told Person B and DAVIS that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review.

### C.   Person A Receives $8.5 Million from Foreign National A; Person B is Paid $6 Million; DAVIS is Paid $1.7 Million

34.   Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong.  That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A from the Company A account.  Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million.  Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on May 8, 2017 was transferred from the Law Firm A account to one of Person B's business accounts.

11

35.    On or about May 8, 2017, DAVIS texted Person B, "Both wires in [Law Firm A] are from [Person A].  The remaining balance was dropped to your office 20 minutes ago -".  DAVIS then added, "702 total cashier check[.]"

36.    On or about May 9, 2017, Person A caused Company A to transfer $250,000 to a company controlled by a family member of DAVIS for the benefit of DAVIS.

37.    On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company.  That same day, Person A transferred $3 million from Company A to Law Firm A.

38.    On or about May 17, 2017, Person B and DAVIS exchanged text messages regarding the payments from Foreign National A to Person B through Person A and Person B's payment of a percentage to DAVIS.  Among the text messages, DAVIS asked, "Did you get it?"  Person B responded, "Yes.  Sent you Wickr[.]  Sending wire to you in morning."  Wickr is a messaging application that allows for end-to-end encryption and content expiration.  Person B later added, "Did you get 2nd confirm?"  DAVIS responded, "When Asia opens ... .  Baby steps at least moving forward now."  Person B responded, "Yes.  Hammer them for the next 2 wires."  Person B later added in part, "Assuming second 3 is in and confirmation that last 2 is being sent.  Please ask [Person B's assistant]."

39.     On or about May 18, 2017, Law Firm A transferred $500,000 to one of Person B's business accounts and $900,000 to a business account controlled by DAVIS.  Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of Person B's business accounts.

40.     On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which Person B and Foreign National A agreed in return for Person B's lobbying the Administration and the DOJ to drop the 1MDB civil forfeiture cases and any related investigations.  That same day, $600,000 was transferred from Law Firm A's account to a business account associated with DAVIS.

### D.     Person B Facilitates Meetings for Malaysian Prime Minister A and Lobbies to Resolve the 1MDB Cases

41.     On or about May 18, 2017, Person B texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Hi [Person D]- Please work on Asian country visit.  Date in July."

42.     On or about June 5, 2017, Person B texted Person D again regarding the visit for Malaysian Prime Minister A:  "Asian country is very motivated re July meeting.  Hoping we can confirm date etc asap."

43.     The same day, at the request of Person A, DAVIS sent Person B text messages regarding Foreign National A.   Among those messages, DAVIS wrote, based upon information conveyed to her by Person A on behalf of Foreign National A, "Please call before u go to bed in ISRAEL if possible… [Foreign National A] keeps calling for news[.]"  Person B responded, "Yes.  Will call you.  I am heading to D.C.  Tonight to work on [Foreign National A] and Asian country[.]"

44.     On or about June 15, 2017, relaying a message from Person A, DAVIS texted Person B, "Hey he'd like to speak w you this evening.  Are u able?"  DAVIS added, "Principal", which was a reference to Foreign National A.  That same day, Person B responded, "Yes[.]"

45.     On or about June 16, 2017, Person B and DAVIS exchanged text messages regarding 1MDB and the seizure of jewelry from a person associated with Foreign National A.

46.     On or about June 17, 2017, Person B and DAVIS discussed Malaysian Prime Minister A.  In or about June 2017, Person B asked the President if he would play golf with Malaysian Prime Minister A.  Person B said, and DAVIS believed, that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter.  Person B also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

47.    On or about June 19, 2017, DAVIS texted Person B a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

48.    On or about June 25, 2017, DAVIS texted Person B a link to an article about Malaysian Prime Minister A and the 1MDB forfeiture action involving Foreign National A. That same day, Person B responded, "Weird article. What can we do?" DAVIS replied, "Call pls. Got news[.]" DAVIS followed up stating that she had sent Person B a "What's app request."

