McCORRISTON MILLER MUKAI MACKINNON LLP

WILLIAM C. McCORRISTON          #995-0
DAVID J. MINKIN                 #3639-0
Five Waterfront Plaza, 4th
Floor500 Ala Moana
Boulevard Honolulu, Hawai'i
96813
Telephone:  808.529.7300
Facsimile:  808.535.8056

E-Mail:      mccorriston@m4law.com;  minkin@m4law.com

JAMES A. BRYANT *(pro hac vice)*
The Cochran Firm California
4929 Wilshire Blvd., Suite 1010
Los Angele, CA 90010
Telephone: 323-435-8205
Facsimile:  310-802-3829
E-mail:      jbryant@cochranfirm.com

Attorneys for Defendant
NICKIE MALI LUM DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>   vs.<br><br>NICKIE MALI LUM DAVIS;<br><br>             Defendant. | CR. NO. 20-00068 LEK<br><br>MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY; MOTION TO STAY SENTENCING; AND MOTION FOR JUDICIAL RELIEF |

MEMORANDUM OF POINTS AND AUTHORITIES

I.      INTRODUCTION

This motion is being filed to disqualify at least one government prosecutor from this case and to request that this Court order a thorough investigation into what the evidence indicates was a brazen scheme that ultimately resulted in the Defendant, Nickie Lum Davis, being coerced by the Department of Justice and her own defense attorney into: 1) pleading guilty under duress, and 2) falsely admitting to having intended to violate the law, which prosecutors then used to leverage a guilty plea in a separate, related case.

While the events underlying this motion are intricate and complex, the conspiracy to coerce Ms. Davis was quite simple at its core.

Either shortly before or at least during the negotiations that resulted in Ms. Davis' coerced guilty plea, her then-attorney, Abbe Lowell, learned that *he* was (at a minimum) a "person of interest" in—and at least potentially the target of—a criminal investigation being handled by the *very same prosecutors with whom he was negotiating* a plea deal on behalf of his (now-former) client, Ms. Davis.

All of this was evidently done in order to gain leverage to secure the guilty plea of a "big fish" just before the 2020 election.  The plea deal negotiated by a clearly conflicted defense attorney ultimately enabled prosecutors to secure a guilty plea from

Ms. Davis' alleged co-conspirator, Elliott Broidy, who had served as the vice-chair of finance for former President Trump's 2016 campaign.

Because there was no documentary proof that either Ms. Davis or Mr. Broidy believed that they needed to register under the Foreign Agents Registration Act (FARA)—and intent is a necessary element of *criminal* FARA violations— prosecutors needed Ms. Davis' false admission of intent to establish that Mr. Broidy had knowingly failed to register.

This reality is why the lead prosecutor in this case, John Keller, apparently told Mr. Lowell that him advising his then-client Ms. Davis to accept the prosecutors' terms for pleading guilty was what the DOJ "wanted."[1]

But underlying both of those guilty pleas was an inherently unconstitutional arrangement, one that abrogated Ms. Davis' Sixth Amendment rights.  There is no conceivable scenario in which a criminal defense attorney could be trusted to zealously represent the interests of a client while negotiating a plea deal on that client's behalf with prosecutors whom he has reason to believe are (or soon might be) investigating *him*.

Setting aside the question of whether or not such a conflict could be waived, however, the appearance of a conflict would be so grave—in a situation wherein the defense attorney would have an obvious incentive to please the prosecutors who could

_____

[1] Declaration of James A. Bryant ("Bryant Decl.") ¶20, Index of Exhibits ("Ex.") Q.

3

potentially soon prosecute him in a different matter—that the waiver of such conflict could only be potentially effective if the client fully understood the nature and the particulars of the conflict, and that this understanding was confirmed by prosecutors, independent defense counsel, and the Court.

Nothing of the sort happened here.  Instead of transparency, Mr. Lowell's conflict was handled with a mix of stealth and deception.  The conflict-of-interest waiver ("Conflict Waiver") that was executed was used to further the conspiracy to coerce Ms. Davis and only served to deepen the injustice that she endured.  The waiver itself gave no indication as to the nature or scope of the conflict.  Further, prosecutors made no effort to ensure that Ms. Davis was truly informed about the conflict, and Mr. Keller himself *intentionally* prevented this Court from having a proper opportunity during the plea hearing (let alone beforehand) to discuss the waiver with the Defendant.

It is crucial to take the extra steps of having multiple parties confirm that the Defendant truly understands the conflict he or she is being asked to waive because "Impairments of the right to conflict-free counsel threaten not only the defendant's right to effective representation, but also the trial court's interest in the fairness of its proceedings and the integrity of its judgments."

The lead prosecutor in this case, Mr. Keller, is not only the person who signed off on the opaque Conflict Waiver on the eve of Ms. Davis' arraignment, but he is

also the author the passage above about "[i]mpairments of conflict-free counsel."

Those powerful words come from a June 2016 motion in which Mr. Keller

successfully argued in *U.S. v. Suhl* that the law required the Court to confirm directly

with the defendant that he possessed the requisite knowledge of the conflict he was

consenting to waive.[23]

Throughout the relevant time frame surrounding Mr. Lowell's conflict, Mr.

Keller's actions have consistently contradicted his own words that *Suhl* motion.  From

the launch of the investigation into Mr. Lowell's role in an alleged "bribery-for-

pardon" scheme to the related *ex parte* hearing in DC regarding that investigation, or

in executing the Conflict Waiver, Mr. Keller time and again was presented with the

opportunity to protect Ms. Davis from the "impairment of conflict-free counsel."  And

yet, time and again, Mr. Keller pointedly chose *not* to protect Ms. Davis' Sixth

Amendment rights.

As detailed below, the evidence indicates that the DOJ's Public Integrity

division (PIN) not only initiated an investigation into Ms. Davis' then-defense

attorney, Mr. Lowell, *before* the very same prosecutors began negotiating with him

regarding Ms. Davis' plea in the present case, but that Mr. Lowell was engaging in

---

[2] *See* United States District Court Eastern District of Arkansas, Case No. 4:15-cr-300 JLH, ECF
Docket No. [52].

[3] Ex. BB

those negotiations with the knowledge that *he* was himself being investigated by those same prosecutors.

The facts below also demonstrate that Mr. Keller and Mr. Lowell scrambled to draft and execute an intentionally opaque Conflict Waiver in the days before Ms. Davis' arraignment, and that they began doing so after Mr. Keller discussed the details of a secret court hearing just hours after its conclusion with a primary subject of that hearing—Mr. Lowell.

On Wednesday morning, August 26, 2020, Mr. Lowell emailed Mr. Keller, regarding "issues being raised by you yesterday late in the day," and Mr. Lowell specifically noted that Mr. Keller had "raised" in their conversation "the taint team issue."[4]

The next day, on August 27, 2020, Mr. Lowell deceptively shared select snippets of information with Ms. Davis' local Hawaii counsel (who had been retained for this matter just one week prior), Bill McCorriston.[5]  Although the particulars of such counsel-to-counsel communication remain privileged, Mr. Lowell mentioned that the DOJ's was reviewing some of his emails related to a client's lobbying activities.[6]  Without revealing his specific comments, Mr. Lowell did not share the

_____

[4] Ex. H
[5] Bryant Decl. ¶35, Ex. H
[6] Only in December 2020 did it become publicly-known that the "bribery-for-pardon" investigation involved potential "LDA violations" by at least Mr. Lowell. Ex. CC  *See* https://www.wsj.com/articles/bribery-for-pardon-investigation-involved-prominent-washington-lawyer-11607131323

accurate context regarding the "taint team" or the potential LDA violations with Mr. McCorriston or Ms. Davis.  That Mr. Lowell intentionally and knowingly misled Ms. Davis and her local counsel is reinforced by the fact that they understood that Mr. Lowell himself was not being investigated, but rather that there was an investigation involving two former clients of Mr. Lowell, neither of whom was an American citizen or connected to any material issue in this case.[7]

Based on Mr. Lowell's own words, Mr. Keller discussed with Mr. Lowell at least the existence of "taint team" (an entity which exists for the purpose of reviewing privileged communications) as well as potential LDA violations on Tuesday, August 25, 2020—the very same day on which Mr. Keller and his PIN colleagues made the extraordinary request in an *ex parte* hearing in Washington D.C. District Court to vitiate certain of Mr. Lowell's attorney-client communications, pursuant to the findings and recommendations of a taint team.[8]  This phone call during the evening of August 25, 2020, also occurred *before* Mr. Keller submitted a supplemental filing to the DC Court on August *26*—meaning that the lead prosecutor was speaking with the subject/target of a secret court hearing *before* the prosecution had even finished presenting its *ex parte* case to the Court.[9]

---

[7] Bryant Decl. ¶32-34, Exs.D-F
[8] Bryant Decl. ¶35, Ex. H
[9] The District of Columbia Circuit Court Chief Judge of the Beryl A. Howell issued a Partial Unsealing Order dated December 1, 2020 which included a redacted version of the Memorandum Opinion and Order dated August 28, 2020, in response to the Government's Ex Parte In Camera Application dated August 25, 2020, as set forth on Page 3 of the Memorandum Opinion and Order the Court identifies a supplemental filing made by the Government on August 26, 2020. Ex. W

This means that Mr. Keller was impermissibly divulging secret information about an *ex parte* hearing to a subject or target at the center of that hearing later *that same day*. This communication also undermined the government's stated purpose for their request—to vitiate certain privileged communications in order to *then* "confront" at least Mr. Lowell—given that Mr. Keller revealed secret information days *before* Judge Beryl Howell had even granted Mr. Keller's and PIN's *ex parte* request.

Perhaps most troubling about Mr. Lowell's August 26 email, though, was his suggestion to Mr. Keller that the investigation progressing to the point of a secret hearing might necessitate his recusal as Ms. Davis' counsel. At a minimum, this would have resulted in the postponement of Ms. Davis' August 31 arraignment.

But even modest outside scrutiny into *why* Mr. Lowell needed to recuse himself easily could have blown up the plea deal altogether—which would have meant that Mr. Keller would have lost what he needed as leverage to get his "big fish," Mr. Broidy.

Although undersigned counsel does not know what conversations occurred between Mr. Lowell and Mr. Keller over the day or two following the August 26 email, Mr. Lowell's stated view on the nature of the conflict flipped 180 degrees. On or around August 27, 2020, Mr. Lowell—one day after suggesting to Mr. Keller that he might need to withdraw as Ms. Davis' attorney—suddenly implied that he had only

just learned of the conflict, and as such, his advice and counsel to Ms. Davis could not have been compromised.[10]

Crucially, evidence has subsequently come out that exposes the falsity of Mr. Lowell's claim of prior ignorance regarding the investigation into him. According to a May 2021 news article, "records reviewed by POLITICO say Lowell retained [criminal defense attorney Reid] Weingarten for work related to the 'bribery-for-pardon' issue in June [2020]."[11]

Notably, neither Mr. Lowell nor Mr. Weingarten were cited in the article as denying that the latter was retained for matters related to Mr. Keller's investigation into Mr. Lowell as of June 2020—at least two months before the Conflict Waiver was drafted and executed. Further, Mr. Weingarten's law firm, Steptoe & Johnson LLP, gave an on-the-record comment for that *Politico* article, yet the firm also apparently did not deny that they and their senior partner, Mr. Weingarten, were retained by Mr. Lowell months before Mr. Keller and his PIN colleagues submitted the *ex parte* request to Judge Howell.[12]

---

[10] Bryant Decl. ¶45 Ex. Q.

[11] *See* https://www.politico.com/news/2021/05/20/pardon-ruling-trump-ally-489724. Ex DD

[12] It is worth noting that Mr. Weingarten also represents a party connected to Ms. Davis in the current matter, Steve Wynn. As part of her plea, PIN told Ms. Davis that she was potentially expected to testify against Mr. Wynn. Thus, Mr. Weingarten's role in representing Mr. Lowell in the "bribery-for-pardon" matter is itself an apparent conflict-of-interest, given that one result of the deal Mr. Lowell negotiated on Ms. Davis' behalf would have potentially required her to testify against Mr. Wynn, who is also Mr. Weingarten's client. *See* https://www.wsj.com/articles/justice-department-wants-casino-mogul-steve-wynn-to-register-as-foreign-lobbyist-11622054103. Ex. CC

Regardless of what discussions Mr. Lowell and Mr. Keller had in the day or two following the August 26 email, Mr. Lowell went from suggesting his recusal might be *necessary*—thus potentially destroying Ms. Davis' plea deal that the DOJ "wanted"—to brazenly acting in a manner that he implied that couldn't have been conflicted in his representation of Ms. Davis.[13]

Two days after Mr. Lowell suggested to Mr. Keller that his withdrawal from the case might be necessary, on Friday, August 28, the Conflict Waiver was executed.  And on the very next business day, Monday, August 31, 2020, Mr. Keller and Mr. Lowell furthered their conspiracy by misleading this Court about the nature of the Conflict Waiver and intentionally curtailing this Court's ability to assess the validity of the waiver.

