CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email:ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
Deputy Director, Election Crimes
NICOLE R. LOCKHART
Trial Attorney
Public Integrity Section

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CR. NO. 20-00068 LEK |
| | ) |
| Plaintiff, | ) RESPONSE IN OPPOSITION TO |
| | ) MOTIONS TO DISQUALIFY, |
| vs. | ) STAY SENTENCING, AND FOR |
| | ) JUDICIAL RELIEF; |
| NICKIE MALI LUM DAVIS | ) DECLARATION OF JOHN D. |
| | ) KELLER; CERTIFICATE OF |
| Defendant. | ) SERVICE |
| | ) |
| | ) DATE: May 18, 2021 |
| | ) TIME: 11:00 a.m. |
| | ) JUDGE: Leslie E. Kobayashi |
| | ) |

## RESPONSE TO MOTIONS TO DISQUALIFY, STAY SENTENCING, AND FOR JUDICIAL RELIEF

On the eve of sentencing, the defendant seeks to avoid responsibility for her

substantial role in an intricate criminal foreign influence scheme by using a fanciful

1

tale laden with speculation, heated rhetoric, and baseless accusations.  The premise of the defendant's motion is that the government initiated an investigation into her prior counsel, Abbe Lowell, for the purpose of extorting him to coerce her to plead guilty despite her innocence, all to coerce another plea from a co-conspirator despite his innocence.  This outlandish claim comes after the defendant unsuccessfully sought a presidential pardon and after the government denied her request for dismissal of this case because her co-conspirator received a pardon and she did not. The allegations underlying this latest attempt to evade the consequences of her actions are as readily disprovable as they are fantastic.  Through the ordinary and entirely appropriate use of a filter team to review potentially privileged evidence in this investigation, communications involving Lowell were discovered on the filter side that exposed him to potential criminal liability.  Undersigned counsel, John Keller, and the prosecution team were screened from this evidence until after the defendant's guilty plea.  Given the prosecution team's lack of knowledge of Lowell's conduct, the defendant's conspiracy theory is a factual impossibility. There was no concurrent parallel investigation of Lowell; there was no leveraging of that investigation to extort him; there was no coercion of the defendant; and there was no government request to manufacture evidence to implicate the defendant's co-conspirator.

Similarly, there was no effort to hide any potential conflicts from the defendant. The government raised all potential conflicts with Lowell and was informed by both Lowell and third-party, conflict-free counsel, William McCorriston, that the conflicts had been fully discussed with and waived by the defendant. To memorialize the fact of the disclosure and waiver, the government insisted on a signed waiver. Conflict-free counsel, McCorriston, who now alleges that the waiver and sealing were in bad faith, personally proposed the final waiver language and requested that it not be filed publicly. In short, the defendant's baseless claims are flatly contradicted by the facts and reflect a lack of candor. The defendant's Motions should be denied.

## I.     Factual Background

### a.  Lum Davis is Identified as a Subject in the Instant Investigation

The government began an investigation into the defendant's and others' illegal foreign influence efforts in 2017. As part of that investigation, on July 9, 2018, the government executed search warrants at the defendant's residence and served her with a grand jury subpoena. Included with the grand jury subpoena was an "Advice of Rights" form, which included, in relevant part:

> The grand jury is conducting an investigation of possible violations of federal criminal laws involving, but not necessarily limited to, 18 U.S.C. §§ 371 and 1956, and 22 U.S.C. § 611, *et seq.*, for conspiracy to interfere or obstruct lawful government functions through dishonest means, conspiracy to act as an unregistered foreign agent,

3

> conspiracy to commit international promotion money laundering by funneling proceeds from overseas into the U.S. to promote violations of the Foreign Agents Registration Act (FARA), and substantive violations of the foregoing statutes. Your conduct is being investigated for possible violations of these laws.[1]

Contrary to the defendant's assertions that the government represented that the defendant was merely a witness without criminal exposure, Mem. in Support, 12, 14, ECF No. 48, she was advised from the commencement of the overt investigation that she was a subject and that her conduct was being investigated by the grand jury.

After the government explained the defendant's exposure to her then counsel, Lowell, and sought her cooperation, the defendant agreed to participate in multiple interviews with the government under proffer protection. As part of those interviews, the defendant's counsel signed a proffer agreement that noted, in part:

> By discussing these matters and by accepting Davis's proffer, the United States does not at this time intend in any way to agree to, or represent that it will, confer immunity upon Davis for any possible federal criminal acts committed by her. . . nor has the United States made any representation or agreement about the disposition of any federal criminal charges which might be filed against her.[2]

Again, contrary to the defendant's claim that she was offered immunity, Mem. in Support at 14, the proffer agreement made plain that the government did not intend

---

[1] July 9, 2018, Lum Davis, Nickie Grand Jury Subpoena, Ex. 1.
[2] June 18, 2019, Nickie Lum Davis Proffer Agreement, Ex. 2.

to provide her with immunity.  Lowell was informed repeatedly that the government anticipated that the defendant would need to plead to a felony offense as part of any resolution.  The defendant proffered with the government several times including on June 18, 2019, and July 26, 2019.

b.  <u>Government Counsel Becomes Aware of and Raises Potential Conflicts with Lowell</u>

During the defendant's proffers, she was asked about foreign national subjects of unrelated national security investigations with whom the defendant had some contact.  The prosecution team was informed by FBI agents and other prosecutors that Lowell may have represented two of those subjects.  On August 26, 2019, the government raised the potential conflict with Lowell directly.[3]  Lowell initially largely dismissed the issue and stated that he could not divulge whether he represented the other subjects.[4]  Two days later, on August 28, 2019, Lowell requested a follow-up call, disclaimed any relationship with the other subjects that would give rise to a conflict adverse to the defendant and stated that he had disclosed the potential conflict, encouraged the defendant to consult with third-party counsel, and that the defendant had done so.[5]

---

[3] FBI FD-302 Report of Aug. 26, 2019, Telephonic Conversation with Abbe Lowell, Ex. 3.
[4] *Id.*
[5] FBI FD-302 Report of Aug. 28, 2019, Telephonic Conversation with Abbe Lowell, Ex. 4.

