McCORRISTON MILLER MUKAI MACKINNON LLP

WILLIAM C. McCORRISTON          #995-0
DAVID J. MINKIN                 #3639-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone:  808.529.7300
Facsimile:   808.535.8056

E-Mail:      mccorriston@m4law.com;  minkin@m4law.com

JAMES A. BRYANT *(pro hac vice)*
The Cochran Firm California
4929 Wilshire Blvd., Suite 1010
Los Angeles, CA 90010
Telephone: 323-435-8205
Facsimile:   310-802-3829
E-mail:      jbryant@cochranfirm.com

Attorneys for Defendant
NICKIE MALI LUM DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 20-00068 LEK |
| Plaintiff, | DEFENDANT'S OPPOSITION TO MOTION FOR JUDICIAL FINDING OF WAIVER OF ATTORNEY-CLIENT PRIVILEGE |
| vs. | |
| NICKIE MALI LUM DAVIS; | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      INTRODUCTION

The government's instant motion before this Court marks at least the second attempt in this matter in which the prosecution team has attempted to vitiate attorney-client privileged communications as nothing more than a cynical ploy to leverage Nickie Lum Davis.

Tellingly, the government was so cavalier in its motion to abrogate one of the most sacrosanct principles of American jurisprudence—that people can speak openly and freely with their counsel—that its brief was just over one page in length.  And the one case cited in the government's one-page argument, *Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003), is wholly inapposite because it applies to the specific question of the extent of a waiver that is necessary when a petitioner bases a writ of habeas corpus on ineffective assistance of counsel.  Ms. Davis' motion to disqualify one or more of the prosecutors in this matter, however, is based on the *prosecutors'* actions, not that her former attorney was "ineffective."

That John Keller and his PIN colleagues have resorted to such brute force methods yet again merely continues the very kind of alarming conduct that led them to exploit *two* different criminal investigations into Ms. Davis' attorney, Abbe Lowell, for purposes of creating inherently unwaivable conflicts—and which ultimately resulted in Ms. Davis being coerced to plead guilty and offer a false admission of intent regarding her alleged co-conspirators.

The government's barebones request to vitiate attorney-client privilege also confirms what is clear from a review of the records—there is no evidence to suggest that Ms. Davis believed her conduct at issue in this case required registration under FARA, let alone that she "willfully" chose not to register.

In fact, it's not even clear that the Department of Justice *itself* believes that representation of Jho Taek Low actually required FARA registration at all.

During the 54 years from the last major amendment to FARA until Ms. Davis entered her plea for aiding and abetting a violation of that law, the U.S. government did not prosecute *anyone* for failure to register similar work, i.e. – work performed on behalf of a foreign individual who lacked governmental authority.  PIN shortly thereafter successfully leveraged her coerced—and false—admission regarding "willfully" not registering as foreign agents, forcing the "big fish," Elliott Broidy, into pleading guilty for failure to register under FARA related to his work for Mr. Low.

Thus, between August and October 2020, the U.S. government went from having never prosecuted *any* FARA case related to an individual outside of government to having secured *two* such convictions.

But if the U.S. government *actually* viewed representing Mr. Low's political or publicity interests as conduct requiring FARA registration, why is it that there were *at least* two dozen others who had engaged in such conduct while not FARA registered (either never registering or belatedly doing so), and *no one* was prosecuted—of course, aside from Ms. Davis, Mr. Broidy, and their associate Pras Michel?

On October 31, 2018—presumably in response to notice letters from DOJ's National Security Division (NSD)—two firms and 16 individuals registered under FARA for representing Low's interests.[1]  This was exactly four weeks after the U.S. government had indicted Mr. Low under seal, but one day *before* the indictment was unsealed.  The bulk of the individual "Short Form" registrations were lawyers at Kobre & Kim and various PR agents and others they had engaged, with all of the individual registrants admitting—by virtue of registering—that they were involved in furthering Mr. Low's political or publicity interests by engaging U.S. government officials and/or advancing Mr. Low's PR campaign.

According to media reports, there were also many others who also represented Mr. Low's interests who never ultimately registered under FARA, including former New Jersey Gov. Chris Christie and Rudy Giuliani.[2]

One of the 16 individuals who was part of the group who FARA registered at the very end of October 2018 was Danielle Rosborough.[3]  Almost immediately afterwards, in November 2018, Ms. Rosborough started working for NSD—the very section within DOJ that oversees compliance with and enforcement of FARA.

What is particularly salient context with respect to Ms. Davis is that Ms.

---

[1] The two firms were Kobre & Kim, LLP and Schillings International (USA) LLP.  See https://efile.fara.gov/docs/6604-Registration-Statement-20181031-1.pdf; and https://efile.fara.gov/docs/6603-Registration-Statement-20181031-1.pdf.
[2] See https://www.washingtonpost.com/opinions/2019/12/16/rudy-inc/; and https://www.bloomberg.com/news/articles/2019-10-31/chris-christie-is-among-lawyers-reaping-15-million-in-1mdb-deal
[3] *See* https://efile.fara.gov/docs/6604-Short-Form-20181031-6.pdf.

Rosborough advanced Mr. Low's interests through her role at Kobre & Kim[4]—the very law firm whose managing partner, Robin Rathmell, had multiple interactions with Ms. Davis and Mr. Broidy, as part of overseeing at least some of *their* efforts.

The contrast in DOJ's treatment of Kobre and the entities whose non-legal work they helped oversee versus that of Ms. Davis, Mr. Broidy and Mr. Michel could not be more stark.  The disparity is distilled quite succinctly in NSD choosing to hire Ms. Rosborough on one hand, while on the other collaborating with Mr. Keller's team in the latter's dogged—and ultimately unethical—pursuit of Ms. Davis and Mr. Broidy.

More fundamentally, though, it is impossible for unregistered representation of Mr. Low to be: 1) a serious felony warranting the incredible resources expended by PIN and NSD to prosecute just three people, but then *also* 2) somehow *not* be a deal-breaker to being hired by DOJ's NSD—the very division responsible for FARA compliance and enforcement.

Of course, there is only one possible answer to those conflicting actions: There is no consensus at DOJ—even within the division responsible for FARA enforcement—that representation of a foreign individual with no governmental authority even requires registration, let alone that such non-registration should be prosecuted.  And it would seem the only reason that there's "no consensus" is that Mr. Keller and his PIN colleagues managed to create an exception for just three people: Mr. Michel, Mr. Broidy,

---

[4] Kobre & Kim's own FARA Registration Statement, it described the "nature of services" provided by Ms. Rosborough specifically as "Public relations strategy and advice."  *See* https://efile.fara.gov/docs/6604-Registration-Statement-20181031-1.pdf at 2.

and Ms. Davis.

