# DECLARATION OF ABBE DAVID LOWELL

I am an attorney admitted to the state bars of New York, the District of Columbia and Maryland, as well as numerous federal trial and appellate courts and the United States Supreme Court. I am providing this declaration following the Order of the U.S. District Court in the District of Hawaii dated May 25, 2022, USA v. Davis, Cr. No. 20-00068 LEK, Dkt. 65.

A. <u>Nickie Lum Davis Was Being Advised by Several Attorneys Before Deciding to Plead Guilty</u>

1. Contrary to Ms. Davis' recent filings that she was "being advised solely" by me or that her local Hawaii counsel was "retained for the matter one week prior" to her plea hearing, Ms. Davis introduced me to James Bryant in February 2018 and William McCorriston in July 2018 as part of her legal team, calling Mr. Bryant "(my la atty)" and explaining Mr. McCorriston was "familiar w the judge and us attorney here in Hawaii." Lowell Declaration ("L.Decl.") Ex. 1.

2. From 2018 through her plea hearing on August 31, 2020, Mr. McCorriston and/or Mr. Bryant and I communicated or included each other in calls or emails about the investigation. *E.g.,* L.Decl. Exs. 2 – 5.

3. Once negotiations began in July 2020, Mr. McCorriston and Ms. Davis herself were actively involved in the process that led to her decision to plead guilty. Emails Ms. Davis sent me include line edits she was making to plea documents, and both Ms. Davis and Mr. McCorriston were being sent details of calls with the DOJ. *E.g.,* L.Decl. Ex. 6.

4. I did not coerce Ms. Davis to plead. She decided to do so after the DOJ and U.S. Attorney said they planned to charge her with numerous felonies and large forfeitures in two separate jurisdictions (Washington, D.C. and Hawaii). I never told her that she could receive immunity, a misdemeanor or some retroactive FARA registration for her cooperation, and she provided the DOJ with the factual basis (her conversations with her friend and business partner Elliott Broidy) for the lesser aiding and abetting/conscious avoidance charge which I negotiated.

B. <u>No Conflict of Interest in Work for and Disclosures Made to Ms. Davis</u>

5. During and after my representation of Ms. Davis, I was never informed by any DOJ official, nor did I ever believe, that I was under any criminal investigation of any kind. This has been confirmed in the government's filings. I advocated zealously on her behalf, and I disclosed to her and/or her other counsel what I had been told by the DOJ.

    a. <u>Prior Client Representation and FARA Inquiry</u>

6. On August 26, 2019, during discussions with the DOJ about Ms. Davis' proffer meetings, Public Integrity Section Deputy Chief John Keller informed me that the DOJ might want to question Ms. Davis about people who I had advised in the past and wanted to make

sure there was no conflict of interest if they did so.  At no time in that or any call in 2019 did the DOJ raise any issue other than that prior client representation.  In particular, nothing was said concerning any FARA investigation of me or anyone else.

7. After the DOJ call, I advised Ms. Davis and Mr. McCorriston, as well as my former clients, of the new communication.  I asked and soon received from Ms. Davis and the other clients a confirmation, after they consulted with independent counsel, that there was no adversity nor conflicts among them.  L.Decl. Ex. 7 – 9.  Later, in August 2020, through Mr. McCorriston, Ms. Davis confirmed that earlier disclosure.  L.Decl. Ex. 10.

8. In April 2020, the FARA Unit of the National Security Division sent a letter requesting information about foreign citizens I had represented, the work done for them, and whether that work might trigger a registration by my law firms or me under FARA.  The request was based on the incorrect premises that my clients were "foreign principals" under the Act and that my work was something other than "legal proceedings."  L. Decl. Ex. 11.  The letter sought information only and did not indicate that there was any criminal or other investigation.  Through counsel, the FARA Unit was told that both their premises were wrong, and neither my firms nor I was asked to register.

9. On July 1, 2020, after a ten-month hiatus from the August 2019 DOJ proffer meetings with Ms. Davis, Mr. Keller called to re-engage regarding Ms. Davis.  He informed me that he had ceased contacting me and had been standing down for a time when he had heard there was a question about FARA registration, that he had not wanted to talk until they worked it out, that it has been addressed in the normal course, and was resolved as far as he was concerned.   He said that he could now re-engage with me, and the DOJ was ready to charge Ms. Davis and others and wanted to see if she wanted to find a different resolution.