49.    On or about June 29, 2017, Person B sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

50.    On or about June 30, 2017, Person B sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, Person B followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

51.     On or about July 3, 2017, Person B again texted Person E regarding the golf date for Malaysian Prime Minister A and the President: "Good morning [Person E]. It would be extremely helpful to me if you could confirm the golf date today with POTUS for [Malaysian Prime Minister A.] POTUS told me he is glad to play at Bedminster or DC. After we spoke, I mentioned to [Malaysian Prime Minister A] that he would have the date last week. Thank you very much! Regards, []." Later that day, Person B texted Person E again: "[Person E], I'm following up. Please send me the date and time for the [Malaysian Prime Minister A] golf with POTUS. Thank you!"

52.     On or about July 4, 2017, DAVIS texted Person B, "Call me asap" and then "Clear your phone – erase messages[.]"

53.     On or about July 5, 2017, Person B exchanged messages with Person E regarding the golf outing. Among other messages, Person B texted, "[Person E], just left you a message. It's been a week. Can you send me the date today? Best, []" Person E responded, "It's with the NSC[.] They coordinate and negotiate – I'm sure it will get done[.]"

54.     On or about July 11, 2017, relaying a message from Person A, DAVIS texted Person B, "Wickr[.] It's 5pm … I think we need to make a move. Date and otherwise. We're getting killed." These messages referred to confirming a date for Malaysian Prime Minister A to play golf with the President and Foreign National

A's displeasure because no date had been confirmed.  Relaying urgency from Person

A, DAVIS continued, "Please call because we need to strategize – I'm getting

inundated[.]"  Person B responded, "See wikr[.]"  The following day, Person B

texted DAVIS, "Send me text on wikr.  I'm taking off and need to get to WH[.]

Taking off.  Need now[.]"  DAVIS responded, "Done[.]"  Person B responded, "Got

it.  Thx[.]  Trying to get [Person F] to do call asap[.]"  Person F was then a high-

ranking official on the National Security Council.

     55.    On or about July 13, 2017, DAVIS texted Person B, "Please call when

u can so we can talk- we gotta handle this so pls pls go to D.C.  And sit at WH until

u get it.  I will keep u company if u worry about being lonely!"

     56.    On or about July 13, 2017, Person B texted Person E again regarding

the golf date:  "Hi [Person E], It's been 2 weeks.  Checking again on date for golf

for [Malaysian Prime Minister A] with POTUS.  Can you text me date today?  Thank

you.  Best, [][.]"  Person E responded, "I'll check now again[.]  These things go

through a process -".  Person B responded "Thank you!!"  Person E replied, "NSC

is on it and coordinating[.]"  Person B responded, "Can we get date today?"  Person

E replied, "They're working directly with [Malaysia.]  NSC is coordinating a date."

     57.    On or about July 15, 2017, Person B texted DAVIS, "Working on

getting meetings for tomorrow."

58.    On or about July 17, 2017, conveying urgency expressed by Person A on behalf of Foreign National A, DAVIS texted Person B, "[Person E] needs to give u this date now and ask him for update on other thing.  We look impotent[.]"  This text referred both to setting up a meeting between the President and Malaysian Prime Minister A and to the matter involving PRC National A.  Person B responded, "Agree.  Hammering away[.]"

59.    On or about July 18, 2017, Person B and DAVIS exchanged several text messages about setting up a meeting between the President and Malaysian Prime Minister A.  Among the messages, relaying information from Person A, DAVIS wrote, "Can u check Wikr[.]  Really really need that date.  It's been crazy for me all day w this.  He's panicking[.]"  DAVIS followed up with, "This date is mandatory today- we're getting creamed."  According to Person A, Foreign National A was panicking because no meeting had yet been scheduled.  Person B responded, "Calling [Person E] now[.]"  DAVIS replied in part, "Call everyone so they know u are raging mad[.]  Call [Person G] too.  We need this today[.]"  Person G was an administrative assistant to the President.  Person B replied, "Doing it now."

60.    On or about July 19, 2017, DAVIS texted Person B in reference to scheduling a date for a meeting between Malaysian Prime Minister A and the President, "Secondly we need this date bad[.]"  Person B responded the following day, "Please bear with me.  Getting some info on mtg[.]"