Near the end of Ms. Davis' plea hearing, Mr. Keller requested to file a "Sealed Addendum," despite Local Rules requiring advance approval to file under seal.  He revealed that he intentionally chose *not* to identify this "addendum" as a conflict-of-interest waiver in an email exchange he had with Mr. Lowell moments later—*while the hearing was still ongoing*.

Mr. Keller was remarkably blunt when explaining how he prevented this Court from examining or otherwise questioning the legitimacy of the Conflict Waiver, writing to Mr. Lowell, "I avoided any details that could reveal the substance."

---

[13] Ex. Q.

As will be detailed in this motion, the evidence shows that Mr. Keller knowingly furthered a conflict that impaired Mr. Lowell's ability to provide Ms. Davis "conflict-free counsel."

The evidence also demonstrates that Mr. Keller knowingly reaped the fruits of the very conflict he helped advance to get what the DOJ "wanted" in the form of Mr. Lowell facilitating Ms. Davis' guilty plea, and that Mr. Keller then conspired with Mr. Lowell to deceive both Ms. Davis, her independent counsel Mr. McCorriston, and this Court about the inherently unwaivable nature of Mr. Lowell's conflict.

Mr. Keller's own conduct necessitates that he be disqualified from the prosecution of Ms. Davis, and further, that Ms. Davis' cooperation with the DOJ be suspended at least pending the outcome of this present motion.

Because the interests of justice require no less, this motion also seeks this Court to order a thorough, independent investigation into the troubling and unconstitutional conduct of Mr. Keller—and potentially also his fellow DOJ prosecutors involved in this case.

II.    FACTUAL BACKGROUND

A. The Department of Justice Investigates Possible FARA Violations Against Defendant Nickie Davis and Elliott Broidy While Disregarding Others

In 2017, Defendant Nickie Davis, along with three others, acted on behalf of Malaysian national named Jho Low.  On or around February 21, 2018, Ms. Davis retained attorney Abbe Lowell, through his then-firm Norton, Rose Fulbright US

LLP, to represent her in connection with an investigation conducted by the Department of Justice's Public Integrity Section ("PIN") concerning her efforts with three others, Elliott Broidy, Pras Michel and a Department of Justice-employed attorney, who together represented Jho Low in 2017. Shortly after Ms. Davis retained Mr. Lowell, Mr. Lowell departed Norton Rose to join Winston & Strawn, LLP.

Following an initial search warrant that was effectuated by the U.S. Attorney's Office in Hawaii in July of 2018, Mr. Lowell contacted lead prosecutor John D. Keller ("Keller") of PIN to discuss Ms. Davis' knowledge regarding Mr. Broidy's dealings with Jho Low. At that time, DOJ assured Ms. Davis that she was not a target or subject of their investigation.  Almost a year later, and still under the pretense that Ms. Davis was viewed merely as a potential witness, Mr. Keller requested a proffer from her to discuss a broad range of matters related to Mr. Broidy, Mr. Michel, Jho Low, Chinese fugitive Guo Wengui, as well other numerous entities and persons related to these individuals.  In the spirit of cooperation, under the representation and advice of Mr. Lowell, Ms. Davis participated in two proffers with PIN prosecutors on June 20, 2019 and August 1, 2019.  Only another year after that, however, would it become clear that despite these early representations, the DOJ was simply in the process of building a case against her for the purpose of leveraging her to pursue bigger targets.

Based on media reports and belated FARA filings, during this same period, it appears that more than two dozen U.S. citizens also engaged in unregistered efforts on

12

Jho Low's behalf—and yet, the only people apparently to have faced even potential prosecution for substantially similar fact patterns are former RNC fundraiser Mr. Broidy, and three others directly or indirectly connected to his efforts, including Ms. Davis and Mr. Michel.

The fact that so few others faced prosecution despite being similarly situated pointed to what seemed to be PIN's alarming fixation on "getting" a high-profile target in Mr. Broidy. (As does this being the first time DOJ had ever prosecuted a FARA violation based on representing an individual not in government.)

Further proof is that other known unregistered agents of Jho Low evidently were given an opportunity to remedy their unregistered status via DOJ sending them "notice" letters of their potential need to register under FARA, including the law firm Kobre & Kim ("Kobre"). Neither Ms. Davis nor Mr. Broidy was ever given the same opportunity, even though at least some of their efforts on behalf of Mr. Low were done under the guidance and supervision of Kobre's managing partner, Robin Rathmell.

While Kobre and its subcontractors were allowed to avoid criminal prosecution by simply retroactively FARA registering in October 2018, the DOJ and Mr. Keller spent another two years *after that* pursuing Ms. Davis and Mr. Broidy for FARA violations.

PIN and Mr. Keller's determination to focus solely on Mr. Broidy and those

connected with him arguably *could* be within standard prosecutorial discretion. Where Mr. Keller's pursuit of Ms. Davis, Mr. Broidy and Mr. Michel transformed into unethical conduct, however, was when he chose to pursue an investigation into a separate and unrelated matter directly involving Mr. Lowell. Mr. Keller's *other* investigation was not into a different client of Mr. Lowell, but rather one where Mr. Lowell's *own* actions were being probed—and Mr. Broidy would have been the only potential witness against him.

Following Ms. Davis' proffers in the summer in June and August of 2019, it would be another 11 months before Mr. Keller and PIN prosecutors would follow up with her.

B. The Plea Deal

In or around early July of 2020, following an 11-month hiatus of no contact with Ms. Davis or Mr. Lowell, Mr. Keller began to engage in a series of conversations with Mr. Lowell pertaining to Ms. Davis.[14] Mr. Keller in July 2020 had suddenly taken an aggressive posture that stood in stark contrast to his indications in 2018 and 2019 that PIN was willing to offer some type of deal whereby Ms. Davis would likely receive some form of immunity in exchange for her cooperation. Pursuant to his July 2020 conversations with Mr. Keller and other PIN prosecutors, Mr. Lowell advised Ms. Davis that she would have to accept a one-count felony plea for violating Title 18

---

[14] Bryant Decl. ¶21, Ex. A

United States Code Section 2 (aiding and abetting) violations of Title 22, United States Code, Sections 612 and 618(a), aiding and abetting failure of another person to register as a foreign agent in violation of FARA. Mr. Keller demanded that Ms. Davis needed to make an immediate decision on PIN's offer, and should she fail to accept the felony plea deal, the DOJ intended to file a criminal complaint against her alleging numerous criminal counts against her.

This dramatic shift shocked Ms. Davis.  Originally in 2018, PIN assured her that she was merely a person with information helpful to investigators, and then there were two proffers the following year during which she was led to believe that her worst-case scenario was that she might have to plead to a misdemeanor.  Following 11 months of silence from PIN after the second proffer, Mr. Keller was suddenly demanding that Ms. Davis—who had no criminal record—accept a felony for aiding and abetting a FARA violation or face a flurry of other criminal charges. Further, Ms. Davis was informed that she would need to "admit" that both she and Mr. Broidy had intentionally violated FARA, even though she did not believe at any point during the relevant time period that either she or Mr. Broidy had any obligation to register under FARA—nor was any evidence ever offered by PIN prosecutors suggesting that either she or Mr. Broidy *even suspected* that they needed a FARA registration.[15]  Because they lacked any such evidence—and intent is a necessary element that the government

---

[15] Ex. B, Pgs. 4

must prove in order to establish a criminal violation of FARA—PIN prosecutors

needed Ms. Davis to "admit" that she and Mr. Broidy had an "intent" to violate FARA

in order to secure a criminal conviction of the "big fish," Mr. Broidy.

Ms. Davis was distraught as to how the severity of the potential punishment had

escalated so rapidly, and seemingly out of nowhere.  As PIN had acknowledged, at no

point had Ms. Davis personally interacted with any government officials on behalf of

Jho Low.  Most importantly, Ms. Davis never believed that she had an obligation to

register under FARA, nor was there any evidence presented suggesting that she even

*suspected* that she needed a FARA registration.  Thus, Ms. Davis, who was solely

being advised by Mr. Lowell at that time on this matter, initially—and adamantly—

stated her desire to reject the government's proposed plea deal.[16][17]

Only after feeling coerced upon being told that the full force of the DOJ would

be brought against her if she rejected the felony plea deal[18]—including charges filed

against her and even veiled threats of possible prosecution of her family members on

unrelated matters—Ms. Davis under duress agreed to accept the plea deal.  On August

16, 2020, approximately a little over a month since Ms. Davis was first presented the

DOJ's offer, solely following the advice of Mr. Lowell, she agreed to enter into a

---

[16] Ex. B, Pgs. 1-2

[17] Ms. Davis has always clearly expressed her position that she was furthering what she believed to be in the interests of the U.S., such as when she and Mr. Broidy raised the plight of American citizens who were wrongfully imprisoned by the Chinese government. These efforts led to the release of a pregnant U.S. citizen detained by the Chinese.

[18] Ex. C

written plea agreement for aiding and abetting an individual in failing to register under FARA.

Following the execution of the Plea Agreement, an arraignment and plea date was been set for August 31, 2020 in the United States District Court of Hawaii, before the Honorable Judge Leslie E. Kobayashi.

It should be noted that as late as a few days before her arraignment, despite signing the Plea Agreement, Ms. Davis continued to express her frustration that PIN prosecutors did not want to hear the truth—namely that during the time period in question, Ms. Davis did not believe that either she or Mr. Broidy were required to register under FARA.[19]  Ms. Davis formed this understanding based upon her discussions with Mr. Michel, who assured her that his partner, then-DOJ attorney George Higginbotham, was ensuring legal compliance for their efforts, as well as with Mr. Broidy, who told her that he had consulted with legal counsel who confirmed that he was not required to FARA register.  Ms. Davis' understanding was further reinforced by her interactions with an experienced attorney, Kobre's managing partner, Robin Rathmell, who never suggested that either she or Mr. Broidy even *potentially* might need to FARA register.  In light of her reasonable belief that neither she nor Mr. Broidy had an obligation to FARA register, her admission of "intent" was solely the result of Mr. Keller and Mr. Lowell coercing her to admit to facts that were

---

[19] Exs. C, O

in direct contradiction to what both she and Mr. Broidy understood at that time.