At approximately the same time, in late August or early September 2019, the prosecution team learned that Department of Justice's ("DOJ") civil FARA Unit assessed that Lowell might have an obligation to register pursuant to FARA based on his former representation of the foreign subjects of the national security investigations.  To avoid disclosing the FARA issue to Lowell prematurely and in recognition of the potential conflict, the prosecution team ceased all contact with Lowell.  Separately, on April 6, 2020, the FARA Unit sent a letter of inquiry to Lowell, requesting information about his activities in relation to three different individuals to determine whether he had an obligation to register under FARA.[6]  The prosecution team had no involvement in the civil FARA inquiry and was not informed when the letter was sent.

In June 2020, the prosecution team contacted the Assistant U.S. Attorney investigating Lowell's former clients and the FARA Unit to determine whether a letter of inquiry had been sent to Lowell.[7]  The government was informed that a letter requesting additional information had been sent and that Lowell retained attorney Reid Weingarten to respond.  Ultimately, in 2021, the FARA Unit determined that it had insufficient information to determine whether Lowell had an obligation to register under FARA.  The instant prosecution team at no time had any involvement

---

[6] Apr. 6, 2020, Email from Scott Claffee to Lowell, Ex. 5.
[7] June 18, 2020, Email between Keller, Ian Richardson, and Brandon Van Grack, Ex. 6.

in any aspect of the national security investigation of Lowell's former clients or the civil FARA inquiry.

        c. <u>Government Counsel Resumes Contact with Lowell and Negotiates a Plea Resolution</u>

In early July 2020, after learning that Lowell had been informed of the civil FARA inquiry, the instant prosecution team resumed contact with Lowell.[8]   The prosecution team informed Lowell that it had no involvement in the civil FARA matter but had ceased contact given a desire to avoid any interference with that matter.   The prosecution team also subsequently raised the need for Lowell to disclose the civil FARA matter as a potential conflict to the defendant.   Lowell and the prosecution team began plea negotiations, and by July 15, 2020, were finalizing the defendant's plea to one count of willfully violating FARA.[9]   The prosecution team initially proposed a conspiracy plea and also proposed a plea to 18 U.S.C. § 951, but Lowell requested a plea to FARA.[10]   A plea to 18 U.S.C. § 951 would not have required any admission by the defendant regarding willfulness—*i.e.*, her knowledge of FARA.   These negotiations continued until the Information for the defendant's plea was filed on August 17, 2020.[11]

---

[8] July 1, 2020, Email from Keller to Lowell, Ex. 7.
[9] July 15, 2020, Emails between Keller and Lowell, Ex. 8.
[10] *Id.*
[11] Filed Information, ECF No. 1.

>    d.  A Separate Government Filter Team Uncovers Communications
>        Indicating Lowell's Involvement in an Effort to Secure a Pardon
>        Potentially in Exchange for Campaign Contributions

On June 29, 2020, in reviewing investigative evidence, a member of the prosecution team came across a potentially privileged communication between Elliott Broidy and defendant's counsel, Lowell.[12]  Although filters for other counsel had already been instituted for Broidy's records, and although Lowell was on the counsel list for the defendant, Lowell was not on the counsel list for Broidy.  The prosecution team immediately notified the filter team and restricted access to the potentially privileged information.  The filter team reviewed all communications with Lowell and withheld them from the prosecution team as potentially privileged.[13]

Some of these communications revealed that Lowell and a third party were retained by a wealthy businessman to engage in what could potentially constitute an illegal lobbying scheme to obtain a pardon for one of the businessman's associates. The communications also suggested that some combination of the parties may have contemplated the businessman making a sizeable political contribution in exchange for a presidential pardon for his associate.  The prosecution team was not aware of the substance of these allegations until the United States District Court for the

---

[12] July 13, 2020, Emails between Filter Team, Keller, and Nicole Lockhart re: Filing, Ex. 9.
[13] *Id.*

District of Columbia authorized their release, and the filter team notified the prosecution team of the Court's ruling on September 1, 2020.

On August 10, 2020, the filter team submitted an *ex parte* motion seeking authorization to provide the withheld communications to the prosecution team and referenced the plea negotiations with Lowell.[14]   On August 25, 2020, the United States District Court for the District of Columbia held a hearing on the filter team's motion, and on August 26, 2020, the filter team submitted a supplemental filing in support of the motion.[15]

Because it did not appear that the filter litigation would be resolved prior to the plea hearing, the filter team asked to be connected with Lowell to advise him of the conflict stemming from his potential exposure.  On August 25, 2020, Keller connected the filter team with Lowell.[16]

On August 26, 2020, the filter team called Lowell and disclosed the substance of the allegations contained in their filing.  In response to a request from Lowell, the filter team forwarded a sample of emails included in the filing.[17]   The filter team noted that while they were not "saying that those crimes were necessarily committed[,] [g]iven the potential exposure" the filter team wanted to bring it to

---

[14] Aug. 10, 2020, Filter Team Submission of Filing to Court, Ex. 10.
[15] Aug. 26, 2020, Filter Team Submission of Supplemental Filing, Ex. 11.
[16] Aug. 25, 2020, Email from John Keller to Abbe Lowell and Filter Team, Ex. 12.
[17] Aug. 26, 2020, Email from Filter Team to Lowell re: Emails, Ex. 13.