Given that even DOJ's NSD revealed its actual view of unregistered representation of Mr. Low with its hiring of Ms. Rosborough—and also given that there was never any evidence suggesting that Ms. Davis believed that either she or Mr. Broidy needed to register—Mr. Keller *needed* Ms. Davis not only to plead guilty, but also to make a false admission that he could leverage to force Mr. Broidy also to plead guilty.

Perhaps Mr. Keller and PIN filed their motion in the (vain) hope that Ms. Davis had secretly "admitted" to Mr. Lowell that she "knowingly" chose not to FARA register.  Or perhaps it was a poorly thought-through attempt to scare Ms. Davis with the prospect of what anyone would presume to be her candid, often emotional, expressions of anger and fear about what she felt at the time was her being forced into accepting a felony for conduct that wasn't treated as criminal for *dozens* of others.

Regardless, undersigned counsel is prepared to show this Court any or all of the privileged communications involving Mr. Lowell *in camera*, if the Court deems it necessary.

But because the motion to disqualify one or more of the prosecutors turns entirely on *their* conduct and *not* Mr. Lowell's effectiveness, the only material required to see through the government's mean-spirited and cynical motion is the substantial—and soon to expand[5]—body of evidence demonstrating a shocking degree of prosecutorial

---

[5] DOJ has been producing materials responsive to requests made by undersigned counsel, and as of this filing, there is likely to be substantial additional production in the coming days and weeks.

misconduct.

The fundamental issue here is not that Ms. Davis' former attorney was deeply conflicted in his representation or that the Conflict Waiver did not "cover" the nature, let alone the scope, of Mr. Lowell's conflicts.

Rather, the fundamental issue is that Mr. Keller (and, to varying degrees, his PIN colleagues) knowingly, intentionally, and repeatedly sought to benefit from Mr. Lowell's conflicts—going so far as to launch an investigation into Mr. Lowell a mere two days before contacting him to start plea negotiations regarding the Defendant—and then knowingly, intentionally, and repeatedly concealing not just the extent, but also the *existence*, of those conflicts from everyone *except* Mr. Lowell.

There were *two* separate and distinct criminal investigations into Mr. Lowell that Mr. Keller and potentially also his colleagues sought to exploit: 1) A probe into potential FARA violations "in relation to three different individuals";[6] and 2) An investigation into an alleged "bribery-for-pardon" scheme that PIN claimed also involved Mr. Lowell potentially violating the Lobbyist Disclosure Act ("LDA").

By the government's own telling, Mr. Keller and PIN learned in the latter half of June 2020 that Mr. Lowell had received a "notice letter" from the FARA Unit, which meant that he was aware he was under investigation for potential FARA violations—and only then, on July 1, 2020, did Mr. Keller reach out to begin plea negotiations with Mr. Lowell. Despite the government's claim that the FARA probe was "handled by an

---

[6] ECF No. 55 at 6.

7

entirely separate office,"[7] Mr. Lowell very much appears to have first learned about the investigation in two calls in August 2019 with two FBI agents, a criminal prosecutor from the Eastern District of New York (EDNY), *and Mr. Keller and his PIN colleagues*.[8] And from Mr. Lowell's perspective, Mr. Keller would not have been a mere participant, as it was Mr. Keller who *initiated* the first call[9]—and the calls were done under the auspices of the PIN-led investigation of Ms. Davis.[10]

Shortly after the time when the government claims PIN learned about Mr. Lowell receiving the FARA letter—and a *mere two days before* contacting him to start plea negotiations—PIN launched another investigation into Mr. Lowell, specifically the one that resulted in the *ex parte* request to vitiate certain of Mr. Lowell's attorney-client privileged emails related to an alleged "bribery-for-pardon" scheme.  Even if Mr. Keller and the prosecution team were, in fact, "screened from this evidence until after the defendant's guilty plea,"[11] Mr. Keller knew that Ms. Davis' then-counsel was at least the subject of a developing probe, he specifically requested to be kept informed of the progress of the investigation.[12]

---

[7] *Id.* at 28.
[8] *See* ECF No. 55-2, Exhibits 3 and 4.  For the first of the two calls, on August 26, 2019, Mr. Keller was joined by Nicole Lockhart and James Mann. (*See* Ex. 3)  For the follow-up call on August 28, 2019, only Ms. Lockhart joined Mr. Keller in representing PIN. (*See* Ex. 4)
[9] *Id.*, Ex. 7 at 3.
[10] *See* ECF No. 55-2, Exhibits 3 and 4.  At the bottom of the FD-302 forms for both the August 26 and August 28, 2019 calls, the captioned investigation is the file number for Ms. Davis' matter.
[11] ECF No. 55 at 2.
[12] *See* ECF No. 55-2 at 2-3.

As will be detailed below, it was no mere coincidence that the "bribery-for-pardon" investigation reached the point of an *ex parte* request to vitiate attorney-client privilege at the very point when Mr. Keller and PIN were most aggressively pressuring Ms. Davis, first to sign the plea deal and then to give the (false) admission of intent at the arraignment that they so desperately needed in order to force the "big fish," Mr. Broidy, to plead guilty.

Mr. Keller's conduct—and potentially that of one or more of his PIN colleagues—is the only issue before this Court with respect to Ms. Davis' Motion to Disqualify one or more of the prosecutors on this case.  The government's attempt to mischaracterize Ms. Davis' motion as one premised on Mr. Lowell providing ineffective assistance of counsel should be seen for what it is—the second disingenuous request to vitiate attorney-client privilege, and the latest in a series of desperate acts by the prosecution team to distract from a brazen pattern of prosecutorial misconduct.

The government's motion for a judicial finding of waiver of attorney-client privilege should therefore be denied.

II.     <u>PROSECUTION TEAM EXPLOITED TWO DIFFERENT CONFLICTS AND EFFECTIVELY CONCEALED THEM FROM MS. DAVIS AND THIS COURT</u>

A.  DOJ Investigation into Mr. Lowell's Own Potential FARA Violations

PIN was well aware of Mr. Lowell's first conflict of interest no later than August 2019,[13] the one which resulted in a criminal FARA probe of Ms. Davis' then-counsel "in relation to three different individuals."[14]  Just with respect to the FARA investigation, there were several moments in time when Mr. Keller *both*: 1) made sure that Mr. Lowell knew that DOJ was looking into him, and 2) actively facilitated the concealment of that highly relevant information from Ms. Davis, as well as from independent, conflict-free counsel.