10. Shortly after my call with Mr. Keller in July 2020, I contacted Ms. Davis and told her of the conversation with Mr. Keller and the FARA letter.  She indicated that she wanted me to continue to engage with the DOJ concerning the proposed charges.  I immediately did so and involved Mr. McCorriston as well.

      b.    <u>Bribery-for Pardon Investigation</u>

11. After the basic terms of a plea had been worked out in July, eight days after the criminal information in Ms. Davis' case was filed on August 17, and six days before her plea hearing on August 31, late in the day on August 25, 2020, Mr. Keller called to connect me with a DOJ "taint team" concerning some communications I had in an older matter that had come up in the investigation of Mr. Broidy.  Dkt. 55-2, Ex.12.  Mr. Keller never said then or ever that I was under investigation, a subject, a target, or a person of interest as Ms. Davis now claims.

12. On August 26, 2020 at 4:30 PM, I spoke with the taint team.  They explained that in the investigation of Mr. Broidy, some emails of mine and a legal memorandum I prepared had been obtained for work I and others had done in 2016-2017 for a client seeking a re-

sentencing or executive clemency. The taint team attorneys explained in general terms what might be the underlying issues – there was one email written by the client's friend in which he complained that his contributions to Republican causes had not gotten him anywhere and whether efforts to seek executive clemency were covered by the Lobbying Disclosure Act (LDA). The taint team did not tell me I was under investigation; to the contrary, the taint team said that they were not alleging that any crime had been committed by me or anyone else. Recent DOJ filings confirm that no investigation of me occurred. Dkt. 62 at p. 8

13. From August 25 through August 27, there were various exchanges among Mr. Keller, Mr. McCorriston and me about what documents had to be executed for the August 31 plea hearing. One document the government requested be prepared was a written waiver of potential conflicts that they had raised.

14. Initially, on August 25, Mr. Keller sent a draft that misstated the nature of the April FARA letter. Dkt. 55-2, Ex. 15. I advised him of this error, Dkt. 55-2, Ex. 16, and he responded at 9:51 PM that he had not been involved in the FARA issues and the document should be corrected to be accurate. Id. I told Mr. Keller that I would inform Ms. Davis and Mr. McCorriston of the issue, Dkt. 55-2, Ex. 17, and then did so, specifically referring to the FARA letter and the need for it to be accurately described. L. Decl. Ex. 12

15. Before I spoke with the taint team in the late afternoon on August 26, at 3:22 PM, Mr. Keller wrote: "After your call with the filter side [taint team] this afternoon, we should move quickly to try to finalize this language so that we can get a revised signature page to you Ken and Mike in the USAO and you, Mac, and Ms. Lum Davis for signature." L. Decl. Ex. 13.

16. I responded to Mr. Keller at 3:35 PM, copying Mr. McCorriston: "With all these issues being raised by you yesterday late in the day and especially with your first language for *the FARA letter* and now the *taint team* issue which I will not be able to speak with them until the end of the day and with the time difference and Mac being in court, I will not be able to talk with him and Ms. Davis until late eastern time. Then we can figure out the status of all this tomorrow. Depending on all of that, we might have to delay further depending on whether Mac and I can still continue." L. Decl. Ex. 14 (emphasis added).

17. At 10:00 PM on August 26, I had a video conference with Ms. Davis, Mr. McCorriston and one of his colleagues and recounted my late afternoon conversation with the taint team. I told them the information the taint team and I discussed, described in paragraph 12 above.

18. Following the conference, at 11:33 PM, Mr. McCorriston wrote to Messrs. Keller, Sorenson and me: "Before we proceed further I need to have a discussion with client regarding issues raised as to Mr. Lowell's representation." Dkt. 55-2, Ex. 18 (emphasis in original). The only new issue that had been "raised" was the taint team call.

3

19. In the morning of August 27, I wrote to Mr. McCorriston and Ms. Davis to tell them they could delay or forego entering my appearance for Ms. Davis in Hawaii if they had any issues: "At least for the optics and impact, I would like to get the court to wait on my PHV [appearance]. I do not need that to be helpful to Nickie in what she needs now or even at debriefings esp. if the appearance, etc. is in Hawaii." L. Decl. Ex. 15

20. After all the exchanges described above, Mr. McCorriston, copying Ms. Davis and one of Mr. McCorriston's colleagues, wrote back to me at 2:39 PM on August 27: "Abbe, thank you for again disclosing *in detail* your prior representations of and/or *contacts with individuals brought to your attention by the government* to Nickie as well as to David Minkin and me. As I stated in my earlier email to you, Ms. Davis acknowledges your previous disclosures and wishes to proceed with your representation of her. David and I as independent counsel confirm that Ms. Davis is making an informed and voluntary decision with assistance of independent counsel. Accordingly, please finalize the language with the government on this issue." L. Decl. Ex. 15 (emphasis added).