61.    On or about July 21, 2017, Person B texted Person E regarding the golf outing: "[Person E], [Malaysia] have heard nothing from NSC.  POTUS said he would play golf with Malaysian Prime Minister A in late July or early August.  POTUS said he was happy to do it.  You said it would be scheduled in a day or two.  We're in the 4th week.  I know you are busy and procedures apply but I've been more than patient.  Instead of being positive, this is now causing me damage.  I would truly appreciate it if you could get back to me today with a date.  Thank you! []."

62.    On or about July 24, 2017, Person B texted Person D, "Received golf date in NJ in Sept. Sat before the UN General Assembly. Finally!  Crossed off my list!  Thank you also for helping!"  Person D responded, "Let's follow through and make sure the date is confirmed by the NSC.  Did he tell you who gave him the date?"  Person B replied, '"Thank you!! Fantastic.  Given to [Person H] by [Person E]."

63.    On or about July 27, 2017, Person B texted Person D, "Just checked again with [Malaysia].  Their Amb to US and Foreign Minister have heard nothing.  Please check asap. Best, []."  Person B followed up with, "Hi [Person D]- Can you call NSA for me re [Malaysia] receiving official word.  Still no contact from NSC to [Malaysia] Amb on meeting.  Thank you.  Best, []"  Person D responded, "[] will call again this morning.  Talked to [] briefly yesterday ... .  Will call shortly."

64.    On or about July 29, 2017, relaying information that she received from Person A on behalf of Foreign National A, DAVIS texted Person B in reference to the meeting between Malaysian Prime Minister A and the President, "They were told 12 sept is mtg.  That's day that un general assembly stars- it's a Tuesday???? No golf??"   DAVIS immediately followed by texting "Wickr[.]"   Person B responded, "May be two mtgs.  Amb should ask.  Golf at Bedminster on Sat and tues at WH?"

65.    On or about August 7, 2017, Person B sent his assistant an email with the subject, "Malaysia Talking Points *Final*," with talking points intended for an upcoming meeting between the Secretary of State of the United States and Malaysian Prime Minister A.   DAVIS received the talking points from Person A—who provided them on behalf of Foreign National A—and relayed them to Person B, knowing that Person B would then provide them to the Secretary of State as background for the meeting.  The talking points mentioned, among other things, Person B's ongoing relationship and work with [Malaysia], and identified 1MDB as a "[p]riority[.]"  The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]"

66.    On or about August 7, 2017, Person B also sent the talking points document to Person D for his review and edits and to obtain details about the timing

20

of a meeting in Malaysia between Malaysian Prime Minister A and the Secretary of State: "Hi [Person D]; When is [Secretary of State] mtg?; Already 11:00 am Monday in [Malaysia]. Can you expand and send me final version?" Person D responded by sending a revised version of the talking points to Person B and stating, "[]- here is the marked up version I am going to forward to [Secretary of State]'s office. He heads to Bangkok today and then to [Malaysia]. Let me know if you have any other changes. Thanks."

67.     Later, on or about August 7, 2017, Person B messaged Person D, "[Secretary of State] is meeting with [Malaysian Prime Minister A] on 8th and deputy PM on 9th. Let's get a plug in my name. They know my name and might not immediately recognize [my company's] name. Thank you!" Person D responded, "Definitely important to make this connect. It will not likely be part of the formal meetings but will work to get a plug during their conversations."

68.     Also on or about August 7, 2017, Person A executed an agreement between another of Person A's companies and a representative of Foreign National A providing for "Strategic Communications and Crisis Management" in exchange for approximately EUR 8.4 million to be paid on or before August 16, 2017.

69.     On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A. Person A then transferred $3 million to Law Firm A. Person A also transferred $833,333 to a

business account controlled by DAVIS.  On or about August 10, 2017, Law Firm A

transferred $900,000 to a business account associated with DAVIS.

70.    On or about August 10, 2017, Person B texted Person D regarding the

meeting between Malaysian Prime Minister A and the Secretary of State:  "Heard

from [Malaysia] that meetings went very well.  They were happy with [Secretary of

State].  My name was not mentioned – no plug. ;- ... ."