C. Mr. Lowell's Unwaivable Conflict and Suspicious Timing of the "Probe" Into The Bribery-For-Pardon Matter Involving Mr. Lowell

Unbeknownst to Ms. Davis and the McCorriston firm, starting as early late-spring / early-summer 2020, Mr. Keller and other PIN prosecutors launched a separate and unrelated "investigation" into Mr. Lowell over, amongst other things, an alleged "bribery-for-pardon" scheme involving Mr. Lowell, Mr. Broidy, a convicted felon named Hugh Baras, and a now-deceased, non-practicing attorney and friend of Baras, Sanford Diller.[20]

Based upon Partial Unsealing Order dated December 1, 2020 issued by the District of Columbia Circuit Court Chief Judge of the Beryl A. Howell (the "Partial Unsealing Order") and news reports published in or around December 2020, the DOJ, and specifically Mr. Keller and other PIN attorneys,[21] was investigating whether Mr. Lowell had participated in a bribery-for-pardon scheme, using his political influence

---

[20] See Bryant Decl. ¶¶50, 54-58 Ex. T. There is a lack of clarity as to when the DOJ actually began looking into the Baras bribery-for-pardon matter. (And despite the secret court hearing and resulting order, PIN has disputed that it was officially an "investigation.") According to January 2022 communication between counsel for Ms. Davis and AUSA Sean Mulryne, as well as a June 2021 call between counsel for Ms. Davis and AUSA John Keller and Sean Murlyne, a "taint team" was assembled in July of 2020 after the discovery of email communications involving Elliott Broidy and Abbe Lowell in a separate, unrelated matter pertaining to obtaining a pardon for a convicted felon named Hugh Baras. Mr. Mulryne maintains that this "probe" began in July 2020, but did not specify a specific date in July. However, based upon media reports and privileged information, the "probe" appears to have started *prior* to that period.
[21] This was confirmed by both Mr. Mulryne and Mr. Keller through verbal and email communications. Id.

to obtain clemency for Mr. Baras. It was also further disclosed that Mr. Broidy was involved in this matter, reportedly as at least a potential witness, since Mr. Broidy allegedly had facilitated the introduction between Mr. Lowell and the now-deceased Mr. Diller, and may also have been copied on communications between the parties. Mr. Diller allegedly anticipated that Mr. Broidy would also utilize his political influence with the White House. To provide context regarding the alleged dynamics between Mr. Broidy, Mr. Lowell and the DOJ, below are relevant excerpts from the unsealed portions of Judge Howell's August 2020 opinion allowing PIN to vitiate privileges attached to certain communications involving Mr. Lowell, with identities of redacted names listed inside [brackets]:

> "Pending before the Court is the government's *Ex Parte, In Camera* Application Seeking Authorization to Review Certain Attorney-Client Communications ("Gov't's Mot.") "between and among **[SANFORD DILLER], [ELLIOT BROIDY] [ABBE LOWELL]** and **[HUGH BARAS]**," and their agents, "based on a crime-fraud finding" or, alternatively, "a finding that there was no attorney-client or other privileged relationship protecting communications involving **[BROIDY]**" **[REDACTION]** … [E] mail communications have been identified "indicat[ing] additional criminal activity," **[CITATIONS OMITTED]**, namely: (1) a "secret lobbying scheme," id. at 7, in which **[LOWELL]** and **[BROIDY]** acted as lobbyists to senior White House officials, without complying with the registration requirement of the Lobbying Disclosure Act ("LDA"), 2 U.S.C. §§ 1601 et seq., to scheme "a pardon or reprieve of sentence for **[BARAS]**," id at 6, **[REDACTION] [CITATIONS OMITTED]** ("LDA scheme"); and (2) a related bribery conspiracy scheme, in which "**[DILLER]** would offer a substantial political contribution in exchange for presidential pardon or reprieve of sentence for **[BARAS]**," **[CITATIONS OMITTED]**, using **[REDACTION IN PART][ LOWELL AND BROIDY]**, "as the intermediaries to deliver the proposed bribe," id

19

("Bribery-for-pardon scheme"). The government now seeks a court order "so that the investigative team may access these communications, confront **[BROIDY]**, **[LOWELL]** and **[BARAS]** with the facts recited herein, and take any other investigative steps needed to complete its investigation.

Upon consideration of the government's initial submission and exhibits, argument presented at an *ex parte* hearing held on August 25, 2020, and supplemental government filing on August 26, 2020, see Gov't's Supp., ECF No. 5, the government's motion is granted, based on a finding that, notwithstanding any attorney-client relationship that may have had with either **[LOWELL]** or **[DILLER],** any communication related to the alleged LDA or Bribery-for-pardon schemes between or among those individuals, in which communications **[BROIDY]** was a participant or otherwise a recipient, is not protected by the attorney-client or any other privilege and is therefore reviewable by the government's investigative team.[22]

As already discussed, even PIN prosecutors have acknowledged that at least by July 2020, Mr. Keller and his PIN colleagues were investigating an alleged bribery-for-pardon scheme in which Mr. Lowell was being investigated, and possibly Mr. Broidy as well, for potentially conspiring with Mr. Lowell. Mr. Keller and PIN pursued this investigation and made the extraordinary request to vitiate attorney-client privilege even though the DOJ's own *ex parte* application admitted in Fn. 9 that at that time a "violation of the LDA may be elusive" due to "insufficient evidence [was] currently unavailable to show either **[LOWELL]** or **[BROIDY]** engaged in "lobbying

---

[22] It should be noted that the redacted identities are not confirmed as accurate, as the identifications are based upon reviewing media reports on this matter, discussions with the DOJ identifying certain persons involved in this matter, as well as direct knowledge related to Mr. Broidy's role as a prominent fundraiser, Mr. Lowell an attorney, and the deceased Mr. Diller a then unlicensed attorney, and former member of the California State Bar.

activities."  The purported rationale for vitiating privilege, then, was to obtain

information that would lead to evidence to support a potential bribery-for-pardon

scheme and/or LDA violations committed by Mr. Lowell and possibly also Mr.

Broidy.

At the moment in which Mr. Keller, who was also the lead prosecutor in the

FARA matter before this court, began to investigate Ms. Davis' counsel, Mr. Lowell,

an inherently unwaivable conflict-of-interest arose between Mr. Lowell and Ms.

Davis.  At any level of analysis, it would have been impossible for Mr. Lowell to

maintain an unwavering duty of loyalty to Ms. Davis when he was facing potential

criminal jeopardy himself *from the very same prosecutor* also pursuing his client, Ms.

Davis, in an entirely unrelated matter.

The timing was as striking as it is suspicious.  Mr. Lowell was already two

years into his representation of Ms. Davis at the time when Mr. Keller suddenly

launched a concurrent investigation into possible criminal violations involving both

Ms. Davis' own attorney and the person she would soon be compelled to testify

against, Mr. Broidy.  Even if it was determined that Mr. Broidy was not actually

criminally implicated in the bribery-for-pardon scheme, the only potential living

witness to any of the events pertaining to Mr. Lowell's alleged actions apparently

would have been Mr. Broidy, against whom the DOJ required Ms. Davis to testify as

part of her plea deal.[23]

In other words, when Ms. Davis entered into her plea agreement, Mr. Lowell not only delivered a "win" to the prosecutor investigating *him*—Mr. Keller—by helping the DOJ secure the guilty plea of a "major target," but he also further helped himself by damaging the credibility of the only potential witness had the DOJ ever brought charges against him in the bribery-for-pardon matter.[24]

While it is not yet clear exactly when Mr. Keller started investigating the "pardon" matter, Mr. Lowell knew he was at least a person of interest to some type of DOJ investigation prior to Ms. Davis entering her plea in this matter. Based upon media reports, Mr. Lowell hired prominent criminal defense attorney, Reid Weingarten, sometime in or around June 2020,[25] and Mr. Weingarten spoke as Mr. Lowell's attorney on the pardon matter specifically in media reports later that year.

---

[23] According to media reports, Sanford Diller died on February 2, 2018. "West Coast Developer Used Real Estate Wealth to Support Medical Research" February 16, 2018, https://www.wsj.com/articles/west-coast-developer-used-real-estate-wealth-to-support-medical-research-1518795001?mod=article_inline

[24] See Bryant Decl. ¶¶48-49, 50, 54-58 Exs. T, V; Excerpts of the Plea Hearing Transcript 42:11-43:21. Further, during both a January 2022 email exchange between counsel for Ms. Davis and AUSA Sean Mulryne and a June 2021 call between counsel for Ms. Davis and AUSA John Keller and Sean Mulryne, PIN prosecutors claimed that the DOJ was neither "investigating" Mr. Lowell, nor was he a "person of interest." This position directly contradicts Mr. Keller's representations made on the record at the August 31, 2020 arraignment, however, during which he stated that the reason that Ms. Davis' conflict waiver needed to be sealed was on the following basis: "the description in the sealed addendum would potentially make it possible for individuals that are—that are referenced there, although they are not referenced by name, to figure out that they are potential subjects of the government's investigation given." Based on Judge Howell's unsealed, but still redacted opinion, the only people who could have been "potential subjects" of the alleged bribery-for-pardon matter were Mr. Lowell and Mr. Broidy.

[25] *See* https://www.politico.com/news/2021/05/20/pardon-ruling-trump-ally-489724.

At the time Mr. Lowell hired Mr. Weingarten in June 2020, media accounts indicate that it had been more than three years since the alleged "bribery-for-pardon" events had transpired—and 11 months since Mr. Keller had last engaged in discussions with Ms. Davis (via Mr. Lowell).  Then around the same time Mr. Lowell became aware that he was somehow involved in a bribery-for-pardon "investigation," Mr. Keller unexpectedly reached out to start plea discussions.

Mr. Keller's newfound approach in July 2020 wasn't just to insist on a felony plea, but also that Ms. Davis, as part of any plea agreement, had to "admit" that she and Mr. Broidy both "knew" they were acting in violation of FARA.  Mr. Keller made this new demand even though there was *no evidence* in the thousands of pages of communications that Ms. Davis even *suspected* that she had an obligation to register under FARA, let alone that she believed Mr. Broidy thought that *he* needed to register.[26][27]  Again, Mr. Lowell was the only lawyer advising Ms. Davis in this matter from the time Mr. Keller restarted discussions on or around July 1, 2020 until an agreement on the plea was reached in principle several weeks later.

---

[26] Exs. B, O

[27] It is worth noting that in an email exchange in January 2022 with counsel for Ms. Davis in which he acknowledged that he and his colleagues had read Ms. Davis' OPR complaint—which discussed how there was no evidence suggesting that Ms. Davis had "intent" to violate FARA or even suspected that she was required to FARA register—PIN prosecutor Sean Mulryne (with his PIN colleagues, including Mr. Keller, cc'd) made a point to highlight what that office claimed were mistakes or errors in that complaint, but Mr. Mulryne conspicuously ignored the issue of "intent." Presumably, if PIN prosecutors believed that there *was* any such evidence of "intent," they would have included such evidence in their listing of supposed errors or mistakes in Ms. Davis' OPR complaint; that they did not do so seems particularly revealing.

At no point in time did Mr. Keller alert Ms. Davis or this Court that he was investigating her criminal defense attorney for potential criminal conduct related to the "bribery-for-pardon" scheme and/or LDA violations.  Nor was Ms. Davis informed that pursuant to that investigation, both her attorney and the person against whom she was expected to testify in the FARA matter, were—*at a minimum*—persons of interest and possibly "co-conspirators."  Nor did Mr. Keller inform either Ms. Davis or this Court that Mr. Broidy could be a potential witness in the "bribery-for-pardon" matter against her attorney negotiating her plea agreement, Mr. Lowell, let alone that PIN was—in the words of AUSA Sean Mulryne to Ms. Davis' counsel in January 2022—"looking into" the "bribery-for-pardon" matter to the extent that a "taint team" had been assembled.[28]  Nor did Mr. Keller tell Ms. Davis or this Court that this "taint team" was already reviewing Mr. Lowell's privileged communications at the *exact same time* that Mr. Keller was communicating with Mr. Lowell, and insisting that his client, Ms. Davis, must accept a *felony* plea deal and make an admission of "intent" that was not supported by *any* evidence.

The very existence of the "bribery-for-pardon" probe, in fact, was concealed from Ms. Davis and this Court until December 2020, months after the arraignment at

---

[28] It should be noted that although Mr. Keller and Mr. Mulryne have continued to maintain that Mr. Lowell was not being "investigated" for a bribery for pardon scheme / LDA violations, the August 2020 *ex parte* opinion made public (with redactions) through the Partial Unsealing Order makes it very clear that Mr. Lowell was, at a minimum, a person of interest, and that PIN's position before Judge Howell was that both he and Mr. Broidy could possibly have been involved in some form of criminal conspiracy.

which Ms. Davis entered her plea.[29]  Even then, the matter only came to light because

Judge Howell—over the strenuous objections of Mr. Keller and his PIN colleagues—

ordered the partial unsealing of her August 2020 opinion.  Had she not done so, it is

unclear when—if ever—Ms. Davis or this Court would have learned about the

shocking conduct of both Mr. Keller and Mr. Lowell.

D. "Waiver" Materially Misrepresented Actual Conflict

Of course, Mr. Keller and Mr. Lowell had to conspire together in order to keep

both Ms. Davis and the Court in the dark about the probe that was initiated at a deeply

suspicious moment by Mr. Keller and which created an inherently unwaivable conflict

for Mr. Lowell.

Their collusion originally involved simply concealing information, but because

Judge Howell granted the government's request to vitiate certain of Mr. Lowell's

attorney-client privileges in the "bribery-for-pardon" probe on August 28, 2020, Mr.

Keller and Mr. Lowell quickly progressed into actively deceiving others and making

false statements in the week before Ms. Davis was set to enter her Plea before this

Court.  On or around Tuesday, August 25, 2020—evidently when it became apparent

to PIN that Judge Howell was poised to rule on its *ex parte* application *before* Ms.