Lowell's attention so that he "could discuss it with [his] client."[18]  Notably, these communications occurred more than a week after the defendant had already agreed to plead guilty to the detailed Information filed on August 17, 2020.  The prosecution team was not a party to these conversations and communications.

e. <u>Lowell and Third-Party Counsel Disclose the Conflict and The Parties Draft a Conflict Waiver</u>

On August 25, 2020, Keller proposed conflict waiver language to Lowell "to encompass the potential conflicts raised by the [civil] FARA letter of inquiry, the issue to be discussed with the filter team, and the prior representation of individuals as to whom Ms. Lum Davis may provide information."[19]  Keller indicated that the waiver would avoid surprising the Court with the conflict issue at the plea hearing and should avoid inserting a full-blown conflict colloquy into the middle of the plea hearing.[20]  Given that the government had detailed the potential conflicts to Lowell and that McCorriston was available to serve as third-party counsel to independently advise the defendant regarding Lowell's conflicts, the government did not believe that a separate conflict hearing was necessary in addition to the third-party advice and written waiver.  When Lowell disputed the characterization of the FARA letter of inquiry, Keller wrote: "we need to place on the record something to reflect the

---

[18] Aug. 26, 2020, Email from Filter Deputy Chief, Todd Gee, to Lowell re: Exposure, Ex. 14.
[19] Aug. 25, 2020, Email from Keller to Lowell re: Conflict, Ex. 15.
[20] *Id.*

potential for you to be inclined to assist the government through facilitating Lum Davis's cooperation in this matter in order to gain favor in your other unrelated dealings with the Department,"[21] and provided modified language for the waiver[22]. The exact issue that the defendant now accuses the government of concealing was explicitly raised with counsel in advance of the plea.

On August 26, 2020, shortly after Keller and Lowell's communications regarding a conflict waiver and Lowell's conversation with the filter team, McCorriston emailed Keller, without Lowell on the communication, stating: "Before we proceed further I need to have a discussion with client regarding issues raised as to Mr. Lowell's representation.  I have scheduled a time to speak with her tomorrow and I will contact you thereafter."[23]

The following day, after McCorriston discussed the conflict issues with the defendant, McCorriston confirmed that the defendant wished to proceed with Lowell as counsel.[24]  McCorriston then proposed language for a conflict waiver, closely resembling the language previously sent to Lowell.[25]  Keller proposed edits to the language to make clear that the government had affirmatively reviewed and raised matters with Lowell unrelated to the defendant—namely, the FARA matter and the

---

[21] Aug. 25, 2020, Second Email from Keller to Lowell re: Conflict, Ex. 16.
[22] Aug. 25, 2020, Third Email from Keller to Lowell re: Conflict, Ex. 17.
[23] Aug. 26, 2020, McCorriston to Keller re: Conflict, Ex. 18.
[24] Aug. 27, 2020, Email from McCorriston to Keller re: Lowell, Ex. 19.
[25] Aug. 27, 2020, McCorriston to Keller, Lowell re: Waiver, Ex. 20.

filter matter—and stated that he would add the conflict waiver language to the plea agreement that had already been previously approved by all parties.[26]  McCorriston approved the language but then noted, *sua sponte*:  "My greater concern is confidentiality.  If the plea agreement becomes public it would affect both Nickie and Abbe.  Is there a way to make this confidential, perhaps a different document?"[27]  In response to McCorriston's request, Keller stated that he could draft it as a sealed addendum to the plea agreement and noted that he expected the plea agreement to appear on the public docket.[28]  McCorriston subsequently proposed a further edited version of the conflict waiver containing "more benign language," "[i]f it has to be in a public document."[29]  The government responded:

> That language doesn't cover it.  Let's file the sealed addendum.  There is no reason we can't address the general concept of a conflict waiver in open court and reference the sealed addendum.  You just don't want the more specific text detailing the conflict to be public, right?  I'll prepare the addendum.[30]

After an additional exchange with McCorriston, the government agreed that McCorriston's language was sufficient but filed the waiver under seal because of concerns about alerting Lowell's former foreign national clients to the national security investigations and in compliance with DOJ policy not to identify uncharged

---

[26] Aug. 27, 2020, Keller to McCorriston re: Waiver, Ex. 20.
[27] Aug. 27, 2020, McCorriston to Keller re: Sealing, Ex. 21.
[28] Aug. 27, 2020, Keller to McCorriston re: Sealing, Ex. 21.
[29] Aug. 27, 2020, McCorriston email to Keller re: Waiver, Ex. 22.
[30] Aug. 27, 2020, Keller email to McCorriston re: Proposed Conflict Waiver, Ex. 22.