The first such moment occurred during the August 26, 2019 call that Mr. Lowell had not just with the FBI and EDNY criminal prosecutor Ian Richardson, but also Mr. Keller and his PIN colleagues (and fellow members of the prosecution team) Nicole Lockhart and James Mann.[15]  The call was so hostile and adversarial to the party whose perception matters most that Mr. Lowell said it felt like an "ambush."[16]

The government's own exhibits attached to their opposition to the present Motion make clear that the government itself believed that Mr. Lowell had a conflict which needed to be "addressed preemptively" with Ms. Davis.[17]

Mr. Keller (and possibly at least one other PIN colleague) deliberately and willfully avoided taking the steps that he knew would result in Ms. Davis actually learning that Mr. Lowell faced criminal FARA liability—and that Mr. Keller had

---

[13] *See* ECF No. 55-2, Ex. 3.
[14] ECF No. 55 at 6.
[15] *See* ECF No. 55-2, Ex. 3.
[16] *See* ECF No. 55-2, Ex. 4.
[17] *See* ECF No. 55-2, Ex. 3.

insinuated himself into that investigation by joining (at least) the two calls Mr. Lowell had in August 2019 with the FBI and the EDNY criminal prosecutor.

And from the perspective of the person whose mindset is most relevant, Mr. Lowell, it would have been Mr. Keller who initiated the very call during which Mr. Lowell *first learned* that the government was looking into his work on behalf of at least two Chinese nationals.  Further, both the initial call on August 26, 2021 and the follow-up call two days later, per the FD-302 forms attached as exhibits to the government's opposition to the Motion to Disqualify, were officially part of the PIN-led investigation into Ms. Davis.

As the 9th Circuit held in *Mannhalt*, prosecutors have an obligation to tell others *besides* the conflicted attorney that said counsel has a given conflict. *See Manhalt v. Reed*, 847 F.2d 576 (9th Cir.1988). Mr. Keller himself, regarding a defense lawyer he deemed to have a conflict by virtue of having discussed *potential* representation with a key government witness, pushed for the Court to appoint independent Counsel and then confer directly with the Defendant in his successful June 2016 motion in *U.S. v. Suhl*.

Nothing of the sort happened in August 2019. Nor did it happen in June 2020, when Mr. Keller apparently first learned that the FARA probe into Mr. Lowell had progressed to the point that the FARA Unit had sent a formal notice letter to Mr. Lowell—with the head of the FARA Unit cc'd on the email.

It is both telling and troubling that Mr. Keller didn't contact Mr. Lowell to start plea negotiations until less than two weeks after he claims to have learned that Mr.

Lowell would have become aware that he was formally being investigated for potentially violating FARA.

Once again, Mr. Keller had an opportunity to share the relevant details about Mr. Lowell's criminal exposure with a Court or independent, conflict-free counsel, and then request that they witness PIN's explanation of facts to Ms. Davis or present the explanation directly, followed by Ms. Davis confirming her *informed* consent.

Even if Mr. Keller somehow genuinely believed that informing only Mr. Lowell and then deputizing the *conflicted party* to share derogatory and embarrassing information *about himself* with his client, by no later than June 2020, Mr. Keller knew that Mr. Lowell realized that the FARA probe had progressed significantly.

Thus, given that the nature and scope of the FARA matter had changed once Mr. Lowell knew that he was being investigated (by way of *at least* the April 2020 FARA letter), Mr. Keller should have insisted on briefing Ms. Davis, independent, conflict-free counsel, and/or a Court about the exact nature and scope of the potential conflict, and then insisted that negotiations could not commence until after Ms. Davis had discussed the relevant details regarding the conflict with either or both independent, conflict-free counsel and/or a Court and those parties had signed a conflict-of-interest waiver.

Instead, Mr. Keller aggressively pushed Mr. Lowell to have Ms. Davis plead guilty and implicate Mr. Broidy.

B.  FARA Probe of Mr. Lowell Was Criminal in Nature, Not Civil

In 14 separate instances, the government's opposition filing takes great pains to describe the FARA investigation into Mr. Lowell as "civil."  The facts say otherwise.

The government's opposition to the Motion to Disqualify stated unequivocally that the FARA investigation into Mr. Lowell "was a civil inquiry handled by"[18] the "civil FARA Unit [which] *does not conduct criminal investigations*."[19] (emphasis added) There is nothing in the public record indicating, however, that the two prosecutors currently publicly known to have been most involved in the FARA probe handled *any* civil cases during the relevant time frame, let alone that they worked in 2019 and 2020 in a "civil FARA Unit."  In fact, the two prosecutors who appear to have been most involved in the FARA probe,[20] Ian Richardson and Scott Claffee, are both *criminal* prosecutors based in EDNY.

In the same year during which Mr. Lowell first received formal notice from Mr. Claffee and two others of the government's investigation and Mr. Lowell negotiated Ms. Davis' (coerced) plea agreement, Mr. Claffee was involved in an extensive number of "civil" cases for conduct such as "Violating U.S. Sanctions Against Iran," "Illegally Retaining Classified National Defense Information," "Espionage," "Acting as an Illegal

---

[18] ECF No. 55 at 28

[19] *Id.* at 29.

[20] This is based on the government's own exhibits and what DOJ has thus far produced, and it is possible that the investigation involved other prosecutors.

Agent of the People's Republic of China," and "Conspiring to Act as Illegal Agents of the People's Republic of China."[21]

For his part, Ian Richardson was also very active prosecuting "civil" cases in EDNY from at least 2019, when he joined the two calls where Mr. Lowell first learned of the government looking into his conduct vis-à-vis FARA,[22] through 2021, when Mr. Keller emailed Mr. Richardson regarding the status of the investigation into Mr. Lowell.  During that time frame, Richardson worked on "civil" cases regarding conduct such as "Acting as an Agent of the Chinese Government," "Molotov Cocktail Attacks on the NYPD," "Coordinat[ing] with the PRC Government to Target Dissidents," "Intrusions into Competitor's Computer Systems," "Acting as an Unregistered Agent of The Iranian Government," and "Threatening to Murder Members of Congress."[23]

Notably, both Mr. Claffee and Mr. Richardson have worked on numerous prosecutions emanating from what DOJ had called the "China Initiative."[24]  The relevance to the FARA probe into Mr. Lowell focused in large part on his relationship with someone who was reportedly an intelligence officer with China's Ministry of State Security, which is China's primary foreign intelligence agency.