21. Contrary to Ms. Davis' assertions, it was Mr. McCorriston who then at 2:46 PM suggested that Mr. Keller and I propose waiver language which Mr. McCorriston would review: "Ms. Davis is proceeding with Mr. Lowell as counsel. Please work out the final language regarding this matter *with him* which I will also review and approve." Dkt. 55-2, Ex. 19 (emphasis added).

22. Ms. Davis, herself, then wrote me at 2:50 PM and said: "Abbe Please I want you to be PHV [admitted in the Hawaii proceedings] - For me for my things even in Hawaii Thanks Nickie." L. Decl. Ex. 16

23. In her filings, Ms. Davis mischaracterizes what was going to be written for a possible *public* potential conflict filing with what she and Mr. McCorriston were told by me and knew. It was Mr. McCorriston who at 5:40 PM raised the issue of confidentiality for any public filing: "I can live with it [DOJ language]. My greater concern is confidentiality. If the plea agreement becomes public it would affect both Nickie and Abbe. Is there a way to make this confidential, perhaps a different document." Dkt. 55-2, Ex. 21

24. As a solution, I suggested to Mr. McCorriston a side colloquy with the Court and my concern not to undermine Ms. Davis' ability to cooperate or "undercut[] Nickie's credibility," L. Decl. Ex. 17, and that any public filing could be "watered down" but, notably, that "*Nickie, USAO and you all know what it refers to . . .*" L.Decl. Ex. 18 (emphasis added).

25. Later on August 27, it was Messrs. McCorriston, Keller and Sorenson who then worked out the language that might be on the public docket or someday unsealed, with Mr. McCorriston stating he discussed the issues with Ms. Davis. Dkt. 55-2, Ex. 20 – 22; L. Decl. Ex. 19

26. There can be no doubt that that I disclosed to Ms. Davis and Mr. McCorriston the existence of the taint team, the timing and substance of the taint team call, and the fact

4

that the call could have had no impact on any advice I gave Ms. Davis.  At 10:20 PM on August 27, I wrote Mr. McCorriston: "BTW – one aside I might want you to raise with Keller at some point – I had no idea that there was a taint team, that it found emails in which I was included, that they were reviewing as maybe someone's LDA violation, etc. SO how the F could it have influenced any of my advice to Nickie to give the DOJ want they wanted?"  L.Decl. Ex. 20

27. Ms. Davis' counsel now suggest something improper in exchanges concerning her plea statement in court or an email I exchanged with Mr. Keller during the plea hearing on August 31.  Ms. Davis and Mr. McCorriston were actively involved in drafting the statement, L. Decl. Ex. 21, and the August 31 exchange concerned only what was going to be said publicly about the names of clients or details of my exchanges with the DOJ, not what Ms. Davis or Mr. McCorriston had been told and knew.

C.     No Disclosure of Privileged Communications

28. Contrary to yet another new allegation, I did not violate Ms. Davis' attorney-client privilege or some common interest privilege with others in conversations I had with Mr. Keller in August 2020.  I contacted the DOJ at Ms. Davis' request to assert that the DOJ should not give others a better deal than Ms. Davis was going to receive and that she should receive credit for her cooperation leading others to plead.  There was and could be no common interest privilege at that time with any of the other targets, as Ms. Davis had begun her cooperation and her and their interests were not aligned.  Mr. Keller and I exchanged no privileged information.

D.     Ms. Davis' Reliance on Incorrect Reporting

29. The first I knew of any details concerning the "bribery-for-pardon" investigation was December 3 – 4, 2020, three months after Ms. Davis pled guilty when there were articles written about the matter.  Some of the articles misreported that my work for the former client was based on my ties to the new administration (which I did not have at the time).  After press inquiries to me were made, the DOJ confirmed I was not under investigation.

30. When the December articles appeared, I immediately called Ms. Davis to again go over the facts as I knew them. I believe Mr. McCorriston was also on the call.  Contrary to Ms. Davis' assertions of when she and I discussed the details I knew of the bribery-for-pardon investigation, she received an email from someone on December 14, 2020.  Apparently relying on the inaccurate articles, the email alleged that I had a conflict of interest when I and Mr. McCorriston negotiated her plea agreement if I was under investigation and did not disclose that to her.  Mr. McCorriston sent me the email on January 6, 2021, L. Decl. Ex. 22, and asked for a call to discuss the matter.  Another call occurred, and I explained the facts again.

31. On May 4, 2021, despite my telling its reporter he was wrong, the publication *Politico* published an article misreporting that I had hired an attorney to represent me in the bribery-for-pardon investigation in June 2020, before I was working to negotiate a plea

      resolution for Ms. Davis.  For at least the fourth time,  I explained the facts to Ms. Davis (through Mr. Bryant).  L. Decl. Ex. 23 – 24.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 2, 2022                               _____/s/ *Abbe David Lowell*_
                                                                                Abbe David Lowell