71.    On or about August 16, 2017, Person B and DAVIS exchanged text

messages to set up a meeting and a phone call.  Among the messages, DAVIS wrote,

"[Person A] really wants to see u today if possible since u leave Friday[.]"

72.    On or about August 18, 2017, Person B and DAVIS exchanged text

messages setting up a phone call.  Among the messages, DAVIS wrote, "Call me

pls.  [Person A] wants to conference in[.]"

73.    On or about August 19, 2017, Person B texted Person D, "Any update

on [Malaysia]?  Person D responded, "As of now it is going to be in DC.  And hard

to do golf due to schedule but I am working on it.  Might have to go to [Person I]

directly on this and use the history of the two of them playing golf."  Person B

responded, "Yes.  If you think it would help I could directly call one of [Person I]

deputies or [Person I]. Also need to add time to meetings.  I would like to discuss

details with you.  Please let me know what is best."  Person I was then a high-ranking

official at the White House.

22

74.     On or about August 21, 2017, DAVIS wired $375,000 in funds she received as a commission from Person A, to Person C, the spouse of Person B.

75.     On or about August 24, 2017, Foreign National A directed the transfer of approximately $10 million to Person A's separate company that had entered into the "Strategic Communications and Crisis Management" agreement with a representative of Foreign National A for EUR 8.4 million.  Based on the prevailing exchange rate on August 24, 2017, EUR 8.4 million converted to approximately $10 million.

76.     On or about September 11, 2017, DAVIS typed a letter at Person B's direction to be sent from Person B to the President in anticipation of Malaysian Prime Minister A's meeting with the President.  The letter included several positive developments in the relationship between Malaysia and the United States.  The letter was never provided to the President.

77.     On or about September 12, 2017, Malaysian Prime Minister A met with the President at the White House, due in part to the assistance provided by DAVIS for Person B's efforts to facilitate the meeting.  Although Person B contacted high-ranking officials in the Administration to arrange a golf meeting between the President of the United States and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

78.    On or about October 6, 2017, Person B met with the President at the White House.  Person B represented to Person A, DAVIS, and Foreign National A that he raised the 1MDB investigation with the President during the meeting.

79.    On or about January 5, 2018, Person B drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that Person B had undertaken on his behalf.  Among other things, the talking points provided: "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in [Malaysia].  I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue.  2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the [] case. She is a [presidential] appointee and can be helpful ... .  3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved.  It is important that I take his lead but will continue to communicate the importance of this issue."   Person B greatly exaggerated his efforts regarding the 1MDB investigation.

80.    On or about January 6, 2018, Person B met with Person A, who asked Person B for a loan.  Person A told Person B that Person A's friend was "checking on" the money they had received from Foreign National A and "helping to keep it clean."

**II.    Campaign to Remove PRC National A from the United States**

### A.      Person B Travels to China to Meet with PRC Minister A

81.      In or about May 2017, following the trip to Bangkok, Person B agreed to travel to Hong Kong to meet again with Foreign National A.  Prior to the trip, DAVIS and Person B discussed that it was important to Foreign National A that PRC National A be deported from the United States.  The purpose of the trip to Hong Kong was to meet with Foreign National A and a foreign government official of the PRC to discuss PRC National A.

82.      On or about May 15, 2017, DAVIS emailed Person B's assistant regarding travel arrangements and the itinerary for the trip to Hong Kong.  The same day, DAVIS also emailed Person B and Person C banking information for DAVIS's company.

83.      On or about May 18, 2017, Person A, Person B, and DAVIS traveled to Hong Kong and were transported to Shenzhen, China, where they met with Foreign National A and PRC Minister A in a hotel suite.  PRC Minister A spoke to Person B about PRC National A and his alleged crimes and stated that the PRC wanted PRC National A to be returned to the PRC.  PRC Minister A asked Person B to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC.  PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials.

**B.    Person B Lobbies Top U.S. Officials for the Removal of PRC National A**

84.   On or about May 20, 2017, during the return trip from China, Person B texted DAVIS, "I'll try to make this a big week for us with [the Attorney General.]"

85.   On or about May 21, 2017, Person B texted Person D regarding his meeting with Foreign National A and PRC Minister A: "[Person D]- Just returned. Huge opportunity.  Can we meet Monday morning at 9:30 a.m. at [hotel]? []."