Davis' August 31 arraignment—Mr. Keller reached out to Mr. Lowell, requesting that

---

[29] It would not be until a May 2021, when *Politico* published an article on the matter, did it become clear the full extent of the conflict-of-interest because of the involvement of Mr. Lowell, Mr. Broidy and Mr. Keller in the "bribery-for-pardon" matter. Bryant Decl. ¶26, Ex DD

he and his client, Ms. Davis, sign a "conflict-of-interest" waiver. Mr. Lowell

represented to Ms. Davis that the waiver was needed because of a "potential conflict

of interest" related to his work for one or more of his past clients.

On August 26, 2020, a video conference with Mr. Lowell, Ms. Davis, and

independent counsel Bill McCorriston and David Minkin was held regarding the

purported nature of the conflict(s) covered by the waiver.  While the actual discussion

regarding Mr. Lowell's purported conflict and the effect of Ms. Davis' waiver that

was represented to her remains privileged, there was no discussion regarding nor was

or it even mentioned during that meeting that the conflict related to a U.S. citizen that

Mr. Lowell represented in the past, that Mr. Lowell was potentially being investigated

by PIN for his role in an alleged "bribery-for-pardon" matter or possible LDA

violations, or that the conflict Mr. Lowell sought from Ms. Davis to waive was

directly pertaining to him.[30]

Between the period of August 25, 2020 and August 27, 2020, Mr. Lowell and

Mr. Keller exchanged drafts of what would be the conflict-of-interest waiver that Ms.

Davis would be asked to sign (the "Conflict Waiver").[31] The initial draft of the

Conflict Waiver was negotiated solely between Mr. Lowell and Mr. Keller, and the

---

[30] On the same day as the video conference, on August 26, 2020, Mr. Lowell sent an email to Mr.
Keller, with Mr. McCorriston cc'd, referencing "the taint team issue," but there is no indication that
Mr. Lowell actually clearly articulated to Mr. McCorriston the full ramifications of the "taint team
issue." Ex. H

[31] Bryant Decl. ¶¶32-47, Exs. D-N, X

language of the earlier version(s) of the Conflict Waiver have never been disclosed to Ms. Davis or the McCorriston firm—including through the present day.[32]

On or about Friday, August 28, 2020, upon completion of the final version of Conflict Waiver, Ms. Davis signed the document—the business day immediately prior to her arraignment.  As discussed above, it was only many months later that Ms. Davis learned that her consent regarding the Conflict Waiver was procured under false pretenses.  Alarmingly, it appears that Mr. Keller may have also concealed at least some aspects of the "bribery-for-pardon" matter from his Hawaii-based counterparts.  Despite the fact that the Conflict Waiver required signatures from the Hawaii Chief National Security prosecutor, Ken Sorenson, and Chief Criminal Division prosecutor, Michael Nammar, Mr. Keller affixed his *own* signature to their respective spots on the Conflict Waiver, noting on the document that he was signing the Waiver "for" his fellow DOJ prosecutors.[33]  Neither Mr. Keller nor any other DOJ prosecutor involved in this matter has ever given an explanation as to why Mr. Keller chose to sign such a profoundly important document "for" his fellow DOJ prosecutors—or if Mr. Sorenson and Mr. Nammar were ever informed of the "bribery-for-pardon" matter, the *true* conflict that the Waiver was deceptively

---

[32] Mr. Lowell was the only party involved in the drafting of the initial version of the conflict waiver that was circulated amongst Mr. Davis' counsel. To date, despite having turned over Ms. Davis' file to her current counsel, there is no evidence that Mr. Lowell produced the communications and early drafts of the conflict waiver to her current counsel.  Thus, it is still unclear what was actually stated in the initial versions of the conflict waiver. *See* Bryant Decl. ¶39-40, Ex. I.

[33] See Bryant Decl. ¶¶47-49 Exs. P, V-W Ex. V; Excerpts of the Plea Hearing Transcript 42:11-43:21

attempting to cover.[34]

Upon review, the Conflict Waiver itself was facially deficient in several different respects.  Most importantly, the Waiver avoids any suggestion that Mr. Lowell was—at a minimum—a "person of interest" in an active, unrelated criminal investigation conducted by the very same PIN prosecutors from her case, including Mr. Keller.  To the extent the Waiver says anything though, the supposed "conflict" described in the agreement deceptively misstates the supposed nature of the conflict. The operative line states that Ms. Davis "understands that [DOJ] has raised with one of her attorneys, Abbe D. Lowell, his previous representation of certain individuals with whom Ms. Davis also has had contact or interactions and whose names have or might come up during her cooperation and of certain other individuals on matters unrelated to Ms. Davis."

There were perhaps two individuals whom Mr. Lowell had previously represented in matters unrelated to Ms. Davis of whom she was aware by virtue of the fact that the DOJ had at some point in 2019 expressed a possible conflict of interest because Mr. Lowell had also represented them. Neither of these persons was an American citizen, and neither person was in any way connected to the "bribery-for-pardon" matter.  Of course, if the conflict had actually stemmed from Mr. Lowell's

---

[34] In a January 2022 email exchange with counsel for Ms. Davis, Mr. Keller's PIN colleague Sean Mulryne acknowledged that several of PIN attorneys involved with Ms. Davis' case were also on the "investigative team" for the "bribery-for-pardon" matter, including (at least) Mr. Keller, Nicole Lockhart, Jamie Mann, and himself. Bryant Decl. ¶57, Ex. T

representation of other clients, those other clients would have been required as joint signatories on the Conflict Waiver, which is standard for conflict waivers in any jurisdiction—and is required by the Hawaii Rules of Professional Conduct.[35]

Mr. Keller could have prevented Ms. Davis from signing a Conflict Waiver under false pretenses or other any misunderstandings, however, by adhering to the DOJ's own policy that the government *must itself* explain its understanding of a conflict to the interested party, which was Ms. Davis in this matter.  That did not happen. Or Mr. Keller could have raised the issue during the August 31, 2020 arraignment or any other hearing before this Court, as he had personally been involved *previously* in moving for potentially disqualifying defense counsel in the past over alleged conflicts between defense counsel and a given client.  None of those things occurred, however, in Ms. Davis' case.

The Conflict Waiver, in fact, placed the burden of disclosure exclusively on the *other conflicted party*, Mr. Lowell: "Ms. Davis has discussed these issues and the resulting potential for conflicts of interest with Mr. Lowell and with third party counsel and knowingly and intelligently waives any potential or actual conflict of interest as to Mr. Lowell and affirms that she wishes to proceed with Mr. Lowell as one of her attorneys in this matter." Many months after the fact, Mr. Keller shockingly claimed to counsel for Ms. Davis during a June 2021 conference call that Mr. Lowell

---

[35] See Haw.R. Prof. Cond. 1.7(b)

had specifically asked Mr. Keller to prevent disclosure of his connection to the

"bribery-for-pardon" matter in order for Mr. Lowell "to protect his personal

reputation."

Given that Judge Howell's ruling on the "bribery-for-pardon" *ex parte* ruling

was only issued—obviously in a secret proceeding—on the business day before the

arraignment, the natural question is *how* could Mr. Lowell *already* have been aware of

the investigation into him before the DOJ had even won approval to review ostensibly

crucial evidence?  After all, if Mr. Lowell requested the opaque nature of the Conflict

Waiver[36]—which was signed and executed on the same day Judge Howell issued her

ruling—the only way he could have requested concealment of his role in the "bribery-

for-pardon" investigation is if he knew that the government was specifically

investigating *him* and soon would be "looking into" his attorney-client

communications from that matter.

Regardless, even if Mr. Keller's cover story were true, it would also be deeply

troubling from the standpoint that Mr. Lowell requesting that pertinent information

about a clear conflict remain concealed for his own self-serving purposes should have

served as unambiguous notice to PIN prosecutors that Mr. Lowell had compromised

his duty of loyalty to his client by prioritizing the ability "to protect his personal

reputation." Even if this scenario presented by Mr. Keller were somehow true, PIN

---

[36] Bryant Decl. ¶¶39-43, Exs. J-N

prosecutors—at a minimum—should have considered it a realistic possibility that Mr. Lowell would conceal these damning facts to his own client.

E. <u>Mr. Keller and Mr. Lowell Intentionally Misled The Court About The Conflict Waiver Addendum</u>

Not only was the Conflict Waiver facially deficient and deeply deceptive, it was improperly filed under seal, as the parties did not seek leave of the Court, as required under local rules.[37] [38]  Of course, had Mr. Keller sought leave of the Court to file the Conflict Waiver under seal, that request would have given this Court the opportunity not only to carefully review the document, but also to question the attorneys and Ms. Davis to ensure that she understood the true nature of the conflict— and for the Court to determine if such a conflict could even be waived.

In that light, the timing and manner of Mr. Keller's request of this Court to file the Conflict Waiver reveals his intent to prevent any such inquiry from the Court. During the arraignment on August 31, 2020, Mr. Keller waited until almost the very end of the proceeding before ambiguously requesting to file the Conflict Waiver under seal—which he pointedly did not identify as a "waiver" pertaining to any conflict-of-interest, but rather in an intentionally vague manner as a "sealed addendum."  When Judge Kobayashi informed the parties that she had not been able

---

[37] See Local Rule 5.2(c)

[38] It is believed that the improper filing of the document under seal was intentionally done in order to hide the real conflict to the court by suppressing any scrutiny an unsealed document would have received, and Mr. Keller supported this by "going along" with it as will be evidenced in this brief.

to review the document because the government had not requested leave of the Court in advance, Mr. Keller explained to the Court that the "addendum" to the plea agreement needed to be sealed to prevent certain parties from potentially learning of an ongoing investigation.

Mr. Keller's underhanded attempt to slip the Conflict Waiver past the Court—thus avoiding the possibility that Judge Kobayashi might seek to query Ms. Davis to ensure that her consent was in fact "informed"—is reflected during Mr. Keller's following exchange with the Court:

> **THE COURT**: All right. Mr. Keller, is there anything else we need to address at this time?
>
> **THE COURTROOM MANAGER**: You're on mute.
>
> **MR. KELLER**: Your Honor, **I would just note, without, of course, getting into the details because of the substance, that the parties did also file a signed sealed addendum to the plea agreement. I just wanted that to be -- to be on the record**, and that it's the government's understanding that Ms. Lum Davis has consulted with counsel and third-party counsel with respect to the issues addressed from the sealed addendum.
>
> **THE COURT**: So I have a problem with this sealed addendum. Why is it sealed?
>
> **MR. KELLER**: Your Honor, because the references -- **the description in the sealed addendum would potentially make it possible for individuals that are -- that are referenced there, although they are not referenced by name, to figure out that they are potential subjects of the government's investigation given -- given the lengths that are set forth in the sealed addendum**, Your Honor.
>
> **THE COURT**: Well, I don't see any names that are listed, so I don't understand that aspect of it. But I won't address it. You didn't seek court

**approval to file it under seal**. So if there are any requests to unseal it, I got to tell you at this point I would be inclined to grant it, but I'll leave that for another day.

**MR. KELLER**: Understood, Your Honor. I just wanted to ensure that the sealed addendum was on the record as part of the plea agreement. Thank you, Your Honor.

**THE COURT**: It's part of the plea agreement? Okay. I mean, you say it's an addendum, but I'll accept your representation with regard to that. I just want to point out that that's a concern with regard to the fact that it's filed under seal. But that may be another thing for us to address at another day.

**MR. KELLER**: Understood, Your Honor.[39]

As evidenced in that excerpt above, the Court expressed its concern as to the waiver itself, specifically why it was being filed under seal and why it was so generally vague, concluding that this issue would possibly be addressed at a later date.