third parties—even descriptively—in public documents.[31]   Contrary to the defendant's insinuation that the conflict waiver was concealed from the United States Attorney's Office for the District of Hawaii or filed without their agreement, Mem. in Support at 27, AUSA Sorenson was copied on the correspondence with McCorriston related to the waiver and agreed that Keller could sign the waiver on behalf of the Criminal Chief for the United States Attorney's Office and Sorenson given that Sorenson was "teleworking [] and having some computer issues."[32]

### f.   The Defendant Pleads Guilty

On August 31, 2020, the defendant pleaded guilty to a one-count Information charging her with aiding and abetting a violation of FARA, in violation of 22 U.S.C. § 622 and 18 U.S.C. § 2.[33]   During the plea hearing, the defendant represented that she was "fully satisfied with the legal representation that [she] ha[d] received from [her] attorneys in this case."[34]   McCorriston represented that "[he] and [his] co-counsel [were] in agreement with [their] client's decision to plead guilty."[35]   The defendant represented that no one had  "attempted to threaten [her] or pressure [her] in any way in order to force [her] to plead guilty."[36]   The defendant confirmed under

---

[31] DOJ Justice Manual 9-27.760 – Limitation on Identifying Uncharged Third-Parties Publicly
[32] Aug. 28, 2020 Email from AUSA Ken Sorenson to Keller re: Computer Issues, Ex. 23.
[33] ECF Nos. 13, 15.
[34] ECF No. 21, Plea H'rg Transcript, 9.
[35] *Id.*
[36] *Id.* at 12-13.

oath that the factual basis of the plea agreement was "true in every respect."[37]   The defendant also stated in her own words that she "knew that the Foreign Agent Registration Act required disclosure of such contact unless there were exceptions that applied" and that she "realized that the contacts being made required registration under FARA."[38]

Despite the fact that the defendant now claims that she was pressured to implicate Broidy, she made no reference to Broidy at all in her allocution, and when asked by the Court, the government did not request that the defendant admit any additional facts related to Broidy or anything else.[39]   The reference to Broidy in the defendant's factual basis was proposed entirely by the defendant.  The government never indicated to the defendant or counsel that Broidy's knowledge of FARA was at issue, in part because there was independent evidence conclusively establishing his knowledge.[40]

Throughout the hearing, McCorriston and Lowell did not mention the conflict waiver at all.  At the end of the hearing, to ensure that the Court was aware of the conflict waiver and to ensure that it was placed on the record, Keller raised the sealed addendum and noted that the government understood that the defendant had

---

[37] *Id*. at 21.
[38] *Id*. at 22.
[39] *Id*.
[40] Jan. 11, 2017, Draft Consulting Proposal from Broidy Referencing FARA, Ex. 24.

"consulted with counsel and third-party counsel with respect to the issues addressed from the sealed addendum."[41]  The Court questioned the government as to why the addendum was filed under seal.[42]  The government explained that the description in the addendum, although it did not reference individuals by name, could reveal to third parties that they were subjects of ongoing investigations.[43]  The individuals referenced were the former clients of Lowell, were subjects of ongoing national security investigations, and were also associates of the defendant.  The government had concerns that only a small number of individuals who were associates of the defendant would also have previously been represented by Lowell.  Those individuals could have put two and two together if the description in the conflict waiver was disclosed publicly.  When the motion to unseal the waiver was filed nearly five months later, the government contacted the national security prosecutors investigating Lowell's former clients and learned that the investigations were no longer deemed likely to lead to charges and that the need for sealing was diminished.[44]

The defendant points to an email exchange between Lowell and Keller at the end of the plea hearing as evidence of a nefarious conspiracy to conceal the

---

[41] ECF No. 21, Plea H'rg Transcript at 42.
[42] *Id.*
[43] *Id.* at 42-43.
[44] Jan. 19, 2021, Emails Between Keller, Richardson, and Claffee, re: civil FARA inquiry, Ex. 25.

substance of the waiver.  Mem. in Support at 34.  Lowell did email Keller asking why Keller had referenced the sealed conflict waiver, presumably because Lowell was concerned about having his conflicts and potential civil and criminal exposure publicly aired.  Keller responded that the waiver "needed to be acknowledged" and noted that he avoided details that could publicly reveal the substance, i.e., the identities of Lowell's former clients, the FARA issue, and Lowell's potential criminal exposure.  Keller avoided publicly discussing this substance for the same reason that the addendum was sealed:  to avoid alerting the subjects of the national security investigations and to avoid publicly identifying Lowell and his former clients as uncharged third parties pursuant to DOJ policy.[45]  As indicated by his email to the courtroom deputy prior to the hearing, Keller stood ready to answer any questions from the Court regarding the substance underlying the waiver and requested a "virtual sidebar where only the parties and the Court will be able to hear the content of the colloquy."[46]

g.   The Prosecution Team is Provided with the Evidence Detailing Lowell's Potential Exposure After the Plea Hearing

On August 31, 2020, at nearly 5:00 pm EST, the United States District Court for the District of Columbia granted the filter team's motion to provide the withheld

---

[45] DOJ Justice Manual 9-27.760 – Limitation on Identifying Uncharged Third-Parties Publicly.
[46] Aug, 27, 2020, Email from Keller to Elkington re: Sidebar, Ex. 26.

communications to the prosecution team.[47]   After reviewing the memorandum opinion and order, the filter team provided the withheld communications and the underlying motion, memorandum opinion, and order to the prosecution team on September 1, 2020—the day after the defendant had pleaded guilty.[48]   The prosecution team reviewed the evidence, obtained an attorney proffer from a key witness, and determined that the evidence was insufficient to warrant a separate grand jury investigation given a lack of additional evidence and the fact that the primary subject was deceased.