Thus, from Mr. Lowell's standpoint, the FARA probe involved his relationship with an alleged Chinese intelligence officer and was being carried out by two criminal

---

[21] *See* Ex. E, a compilation of DOJ press releases related to cases involving Scott A. Claffee.
[22] *See* ECF No. 55-2, Exhibits 3 and 4.
[23] *See* Ex. F, a compilation of DOJ press releases related to cases involving Ian C. Richardson.
[24] *See* https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related

prosecutors involved with DOJ's China Initiative.[25]  It is little wonder, then, that he hired Steptoe & Johnson LLP partner Reid Weingarten, widely considered to be one of the top criminal defense attorneys in the U.S., to represent him in the investigation.

Of course, the other prosecutors that Mr. Lowell would have reasonably viewed as being involved from the beginning would be Mr. Keller and his PIN colleagues.  Mr. Keller *could* have—and should have—avoided the appearance of his connection to the inquiry by not arranging for Mr. Lowell to speak during the same August 26, 2019 call with Mr. Richardson and *three* PIN prosecutors.

Regardless of his motivations, Mr. Keller irrevocably created for Mr. Lowell the clear, unmistakable impression that he was involved with the FARA probe from the first moment that Mr. Lowell learned of it.

Before filing this responsive brief, undersigned counsel gave PIN the opportunity to provide communication or documents substantiating the prosecution team's insistence in its opposition filing that the FARA investigation into Mr. Lowell was, as PIN claimed 14 different times, "civil" in nature.  PIN's response was both revealing and troubling: "[T]here is no documentation specifying that the FARA letter was sent [to Mr. Lowell] pursuant to a civil inquiry." [Sean email]

In short, PIN's position is that, despite there not being *any* documentation that the FARA probe was "pursuant to a civil inquiry," the investigation—which included two "China Initiative" criminal prosecutors, regarding potential FARA violations relating to,

---

[25] *See* Ex. G.

among other things, Mr. Lowell's relationship with a reported Chinese intelligence officer—was "civil in nature."

PIN does not have credibility in this matter to merely tell the Court "trust us" as proof of anything.  Despite Mr. Keller submitting a declaration with the government's opposition filing that "the facts set forth…are true and correct to the best of my knowledge and belief,"[26] for example, the government's brief to which Mr. Keller's declaration was attached stated matter-of-factly, "Ultimately, in 2021, the FARA Unit determined that it had insufficient information to determine whether Lowell had an obligation to register under FARA."  The footnote at the end of that statement—thus the substantiation to "prove" that claim—cited an email thread that Mr. Keller and PIN had included in the attached exhibits.

The unredacted portion of the cited email thread, however, said *nothing* about the status of the FARA probe into Mr. Lowell.  But because the government's exhibit containing the January 19, 2021 email thread between Mr. Keller, Mr. Richardson, and Mr. Claffee was entirely redacted except for the top message, undersigned counsel requested that DOJ produce the entire thread in unredacted form.[27]  Although an interim agreement prevents directly quoting from the email, what is clear is that the FARA Unit had *not* made any such determination regarding Mr. Lowell.  Without quoting from the emails in the thread, there is no question that the FARA investigation into Mr. Lowell

---

[26] ECF No. 55-1
[27] Email communication between Ian Richardson and John Keller dated January 19, 2021 – Filed Under Seal Ex. H

was very much still active and ongoing through at least early 2021—and that Mr. Lowell would have known as much himself.

All evidence currently available to undersigned counsel indicates that Mr. Lowell faced criminal exposure for potential FARA violations, and even PIN has confirmed that there is *not one piece of documentation*—no memos to file, no emails, *nothing*—to substantiate their claim that the FARA probe was "civil."  And to the extent PIN claimed to offer "proof" to support their attempts to downplay the FARA probe in the opposition filing, the redacted portion of the email thread that PIN cited to actually *directly* contradicted the government's own representation.

C.  PIN Launched a Second, Separate Criminal Investigation into Mr. Lowell Two Days Before Starting Ms. Davis' Plea Negotiations with Mr. Lowell

Shortly after the time that PIN claims that Mr. Keller and the prosecution learned that Mr. Lowell knew that he formally was the focus of a FARA probe, the "filter team" within PIN began the investigation that resulted in the *ex parte* filing regarding the alleged "bribery-for-pardon" matter to Judge Beryl Howell, Chief Judge of the U.S. District Court for the District of Columbia.  A mere *two days* after PIN's own investigation began, Mr. Keller contacted Mr. Lowell—for the first such contact in 11 months—to begin plea negotiations with Ms. Davis.[28]

Showing how directly involved he was with the "bribery-for-pardon" investigation, Mr. Keller responded to the filter team's notification that their inquiry was

---

[28] *See* ECF No. 55-2, Ex. 7 at 1-2.

underway *within two minutes*.[29]  Mr. Keller's initial response also made clear that he expected to be kept apprised of developments in the probe, writing, "Let us know if there are additional communications with Lowell, Winston & Strawn, or other counsel so that we can have IT pull those communications off of the investigative side."[30]  The evidence demonstrates that Mr. Keller not only received regular updates, but that he was *overseeing* the investigation.

On Wednesday, July 8, 2020, Mr. Keller and the prosecution team had their first phone call with Mr. Lowell to discuss a potential plea agreement for Ms. Davis.  The next day, Erica O'Brien Waymack of the filter team notified Mr. Keller and his PIN colleague Ms. Lockhart, "I'll start working on the privilege review ASAP."[31]  Then on the afternoon of Friday, July 10, 2020, Ms. Waymack updated Mr. Keller and Ms. Lockhart, writing, "Victor [Salgado] and I have decided to withhold all of these communications on the basis of potential attorney-client privilege."[32]  *One minute later*, Mr. Keller replied, "Thanks, Erica and Victor."[33]

That weekend, the filter team somehow ended up burning the midnight oil—*literally*.  In the early-morning hours of Sunday, July 12—almost an hour and half past midnight on Saturday night—Victor Salgado of the filter team emailed Mr. Keller to inform him, "Erica and I are thinking about seeking court relief for some of these

---

[29] *See* ECF No. 55-2, Ex. 9 at 2-3.
[30] *Id.*
[31] *Id.* at 2.
[32] *Id.* at 1.
[33] *Id.*

communications."[34]