86.   On or about May 22, 2017, Person B texted Person D, "I will need to meet with [Attorney General] asap.  We will discuss."  Person B followed up with, "I am emailing you a memo.  We will discuss."  Later the same day, Person D responded, "Have a request into [Attorney General] for mtg."

87.   On or about May 22, 2017, Person B sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and [the PRC][.]"  Person B attached to the email a memorandum from Person B addressed to the Attorney General, intending that Person D would then provide the memorandum to the Attorney General.  The content of the memorandum had been provided to Person B by DAVIS, who received it from Person A during the May 2017 trip to China where the content originated from PRC Minister A and Foreign National A.  Upon receipt, Person B and Person C revised the memorandum.

88.   In the memorandum, Person B misrepresented the reason for his trip to China and the circumstances leading to his meeting with PRC Minister A.  Person B

26

concealed his contact with Foreign National A and concealed Foreign National A's role in setting up the meeting between Person B and PRC Minister A.  Person B also concealed the $4 million that he had been paid by Foreign National A over the two weeks preceding the meeting in Shenzhen with PRC Minister A.  Person B also did not disclose that his lobbying efforts with respect to PRC National A were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

89.    In the memorandum, Person B stated, "I was told by [PRC Minister A] that [the PRC] would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security."  Person B wrote about PRC Minister A's upcoming trip to Washington, D.C., in which PRC Minister A and his delegation planned to meet with several high-ranking United States government officials.  Person B advocated for the Attorney General to meet with PRC Minister A.  Person B also noted several items that the PRC, according to PRC Minister A, would be willing to do to improve law enforcement relations between the United States and the PRC.  Person B then added:

> According to my conversation with [PRC Minister A], the one request [the PRC] will make is that [PRC National A], who [the PRC] alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of [the PRC] (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to [the PRC] so he can be charged with these

violations and go through regular criminal proceedings in [the PRC] with regard to these allegations.

Person B appended an Interpol Red Notice for PRC National A to the memorandum.

90.   On or about May 23, 2017, Person B texted Person D, "Hi [] Is meeting set for tomorrow? Has my memo been sent to [Attorney General]?  Please update Thanks [][.]"  Person D responded, "[Person B]- letter was delivered yesterday.  Pls see the final version with changes.  Working on mtg for tomorrow but shooting for early afternoon.  Will call you later today.  I am now on redeye tonight so I can get back to DC early."  Person B responded, "Great. Thank you []. Also try to determine if his mtg was set or if we can set for thurs or in Alabama on fri or sat."  The following day, on or about May 24, 2017, Person D responded, "[W]aiting to hear from DoJ on mtgs – ours and [PRC Minister A].  let me know when you are free and we can meet up to go over other issues. thanks."

91.   On or about May 24, 2017, Person D texted Person B, "Just got a call from [Attorney General]'s office and he cannot do tonight.  But I got a text back from him directly that said he would call me later."

92.   On or about May 25, 2017, Person B texted Person D, "The meetings are at Justice at 10:00 am this morning.  Then FBI and DHS tomorrow.  Perhaps I could tell my contact to get there 10 min early and a brief meeting could occur. And then have meet with [] one on one to discuss more details.  Please try to see [Attorney General] first thing today.  Really important that we pull it off.  I need to speak with

28

my contact this morning.  Thank you. [  .]"  Person D responded, "[ ]- working on it.  [Attorney General] is not in the office this morning but trying to see what time he is returning.  Stand by."  Later the same day, Person B texted Person D, "Detail is that the 3 things in my memo are only for [Attorney General].  [PRC Minister A] wants to tell [Attorney General] directly.  Mine is legitimate back channel.  [PRC Minister A]'s boss wants confirmation that [Attorney General] heard the 3 things which really help US[.]"  Later that day, Person D responded, "[ ]- actually just got off the phone with [Attorney General].  Not great news.  Let me know when you are free to talk.  Thanks."