At no point did either Mr. Keller or Mr. Lowell explain to the judge that they were seeking the Court to approve the Conflict Waiver or to make a determination if such a conflict even *could* be waived. It would become apparent that not only did Mr. Lowell and Mr. Keller intend to hide this from Ms. Davis, but they also intended to hide the true nature of the conflict from the Court. Instead of Mr. Keller requesting that the specifics of this waiver be discussed in a private setting in order to provide full disclosure to the Court, he conspired with Mr. Lowell in both misleading the Court as to people and subject matters supposedly covered by the "sealed addendum," and they further conspired in helping Mr. Lowell disregard his legal obligation to

---

[39] Ex. V; Excerpts of the Plea Hearing Transcript 42:11-43:21

immediately disclose to the Court his unwaivable conflict of interest.[40]

Mr. Keller chose to play a central role in promulgating these misleading acts and false statements.  In fact, he was actively conspiring with Mr. Lowell *during the arraignment itself*.  Near the end of the Plea Hearing, Mr. Keller and Mr. Lowell exchanged several emails concerning their plan to prevent the Court from learning "the substance" of the intentionally misleading Conflict Waiver.  This scheme to deceive Ms. Davis and the Court would **only** later be discovered by Ms. Davis because Mr. Lowell inadvertently forwarded her the email communications exchanged during the arraignment by Mr. Lowell and Mr. Keller.

The emails are troubling on their face.  In a back-and-forth exchange that occurred just a few minutes before the end of the August 31st hearing, at 11:53 am Hawaii time, immediately after the exchange between Mr. Keller and Judge Kobayashi excerpted above, Mr. Lowell emailed Mr. Keller with just the Subject line, "**Why Did You Raise That**," to which Mr. Keller responded almost immediately, "**It needed to at least be acknowledged in some capacity. I avoided any details that could reveal the substance**."  The exchange ended with Mr. Lowell replying at 11:59am, by admonishing Mr. Keller, "**But we need to have you do a better job of getting it sealed and also deal with sentencing dates[,] unless you think it will all**

---

[40] Although the parties were appearing via Zoom Video for this arraignment, it would have been possible to arrange a chambers call to discuss the waiver's purpose and specific details related to the waiver. Conversely, the parties could have withdrawn the addendum and requested that the court hold a hearing on the matter to determine if the waiver was enforceable.

**be over by then**."[41]

F.  The Waiver Only Presented When Judge Howell Acted in Pardon Matter

One of the strongest indications that the Conflict Waiver was hastily enacted as an emergency measure is that the waiver was only presented to Ms. Davis and signed nearly two weeks *after* the Plea Agreement was reached.  Likely not coincidentally, the date when Mr. Keller first began discussing the Conflict Waiver with Mr. Lowell, August 25, 2020, happens to have been the *exact same day* that Mr. Keller's team appeared before Judge Howell *ex parte* to request that the DOJ be given a secret court order to review certain of Mr. Lowell's attorney communications in the pardon matter, as described in detail above.

It is relevant and important that DOJ had an *ex parte* hearing with Judge Howell that same day, for two reasons:

(1) There's no indication that Mr. Keller informed Judge Howell that Mr. Lowell, in an unrelated matter, was representing a similarly situated party to the main potential witness / possible co-conspirator (Mr. Broidy) in the "bribery-for-pardon" matter.

(2) Mr. Keller based his *ex parte* request to Judge Howell on the grounds that the investigation was—and needed to remain—a secret to those being investigated, yet Mr. Lowell somehow had been informed of the investigation sometime before

---

[41] Bryant Decl. ¶¶48-49, Ex. P

DOJ approached the court for approval to review certain communications in the probe.  Given that Mr. Lowell reportedly hired noted criminal defense attorney Reid Weingarten to represent him for matters related to the "bribery-for-pardon" probe in *June* 2020, Mr. Lowell potentially learned about the matter *two months before* the *ex parte* hearing in August 2020 with Judge Howell.

G. Sealing Used to Thwart Disclosure

Mr. Keller and Mr. Lowell intended to and did deceive Ms. Davis, Judge Kobayashi, and Judge Howell.  Mr. Keller offered dubious arguments to prevent disclosure of both the Conflict Waiver and Judge Howell's opinion—and then never went back to either court as required after the *Wall Street Journal* and others revealed specifics of the investigation in early December 2020.[42]

In the Hawaii trial court, Mr. Keller acknowledged the waiver was filed under seal without court permission, but stated its purpose was "to avoid potentially alerting subjects of ongoing criminal investigations of the investigations and to avoid the risk of unnecessarily identifying uncharged third parties."

Once the news broke, however, any potential subject would have been alerted, and the media apparently identified all four of the meaningful figures in the pardon matter.

Likewise, in late November 2020, Mr. Keller unsuccessfully resisted unsealing

---

[42] "Now Deceased Billionaire Prompted Bribery-for-Pardon Investigation" December 4, 2020. Ex. CC

any portion of Judge Howell's opinion.  But Judge Howell's Partial Unsealing Order also "ordered" that the "government shall file… within thirty days of when any public disclosure obviates the need for further sealing, a status report advising" whether the opinion "may be further unsealed." Clearly, once the media revealed ostensibly most of the pertinent information, further unsealing should have happened by the 30-day deadline set in Judge Howell's order.  It has not.

H. PIN Prosecutors Leverage Ms. Davis' "Admission" of "Intent" to Secure Guilty Plea from Elliott Broidy

As discussed above, Mr. Keller and his PIN colleagues conditioned Ms. Davis' Plea Agreement on her "admission" that both she and Mr. Broidy possessed knowing "intent" to violate FARA by understanding they had triggered the requirement to register and then choosing not to do so.  But the reason PIN prosecutors desperately sought this admission is that nowhere in the thousands of pages of communications was there *any* evidence that either Ms. Davis or Mr. Broidy even *suspected* that they needed to register.

In fact, there was actually powerful evidence that Ms. Davis and Mr. Broidy possessed a reasonable belief that they did *not* need to register.  As PIN prosecutors were surely aware, shortly after they had returned from their initial meeting with Mr. Low in May 2017, Ms. Davis and Mr. Broidy participated in a conference call with Robin Rathmell, managing partner of Kobre and Kim.  At that time, neither Mr.

Rathmell nor his firm was registered under FARA, and Mr. Rathmell had not suggested to Ms. Davis or Mr. Broidy that *any* of the people working on behalf of Mr. Low might have an obligation to register under FARA.

Without any documentary evidence suggesting that Mr. Broidy believed he needed to register—and given the existence of exculpatory evidence in his favor— PIN prosecutors needed Ms. Davis not only to "admit" to an intent that she simply did not possess to violate FARA, but also to testify that Mr. Broidy also intentionally chose not to register, even though the prosecutors had sufficient evidence to believe that she did not possess any such knowledge concerning Mr. Broidy's state of mind. This is why her statement before this Court during the Plea Hearing was so vague: "As the work continued on, I realized that the contacts being made required registration under FARA, but I deliberately avoided taking the steps necessary that might confirm what I had suspected, that registration was required."  Ms. Davis did not offer any specifics about *when* or *how* she and Mr. Broidy had "realized" their obligation to register for one simple reason: She didn't have any such details because she did not "realize" that she had any obligation to register under FARA during the relevant time frame, nor did she have any knowledge that Mr. Broidy had become aware of any obligation for himself, either.

But less than two months after Ms. Davis provided PIN prosecutors with the vague "admission" of intent that they so desperately needed, they got their "big fish."

On October 20, 2020, Mr. Broidy pleaded guilty before Judge Colleen Kollar-Kotelly in the United States District Court for the District of Columbia to one count of conspiracy to violate FARA.  With Mr. Broidy's guilty plea, Mr. Keller and his PIN colleagues secured a high-profile conviction of a significant figure in the Republican Party just two weeks before the Presidential election.

On January 20, 2021, three months after Mr. Broidy entered his guilty plea for conspiracy to violate FARA, former President Donald Trump issued Mr. Broidy a full pardon, relieving him of any wrongdoing related to the FARA violation, and restored any civil rights lost. Although Mr. Broidy was granted a pardon for the FARA related offenses, Ms. Davis was not.

I.    Media Publications Reveal Mr. Lowell's and Mr. Keller's Cover-Up

Following the initial media reports in December of 2020 exposing Mr. Lowell as having had some unclear level of involvement in the "bribery-for-pardon" matter, Ms. Davis began pressing Mr. Lowell for answers to help her understand whether or not he had significant conflicts impacting his representation that he had not disclosed to her.  While she was still engaged in this process, this Court granted a motion from Hawaii Civil Beats to unseal the Conflict Waiver.  After consulting with other counsel, Ms. Davis inquired further of Mr. Lowell about the full background behind and rationale for the Conflict Waiver.  Unfortunately, Mr. Lowell chose continued deception and evasion, leaving his client no choice but to terminate his representation

of her.  On April 16, 2021, after Ms. Davis terminated his engagement, Mr. Lowell filed with this Court a Motion to Withdraw.[43]

Approximately one month after Mr. Lowell's withdrawal, *Politico* published an investigative news story, exposing what appeared to be the DOJ inappropriately influencing Mr. Lowell with a direct or indirect threat of possible criminal charges as a co-conspirator in the "bribery-for-pardon" investigation, for the purpose of having him influence his then-client, Ms. Davis, to take a plea deal and "admit" that she and Mr. Broidy had intended to violate FARA.  Mr. Keller, according to the article, was threatening Mr. Lowell throughout the very same time frame during which he was also negotiating with Mr. Lowell regarding the Plea Agreement for Ms. Davis:[44]

> What's more, the "bribery-for-pardon" probe Howell revealed in her opinion and the Davis case were both being managed by the No. 2 official in Justice's Public Integrity Section, John Keller, who was also the lead prosecutor in Davis' case, the sources said.
>
> That means Keller was overseeing her prosecution even as he was investigating the dealings between Broidy and her attorney, Lowell, in connection with Diller's bid to win a pardon for Baras.
>
> Precisely how and when Lowell, a partner with Chicago-based Winston & Strawn, learned of the Justice Department's interest in that issue remains unclear. However, records reviewed by POLITICO say Lowell retained Weingarten for work related to the "bribery-for-pardon" issue in June — months before the matter became public in December. In addition, Howell's sealed opinion issued in August authorized the government to use the emails to "confront" those involved.
>
> After the news reports in December, Davis became concerned that

---

[43] Bryant Decl. ¶24

[44] "Pardon-probe ruling roils legal teams for Trump all Broidy, associate" May 20, 2020, Ex. DD

because of the ongoing probe involving Lowell, he might not have pressed for the best possible deal for her with the Justice Department, a source familiar with her thinking said.

Shortly after the *Politico* article was published, counsel for Ms. Davis immediately reached out to Mr. Keller to discuss the grave concerns Ms. Davis' legal team had regarding the communications between Mr. Lowell and Mr. Keller during the period in which the DOJ was pressuring Ms. Davis to accept a felony plea deal.

In June 2021, Ms. Davis' legal team and Mr. Keller's legal team held a conference call to discuss the troubling issues presented in the article.[45] In response, Mr. Keller represented that the communications described in the partially unsealed opinion from Judge Howell were obtained through subpoenas of Mr. Broidy's electronic mail records acquired during the FARA violation investigation, and that this occurred approximately around July 2020.[46] Mr. Keller represented that he did inform Mr. Lowell that they were investigating a bribery-for-pardon matter that involved him, although no precision was offered as to when *exactly* he gave notice to Mr. Lowell, or when Mr. Lowell could have possibly gained independent knowledge about the investigation.[47]  Mr. Keller further represented that the purpose of the Conflict Waiver was to waive any conflicts with Mr. Lowell and Ms. Davis related to the "bribery-for-

---

[45] Bryant Decl. ¶¶50-51
[46] Id.
[47] While Ms. Davis' legal team is unable to confirm *Politico*'s reporting that Mr. Lowell had retained criminal lawyer Reid Weingarten in June of 2020 related to this issue, it does lead to confusion over exactly when this probe began and when Mr. Lowell learned of his connection to the investigation. It would seem self-evident that Mr. Lowell would not have hired a criminal attorney to represent him in June 2020 unless he believed that he faced possible criminal exposure.