### h.   Lum Davis is Interviewed in Connection with the PSR

On October 1, 2020, the defendant was interviewed by probation in connection with the preparation of her presentence report.[49]   The draft report states that "the defendant accepted responsibility for committing the instant offense" and included an excerpt of her written statement which explained, in part, the factual underpinning of her plea—that the defendant willfully failed to disclose to the Administration and DOJ that Broidy was acting on behalf of a foreign national.[50]   At no point during the interview did the defendant disavow that she lacked the requisite

---

[47] Aug. 31, 2020, Court Email to Filter Team re: Order, Ex. 27.
[48] Sep. 1, 2020, Filter Team to Prosecution Team re: Order, Ex. 28.
[49] Draft Presentence Report.
[50] *Id.* at ¶ 80-82.

intent to register as a foreign agent or indicate that she had been coerced into pleading guilty or making false admissions.

i.   <u>Broidy Pleads Guilty and is Pardoned</u>

Elliott Broidy pleaded guilty on October 20, 2020, to a one-count information charging conspiracy to serve as an unregistered agent of a foreign principal in violation of 18 U.S.C. § 371, based on his role in the same scheme for which the defendant pleaded guilty.[51]   On January 19, 2021, Broidy was granted a full presidential pardon.[52]

At the same time that Broidy was seeking a pardon, so too was the defendant.[53] Public reporting stated that the defendant "paid $100,000 to a consulting firm led by Mark Cowan, a member of [then-President] Trump's transition team, to try to secure clemency for herself."[54]   McCorriston confirmed this reporting and stated that the defendant had submitted documents to the White House in support of her bid, and that the then legal team did not understand why Broidy was pardoned and she was "overlooked," and that the defendant was "distraught."[55]

---

[51] *United States v. Elliott Broidy*, No. 1:20-cr-210, ECF No. 8.
[52] *Id.*, ECF No. 15.
[53] <u>The cottage industry behind Trump's pardons: How the rich and well-connected got ahead at the expense of others</u>, Feb. 5, 2021, Ex. 29.
[54] *Id.*
[55] *Id.*

### j. Lum Davis Seeks Dismissal of her Case by DOJ

After the defendant's efforts to obtain a pardon were unsuccessful, she then continued her efforts to erase her guilty plea and sought to have her case dismissed by the government.[56]  On February 1, 2021, McCorriston and Lowell sent a letter to the Chief of the Public Integrity Section and the then-U.S. Attorney of the District of Hawaii seeking the dismissal of the charges against the defendant because Broidy received a pardon and she did not.[57]  The letter did not assert, nor could it, that the defendant lacked criminal culpability.[58]  Two days later, the government rejected the defendant's request to dismiss the charges noting that "the fact that Mr. Broidy received a pardon does not diminish the seriousness of the criminal scheme executed by the co-conspirators or Ms. Lum Davis's central role in the offense."[59]

On April 13, 2021, after Lowell's efforts to unwind the defendant's guilty plea were unsuccessful, the prosecution team was notified that Lowell would no longer be representing the defendant.[60]

### k. Lum Davis and New Counsel Confirm the Factual Basis Underlying Lum Davis's Plea

On April 30, 2021, represented by new counsel, James Bryant, the defendant engaged in an interview in preparation for the defendant's grand jury appearance.

---

[56] Feb. 1, 2021, Letter from Lowell/McCorriston to PIN Chief and U.S. Attorney, Ex. 30.
[57] *Id*.
[58] *Id*.
[59] Feb. 3, 2021, PIN response to Lowell/McCorriston, Ex. 31.
[60] Apr. 13, 2021, Email from McCorriston to Keller re: Lowell Withdrawal, Ex. 32.

During the interview, the defendant confirmed the factual basis for her plea.  At no point did the government ever indicate to the defendant that she needed to describe Broidy's knowledge of FARA—the defendant volunteered these facts.  As discussed above, Broidy's knowledge was conclusively proven by other evidence unrelated to the defendant or her statements.[61]  The defendant was encouraged, repeatedly, not to try to help the government or any third parties and to simply tell the truth.

### l.  New Defense Counsel Raises These Allegations

Approximately one month later in June 2021, Bryant and McCorriston raised concerns regarding Lowell's potential conflicts of interest and collusion with the government.  The government, Bryant, and McCorriston participated in a conference call on June 15, 2021.  During that call, the government explained the chronology of events, including that Keller was not involved in any alleged investigation of Lowell prior to the defendant's plea and that a separate filter team informed Lowell of his potential exposure within days of the defendant's plea hearing.  The government, including Keller, offered to self-refer to DOJ's Office of Professional Responsibility ("OPR") if counsel believed, after hearing the information provided, that any government counsel acted unethically.  Counsel indicated appreciation for the call and the detailed information and did not indicate that they believed that the government had acted unethically.

---

[61] Jan. 11, 2017, Draft Consulting Proposal from Broidy Referencing FARA, Ex. 24.