Demonstrating that Mr. Keller was the person overseeing the "bribery-for-pardon" investigation, Mr. Salgado's email then asked Mr. Keller to determine how the probe should continue: "[W]ould you be inclined to assign a supervisor to oversee our efforts or is this something we can decide on our own?"[35]  On Monday morning, July 13, 2020, Mr. Keller exercised his clear authority over the investigation, telling Mr. Salgado and Ms. Waymack, "Todd will serve as the filter deputy if you have pleadings for review or want to discuss whether specific communications are worth litigating."[36]

The evidence clearly shows that Mr. Keller not only directed the overall course of the "bribery-for-pardon" investigation, but wanted to be updated throughout.  Although it is unknown as of this filing what other written communications exist between Mr. Keller and the filter team after July 13 and before August 25, 2020, there is a strong basis to at least suspect that Mr. Keller also dictated the timing of the submission of the *ex parte* motion to vitiate certain of Mr. Lowell's attorney-client privileged communications.

The *ex parte* motion was submitted to Judge Howell on Monday, August 10, 2020, a few minutes before 5PM EST.  Less than 24 hours earlier, Mr. Lowell emailed Mr. Keller, warning him, "I am still afraid that your view of the forfeiture will be the deal breaker (which we both agree is a shame)."[37]

On Monday, August 10, 2020, Mr. Keller was aggressively attempting to lock Ms.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] August 9, 2020 e-mail from Abbe Lowell to John Keller, et al., Ex. A

Davis into a plea agreement.  In response to Mr. Lowell sending an email late that morning pushing back against the prosecution's position once again, Mr. Keller suggested, "These conversations would perhaps be more productive on a call."[38]  Shortly before 1PM EST, Mr. Lowell suggested that he, Ms. Davis' local Hawaii counsel, Bill McCorriston, and PIN have a call that afternoon at 3PM EST.  Mr. Keller responded, "Works for me."[39]  Mr. Lowell, however, does not appear to have confirmed or replied at all.

Almost two hours after the missed call—and more than four weeks after the filter team had finished its review of Mr. Lowell's emails and Mr. Keller had placed Mr. Gee in charge of the investigation—Mr. Salgado submitted the *ex parte* motion to vitiate certain of Mr. Lowell's attorney-client privileged communications.

D. Mr. Keller Directed Filter Team to Divulge Contents of Secret Government Motion the Same Day the Motion Was Filed

Even though Ms. Davis had signed the as-yet-unfinished plea agreement on August 13 and it was submitted to this Court on Monday, August 17, 2020, the evidence clearly shows that Mr. Keller was worried that Ms. Davis would not successfully recite during her then-forthcoming arraignment the false admission of intent that he so desperately needed in order to force the "big fish," Mr. Broidy, to plead guilty.

In the early morning hours of Friday, August 28, 2020, for example, Mr. Keller at

---

[38] August 10, 2020 e-mail from John Keller to Abbe Lowell, et al., Ex. B
[39] August 10, 2020 e-mail from John Keller to Abbe Lowell, et al., re: Status Call, Ex. C

2:17 AM EST emailed Mr. Lowell, cc'ing their respective Hawaii-based counterparts, "[I]t may be worth working with Ms. Lum Davis to prepare some specific statements explaining what she did that hits all of the elements, especially willfulness."  Mr. Keller explained that his concern stemmed from a remote plea hearing he watched earlier that week, noting "[O]ne critical piece to flag is that the Judge [Kobayashi] went into some detail with the defendant asking him to state what he did in his own words and following up with factual questions."[40]

As Mr. Keller well knew, there was no evidence at all that Ms. Davis even suspected that she needed to register under FARA, let alone that she had "willfully" chosen not to do so.  So he was pressuring Mr. Lowell to provide Ms. Davis a script "admitting" to knowingly choosing not to FARA register, which he stated "may help us avoid things going off of the rails during the actual hearing."[41] Later that same day, he sent another e-mail to the same group, reiterating the same message: "I think the primary point is that it would likely be helpful to have some precise language available to Ms. Lum Davis for her to rely on in admitting what she did and specifically, her awareness of FARA and deliberate avoidance of raising the issue after it became clear that their conduct required registration."[42]

This is the backdrop against which to best understand Mr. Keller's bizarre decision to have the filter team discuss with Mr. Lowell the contents of a secret, *ex parte*

---

[40] August 28, 2020 e-mail communications between John Keller to Abbe Lowell, et al., re: Lum Davis Plea Colloquy, Ex. D
[41] Id.
[42] Id.

motion—in which Mr. Lowell played the central role—immediately after the government completed its hearing regarding the motion with Judge Howell.

If, in fact, Mr. Lowell was unaware until speaking on August 25, 2020 with Mr. Keller and then the filter team, then there would have been no conflict of the probe because Mr. Lowell's conduct could not be altered by circumstances about which he was completely unaware. In other words—*if* the government's representation is true—the conflict related to the "bribery-for-pardon" investigation only arose on August 25, 2020, when Mr. Keller discussed the probe with him and then connected him with the filter team for a detailed discussion of the (then-secret) evidence presented to Judge Howell.

Thus, even according to the government's own telling of events, it is difficult to conceive of any reasonable purpose for informing Mr. Lowell of an *ex parte* motion to vitiate his attorney-client privileged communications other than to make sure he knew what fate might await him should Ms. Davis not deliver the false admission Mr. Keller so desperately sought.

Even if that was somehow not Mr. Keller's intended purpose, the tactic seems to have had that effect. Mr. Lowell and Mr. Keller continued exchanging e-mails between just the two of them up to the morning of the arraignment on Monday, August 31, 2020, specifically regarding what Mr. Keller wanted Ms. Davis to say regarding willfulness.

Once the arraignment had ended, Mr. Keller and PIN promptly dropped the "bribery-for-pardon" investigation—almost immediately after Judge Howell granted in part their *ex parte* motion. In fact, evidence produced by DOJ indicates that PIN never

discussed the matter with Mr. Broidy—who would have been the only potential witness

regarding Mr. Lowell's alleged LDA violations and involvement in a "bribery"

scheme—until *after* Judge Howell unsealed her opinion on December 1, 2020.  And

based on PIN's responses to questions from undersigned counsel, it appears that PIN

never investigated the matter further, aside from an "attorney proffer" with Mr. Broidy's

counsel in April 2021—four months after Judge Howell unsealed her opinion, and nearly

eight months after she granted in part PIN's *ex parte* request.