93.    On or about May 26, 2017, referencing meetings for PRC Minister A, Person B texted Person D, "10 am head of ICE  11:30 FBI  Perhaps a play at DHS would save situation.  Fly by [Person I].  The three items can be shared."  Person B followed up with, "Please call me" and "I'm trying to do damage control and need to speak with you.  Best is pull aside with [Person I]."  Person I was a senior official in DHS at the time.

94.    On or about May 28, 2017, Person B emailed Person D, "transcribed correspondence to and from [the Attorney General] and [the PRC's] Ambassador to the US."  Person B noted, "I believe there is an excellent opportunity for [the Attorney General] to further US interests.  I added comments below.  Can we discuss asap?  There is another matter of interest that the AG should be made aware of."

29

Later that same day, Person B and Person D exchanged emails to schedule a time to discuss the email and its content.

95.      On or about May 30, 2017, relaying information from PRC Minister A and Person A regarding PRC Minister A's meetings with United States Government officials, DAVIS texted, "Check Wickr- all clear now for meetings[.]"  Person B responded, "Yes.  All set[.]"  DAVIS replied, "He got his Mtgs reinstated[.]"

96.      In or about May 2017, DAVIS, at Person A's request, asked Person B to meet with PRC Minister A in Washington, D.C.

97.      On or about May 30, 2017, Person B met with PRC Minister A at a hotel in Washington, D.C.  Person B also asked Person D if Person D could help PRC Minister A arrange meetings with high-ranking United States government officials.

98.      On or about May 31, 2017, Person B texted Person D:

I met with the VM last night. He is on a 4 pm flight back this afternoon. The FBI had him meeting with very low level people and had the person he was to meet with meet with Vietnam instead. His superiors told him to come home unless meeting with [Attorney General] or [Person I]. He is happy meeting with [Person I]. . . . . So far, he has delivered a pregnant woman and the next 2 will be sent shortly. He will accept 60 Chinese Nationals for deportation but only if he has a proper "short meeting". This is a big win for the admin that can be publicized. It is the result of Mara Largo meeting between the two presidents. Please call me and I will tell you more specifics. Thank you.

99.      Person D responded, "[]-got the info. I will call in a few mins." Person B replied, "If you get the meeting, can we have the political WH liaison meet the

VM at DHS? He can mention my name. Also try to get [Person I] to warm up situation. Mention me as well. Thank you! Fingers crossed."

100.   On or about May 31, 2017, DAVIS texted Person B with respect to PRC Minister A's purported meeting with Person I, "In principal [Person I] us ok- just a schedule issue?"  Person B responded, "Just a short notice scheduling issue.  Still might hear in next hour or so.  There is no issue with [PRC Minister A]."  Person B later continued, "Please pass along my good wishes to the VM.  Wait a little while longer."  DAVIS responded, "Yes, I'm telling him that."  Person B replied, "Tell him I'm telling WH and [Attorney General] what happened."  DAVIS then texted, "Isn't [Person I] scheduled to be in Haiti this afternoon?"  Person B responded, "Scheduler did not mention this??  Are you sure?  Neither did [Attorney General']s people[.]"  DAVIS responded, "It's on the DHS website[.]  He's there for the afternoon[.]  Just spoke to VM and he sounded like he was crying[.]"  Person B responded, "Terrible.  What a mess.  Bottom line not our fault.  Normally their Amb would handle.  This is a cluster f[*]ck."  DAVIS replied, "Wickr."

101.   On or about June 9, 2017, DAVIS texted Person B a news article titled "[the PRC]-cranks-up-heat-on-exiled tycoon-[PRC National A.]"

102.   On or about June 27, 2017, Person B and DAVIS exchanged several text messages regarding PRC National A.

103.   On or about June 27, 2017, Person B texted Person H's spouse regarding the removal of PRC National A.   Person B knew that Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, had immediate access to and influence with the President and could be effective in seeking the removal of PRC National A. Person B texted Person H's spouse, "On another note, I would like to meet with Person H tomorrow morning and on important and sensitive matter.  Is there a time tomorrow morning that would be convenient or perhaps for lunch?  Looking forward to seeing you at the [] Hotel!  Regards, [][.]"  Person B later continued:

> Hi [], [Person H] asked me to send this information to you via text.  I have a number of items I will be sending to you regarding the fugitive [PRC National A].  The first is an Interpol red notice. . . . The highly time sensitive matter is that [PRC National A]'s visa to stay in the US expires on June 30th.  It is critically that his new visa application he immediately denied.  He must also be placed on the DHS no fly list. . . . The order would need to come from the very top as [PRC National A] is well connected with former FBI who are on his private security detail. The President of the PRC mention to [the President] at Mar-A-Lago that he would like [PRC National A] returned.  [PRC Minister A] met with me and requested help with regard to [PRC National A]. . . . He promised to return certain US citizens held hostage by [the PRC] and would accept a very large number of [the PRC] illegal immigrants for deportation back to [the PRC].  Finally he offered new assistance with regard to North Korea.

104.   On or about June 28, 2017, Person B met with Person H and his spouse at a social gathering.  After the meeting, Person B exchanged text messages with Person H's spouse regarding [PRC National A]: "Hi [], it was great to see you and

32

[Person H] tonight!  I just heard from [PRC Minister A] again.  He would like to know the status of [PRC National A]'s VISA as time is of the essence.  -Was the VISA issued already or did we deny it?  Can we confirm that [PRC National A] is on the DHS no fly list?  [PRC Minister A] is very concerned that [PRC National A] will flee the US this week.  I hope we can confirm and move to deportation.  This will be an incredible step for our two countries.  [PRC Minister A] says they are grateful for your help."  Person H's spouse responded, "This is with the highest levels of the state department and the defense department.  They are working on this."

105.  On or about June 29, 2017, Person B and DAVIS exchanged text messages regarding PRC National A's visa application.  Person B texted, "Is rejection or acceptance letter already generated?"  DAVIS responded, "I have no idea."  Person B replied, "Sorry always generated.  In others words each applicant eventually re wives a yes or no in writing[?]  Sorry receive a yes or no in writing[?]"  DAVIS responded, "Yes[.]  Check Wickr[.]"

106.  On or about June 30, 2017, DAVIS, in reference to their efforts to facilitate the removal of Foreign National B and the potential return of United States citizens held in Country B, texted Person B, "Wickr.  You are the man right now.  They are going to give you the President's medal of freedom award after what you will accomplish for this country this July 4th[.]"  Person B responded, "I am going

to slam until it's done[.]"  DAVIS replied, "Let's make sure part 1 happens today. And date for m[.]  Don't leave that dude until we do it."  Person B responded, "Agree."  DAVIS continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.]  After other phase 2- we can do the 60 take back[.]"  Person B responded, "Sounds good.  [Person H] calling me back shortly.  On a call."

107.  On or about June 30, 2017, Person B and DAVIS exchanged several text messages about PRC National A.  Person B texted, "Heard from [Person H].  He reiterated to POTUS."  Person B followed up with, "Separately, [Person E] texted me that he got tied up but is on top of it."  That same date, DAVIS replied, "Can we get proof today about revoke?"  DAVIS later specified, "From [Person E]?"

108.  On or about July 1, 2017, Person B texted DAVIS, "Spoke to [Person E] at length.  Call me when you can[.]"  Person B did not speak with Person E but had exchanged text messages with him about PRC National A's visa application. Similar to the representations Person B made in the memorandum that he prepared for the Attorney General and his communications with Person H, Person B did not disclose the true nature of his relationship with PRC Minister A to Person E.

109.  On or about July 2, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his visa application.  Based on public

reporting, DAVIS texted, "There is a call Scheduled for today Sunday with [President of the PRC] about n Korea.  He can ask and confirm about package.  He can even say he heard from [Person H]."

110.   On or about July 3, 2017, again based on public reporting, DAVIS texted Person B:  "[President] leaves D.C. Wednesday for Europe[.]"  DAVIS then followed up:  "July 5.  Scheduled to meet in person w [President of the PRC][.]"

111.   On or about July 18, 2017, Person B emailed DAVIS the contact information for Person H.  DAVIS connected multiple calls between PRC Minister A and Person H in furtherance of the lobbying campaign to remove PRC National A.