41

pardon" investigation, and that he claimed to believe that Mr. Lowell had disclosed all relevant information regarding the matter to Ms. Davis.[48]

Remarkably, Mr. Keller tried to play word games and use semantics to diminish the severity of his decision to launch an investigation into Mr. Lowell in the "bribery-for-pardon" matter right as—or just before—he began negotiating Ms. Davis's Plea Agreement with Mr. Lowell.  During this same June 2021 conference call with counsel for Ms. Davis, Mr. Keller audaciously claimed that Mr. Lowell was not "under investigation."  This statement was in direct contradiction to his *ex parte* motion before Judge Howell, in which Mr. Lowell was unmistakably identified as a possible co-conspirator in the supposed "bribery-for-pardon" scheme, in addition to being suspected of possible LDA violations.[49]

While Mr. Keller was likely playing games over what type of inquiry rises to the level of being labeled an "investigation," Mr. Keller himself used that *exact* word in the context of the Conflict Waiver. During Ms. Davis's arraignment,  Mr. Keller told this Court that the "sealed addendum" (which he did not even identify as being a waiver of conflict-of-interest) needed to be filed under seal because "the description in the sealed addendum would potentially make it possible for individuals that are -- that are referenced there, although they are not referenced by name, to figure out that they are potential subjects of the government's *investigation* given -- given the lengths that

---

[48] Bryant Decl. ¶¶50-51
[49] Ex. W

are set forth in the sealed addendum." (emphasis added) So there is no question that Mr. Keller himself had deemed the probe into the "bribery-for-pardon" matters as an "investigation."  Given the fact that there were only four possible persons being investigated, with one having passed away, one in jail, and with the remaining two possible subjects being Mr. Lowell and Mr. Broidy, common sense dictates that, *of course*, Mr. Lowell *was being investigated*.

J.   Ms. Davis Files an OPR Complaint Against Mr. Keller and a Bar Complaint Mr. Lowell

During that same June 20, 2021 conference call, when questioned as to what steps Ms. Davis should take given the concerns raised by her legal team, Mr. Keller suggested that Ms. Davis could file a complaint with the Office of Professional Responsibility if she believed that there was any prosecutorial misconduct involved, and a bar complaint against Mr. Lowell if she believed he engaged in unethical conduct.[50]

Heeding that advice, on November 5, 2021 Ms. Davis filed a complaint with the Office of Professional Responsibility against Mr. Keller.[51] Subsequently, Ms. Davis filed a bar complaint with the New York State Bar against Mr. Lowell.[52] Both investigations are currently pending.

III.   MR. KELLER AND MR. LOWELL ENGAGED IN ACTIONS THAT ARE IN DIRECT VIOLATION OF THE PROFESSIONAL RULES OF CONDCT AND AS SUCH MR. KELLER MUST BE DISQUALIFIED FROM THIS MATTER AND ANYTHING OBTAINED THROUGH THIS TAINTED

---

[50] Bryant Decl. ¶¶50-51
[51] Bryant Decl. ¶52 Ex. Y
[52] Bryant Decl. ¶53 Ex. Z

PROCESS MUST BE DISREGARDED

A. <u>Legal Standard: Mr. Keller and Mr. Lowell Are Bound To Adhere To The</u>

   <u>Hawaii Rules of Professional Conduct</u>

Local Rule 83.3, "Attorney Standard of Professional Conduct" in the District of

Hawaii states that:

> Every member of the bar of this court and any attorney permitted to practice in this court pursuant to Local Rule 83.1(d) or (e) shall be governed by and shall observe the standards of professional and ethical conduct required of members of the Hawaii State Bar.

Further, as it relates to Department of Justice attorneys, 28.C.F.R. §77.1 states in part:

> (a)    The Department of Justice is committed to ensuring that its attorneys perform their duties in accordance with the highest ethical standards. The purpose of this part is to implement 28 U.S.C. 530B and to provide guidance to attorneys concerning the requirements imposed on Department attorneys by 28 U.S.C. 530B.
>
> (b)    Section 530B requires Department attorneys to comply with state and local federal court rules of professional responsibility, but should not be construed in any way to alter federal substantive, procedural, or evidentiary law or to interfere with the Attorney General's authority to send Department attorneys into any court in the United States.
>
> (c)    Section 530B imposes on Department attorneys the same rules of professional responsibility that apply to non–Department attorneys, but should not be construed to impose greater burdens on Department attorneys than those on non–Department attorneys or to alter rules of professional responsibility that expressly exempt government attorneys from their application.

Further, the Supreme Court has noted that although prosecutors enjoy immunity from

many civil suits, that "'does not leave the public powerless to deter misconduct or to

44

punish that which occurs,' in large part because 'a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." *Town of Newton v. Rumery*, 480 U.S. 386, (1987) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976)).

Here, although Mr. Lowell and Mr. Keller are not members of the Hawaii State Bar, they are both bound by the Hawaii Rules of Professional Conduct when practicing in the State of Hawaii on a limited basis, as they have in this instance.

B. The Conflict Waiver Was A Pure Sham

The Hawaii R. Prof. Cond. 1.7 (a) in part provides that a lawyer shall not represent a client if he labors under a "concurrent conflict of interest," which exists if "there is a significant risk that the representation ... will be materially limited by the lawyer's responsibilities to ...a third person, or by the personal interest of the lawyer."

Further Comment 10 of Rule 1.7 states:

> The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, or with a law firm representing the opponent, such discussions could materially limit the lawyer's representation of the client. In addition, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. See Rule 1.8 for specific Rules pertaining to a number of personal interest conflicts, including business transactions with

clients.

The Supreme Court has held that an aspect of the constitutional right to counsel is a right to representation that is free from conflicts of interest that adversely affect counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980) "The 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by . . . conflicting interests." *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978) (quoting *Glasser v. United States*, 315 U.S. 60, 70 (1942)). Impairments of the right to conflict-free counsel threaten not only the defendant's right to effective representation, but also the trial court's interest in the fairness of its proceedings and the integrity of its judgments. As the Supreme Court explained in *Wheat v. United States*, 486 U.S. 153 (1988), federal courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. In addition, trial courts have "an institutional interest in the rendition of just verdicts in criminal cases," and in seeing that these verdicts "remain intact on appeal." *Id*. at 160-61. Further, the trial courts must pursue "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id*. at 160. For example, a criminal defendant does not enjoy an absolute right to be represented by an attorney laboring under a

conflict of interest. See *Id*. at 162-63.

Haw. R. Pro. Cond. 1.7(b) states:

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives consent after consultation, confirmed in writing.

Further Comment 4 of Rule 1.7 states:

If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the consent of the client after consultation, under the conditions of paragraph (b). See Rule 1.16 of these Rules. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See Rule 1.9 of these Rules. See also Comments [5] and [29] of this Rule.

A valid waiver of conflict of interest **must be voluntary, knowing, and intelligent**, such that the defendant is sufficiently informed of the consequences of his choice. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) citing *Belmontes v. Woodford*, 350 F.3d 861, 885 (9th Cir. 2003). The Court and counsel "are required to 'ascertain with certainty' that a defendant knowingly and intelligently waived that

right by 'focusing on what the defendant understood.'" *Id*. citing *Lockhart v. Terhune*, 250 F.3d 1223, 1233 (9th Cir. 2001). The Ninth Circuit has found a "waiver valid where the defendant had an extensive discussion with the judge about the conflict, received a continuance to consult with his family on the matter, and clearly understood his right to unbiased counsel." *Id*. citing *Garcia v. Bunnell*, 33 F.3d 1193, 1196-98 (9th Cir. 1994).

The conflict of a defense attorney representing a client being prosecuted by the very same prosecutor, who is now possibly investigating that same defense attorney for possible crimes, along with the fact that the defense attorney's possible co-conspirator or adverse witness also happens to be an alleged co-conspirator in his client's case, in which that same prosecutor wants that attorney's client to testify against, would seem to be the quintessential example of an un-waivable conflict. However, setting aside this obvious issue, even if such an unwaivable conflict did not exist, the Conflict Waiver in this case was a sham, and was evidently used as nothing more than a fig leaf that the DOJ and Mr. Keller exploited for the purpose of disregarding the proper legal process of obtaining an informed, knowing and intelligent waiver, fully vetted by the Court, in order to capture their "big fish."

The Conflict Waiver was a sham for these four reasons: (1) the waiver is devoid of any actual information that would provide Ms. Davis specific details to ensure she and all interested parties understood what conflicts were being waived; (2)

if the waiver did involve other past or current clients that Mr. Lowell was

representing, there was no attempt to obtain *their* signed waiver; (3) Mr. Keller and

Mr. Lowell attempted to covertly file the Conflict Waiver under seal, and merely raise

it as a minor mention right before the conclusion of the plea hearing; and (4) neither

Mr. Keller nor Mr. Lowell sought to obtain the Court's opinion on whether Mr.

Lowell's conflict was waivable in the first place.

(1)     In addressing the first reason, the waiver has absolutely no details

as to whom or for what conflict is being waived. Although a conflict-of-interest

"waiver" was signed by Ms. Davis, the waiver materially and thoroughly

misrepresented the nature of the conflict—while pointedly not mentioning that Mr.

Lowell himself was the subject/target of a DOJ investigation led by the *very same PIN*

*prosecutors* on her case, nor did it mention that Mr. Broidy, Ms. Davis' alleged co-

conspirator, was at a minimum a witness in the "bribery-for-pardon" matter.

(2)     With respect to the second reason, the waiver does not include a

signature from any other client of Mr. Lowell's whose representation supposedly

caused the conflict as a former or current client of Mr. Lowell. As set forth above,

Haw. R. Pro. Cond. 1.7(b)(4) requires that in order to have a valid conflict waiver,

"each affected client gives consent after consultation, confirmed in writing." As set

forth in the waiver it states in part, "understands that [DOJ] has raised with one of her

attorneys, Abbe D. Lowell, his previous representation of certain individuals with

whom Ms. Davis also has had contact or interactions and whose names have or might come up during her cooperation and of certain other individuals on matters unrelated to Ms. Davis."

Here, notwithstanding the fact that Ms. Davis was not provided an honest, unbiased consultation regarding the conflicts that had arisen between her and her counsel, there is no indication that the other "certain individuals" whom Mr. Lowell previously represented were consulted about this waiver, and they most certainly did not give consent to waive such conflict in writing as required by Rule 1.7(b)(4). As such on this ground alone, the Conflict Waiver should be voided and deemed invalid on its face.

(3)     In addressing the third reason above, Mr. Lowell and Mr. Keller, both of whom are presumably familiar with the basic requirements in local rules that exist in every District Court across the country requiring a party to seek leave from the Court prior to filing a document under seal, as is the case under Local Rule 5(c), clearly sought to curtail the Court's opportunity to scrutinize the details related to the Conflict Waiver, which could have had the effect of potentially delaying or even "blowing up" the plea.

As discussed above, **during** the August 31, 2020 plea hearing, Mr. Lowell emailed Mr. Keller with the Subject, "Why Did You Raise That," moments after Mr. Keller informed the Judge just before the conclusion of the arraignment that he was

submitting a "sealed addendum," which was only later revealed to be the Conflict

Waiver. Mr. Keller's response revealed their deceitful intent: "It needed to at least be

acknowledged in some capacity. I avoided any details that could reveal the

substance." Mr. Keller's approach was so unusual that it appeared to catch Judge

Kobayashi off-guard, as she responded, "Well, I don't see any names that are listed,

so I don't understand that aspect of it. But I won't address it. You didn't seek court

approval to file it under seal."

As discussed at length above, had Mr. Keller and Mr. Lowell sought leave of

the Court, they would not have been able to continue hoodwinking Ms. Davis and this

Court—and as soon as the Court would closely examine the Conflict Waiver and ask

the pertinent questions, there is no doubt that it would have been exposed as nothing

more than a sham to deny Ms. Davis her Sixth Amendment Constitutional right to

effective legal representation in a felony criminal matter.

(4)     With respect to the fourth reason, the Courts follow that **even

when a defendant seeks to proceed with conflicted counsel by waiving the

conflict, a district court retains authority to reject the proffered waiver to

preserve ethical standards and ensure a fair trial**. See *United States v. Wheat*, 486

U.S. at 160, 163. Accordingly, "trial courts, when alerted by an objection from one of

the parties, have an independent duty to ensure that criminal defendants receive a trial

that is fair and does not contravene the Sixth Amendment." *Id*. at 161. A federal

district court has the power to disqualify an attorney whose representation creates a conflict of interest, or the serious possibility of a conflict, and "the Government has standing to make the motion for disqualification." *United States v. Linton*, 502 F. Supp. 871 (D.C. Nev. 1980) citing *United States v. Horak*, 465 F. Supp. 725 (D. Neb. 1979). Further, as will be more thoroughly discussed in Section C below, Mr. Lowell had a legal obligation to inform the Court of his conflict of interest. See *Holloway v. Arkansas,* 435 US 475 (1978).