After the June 2021 call, the defendant, through counsel, ceased to cooperate. On November 30, 2021, the prosecution team emailed counsel about filing the preliminary order of forfeiture.[62]  No response was received.  On December 10, 2021, the prosecution team again emailed counsel about the preliminary order of forfeiture as well as scheduling an interview to continue the defendant's cooperation.[63]  Again, no response was received.  On December 30, 2021, Keller received an email from a reporter at the news website, Politico.[64]  That email contained a word document purporting to be an OPR complaint filed against Keller based on the same false accusations raised in the defendant's present motions.[65]  On January 6, 2022, the government again emailed counsel, and asked, given the lapse in communications, whether the defendant intended to continue to cooperate.[66]

On January 6, 2022, counsel finally responded to the government's multiple emails, adding the Assistant Attorney General for the Criminal Division on his communication, and confirmed that an OPR complaint had been filed and that counsel intended to move for the disqualification of Keller on this case.[67]

---

[62] Nov. 30, 2021, Email from Keller to Bryant re: Forfeiture, Ex. 33 at 12.
[63] Dec. 10, 2021, Email from Keller to Bryant re: Forfeiture, Ex. 33 at 11.
[64] Dec. 30, 2021, Email from Politico to Keller re: OPR complaint, Ex. 34.
[65] *Id.*
[66] Jan. 6, 2022, Email from Mulryne to Bryant re: Cooperation, Ex. 33 at 11.
[67] Jan. 6, 2022, Email from Bryant to Mulryne re: Complaint, Ex. 33 at 9-10.

The government asked counsel to confirm that the OPR complaint sent by the reporter at Politico was, in fact, authentic, which counsel later did.[68]   The government, through Sean Mulryne, informed Bryant and McCorriston that the allegations were "baseless and without merit."[69]   The government noted that, as explained previously in the June 15 call, at the time of the plea negotiations the prosecution team was not aware of Lowell's involvement in any potential illegal lobbying for a pardon and thus, was not and could not have been investigating him.[70]

Bryant asked additional questions surrounding the timing of events and who participated, to which the government promptly responded and explained the information contained herein:  the alleged bribery-for-pardon scheme emails were uncovered by a filter team in July 2020; no one other than the filter team was aware of those documents or raised the issue with Lowell until days before the plea hearing; and the prosecution team was not provided the underlying emails or the factual details surrounding the allegations contained in the filter team's filing under after the plea hearing.[71]

Despite counsel's assertions that a filing would be "imminent," the instant motion was filed nearly five months later, within a week of deadlines for the

---

[68] Jan. 11, 2022, Email from Bryant to Mulryne re: Complaint, Ex. 33 at 6.
[69] Jan. 12, 2022, Email from Mulryne to Bryant, Ex. 33 at 5.
[70] *Id.*
[71] Jan. 21, 2022, Email from Mulryne to Bryant, Ex. 33 at 3-4.

defendant's sentencing, raising the same accusations that counsel had raised nearly a year prior to the filing. Shortly before counsel filed the instant Motions, counsel nominally agreed to participate in another witness preparation session in furtherance of her cooperation. Given the impending motion and the representations that the motion would disclaim portions of the defendant's factual basis, the government did not interview the defendant. In yet another unfounded accusation, the defendant argues that the government engaged in "intimidation" and "scare tactics" by listing topics of inquiry for the interview that included conduct of the defendant and her family unrelated to the scheme to which she pleaded guilty. Mem. in Support at 69. This allegation is baseless: the listed topics related to suspicious financial transactions flagged by other government agencies, and the purpose of discussing those topics was standard assessment of and preparation for potential impeachment of the defendant in an upcoming trial.

## II.   Legal Analysis

### a.   <u>Disqualification Should be Denied Because There has been No Government Misconduct</u>

The defendant seeks to disqualify Keller and other government counsel due to alleged improprieties involving the defendant's former counsel, Lowell. As outlined in detail above, the government engaged in no misconduct, and there is no basis for disqualification. To the contrary, the government took all steps necessary

to address the possibility of a conflict and to nullify any basis for the very attack launched here.

"The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except when necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (citation and internal quotation marks omitted). Disqualification of a prosecutor is, therefore, inappropriate and unjustified where no prosecutorial misconduct occurred or prejudice exists. *United States v. Chong*, 58 F. Supp. 2d 1153, 1160 (D. Haw. 1999) (citing *United States v. Skeddle*, 989 F. Supp. 890, 899 n.8 (N.D. Ohio 1997) (motion to disqualify a prosecutor should not be granted "absent a showing of prejudice which cannot otherwise be avoided or remedied by less drastic means")).

As for the defendant's primary allegation of misconduct, the prosecution team could not have leveraged any potential criminal exposure against Lowell because the prosecution team was unaware of the conduct underlying the potential exposure until after the plea. The defendant claims that Keller operated under a personal conflict of interest because he was running parallel investigations of Lowell and the defendant. Mem. in Support at 54-56. This is patently and provably false. Keller never initiated an investigation of Lowell, and only the filter team was aware of the evidence giving rise to potential exposure for Lowell at the time of the plea.

24

Moreover, the government's conduct throughout this matter demonstrates good faith at every step of the investigation and plea negotiation process. First, in the early stages of the investigation, the prosecution team alerted Lowell to potential conflicts relating to his prior representation of subjects of national security investigations against whom the defendant could be asked to cooperate. Lowell affirmed that his client had consulted third-party counsel regarding the potential conflicts. Later, when the prosecution team learned that Lowell might receive a civil letter of inquiry from the FARA Unit, the prosecution team ceased contact with Lowell for nearly eleven months until it learned that the FARA Unit contacted Lowell independently, and the prosecution team subsequently informed Lowell of the need to raise the issue with his client.