There is perhaps no better context for this Court when weighing the government's

instant request than its past conduct, immediately discarding an investigation once the

vitiation of attorney-client privilege was no longer necessary to get what Mr. Keller

wanted.

III.   <u>MR. KELLER AND PIN POTENTIALLY VIOLATED ATTORNEY-CLEINT</u>
       <u>PRIVILEGE TWICE IN WEEK BEFORE AND AFTER MS. DAVIS' PLEA</u>
       <u>AGREEMENT WAS FINALIZED</u>

A.  Warrantless Search and Seizure of Ms. Davis Shortly Before Signing Plea Deal

On Tuesday, August 11, 2020, at approximately 6PM EST, two events occurred

almost simultaneously: 1) Mr. Keller had a call with Mr. Lowell and Mr. McCorriston to

discuss Ms. Davis' not-yet-finalized plea agreement; and 2) Ms. Davis was stopped in the

jetway at O'Hare Airport, as she was attempting to board her outbound flight to Brussels,

by Customs and Border Patrol ("CBP"), who soon engaged in a warrantless search and

seizure.[43]

After searching Ms. Davis, CBP officers seized the cash in her possession, and then proceeded to spend the next several *hours* reviewing her phone in her presence.  Ms. Davis repeatedly alerted them to the fact that the email and text message apps they were scouring contained substantial numbers of attorney-client privileged communications— which would be expected, given that her counsel had been actively engaged in plea discussions for several weeks at that point.  The CBP officers ignored Ms. Davis' repeated requests that they respect her attorney-client privileges, taking numerous screenshots of various emails and text messages.

The next day, on Wednesday, August 12, 2020, Mr. Lowell angrily confronted Mr. Keller about CBP's actions.  Mr. Keller acknowledged in his reply that he was aware of the stop and the seizure of the cash, but claimed ignorance regarding CBP reviewing and capturing copies of Ms. Davis' attorney-client privileged communications.

To this day, neither Ms. Davis nor her counsel have ever received clarity regarding exactly what CBP captured—or who ordered CBP to conduct the warrantless search and seizure.  CBP policy requires "reasonable suspicion" to perform an "advanced search," which is any search of a device "to review, copy, and/or analyze its contents." But given that Ms. Davis was leaving the U.S.—meaning she would not have encountered Customs officials—CBP could not have had the requisite "reasonable suspicion" to perform an "advanced search" without being provided that "reasonable

---

[43] CBP policy allows for "advanced searches" to be performed without warrants, so long as there is "reasonable suspicion."

suspicion" by a third party.

In light of Mr. Keller's alarming pattern of conduct in this matter, undersigned counsel has asked PIN to produce all documents and communications regarding the warrantless search and seizure of Ms. Davis on August 11, 2020.  In the meantime, it is reasonable to state that there is at least a significant likelihood that Mr. Keller or one of his PIN colleagues ordered CBP to conduct the warrantless search and seizure—which would make them responsible for CBP's flagrant abrogation of attorney-client privilege, whether they specifically requested CBP to do so or not.

B.  Mr. Keller Actively Facilitated and Encouraged Mr. Lowell in Divulging Common Interest Privileged Communications

On Friday, August 14, 2020, counsel for Mr. Broidy gave a presentation to multiple Assistant Attorney Generals ("AAGs"), appealing to those high-ranking officials regarding PIN's prosecution of their client.  In the days leading up to that presentation—and in the days that followed—Mr. Lowell and Mr. Keller discussed Mr. Broidy's appeal.

Of course, Mr. Lowell at that time was still a party to a common interest agreement with Mr. Broidy's counsel, meaning that he was privy to Mr. Broidy's attorney-client privileged communications.  Mr. Keller was surely aware of this agreement, which is standard practice for defense attorneys representing similarly situated parties.

Despite that, Mr. Keller actively encouraged Mr. Lowell to share *privileged*

communications with him.  The day before the presentation by Mr. Broidy's counsel, on Thursday, August 13, 2020, Mr. Lowell emailed Mr. Keller, offering to glean information for Mr. Keller, "We can figure out what you or anyone says (or nothing) to hear them out."  This stunningly casual offer to breach the common interest privilege came one day after Mr. Keller explicitly asked Mr. Lowell to delay telling Mr. Broidy's counsel about the impending plea deal, writing on Wednesday, August 12, 2020, "I would ask that you not related anything to other counsel until the day we file."[44]

On Saturday, August 15, 2020—one day after Mr. Broidy's counsel presented the appeal—Mr. Lowell emailed Mr. Keller, stating, "Want to… find out what happened on Friday."[45]  *One minute later*, Mr. Keller replied, "Sounds good," then asked, "What time works for you tomorrow for a call[?]"[46]  Further e-mail exchanges indicate that Mr. Keller had a call with Mr. Lowell the next day, on Sunday, August 16, 2020, where they presumably each shared information that the other had regarding Mr. Broidy's legal strategy.

This stunning disregard for the privileged nature of common interest communications evidently continued for *days after* the filing of the Information with this Court on Monday, August 17, 2020.  In fact, on Thursday, August 20, 2020—which was still four days before Ms. Davis' Information was public knowledge—Mr. Lowell

---

[44] August 13, 2020 e-mail from Abbe Lowell to John Keller, Ex. I
[45] August 15, 2020 e-mail from Abbe Lowell to John Keller, Ex. J
[46] August 15, 2020 e-mail from John Keller to Abbe Lowell, Ex. K

emailed Mr. Keller, straightforwardly noting, "EB [Elliott Broidy's] counsel *keep* making their factual and especially legal arguments to me."[47] (emphasis added). Mr. Keller responded less than an hour later, explaining the status of Mr. Broidy's appeal: "The AAGs are comparing schedules to provide a formal response."[48]

The casual and comfortable nature of their collusion exhibited in these exchanges not only illustrate the depths of their conspiracy to coerce Ms. Davis, but reveal that Mr. Keller views attorney-client privilege as meaningless if stripping away the privilege serves his purposes to help him get what he wants.

IV.   LEGAL STANDARD

A. The Attorney-Client Privilege

The attorney-client privilege is "perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir.1997). The Supreme Court has noted that "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The court has held that under federal common law, the client is the holder of the attorney-client privilege, and only the client can waive the privilege. *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1411 (S.D. Cal. 1994), *citing In re von Bulow*, 828

---

[47] August 20, 2020 e-mail from Abbe Lowell to John Keller, Ex. L
[48] Id.