112.   On or about July 26, 2017, Person B and DAVIS exchanged text messages regarding PRC National A and his removal from the United States to the PRC.  Among the messages, DAVIS wrote, "Really need confirm it was officially transmitted.  At this point – he says no[.]"  Person B responded, "Asked 3 different people to follow up[.]"  Person B later added, "Called [Person E].  Seeing [Person H] in an hour."

113.   On or about July 26, 2017, Person B texted Person H to meet at a hotel in Washington, D.C., to discuss PRC National A:  "Hi [Person H], I understand from staff that you're in DC, as am I, staying at the [hotel].  Would you like to have a cup of coffee today?  Regards, []."  Later the same day, Person H's spouse texted Person

B, "Hi [].  Can you text me the details again of the [the PRC] man you texted previously thank you[.]"  Person B responded, "Hi [], You are referring to [PRC National A] or [PRC Minister A]? Best, [][.]"  Person H's spouse replied, "[PRC National A]."  Person B then resent the message that he previously sent on June 27.

114.   On or about July 27, 2017, Person B and DAVIS exchanged text messages regarding PRC National A.  DAVIS texted Person B, "Any word on embassy??"  DAVIS later added, "Hey any update about formal notice?"  Person B responded, "I'm dealing with people in NSC.  Emailing directly.  Awaiting response[.]"

115.   On or about August 19, 2017, Person B texted DAVIS several times.  Among those messages, Person B wrote, "Urgent.  Call me.  Good news[.]"  Person B later added, "im with [Person H].  have break thru opportunity[.]"

116.   On or about August 19, 2017, Person B met with Person H on Person H's yacht.  During their time together, Person B asked Person H about the matter involving PRC National A, and Person H suggested that they call the President.  Person B and Person H then called the President, asking about PRC National A's status within the United States.

117.   On or about September 13, 2017, Person B texted DAVIS, "Please text me asylum article.  And other article[.]"  That same day, DAVIS texted Person B links to articles about PRC National A.

118.   On or about October 2, 2017, Person B texted DAVIS a link to an article about PRC National A.

119.   On or about January 5, 2018, Person B texted DAVIS, "Send me more info on [PRC National A] involved in funding Dem politicians, . . . ASAP[.]"

## COUNT ONE
## 18 U.S.C. § 2 and 22 U.S.C. § 612
**(Aiding and Abetting & Unregistered Agent of a Foreign Principal)**

120.   From in or about no later than May 2017 to at least in or about January 2018, within the District of Hawaii and elsewhere, the defendant, NICKIE MALI LUM DAVIS, knowingly and willfully, without registering with the Attorney General as required by law, aided and abetted Person A and Person B in their actions as agents of a foreign principal, to wit: their execution of a back-channel lobbying campaign to resolve the 1MDB investigation favorably for Foreign National A and to return PRC National A to the PRC, all on behalf of Foreign National A and PRC Minister A and the Government of the PRC.

All in violation of 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a)(1).

## **FORFEITURE ALLEGATION**

121.   The allegations contained in Count 1 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

122.   Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Count 1, in violation of Title 18 United States Code, Section 2, and Title 22, United States Code, Sections 612 and 618(a)(1), the defendant, NICKIE MALI LUM DAVIS, shall forfeit to the United States of America a sum of money representing property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s).  Notice is further given that, upon conviction, the United States intends to seek a judgment against DAVIS for this sum of money representing the property described in this paragraph.

123.   If any of the property described above, as a result of any act or omission of the defendant:

  a.   cannot be located upon the exercise of due diligence;
  b.   has been transferred or sold to, or deposited with, a third party;
  c.   has been placed beyond the jurisdiction of the court;
  d.   has been substantially diminished in value; or
  e.   has been commingled with other property which cannot be divided without difficulty,

38

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c)

DATED: August 17, 2020, at Honolulu, Hawaii.

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

/s/ Kenji M. Price
KENJI M. PRICE
United States Attorney
District of Hawaii

/s/ John D. Keller
JOHN D. KELLER
Principal Deputy Chief

/s/ Kenneth M. Sorenson
KENNETH M. SORENSON
Chief, National Security

SEAN F. MULRYNE
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

United States v. Nickie Mali DAVIS
Information
Cr. No. _____

39