Thus, in instances where there potentially exists the personal interests of a defendant's counsel that are so inherently conflicted, that it make it impossible for a defendant's counsel to maintain an absolute and un-wavering duty of loyalty to the client over the lawyer's own self-interests, even if the client **knowingly** waived such a conflict of interest, the U.S. Supreme Court has made clear that the District Court, and the District Court only, should be the final decisionmaker in determining whether a conflict of interest is so great that there is no possibility that it could be waived.

As Mr. Keller certainly knows, judges must be included in the process to ensure that consent relating to a waiver of conflicts that one's attorney might have. "Impairments of the right to conflict-free counsel threaten not only the defendant's right to effective representation, but also the trial court's interest in the fairness of its proceedings and the integrity of its judgments." Those exact words were ***written by***

**Mr. Keller himself** in a June 2016 motion in *United State v Theodore E. Suhl,*[53] wherein he successfully argued that case law required a court hearing for the judge to confirm directly with the parties that they knowingly gave informed consent to waiving the conflict, as the court maintains the ultimate power to make such a determination of whether a waiver is valid or not.[54]

Thus, Mr. Keller's failure to include this Court in the process of reviewing and executing the waiver cannot be seen as an oversight or a mistaken understanding (let alone ignorance) of case law.  Likewise, given that Mr. Keller directly created Mr. Lowell's conflict by launching the "bribery-for-pardon" investigation, it is impossible to suggest innocent mistake resulted in the waiver fundamentally misrepresenting the nature of the conflict. Even though Mr. Lowell had his own legal obligation as defense counsel to inform the Court of this conflict, it was Mr. Keller who intentionally short-circuited normal procedures in order to hinder this Court's ability to make its own determination as to whether this conflict was even waivable at all. In short, all of their actions have made it abundantly clear that neither Mr. Keller or Mr. Lowell ever had a legitimate interest in actually obtaining an informed, knowing and intelligent conflict waiver from Ms. Davis or the other alleged clients whom Mr. Lowell supposedly had previously represented.

Perhaps Mr. Keller believed that no one would be able to figure out his sleight

---

[53] *See* United States District Court Eastern District of Arkansas, Case No. 4:15-cr-300 JLH, ECF Docket No. [52].
[54] Ex. BB

of hand.  And Mr. Lowell must have believed that he helped his standing with the very prosecutors investigating *him* in a separate, unrelated matter by "delivering" a guilty plea from his client, Ms. Davis.  After all, Mr. Keller and his PIN colleagues leveraged her plea deal to pressure Mr. Broidy into a guilty plea of his own—just a few weeks after Ms. Davis' plea.

### C. Keller's *Own* Conflict Required Him To Recuse Himself

The appearance of impropriety is critical under these circumstances. Congress has directed that:

> "[t]he Attorney General shall promulgate rules and regulations which require the disqualification of any officer or employee of the Department of Justice, including a United States attorney or a member of such attorney's staff, from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof. Such rules and regulations may provide that a willful violation of any provision thereof shall result in removal from office."

28 U.S.C. §528. (emphasis added). Pursuant to that congressional directive, The United States Attorney's Manual § 3-2.170 provides:

When United States Attorneys, or their offices become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact General Counsel's Office (GCO), EOUSA. **The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality**.

54

A United States Attorney who becomes aware of circumstances that might necessitate a recusal of himself/herself or of the entire office, should promptly notify GCO, EOUSA, at (202) 252-1600 to discuss whether a recusal is required. If recusal is appropriate, the USAO will submit a written recusal request memorandum to GCO. GCO will then coordinate the recusal action, obtain necessary approvals for the recusal, and assist the office in arranging for a transfer of responsibility to another office, including any designations of attorneys as a Special Attorney or Special Assistant to the Attorney General (see USAM 3-2.300) pursuant to 28 U.S.C. Sec. 515.

Even if the "probe" into Mr. Lowell's activities related to the "bribery-for-pardon" scheme was a legitimate inquiry, Mr. Keller should have immediately recused himself so as to prevent the clear conflict of concurrently building potential prosecutions in separate, unrelated matters against both Ms. Davis and her attorney, with both matters involving Ms. Davis' alleged co-conspirator, Mr. Broidy.  He did not.

That Mr. Keller even engaged in these parallel tracks raises disturbing questions about his motivation in pursuing a probe into Mr. Lowell's activities related to a bribery for pardon scheme and/or possible LDA violations.  After all, the conflict of negotiating Ms. Davis' plea with Mr. Lowell while also "investigating" an alleged crime of "bribery-for-pardon" and possible LDA violations involving Mr. Lowell in a

separate matter is so flagrant that the only conceivable explanation is that Mr. Keller intentionally created the conflict in order to ensure that Ms. Davis entered her guilty plea on August 31, 2020.

Just as confounding is that the only apparent witness in the "bribery for pardon" investigation with meaningful knowledge of Mr. Lowell's potential misconduct would have been Mr. Broidy (based on court filings and media accounts), the very person whose credibility would take a hit pursuant to Ms. Davis helping DOJ pressure him into a felony plea deal. If such a situation does not prompt a prosecutor to believe that there is at least the *appearance* of an unwaiveable conflict, it is hard to imagine an instance in which such a recusal would ever be necessary.

D. Mr. Keller Conspired with Mr. Lowell to Deceive the Court and Violate The Rules of Professional Conduct For Their Personal Benefits

As mentioned above, "defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Holloway v. Arkansas,* 435 US at 485-486 citing *State v. Davis*, supra, at 31. Further, "attorneys are officers of the court, and 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.'" *Id.* at 486, citing *State v. Brazile*, supra, at 266. Haw. R. Prof. Cond. 3.3 states: "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal…(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the

lawyer to be directly adverse to the position of the client and not disclosed by

opposing counsel..." Accordingly, Comment 2 of Rule 3.3 states:

> "…an assertion purporting to be on the lawyer's own knowledge, as in
> an affidavit by the lawyer or in a statement in open court, may properly
> be made only when the lawyer knows the assertion is true or believes it
> to be true on the basis of a reasonably diligent inquiry. **There are
> circumstances where failure to make a disclosure is the equivalent
> of an affirmative misrepresentation**."

As required by law, Mr. Lowell was obligated to inform the Court that, among

other potential conflicts that may have existed at the time that Ms. Davis entered her

guilty plea on August 31, 2020, there existed a conflict that expanded beyond a

typical conflict involving an attorneys former and present clients, but instead involved

a conflict that was so personal in nature to Mr. Lowell, that not only did this conflict

include Ms. Davis' lead prosecutor, Mr. Keller, and her alleged co-conspirator Mr.

Broidy, but more specifically it included Mr. Lowell not in his role as an attorney, but

instead in a role as a potential subject of a criminal investigation, with Mr. Broidy as

at least the possible witness against him, all the while the prosecutorial team was

being led by none other than Mr. Keller. This may be a first-of-its-kind case where

such a set of facts has evolved, in a federal criminal matter, let alone a high-profile

matter involving some of the most well-known figures in the country. It is bitterly

ironic, however, that Ms. Davis was coerced into an unprecedented plea of "aiding

and abetting" a FARA violation by prosecutor who achieved the result by aiding and

abetting what amounts to a conspiracy to defraud the Court, when he "avoided any

details that could reveal the substance" about the true nature and purpose of the improperly sealed addendum.

Mr. Keller was obligated to follow Rule 3.3(a)(1) and corresponding Comment 2, which forbids an attorney from making a false representation of fact to the court or to make an affirmative misrepresentation through omission or failure of disclosure. During the August 31, 2020 plea hearing, Mr. Keller made both false representations to the court, and affirmative misrepresentations through a failure to disclose. Mr. Keller himself left no room for doubt about his intent to deceive and defraud both Ms. Davis and this Court when he wrote to his co-conspirator, Mr. Lowell, "I purposefully kept it vague" during the plea hearing, moments after filing the "sealed addendum" under seal.

Here, it had become clear that prior to the start of this hearing—as evidenced by the contemporaneous communications between them during Ms. Davis' plea hearing—that Mr. Keller and Mr. Lowell had entered into some agreement that Mr. Lowell would refrain from making his legally obligated requirement to disclose this very serious and unwaivable conflict to the Court, and that in the event the topic was broached, Mr. Keller would support this deception by purposely remaining as vague as possible to the Court, so as not to cause the Court to further inquire as to facts which have required Ms. Davis to enter into such a conflict waiver. At the moment in which Mr. Keller stated to the Court, "**I would just note, without, of course, getting**

**into the details because of the substance, that the parties did also file a signed**

**sealed addendum to the plea agreement**," he set forth in motion a great deception

upon the Court. At the very moment in which Mr. Keller wanted to "just note" the

"sealed addendum," which he intentionally did not reveal was a conflict-of-interest

waiver, both he and Mr. Lowell were **required** to disclose to the Court the very

details that he chose instead to conceal. Mr. Keller's intentional act to omit disclosure

of such a serious conflict, one in which he knew was an "impairment" of Ms. Davis'

"right to conflict-free counsel" as Mr. Lowell's unwaivable conflict "threatened not

only the defendant's right to effective representation, but also the trial court's interest

in the fairness of its proceedings and the integrity of its judgments." And it should

also be noted that when such "impairments" served to benefit his case strategy, Mr.

Keller has had no issues raising such a conflict to the Court, as he did *United State v*

*Theodore E. Suhl*. Again, those quotes above were Mr. Keller's own words and they

establish that he clearly understands when a conflict should be raised by a prosecutor

to the Court. Despite that, he intentionally did not do so here.

In addition to his failure to disclose critical information to the Court, Mr. Keller

also made material misrepresentations to Judge Kobayashi during this August 31,

2020 hearing pertaining to the reasons why the Conflict Waiver was filed under seal

in the first place. When the Court pressed Mr. Keller on that issue, Mr. Keller

responded as follows:

"Your Honor, because the references -- the description in the sealed addendum would potentially make it possible for individuals that are -- that are referenced there, although they are not referenced by name, to figure out that they are potential subjects of the government's investigation given -- given the lengths that are set forth in the sealed addendum, Your Honor."

Even a cursory review of the Conflict Waiver exposes Mr. Keller's statement as false. Judge Kobayashi indicated that something was amiss with the Conflict Waiver, noting moments later, "Well, I don't see any names that are listed, so I don't understand that aspect of it." As detailed above, the Conflict Waiver was nothing more than a sham, and it was intentionally devoid of any specifics as to the nature of the conflict whatsoever, with no names identified, no facts regarding the conflicts ostensibly being waived, and clearly no facts pertaining to Mr. Lowell's own personal conflict. In short, no one could have looked at the stripped-of-all-context Conflict Waiver that would "potentially make it possible for individuals that are -- that are referenced there, although they are not referenced by name, to figure out that they are potential subjects of the government's investigation"—except for the person who was *already* aware that he was a "subject[] of the government's investigation," meaning Mr. Lowell himself.

IV.     CONCLUSION

    A. The Totality of Mr. Keller's and PIN's Actions Unquestionably Resulted in the "Trammeling" of Ms. Davis's Sixth Amendment Right to Conflict-Free Counsel

The egregious nature of Mr. Keller's behavior in pursuit of the "big fish" cannot be overstated.  Mr. Keller—with either the tacit approval or active collaboration of his PIN colleagues—knowingly created a highly unethical conflict-of-interest whose clear purpose was to achieve not just a felony guilty plea from Mr. Lowell's client, but to force Ms. Davis into making an admission of intent that was actually contradicted by the evidence.[55]  That coerced admission, in turn, was then leveraged to enable Mr. Keller to secure a guilty plea from a prominent political figure, former RNC Finance Director Elliott Broidy, two weeks before the Presidential Election. Without Ms. Davis' admission of "intent" to violate FARA, in fact, there is a strong likelihood that both individuals who ultimately pled guilty would not (and could not) have been found guilty of criminal conduct by a jury of their peers.

There is no dispute that the Conflict Waiver was opaque *by design*.  As previously discussed, Mr. Keller admitted to counsel for Ms. Davis that he knowingly and intentionally wrote the Conflict Waiver so as to not mention that Mr. Lowell was—at a minimum—a person of interest in a separate, unrelated criminal investigation also overseen by Mr. Keller and his PIN colleagues.  Mr. Keller also

---

[55] The fact that Mr. Keller and his PIN colleague Sean Mulryne have resorted to semantics about whether the "bribery-for-pardon" probe was officially an "investigation" or not only underscores the breathtaking and brazen nature of their conduct.  Surely a criminal defense lawyer in that situation— upon learning that a "taint team" is reviewing his attorney communications in advance of an *ex parte* hearing at which the government is planning to request that the judge vitiate certain attorney-client privileges—is not basing his reaction on whether or not PIN has formally labeled this probe an "investigation" or not.

acknowledged that he filed the Conflict Waiver with this Court as a "sealed addendum" for the same purpose of obscuring the fact that he and his PIN colleagues were simultaneously investigating Ms. Davis's attorney, Mr. Lowell, as they were negotiating with Mr. Lowell to secure her guilty plea that was being entered at that *very same hearing*.