With respect to the filter issue, the government instituted a filter team to safeguard against the disclosure of any potentially privileged information to the prosecution team. The filter team contacted Lowell to notify him of his potential criminal exposure and advised him that he should inform his client of the conflict. Then, despite third-party counsel's assurances that the client had waived the conflicts, the government insisted on a written conflict waiver before proceeding with the defendant's plea. The final waiver language was proposed by third-party counsel and was general because it was simply intended to memorialize the fact of the waiver, not all of the underlying facts and circumstances giving rise to the

waiver, many of which the prosecution team did not even know.  The government, in good faith, relied upon representations by counsel that the conflicts had been discussed with the defendant.  Only after the government was assured by Lowell and third-party, conflict-free counsel, McCorriston, that the defendant was properly advised of the potential conflicts and that she had executed the conflict waiver, did the government proceed with her guilty plea.  Even then, the government sought accommodations from the courtroom deputy to be able to address the waiver at a virtual sidebar during the plea hearing if necessary and raised the waiver with the Court during the plea hearing.

The true facts and circumstances of the investigation, plea negotiations, and guilty plea of the defendant—many of which included McCorriston's direct involvement and were conveyed to Bryant in multiple exchanges—clearly demonstrate that the government engaged in no misconduct.  Conversely, the government worked diligently to preserve attorney-client confidences, conflict-free representation for the defendant, and the privacy interests of uncharged third parties, all while pursuing justice to hold the defendant accountable for her substantial role in an extensive criminal foreign influence scheme.

      b.  <u>The Defendant Has Failed to Show any Actual Conflict of Interest that Adversely Affected her Representation</u>

In addition to the lack of any bad faith or misconduct by the government, the defendant has failed to demonstrate that Lowell labored under any actual conflict of

interest or that any conflict adversely impacted her representation.  To establish a violation of Sixth Amendment rights based on an attorney's conflict of interest, the defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002) ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.").  A conflict arises when "a defendant shows that his counsel *actively represented* conflicting interests."  *Mickens*, 535 U.S. at 175 (citation and internal quotation marks omitted) (emphasis in original).  A "possibility of conflict is insufficient to impugn a criminal conviction."  *Sullivan*, 446 U.S. at 350.  Courts have found an actual conflict of interest in some instances where a defense attorney is investigated or prosecuted by the same office investigating or prosecuting the attorney's client.  *See, e.g.*, *United States v. McNeary*, No. 12-4010-01, 2013 WL 2237844, at **5-6 (W.D. Mo. May 21, 2013) (collecting cases).  But this presupposes both that the defense attorney is, in fact, being investigated or prosecuted by the same office, and that the attorney is aware of the investigation.

Lowell was not under investigation and did not know about the bribery allegations, or the filter team's awareness of those allegations, until more than a month after the defendant agreed to her plea deal in principle and more than a week after the plea documents were substantively finalized.  Lowell could not have sought

to curry favor with the government in connection with the later-revealed bribery allegations when Lowell was not informed of the filter team's knowledge of those allegations until after the plea agreement had been reached. *See United States v. Purpera*, 844 F. App'x 614, 620, 623-24 (4th Cir. Feb. 5, 2021) (rejecting defendant's arguments that defense counsel feared "angering" federal investigators who "caused him to labor 'under a conflict that provided him with a personal incentive to pull his punches'" because "the facts of this case simply do not bring these concerns to fruition").

Similarly, the civil FARA inquiry did not present a conflict of interest for Lowell because it was a civil inquiry handled by an entirely separate office. Courts have concluded that a defense attorney who is under even criminal investigation by a separate office does not have an actual conflict of interest. *See, e.g.*, *United States v. Baker*, 256 F.3d 855, 861 (9th Cir. 2001) ("Other circuits that have found an actual conflict under analogous circumstances have emphasized the fact that the same office was prosecuting or investigating both the attorney and client."). In *United States v. Baker*, the defendant's appellate counsel was actively under investigation, indicted, incarcerated, and cooperating with the government while representing his client on direct appeal, and had never disclosed any of those facts to his client. *Id.* at 858-59. The Ninth Circuit found that the defendant had put forth nothing more than "the mere possibility of conflict, not that counsel actively represented

28

conflicting interests." *Id.* at 860.  The court noted that defense counsel was prosecuted by a separate U.S. Attorney's Office than that of his client, and there was no indication that any connection existed between any of the parties involved in the two matters.  *Id.* at 860-61 (citing *United States v. Aiello*, 900 F.2d 528, 532 (2d Cir. 1990) (finding no basis to believe that actions of counsel were "intended to curry favor with the prosecutors in another District" when counsel was under investigation by the Eastern District of New York for conduct unrelated to his client's charged conduct in the Southern District of New York)).  The Ninth Circuit cited approvingly several other federal circuit courts that emphasized the significance of the same office investigating or prosecuting an attorney and client in finding an actual conflict.  *See id.* at 861-62.

The civil FARA Unit is housed within the National Security Division of DOJ and does not conduct criminal investigations.  The prosecution team is comprised of prosecutors within both the Criminal Division of DOJ and the United States Attorney's Office for the District of Hawaii and only conducts criminal investigations.  The offices here are entirely distinct, and Lowell was not under criminal investigation by the civil FARA Unit.  There was no actual conflict of interest.