F.2d 94, 100 (2d Cir.1987). To terminate the privilege, the attorney must have the client's consent. See *In re von Bulow*, 828 F.2d 94,100 (9th Cir. 1987). The Ninth Circuit has explained that "'[b]ecause it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.'" *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), as amended on denial of reh'g (Mar. 13, 2002); see also *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) ("[T]he [attorney-client] privilege stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth, [and] thus, . . . [i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.").

In addition, the joint defense privilege also known as the "common interest" privilege is an exception to the general rule that disclosure of privileged communications to a third party destroys the privilege. *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). The Ninth Circuit has explained that the common interest privilege is not "a separate privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). Rather, it "is 'an extension of the attorney-client privilege.'" *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012). The common interest privilege is "designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." Pac. Pictures, 679 F.3d at 1129; Gonzalez, 669 F.3d at 978 ("'[T]he rationale for the joint defense rule [is that] persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.'").

The common interest privilege applies where: "(1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); accord Nidec, 249 F.R.D. at 578. Further, "the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Pac. Pictures*, 679 F.3d at 1129. "[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within [the privilege]." *Id*.

B.  Express and Implied Waiver of The Attorney-Client Privilege

Once the attorney-client privilege has been established, the courts have identified very limited exceptions, in which such a privilege is waived either expressly or impliedly. "Under the attorney-client privilege, it is a general rule that attorney-client communications made 'in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality.'" *Nidec Corp.*, 249 F.R.D. at 578; see *In re Pac. Pictures Corp.*, 679 F.3d at 1126-27 ("[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege."); *Cohen v. Trump*, No. 13-CV-2519-GPC WVG, 2015 WL 3617124, at *13 (S.D. Cal. June 9, 2015) ("As a general rule, the attorney-client privilege is waived by voluntary disclosure of private communications to third parties."). "The reason behind this rule is that, [i]f clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even

without the protection of the privilege." *Pac. Pictures*, 679 F.3d at 1127.

In addition to an express waiver, a waiver may be implied when "a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation." *Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003). More specifically, the Courts have reserved such a drastic measure for the very narrow circumstances where a "habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer".   *Id.* citing *Wharton v. Calderon*, 127 F.3d 1201, 1203 (9th Cir.1997).

V.     THE ATTORNEY-CLIENT PRIVILEGE MAY NOT BE VITIATED ON THE BASIS OF AN IMPLIED WAIVER WHERE A DEFENDANT SEEKS TO DISQUALIFY A PROSECUTOR BASED UPON HIS OWN MISCONDUCT

On its face, this motion submitted by the Government woefully mischaracterizes the basis for Ms. Davis' Motion to Disqualify, as Ms. Davis is not arguing for Mr. Keller's disqualification based upon Mr. Lowell's ineffective assistance of counsel, but instead, the request is based upon Mr. Keller and PIN's own prosecutorial misconduct as evidenced in Defendant's Motion to Disqualify, her Reply to the Government's Opposition, and Defendant's response to this motion before the court. But what is even more troubling isn't the fact that the Government seems to have mischaracterized the basis for Ms. Davis' motion, it is the Government's lack of acknowledgment of the misconduct Mr. Keller and possibly other PIN attorney's engaged in. As shall be

explained below, an implied waiver of the attorney-client privilege is almost always limited to the narrow circumstance in which a criminal defendant seeks to set aside a criminal conviction through a habeas petition, due to ineffective assistance of counsel.

The Government offers the often-cited case *Bittaker v. Woodford* in support of its argument that privilege should be vitiated in this instant matter. In *Bittaker*, the appellant filed a federal habeas petition raising a variety of ineffective assistance of counsel claims. *Bittaker*, 331 F.3d at 716. In response the government filed a motion to vitiate privilege, and argued that this implied waiver should extend beyond the habeas petition and that it was waived for all purposes including a possible retrial. Id. The court in *Bittaker* recognized that "it has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer." Id. The *Bittaker* court ultimately held that when a privilege is impliedly waived, "that the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it." Id. at 720, 728.

As stated above, *Bittaker* is inapposite to the matter currently before the Court. First and foremost, a violation of one's right to conflict-free representation and ineffective assistance of counsel are two legal concepts and should be treated separately. *United States v. Baker*, 256 F.3d 855, 859 (9th Cir. 2001). However, notwithstanding the foregoing, *Bittaker* was related to a "garden variety" habeas petition, where the petitioner had been convicted and sentenced for murder, and was now seeking his conviction be

31

overturned due to, amongst other claims, ineffective assistance of counsel. The prosecution team had not been directly or indirectly involved in his counsel's alleged ineffectiveness, and they were unaware of any of the facts in which petitioner was alleging his counsel was ineffective, thus requiring out of fairness, a limited scope of privileged communications that could be reviewed by the government in order to properly respond to the petition.

Here, the matter pending before this Court is a motion to disqualify certain PIN prosecutors based upon *their* misconduct in exploiting Ms. Davis' compromised legal counsel. Unlike in *Bittaker* Ms. Davis is not seeking relief of a conviction through a habeas petition. Instead, Ms. Davis is requesting that this court disqualify Mr. Keller and possibly other PIN attorneys on the grounds that they engaged in prosecutorial misconduct through the procurement of Ms. Davis' guilty plea and false admission, by use coercive tactics upon her attorney, and further, committed fraud upon the court by colluding with Mr. Lowell in preventing this Court from uncovering the truth, by way of a premediated plan.

Generally, as was stated in *Bittaker*, "courts and commentators have come to identify this simple rule as the fairness principle… The principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword." Id. at 719. However, the case before this court is unusually unique, as the principle set forth above, is in effect inversed. In this matter, it is in fact Ms. Davis, and not the government, that was not privy to the underlying facts that Mr. Keller and Mr. Lowell had kept secret

from Ms. Davis and her independent counsel William McCorriston and David Minkin. When Ms. Davis submitted her motion, undersigned counsel was forced to formulate a cohesive story based upon an incomplete puzzle utilizing her less than complete library of communications with Mr. Lowell, partially redacted court filings related to Mr. Lowell alleged criminal activities, media reports and reasonable inferences. It would not be until the Government filed their opposition brief, and subsequently produced communications, which included both internal DOJ documents and communications between PIN prosecutors and Mr. Lowell, did the full scope of just how egregious the actions of the PIN Prosecutors were. As it would not only be confirmed that Mr. Lowell was in fact under criminal investigation for bribery and LDA violations, but what was more shocking, is that he had been under criminal investigation by the NSD since as early as the summer of 2019 for possible FARA violations.