Mr. Keller's only "dispute" regarding the cloak-and-dagger nature of the Conflict Waiver is his audacious and bizarre claim that he conspired with Mr. Lowell in the "trammeling" of Ms. Davis's Sixth Amendment right to conflict-free counsel in order "to protect [Mr. Lowell's] personal reputation."  If there had somehow been even a shred of merit to this absurd contention, Mr. Keller would have done at least some of the following:

1) Explain the true nature of the conflict directly to Ms. Davis in the presence of her independent counsel;

2) Asked this Court to confirm the Conflict Waiver with Ms. Davis and her independent counsel in Chambers;

3) Secured the signatures of his Hawaii-based colleagues, Mr. Sorenson and Mr. Nammar after explaining *to them* the true nature of the conflict; and

4) Included language in the Conflict Waiver itself that Mr. Lowell was (at least) a "person of interest" in a separate, unrelated investigation being conducted by the same PIN prosecutors, including Mr. Keller.

Of course, even that likely would not have been enough given the bedrock principle of our criminal justice system that starts from the presumption that the public possesses the right to know—even in situations that might cause harm to a prominent attorney's "personal reputation"—but at least such measures would have demonstrated that Mr. Keller was taking steps to protect Ms. Davis's Sixth Amendment right to conflict-free counsel, just as he had successfully argued in 2016 when, as the prosecutor in *U.S. v. Suhl*, he moved the Court to intervene to ensure that the defendant in that case fully understood the conflict so as to render his waiver effective.

But because Mr. Keller took no steps whatsoever to confirm that Ms. Davis understood Mr. Lowell's conflict to the extent necessary for effective waiver, the only reasonable conclusion is that Mr. Keller *intended* to reap the benefits of Mr. Lowell's conflict in order to secure not just Ms. Davis's guilty plea, but also the coerced "admission" of "intent" to violate FARA that he and his PIN colleagues soon leveraged to get their "big fish" a mere two weeks before the Presidential Election. That, in turn, raises profound questions about the legitimacy and intended purpose of Mr. Keller's and PIN's "bribery-for-pardon" investigation.  Media accounts from early December 2020 indicate that little happened after Judge Howell's secret ruling on August 28, 2020 to vitiate certain of Mr. Lowell's attorney privileges.[56]

---

[56] In an email to Ms. Davis' counsel in January 2022, Mr. Mulryne claimed, "No search warrant or subpoena was ever issued for Mr. Lowell's email account."  If this is actually true, that would only

More fundamentally, though, is that PIN has acknowledged that Mr. Lowell himself knew about the "taint team" and *ex parte* process even before Judge Howell gave the ruling that Mr. Keller and his PIN colleagues sought in order to *then* "confront" the people involved.  The fact that Mr. Lowell had *already* been confronted to at least some degree by Mr. Keller should be of grave concern to this Court, Judge Howell, and the leadership at the Department of Justice.  If, as it appears, that an entire investigation was concocted to squeeze Ms. Davis's defense attorney in order for him to be incentivized to protect *himself* by coercing her to plead guilty and provide the necessary "admission" of "intent"— all in order for Mr. Keller to "get" his "big fish"— then this is truly a matter of grave concern for the entire public.

B.  Prayer for Relief

For the reasons set forth above, Mr. Keller has violated Haw. R. Prof. Cond. Rule 3.3(a)(1) for making false representations to the Court, and as such must immediately be disqualified.

But given the profound implications of the deceitful, unlawful, and unconstitutional conduct of Mr. Keller and potentially also that of his PIN colleagues,

---

raise *more* questions about the legitimacy of the "bribery-for-pardon" investigation.  After all, why would Mr. Keller and his colleagues take the extraordinary step of requesting *ex parte* that a Court vitiate attorney-client privilege for the ostensible purpose of gathering more evidence, but then *not* take the next logical step of utilizing the powerful tool that Judge Howell had just granted PIN to use certain of Mr. Lowell's own communications to further the investigation?

mere disqualification of Mr. Keller (and potentially also one or more of his colleagues) would not alone serve the interests of justice. As such, this Court should stay Ms. Davis' cooperation pursuant to her Plea Agreement pending the completion of an independent investigation into the matters raised in this Motion

If not for several factors all coming together—including Judge Howell partially unsealing her *ex parte* ruling, the media confirming that Mr. Keller and PIN had also overseen that "bribery-for-pardon" investigation, and Mr. Lowell accidentally forwarding to Ms. Davis his email exchange with Mr. Keller during the arraignment about concealing the true conflict—it is doubtful that Ms. Davis would have *ever* learned that her defense lawyer and Mr. Keller conspired in the "trammeling" of her Sixth Amendment right to conflict-free counsel, which tainted almost every aspect of PIN's prosecution of her.

As such, Ms. Davis and her undersigned counsel respectfully request that this Court order the Department of Justice's Office of the Inspector General to investigate Mr. Keller and his PIN colleagues for their roles and actions in initiating the "bribery-for-pardon" probe, when and how Mr. Lowell became aware of that probe, what representations were made to Judge Howell about Mr. Lowell concurrently representing Ms. Davis (if any), if Mr. Keller had informed his Hawaii-based colleagues of the true nature of the conflict, the drafting and execution of the opaque Conflict Waiver, and the decision to wait until July 2020 for PIN's first contact with

Ms. Davis in 11 months and immediately demand that she accept a felony Plea.[57]  An OPR complaint was filed in November 2021 against Mr. Keller, but given the reputation that the DOJ has regarding looking into such complaints when filed by private citizens versus when ordered by a Federal Judge, this Court presumably has greater ability to ensure a thorough, robust, and fair inquiry into this matter of profound public interest.

Our system of justice requires ethical conduct and truthful representations from Officers of the Court in order to function effectively and properly balance the needs of the State and the Constitutional rights of Defendants.  This is why, in the rare instances where prosecutorial misconduct has occurred, Courts have not only ordered investigations, but also, when appropriate, dismissed indictments or vacated sentences and pleas.

There is precedent for such a request.  In June 2020, the U.S. Attorney in the Southern District of New York moved to dismiss the conviction that it had won just three months earlier after the Defendant's counsel revealed that prosecutors had belatedly disclosed potentially exculpatory evidence well into the trial, and even then was buried in a dump of other papers.[58]  Even after granting the dismissal and stating

---

[57] Given that Congress has repeatedly expressed concern over the years about the efficacy of reviews conducted by the DOJ's Office Professional Responsibility, undersigned counsel respectfully suggests that the DOJ's Office of Inspector General (OIG) might be better-suited to investigating the misconduct of Mr. Keller and his PIN colleagues.
[58] *United States v. Ali Sadr Hashemi Nejad*, 521 F. Supp. 3d 438 (S.D.N.Y. 2021)

that she believed that prosecutors did not intentionally violate the Defendant's rights, U.S. District Judge Alison Nathan in February 2021 ordered the DOJ to conduct a formal investigation.[59]

The most high-profile example in this vein in recent history concerned the prosecution of then-Senator Ted Stevens.  Unfortunately, the prosecutorial misdeeds were only uncovered and his conviction vacated after he lost his bid for reelection, and shortly before his death.  In that case, Judge Emmet G. Sullivan opted not to trust the Department of Justice to investigate its own prosecutors, instead choosing to appoint a Special Prosecutor.  In April 2009, Judge Sullivan issued an order "appointing Attorney Henry F. Schuelke III to investigate and prosecute such criminal contempt proceedings as may be appropriate, pursuant to Federal Rule of Criminal Procedure 42."[60]

Finally, in the interests of justice given the severity of prosecutors' actions and the Constitutional rights implicated, Defendant and her undersigned counsel respectfully ask that the Court stay sentencing and all of Ms. Davis' obligations pursuant to her Plea Agreement, pending the completion of a formal investigation into this matter.

To underscore the importance of staying Ms. Davis' obligations pending

---

[59] https://www.wsj.com/articles/federal-judge-urges-a-doj-probe-of-prosecutorial-conduct-in-sanctions-case-11613779171
[60] https://www.nacdl.org/getattachment/2d6a4d1b-f932-4c33-bb73-0a0c3c66f9d2/stevens-order-appointing-special-prosecutor-4-7-2009.pdf

completion of a formal investigation into this matter, PIN prosecutor Sean Mulryne just last month issued a not-so-subtle threat directly in response to this planned motion.  Prior to a planned March 29, 2022 meeting between Ms. Davis and PIN prosecutors ostensibly related to her ongoing cooperation pursuant to her Plea Agreement, Ms. Davis' counsel requested the customary preview of topics of discussion in preparation for the meeting.  Incredibly, Mr. Mulryne responded—with Mr. Keller and others from PIN cc'd on the email—with an intended list of topics to be covered that had nothing to do with the pending criminal trial of Mr. Michel or anything remotely related to the scope of her cooperation.[61]

Mr. Mulryne—who, along with his PIN colleagues, had been given the courtesy of a head's up earlier this year about plans to file the present motion to disqualify Mr. Keller—wrote in his email regarding the March 29, 2022 meeting with an audacious request: "We would like to review [the planned motion to disqualify Mr. Keller]—preferably before meeting with Ms. Lum Davis."[62] Mr. Mulryne neglected to explain how "review[ing]" the instant motion would relate to or help improve the quality of Ms. Davis' cooperation.  Mr. Mulryne's email then

---

[61] Bryant Decl. ¶¶59-63, Ex. U. Ms. Davis' cooperation is limited to the underlying investigation in which she entered into a guilty plea.  Pursuant to Paragraph 27 (a) and (b) of the Plea Agreement, she is required "to testify truthfully at any and all trials, hearings, or any other proceedings at which the prosecution requests her to testify…involving co-defendants and others charged later in the investigation, sentencing hearings, and related civil proceedings" and "to be available to speak with law enforcement officials and representatives of the United States Attorney's Office at any time and to give truthful and complete answers at such meetings."
[62] Id.

listed seven bullet point items as "[a]mong the information we will address with Ms. Lum Davis," wherein all seven items ultimately related mostly or entirely to Ms. Davis *or her family*.[63]  None of the items bore any apparent relevance to the government's case against Mr. Michel—whose trial is poised to commence soon—and some of the bullet points stretched back to 2010 or even 2004.

The topics of inquiry were neither appropriate nor made in good faith, and PIN prosecutors were not-so-subtly warning Ms. Davis that they intended to go after her *and her family*—merely because she had the temerity to expose Mr. Keller and his team to such unwanted scrutiny.  Such brute force scare tactics have no place in our criminal justice system, and certainly should not be practiced by anyone working for the DOJ—let alone prosecutors whose entire mission is to protect "public integrity."

This type of intimidation, sadly, is not new for PIN prosecutors in this case. As discussed above, prior to procuring Ms. Davis' coerced felony guilty plea, PIN prosecutors had made veiled threats of potential prosecution against not just Ms. Davis, but also her family members.  Based upon PIN prosecutors' most recent posturing, it is nearly impossible to believe that any further "cooperation" meetings with Ms. Davis—at least until the conclusion of a complete and total investigation into the actions of Mr. Keller, Mr. Lowell and other members of the prosecution's legal team—would be done in good faith.  Given PIN's track record in this case and

---

[63] Id.

the new threats issued recently, a motion to stay Ms. Davis' requirements to cooperate with PIN is both prudent and necessary.

For the foregoing reasons, Defendant respectfully requests that this Motion to Disqualify be granted, that the Court order an independent investigation into this matter, and that Ms. Davis' sentencing and her obligations set forth in the Plea Agreement be stayed, pending a determination of the investigation.

DATED:  Honolulu, Hawai'i, April 25, 2022.

_Isl James A. Bryant_
JAMES A. BRYANT
WILLIAM C. McCORRISTON
DAVID J. MINKIN
Attorneys for Defendant
NICKIE MALI LUM DAVIS