Moreover, throughout plea negotiations and during the plea hearing itself, the defendant had the benefit of third-party, conflict-free counsel in McCorriston, who

continues to represent her to this day.  During the plea colloquy, the defendant made clear that she understood the ramifications of the guilty plea and was voluntarily choosing to plead guilty.  McCorriston, who was fully versed in the facts underlying the defendant's guilt, told this Court that he was in full agreement with the facts supporting her guilty plea and the defendant's decision to plead guilty.  Even if the Court were to find that actual conflicts existed for Lowell, the defendant had the benefit of conflict-free representation.  *See United States v. Wright*, 745 F.3d 1231, 1233-34 (D.C. Cir. 2014) (rejecting defendant's ineffective assistance of counsel claim where, in part, defense counsel enlisted conflict-free counsel to consult with defendant, and thus "[c]onflict-free counsel's prominent role in the plea discussions and in [defendant's] decision to enter a plea belie[d] [defendant's] claim that he was coerced by [defense counsel] into entering the plea").  There was no actual conflict and no adverse effect on the defendant's representation during plea negotiations or the plea hearing itself.

### c. The Defendant Waived Any Actual Conflicts of Interest

Even if an actual conflict existed that was so severe that it undermined McCorriston's conflict-free representation, the defendant waived any conflicts.  A defendant may waive her right to the assistance of an attorney who is unhindered by conflicts.  *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (citing *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978)).  "A valid waiver of conflict of interest must

be voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the consequences of [her] choice." *Id.* The government—both the prosecution team and filter team—took steps to ensure that Lowell was fully informed of any conflicts that may impact his representation. Based on McCorriston's email with the prosecution team standing down the plea hearing preparations in order to speak with the defendant immediately after the filter team informed Lowell of his potential exposure, the record demonstrates that the defendant was apprised of the conflict.

After advising the defendant of the conflicts, McCorriston himself then proposed language for the conflict waiver referencing both Lowell's former representation of subjects against whom the defendant might be asked to cooperate and other matters unrelated to the defendant, and the defendant signed it. The record confirms that any conflict was validly waived.[72]

---

[72] The conflicts held by Lowell were waivable. Trial courts are given "substantial latitude" in determining whether to accept a waiver of a conflict of interest. *Wheat v. United States*, 486 U.S. 153, 163 (1988). Attorney-client conflicts are waivable unless they are "so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *United States v. Martinez*, 143 F.3d 1266, 1270 (9th Cir. 1998) (quoting *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995)). *Compare United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 201 (D.C. Cir. 2013) ("Lopesierra points to no circuit that has accepted the proposition that attorneys who are the subject of criminal investigations are incapable of providing constitutionally adequate representation, and the government identifies numerous circuits that have rejected it.") *with United States v. Jones*, 381 F.3d 114, 120 (2d Cir. 2004) (finding conflict to be unwaivable when defense counsel was likely to become the subject of grand jury investigation related to his representation of defendant and a witness in government's case against defendant). There was no risk that Lowell would become a witness against the defendant or that his conduct was any way connected to the conduct for which the defendant pleaded guilty.

The defendant argues that conflict-free counsel, McCorriston, was deprived of information and the ability to fully advise the defendant because Mr. Lowell "deceptively shared select snippets of information" with McCorriston.  Mem. in Support at 6.  The defendant then states that "the particulars of such counsel-to-counsel communications remain privileged."  *Id.*  Not so.  The defendant is using the attorney-client privilege with Lowell as both sword and shield by putting Lowell's performance at issue as an ineffective assistance of counsel claim masquerading as allegations of government misconduct.  Litigants "waive[] the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation."  *Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003).  In raising these claims as to Lowell's representation, the defendant "must waive [her] privilege to the extent necessary to give [the government] a fair opportunity to defend against it."  *Id.* at 720.  The defendant has waived the attorney-client privilege with respect to any communications or conversations with Lowell or between Lowell and other counsel regarding the potential conflicts of interest.  The government has separately moved for a Court finding that the privilege has been waived.

### III.   Conclusion

The defendant's sensationalized accusations of government misconduct are demonstrably false.  Given counsel's knowledge of the true underlying facts, the

allegations appear to have been made recklessly, if not deceptively, in an eleventh-hour attempt to delay her sentencing. Following her plea, the defendant engaged in multiple efforts to void her conviction. She actively lobbied then-President Trump for a pardon. When she failed in that effort, she argued forcefully for the government to dismiss her case because Broidy had been pardoned. When government counsel refused to drop the case against her, she then filed a professional conduct complaint against the undersigned, which was promptly leaked by an unknown party to the media. While the instant motion states that it seeks disqualification and investigation of government counsel, should the Court find any basis for the defendant's claims, a motion to dismiss or withdraw her plea would surely follow as part of the defendant's pattern of seeking to avoid responsibility for her criminal conduct. Because frivolous allegations underpin all of the defendant's requests for relief, the government respectfully requests that the motions be summarily denied and that the Court proceed to sentencing.

DATED: May 4, 2022, at Honolulu, Hawaii.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice


| /s/ John D. Keller | /s/ Kenneth M. Sorenson |
| --- | --- |
| By: JOHN D. KELLER | KENNETH M. SORENSON |
| Principal Deputy Chief | Chief, Criminal Division |
| Sean F. Mulryne | |
| Deputy Director, Election Crimes | |
| Nicole R. Lockhart | |
| Trial Attorney | |
| Public Integrity Section | |

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

<u>Served Electronically through CM/ECF</u>:

      William McCorriston, Esq.
      James Bryant, Esq.

Attorneys for Interested Party
NICKIE MALI LUM DAVIS

DATED:  <u>May 4, 2022</u>

                                        *John D. Keller*
                                        John D. Keller