While the government argues that Ms. Davis is attempting to use privilege as a sword and a shield, Defendant would argue that in fact if the court were to permit the government to review Ms. Davis' communications, it would effectively be permitting the fox to feast on the chickens in the hen house. In essence, it was not the government that required that fairness be afforded to them in order to respond to Ms. Davis' motion, but instead it was Ms. Davis that required fairness of disclosure to prove the Mr. Keller's misconduct.

VI. PIN PROSECUTORS' MISCONDUCT CREATED THE CONFLICT

A. An Actual Conflict Existed Between Mr. Lowell and Ms. Davis

Although Ms. Davis will be presenting a much more detailed analysis of Mr. Keller and his PIN colleagues exploiting Mr. Lowell's conflicts of interest, in her Reply to her motion to disqualify.

As previously stated in Defendant's Motion to Disqualify, the Supreme Court has held that an aspect of the constitutional right to counsel is a right to representation that is free from conflicts of interest that adversely affect counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980) "The 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by . . . conflicting interests." *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978) (quoting *Glasser v. United States*, 315 U.S. 60, 70 (1942)). Impairments of the right to conflict-free counsel threaten not only the defendant's right to effective representation, but also the trial court's interest in the fairness of its proceedings and the integrity of its judgments. "The waiver of the right to counsel must be knowing and intelligent. Whether there is a proper waiver should be determined by the trial court and any such waiver should appear on the record." *Mannhalt*, 847 F.2d at 581 citing *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938).

To establish a sixth amendment violation based on a conflict of interest the defendant must show: (a) that counsel actively represented conflicting interests; and (2) that an actual conflict of interest adversely affected his lawyer's performance. *Mannhalt*, 847 F.2d at 579, citing *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980). "Unlike a challenge to counsel's competency, prejudice is presumed if the defendant makes such a

showing." Id. citing *Strickland v. Washington*, 466 U.S. 668, 692, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). "Although *Cuyler* involved a conflict of interest between clients, the presumption of prejudice extends to a conflict between a client and his lawyer's personal interest." Id., see also *United States v. Hoffman*, 733 F.2d 596, 601-02 (9th Cir.).

Where the conflict arises from the representation of an attorney who is under criminal investigation concurrently with their criminal client, an actual conflict does not immediately arise in instances where the attorney and client were being prosecuted by two completely unrelated offices, for separate and distinct criminal acts. See *Baker*, 256 F.3d 855. However, the court *Baker* determined that where the same office is investigating or prosecuting both the attorney and the client for either related or unrelated criminal acts, an actual conflict will arise. Id. at 861-862, citing *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (actual conflict when counsel, unbeknownst to defendant, had been under investigation for bribery); *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994) (finding actual conflict for several reasons, including attorney's prosecution on unrelated charges by same office prosecuting defendant).

In *Baker*, the defendant sought to have his conviction overturned on the grounds that his defense attorney and the prosecution violated his Sixth Amendment right to conflict-free counsel on the grounds that his attorney who was representing him on an appeal the U.S. District Court, Central District of Los Angeles, was concurrently being prosecuted for tax evasion in the U.S. District Court, Southern District of New York. *Baker,* xxx. After reviewing the record the court did not find that an actual conflict

existed on the basis that although defendant's counsel was being prosecuted at the same time as the defendant's appeal was being litigated, there was no indication that the two U.S. attorneys' offices were in any way involved with the other matter, and that it appeared that the two offices were not even aware that the other office was prosecuting defendant's attorney at the same time his counsel was litigating his appeal. The Court further found that there was no evidence that defendant's counsel's advocacy was in any way impacted by the unrelated prosecution. The same cannot be said in Ms. Davis' matter.

Here, Ms. Davis' matter is more analogous to *McLain*, 823 F.2d 1457 cited by *Baker*. In *McLain*, the defendant discovered that during his criminal prosecution his counsel was being investigated by the same U.S. attorney's office, for unrelated bribery violations. Id. at 1463. The court found that counsel's failure to "inform Sher of the investigation and the possibility that it would affect Johnson's judgment while acting as Sher's counsel," constituted an actual conflict. Id. The Court noted that a hearing should have been held before the court, in order to assist defendant in determining whether the conflict was waivable, and affording him the right to make a fully informed decision in whether to waive such a conflict. Id. at 1464, fn 11.

Here, Mr. Lowell was being investigated for two separate criminal matters: (1) the NSD was investigating Mr. Lowell for criminal FARA violations; and (2) PIN was investigating Mr. Lowell for bribery and criminal LDA violations. Secondly, Mr. Keller, while not directly overseeing the NSD's investigation in the criminal FARA matter, he

ingratiated himself into that investigation by participating in two 302 sessions with NSD criminal prosecutors in August 2019, and further followed up with them in June 2020, following knowledge that Mr. Lowell had received a letter from the NSD's FARA unit regarding the alleged violations. Third, the NSD was directly involved in Ms. Davis' prosecution, as NSD prosecutors participated in the final draft of Ms. Davis' plea agreement, as the agreement could not be filed until their approval was obtained.[49] Both of criminal investigations into Mr. Lowell were concurrent with the prosecution of Ms. Davis for her own alleged criminal FARA violations. Fourth, despite the Government's representation that plea agreement was completed by July 15, 2020, as late as August 31, 2020, Mr. Keller was frantically trying to convince Mr. Lowell to ensure that Ms. Davis specifically stated a prepared colloquy due to the fact that he believed that Ms. Davis would not testify to the willfulness of her acts, thus confirming that as of the date of Ms. Davis' arraignment, there was no certainty that a plea agreement would be approved and accepted by the Court. On that basis, Mr. Lowell was conflicted with his representation of Ms. Davis for two separate criminal investigations that forced him to ensure that Ms. Davis make a (false) admission of intent.

VII.   <u>CONCLUSION</u>

For the foregoing reasons Defendant respectfully requests that Plaintiff's motion be denied.

---

[49] August 12, 2020 e-mail from John Keller to Abbe Lowell, et al., Ex. M

DATED:  Honolulu, Hawai'i, May 17, 2022.

                             */s/ James A. Bryant*_____
                             JAMES A. BRYANT
                             WILLIAM C. McCORRISTON
                             DAVID J. MINKIN
                             Attorneys for Defendant
                             NICKIE MALI LUM DAVIS