McCORRISTON MILLER MUKAI MACKINNON LLP

WILLIAM C. McCORRISTON         #995-0
DAVID J. MINKIN                #3639-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone:  808.529.7300
Facsimile:   808.535.8056

E-Mail:      mccorriston@m4law.com;   minkin@m4law.com

JAMES A. BRYANT (pro hac vice)
The Cochran Firm California
4929 Wilshire Blvd., Suite 1010
Los Angeles, CA 90010
Telephone: 323-435-8205
Facsimile:   310-802-3829
E-mail:      jbryant@cochranfirm.com

Attorneys for Defendant
NICKIE MALI LUM DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 20-00068 LEK |
| Plaintiff, | DEFENDANT NICKIE MALI LUM DAVIS' MOTION TO COMPEL; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A – E |
| vs. | |
| NICKIE MALI LUM DAVIS; | |
| Defendant. | |

1

<u>DEFENDANT NICKIE MALI LUM DAVIS'</u>

<u>MOTION TO COMPEL DISCOVERY</u>

Defendant Nickie Mali Lum Davis, by and through undersigned counsel, respectfully moves to compel the Government to produce all as-yet un-produced Rule 16 and Rule 6 of the Rules Governing 28 U.S.C. §2255 Proceedings material. This motion is based on the attached Memorandum in Support of Motion, Declaration of Counsel and Exhibits, and the records and files in this case.

DATED:  Los Angeles, CA, August 4, 2022.

<div style="text-align:right">

*/s/ James A. Bryant*
JAMES A. BRYANT
WILLIAM C. McCORRISTON
DAVID J. MINKIN
Attorneys for Defendant
NICKIE MALI LUM DAVIS

</div>

<u>MEMORANDUM IN SUPPORT OF MOTION</u>

## I.    Introduction

In the one month during which the Government voluntarily produced, on a rolling basis, documents and communications after it had filed its initial Opposition in this current matter, Ms. Davis amassed substantial evidence showing that DOJ "did not exercise its discretionary function in an even-handed manner" and that "[Mr. Keller's and PIN's] zeal was not born of objective and impartial consideration of the merits of this case." *United States v. Lorenzo*, 995 F.2d 1448, 1453 (9th Cir. 1993) (citing *People v. Conner*, 34 Cal. 3d 141, 193 Cal. Rptr. 148, 151, 666 P.2d 5, 8 (1983)).

But the record is incomplete.  Once undersigned counsel began requesting additional materials and information—mostly regarding newly-discovered evidence of prosecutorial misconduct or false representations made by Mr. Keller and PIN—Mr. Mulryne abruptly announced that the Government was halting its cooperation.

The Government's decision materially disadvantages Ms. Davis in this matter by denying her access to information that is exclusively in the Government's possession and control.  It is information to which she is entitled, as discussed below, in part because the Government's partial production has already directly refuted numerous material representations and has revealed substantial evidence regarding prosecutorial misconduct not previously known.

Profoundly significant new evidence has also recently entered the public domain, including evidence regarding Mr. Lowell's criminal exposure from the FARA probe into his work for a Chinese Intelligence Officer.  In a letter to the Court just over a week ago, prosecutors in an unrelated matter in the Eastern District of New York indicated that Abbe Lowell *still* faces criminal exposure related to the FARA probe at issue before this Court.

Given the new evidence indicating that Mr. Lowell currently has criminal exposure related to an investigation in which Mr. Keller and his PIN colleagues visibly inserted themselves at the outset, then—at a minimum—complete production is necessary for weighing the evidentiary value and credibility of Mr. Lowell's June 6 declaration attached to the Government's Supplemental Opposition filing.  The status that FARA probe into Mr. Lowell as of June 6, 2022 (and currently) becomes critical for determining whether or not his declaration would be no more credible or relevant than any other sworn statement made under duress.

No less concerning, of course, would be the extent to which Mr. Keller and PIN may have exploited the unresolved nature of the FARA probe in obtaining Mr. Lowell's cooperation.  Any conduct to leverage or exploit Mr. Lowell's criminal exposure would be probative, as cover-ups are generally not needed when there is no "bad act" or misconduct *to be* covered up.

What Mr. Keller and PIN have known throughout the prosecution of Ms. Davis (and into the present) and the current status of the FARA probe into Mr. Lowell are

4

just a few of the myriad issues that remain obscured, despite PIN's partial production effectively placing this matter into a *Brady* posture.  After the government's partial production revealed additional, previously unknown prosecutorial misconduct, PIN reversed course and has since then steadfastly refused to produce documents and communications related to their own conduct in either pressuring Ms. Davis or in their handling of Mr. Lowell's conflicts of interest stemming from the FARA probe and PIN's own bribery-for-pardon investigation.  PIN has even refused to produce materials that it had already agreed to produce.

Additionally, new evidence submitted in an unrelated civil case in the Southern District of New York indicates that the Department of Justice used materials stolen by Qatar-sponsored hackers from Elliott Broidy in order to build a potential criminal investigation into Mr. Broidy.  Mr. Lowell had informed Ms. Davis during the time he served as her counsel that Qatar was a client of his.  He also served as counsel of record for Qatari interests in a high-profile lawsuit brought by Mr. Broidy starting no later than July 2018.

If one of the wealthiest nations in the world was actively cooperating with the DOJ for the express purpose of helping the government build a prosecution against Mr. Broidy, then Mr. Keller and PIN would have had ample reason to believe that Mr. Lowell faced a conflict from two clients with divergent interests with respect to Mr. Broidy.  Such a connection would represent yet another conflict that PIN would have known that Mr. Lowell needed to obtain Ms. Davis's informed consent—but did not.

In short, PIN has acted with bad faith in the ongoing discovery related to this motion practice by selectively refusing to produce certain categories of materials, including those which relate to the Government's own assertions or representations in their briefs and attached declarations.  The Government's refusal to produce documents and communications that relate to its own assertions and representations places Ms. Davis at an inherent disadvantage by being denied the ability to confirm or impeach those claims, in contravention of Rule 3.3 of the Hawaii Code of Professional Conduct.

This Motion is made pursuant to LR 16.1 of the Rules of the U.S. District Court for the District of Hawaii and Rule 16 of the Federal Rules of Criminal Procedure.

## II.    Relevant Facts

On or around May 10, 2022—less than a week after filing its initial Opposition to the underlying motions to disqualify, for a stay, and special judicial relief—the Government of its own volition effectively entered into a *Brady* posture when it began producing internal DOJ documents and communications, as well as communications with Mr. Lowell.  The first production contained unredacted versions of documents that the Government had attached as exhibits to its initial Opposition filing on May 4, 2022, and then expanded to encompass certain communications between PIN and both Mr. Lowell and the Filter Team.  More recently, the government produced *some* of the subpoenas and search warrants related to the investigation and prosecution of Ms. Davis.  In total, the government has produced over 1,000 pages of material.

Despite the volume of production, however, more questions exist now as a result of the partial production and the Government's own filings in this matter than before the underlying motion was filed in April of this year.  When undersigned Counsel requested good faith production of materials related to the new, previously unknown factors or assertions and to newly revealed evidence, PIN's Sean Mulryne on June 13, 2022 abruptly announced in an email that the Government's production would cease, except for materials PIN had previously agreed to produce related to subpoenas and search warrants.  In the email, Mr. Mulryne wrote, "We already have provided numerous documents in response to your multiple, and changing, discovery requests based on evolving allegations of misconduct."[1]  This baseless attack was yet another red herring from PIN, ignoring that the reason for numerous requests and "evolving allegations" was the multitude of new revelations from the Government, including an "evolving"—and growing—list of actions evidencing prosecutorial misconduct.

Even though the government did produce some of the promised search warrants and subpoenas on or around June 15, 2022, careful inspection eventually revealed that PIN had curiously not produced search warrants and subpoenas served by the FBI or U.S. Attorney's Office in Hawaii.  Mr. Keller and PIN also did not adhere to their agreement to produce "any communications that [Mr.] Keller or PIN had regarding" those subpoenas and search warrants.  Nor did Mr. Keller or PIN produce anything

---

[1] See June 13, 2022 email from Sean Mulryne to James Bryant, Ex. A at Pgs. 3-4

related to the warrantless search and seizure conducted by Customs and Border Patrol—just two days before Ms. Davis signed her plea agreement—and during which she witnessed CBP capturing screenshots of attorney-client privileged communications.

As discussed extensively in previous filings, Mr. Keller and PIN have established a shocking pattern of presenting red herrings, misrepresentations, and outright falsehoods in communications with undersigned counsel and in filings to this Court. Their representations are meaningless—at best—especially in the numerous instances where they have refused to produce materials that would either verify or refute their self-serving claims. As just a few relevant examples: **1)** claiming an unnamed "NSD attorney" had "represented to the prosecution team that the inquiry was civil in nature" at some point "in or around June 2020,"[2] but then refusing to provide any communications or documents regarding the supposed representation made by the unnamed "NSD attorney"; **2)** claiming that Mr. Keller and PIN applied no pressure on the Filter Team (comprised *entirely* on his subordinates inside PIN), then PIN refusing to produce all relevant documents and communications, such as communications among members of the Prosecution team or intra-Filter Team communications regarding the bribery-for-pardon matter or the related *ex parte* filing and hearing before Judge Beryl Howell; and **3)** producing as an exhibit a heavily redacted version of the April 6, 2020 FARA letter sent to Mr. Lowell by the then-head

---

[2] May 13, 2022 email from Sean Mulryne to James Bryant, Ex. A at Pgs. 12-13

of the FARA Unit and two criminal prosecutors, but then refusing to produce the original, unredacted letter or documentation regarding the current status of that investigation—even under seal or *in camera* to the Court.

As laid out below, there are four broad categories regarding which production is still required to level the playing field for Ms. Davis.

## A. FARA Probe into Mr. Lowell

The mere fact that prosecutors in the Eastern District of New York requested that the judge conduct a *Curcio* hearing means, by definition, that the prosecutors had a good-faith basis for believing that Mr. Lowell possessed a significant conflict of interest.[3]  The only conflict that the prosecutors actually cited in their letter was the FARA investigation into Mr. Lowell—which, as established by the record evidence in the current matter—has been conducted since 2019 by at least two criminal prosecutors from EDNY, Ian Richardson and Scott Claffee.  Crucially, the EDNY prosecutors' letter cited in the relevant footnote not to the current matter before this Court, but rather to what the prosecution team had been told by other EDNY attorneys.  If the matter was truly closed and Mr. Lowell faced no criminal exposure, there would be no conflict, and thus there would have been no reason to request for the Court's intervention with a *Curcio* hearing.

Notably, in his reply filed two days later—on Sunday, July 24, 2022—Mr.

---

[3] Ex. B. *See generally,* United States' Request for Curcio Hearing *United States v. Matthew Grimes,* 1:21-cr-371 (EDNY 2022) [DKT No. 129]

<u>Lowell never stated that the FARA probe had been closed or that he no longer faced criminal exposure</u>.[4]  Rather, he *only* selectively addressed the *other* part of the letter—in which the prosecutors discussed the current matter before this Court to explain their cause for concern that Mr. Lowell could not be trusted to fully disclose his conflict to his client—simply dismissing the serious allegations leveled against him in this matter.

This was not the first time he carefully avoided discussing under penalty of perjury the final resolution—if any—in the FARA investigation into him.  In his June 6, 2022 declaration attached to the Government's Supplemental Opposition filing, Mr. Lowell offered this strained explanation of events: "Through counsel, the FARA Unit was told that both their premises were wrong, and neither my firms nor I was asked to register."[5]  What Mr. Lowell never stated in that June 6, 2022 declaration was that the FARA Unit (or EDNY) had told him that he had no obligation to register under FARA or that the investigation had been closed—merely that he had not *yet* been "asked to register."  Similarly, another declaration attached to the same filing, from EDNY prosecutor Scott Claffee, carefully but unmistakably avoids any mention regarding the current status or final disposition of the FARA probe.

While the Government might protest that none of this definitively *proves* that Mr. Lowell still faces criminal exposure from the FARA probe—despite substantial

---

[4] Ex. C. See generally, Abbe Lowell's Response to United States' Request for Curcio Hearing *United States v. Matthew Grimes,* 1:21-cr-371 (EDNY 2022) [DKT No. 129]
[5] See Dkt 66-1 at ¶8.

evidence that he does—any such protestation would merely reinforce the need for the Government to produce the materials requested.  In fact, many of the key issues related to the FARA probe into Mr. Lowell remain substantially shrouded, with the government refusing to produce responsive documents that would help establish critical facts surrounding that investigation.

There are four questions central to any analysis about Mr. Keller and PIN's conduct related to Mr. Lowell's conflict vis-a-vis the FARA investigation into Mr. Lowell:

1) What information was shared with Mr. Lowell regarding his own potential criminal exposure?

2) What other actions did Mr. Keller and PIN take that could have influenced Mr. Lowell regarding their potential to impact the trajectory of the FARA probe into him?

3) What did the FARA Unit and/or EDNY tell Mr. Keller and PIN at various points in time between 2019 and the present about progress, status, and/or other particulars of the FARA investigation into Mr. Lowell?

4) Did Mr. Keller or his PIN colleagues reveal anything in internal office communications or to others at DOJ regarding their state of mind about Mr. Lowell's criminal FARA exposure and the potential for them to leverage or exploit Mr. Lowell's predicament?

## B. Bribery-for-Pardon Investigation

There remain many unanswered questions pertaining to the bribery-for-pardon investigation.  Perhaps the key outstanding question is why PIN initiated the probe in the first place, which is especially salient given that it was launched *two days before* Mr. Keller began plea negotiations with Mr. Lowell on June 29, 2020.  Not only that, but the initial conversation for plea negotiations on July 1, 2020, occurred only a few hours *after* the Filter Team provided an initial briefing to Mr. Keller and Ms. Lockhart regarding the then-new investigation.  Of course, the only reason PIN even admitted the existence of *either* July 1, 2020 phone conversation is because of the contents of the government's partial production.  And the revelation of those consecutive conversations only raises more questions.

Because the government has not provided any notes or communications regarding that initial Filter Team briefing beyond emails scheduling the call, the contents of that conversation remain unknown to Ms. Davis and this Court—even though those contents are highly material and relevant, given that Mr. Keller began plea negotiations with Mr. Lowell *later that same day*.  Nor has PIN produced any of its own internal memos to file (except one partial document that forensic analysis shows had been modified in May 2022), notes, or communications either among members of the prosecution team or among members of the Filter Team regarding the bribery-for-pardon investigation, the *ex parte* filings or hearing, or why the investigation was suddenly dropped after Ms. Davis entered her plea on August 31,

2020.  Such information and communications would directly relate in material fashion to PIN's own beliefs about the legitimacy and purpose of an investigation into an attorney two days before starting negotiations with that same attorney regarding Ms. Davis' plea—with that probe being dropped immediately after PIN got what it wanted.

To the extent PIN has produced communications between members of the prosecution team and the Filter Team (who all are Mr. Keller's subordinates inside PIN)—it does not appear that all such communications were produced, either—that partial production has revealed that PIN and the supposedly independent Filter Team celebrated both Mr. Broidy's and Ms. Davis' convictions—with both Mr. Keller and Mr. Mann explicitly thanking the Filter Team for making Ms. Davis' guilty plea "possible."  Thus, it is reasonable to believe that further, more fulsome production regarding the bribery-for-pardon matter will result in additional material information relevant for this matter.

## C. Mr. Keller's and PIN's Aggressive, Coercive Tactics

Undersigned counsel on May 13, 2022 requested that PIN provide not just all "subpoenas and search warrants executed pursuant to the investigation and prosecution of Ms. Davis," but also "all [related] communications that Keller or PIN had."[6]  After undersigned counsel responded on May 16, 2022 to his question seeking the "theory of relevance" for that request, Mr. Mulryne responded later that same day,

---

[6] May 13, 2022 email from James Bryant to Sean Mulryne, et al.  *See* Ex. A at Pg. 11-12

"Regarding your previous request concerning subpoenas and search warrants, we are preparing those materials."[7]  The only qualification offered to their agreement to the request was that a Protective Order would first need to be executed (which happened the following month).[8]

Yet despite the agreement, PIN only provided a partial production of *some* of the relevant search warrants and subpoenas—and none of the related communications. Although subpoenas and search warrants issued by other prosecutors were included in the Government's partial production, the production did not include subpoenas and search warrants issued by the Hawaii Field Office or U.S. Attorney's Office. Undersigned counsel then emailed Mr. Mulryne:

> Thank you for providing your initial, partial production related to subpoenas and search warrants. When will you be providing the remainder?  Your partial production does not appear to include any subpoenas formally issued by Hawaii, including Territorial Savings and Barclay's, or anything related to the CBP's warrantless search and seizure of my client in August 2020. Nor did your partial production include any of the related communications or supporting documentation (besides SW applications). Please advise as to your planned schedule for completing production for this subject matter.[9]

 Neither Mr. Mulryne nor anyone else responded to that June 24, 2022 email.

This requested information is relevant and material to PIN's own credibility in representations made to this Court.  In their initial Opposition filing, Mr. Keller and PIN represented that "by July 15, 2020" Mr. Lowell and PIN were in the process of

---

[7] May 16, 2022 email from Sean Mulryne to James Bryant.  See Ex. A at Pg. 10-11
[8] *Id*.
[9] June 24. 2022 email from James Bryant to Sean Mulryne, et al.  *See* Ex. A at Pg. 1

"finalizing [Ms. Davis's] plea.  Mr. Keller and PIN also claimed in the same filing

that Ms. Davis had "agreed to her plea deal in principle" by or before July 26,

2020.  Of course, in previous filings submitted since that time, Ms. Davis and

undersigned counsel have provided overwhelming evidence from Ms. Davis's own

state of mind about whether or not her plea was being "finalized" or was "agreed to in

principle," which directly refute those claims.  But the government's

misrepresentations were exposed from materials produced in June of this year.

Based on the Government's partial production, it is clear that Mr. Keller and

PIN did not believe that they had "agreed in principle" to a plea deal by or before July

26, 2020.  In fact, starting almost two weeks after that, the Government served a flurry

of subpoenas related to Ms. Davis—at least a dozen of which are known to

undersigned counsel—including right up to when Ms. Davis had actually signed off

on her plea deal.

Two days before she signed the signature page for the Information, on August

11, 2020, Ms. Davis was stopped by Customs and Border Patrol ("CBP") as she was

boarding her outbound flight at O'Hare Airport.  Without explanation, CBP agents

detained her, then proceeded to engage in an extensive, warrantless search and seizure

of her devices—including reviewing and capturing screenshots of her attorney-client

privileged communications.

Then on the day Ms. Davis signed the signature page for her Information,

August 13, 2020, PIN issued a subpoena to Amex, signed by Ms. Lockhart, seeking

not only all manner of Ms. Davis and her husband's private financial information, including their "Credit histories" and "Loan files and histories (including loan repayment records itemizing principal and interest)," as well as "Correspondence, tangible or electronic (emails), between you and [Ms. Davis and her husband]," and "Any and all other electronic or paper documents relating to the above individual and entities, including email, memoranda, notes, and files."

Central to PIN's argument that it did not launch the bribery-for-pardon investigation for the improper purpose of pressuring Mr. Lowell is that it *wasn't necessary* because Ms. Davis had already "agreed to her plea deal in principle" one month before Mr. Lowell even learned of the *other* probe into him. Thus, the full catalog of not just search warrants and subpoenas issued, but all of the related communications involving Mr. Keller and PIN (including regarding CBP's warrantless search and seizure) go directly to the veracity of the representation that the bribery-for-pardon investigation couldn't have had the impact of pressuring Mr. Lowell. The mere fact that Mr. Keller and PIN were aggressively serving subpoenas into mid-August 2020 indicates that further production will yield relevant information about PIN's actual state of mind regarding the need to apply pressure to coerce Ms. Davis not just to accept the plea, but to implicate Mr. Broidy at her arraignment.

### D.  Mr. Lowell's Work for Qatar

Newly disclosed evidence indicates that, even before DOJ had executed any search warrants and had served only one subpoena, DOJ built its case against Mr.

Broidy and Ms. Davis based on illegally hacked materials provided by the intelligence services of the State of Qatar, one of the wealthiest nations in the world.  But Mr. Lowell has represented Qatari interests at least since 2018, starting no later than around the time the hacked materials were evidently provided to DOJ.

Given that Mr. Lowell publicly represented Qatari interests in high-profile litigation opposite Mr. Broidy,[10] the DOJ would have known that Mr. Lowell had yet another profound conflict of interest which would have required Ms. Davis' informed consent.  The extent to which one of Mr. Lowell's clients or its affiliates might have collaborated with the DOJ in the investigation and prosecution of Mr. Broidy—thus also of his other client, Ms. Davis—is highly material and relevant, particularly evidence regarding Qatar's desire for Mr. Broidy to be convicted.  Such information would directly relate to Mr. Lowell's incentive to please (and be rewarded by) one of the wealthiest nations in the world by helping to "deliver" the conviction of Mr. Broidy—an incentive that is clearly in conflict with Ms. Davis' interests.  And the extent to which the case against Mr. Broidy (and thus also Ms. Davis) was predicated on Qatar's assistance is relevant to Mr. Keller's and PIN's obligation to inform Ms. Davis that one of her attorney's clients had assisted DOJ in building its case against her.

According to a sworn declaration attached to a motion filed in SDNY on June 27, 2022, prosecutors from the DOJ's Office of the Special Counsel (OSC) utilized

---

[10] *See* generally, *Broidy Capital Management v. Jamal Benomar*, Case 7:18-cv-06615 (SDNY, 2018).

materials hacked from Ms. Davis's alleged co-conspirator, Mr. Broidy—and which the record evidence shows were stolen by Qatari-sponsored hackers.[11]  This new evidence indicates that DOJ possessed hacked materials and displayed them during interviews,[12] at least some of which could not have come from the media and some which related to materials that the government did not even seek permission to review until exactly one month *after* the OSC interview in question.[13] [14]

The potential for Qatar providing materials and information to the OSC (or DOJ generally) is something that Qatari sources *themselves* have actually leaked to the media.  On March 12, 2018, *NBC News* reported, "Qatari officials gathered evidence of what they claim is illicit influence by the United Arab Emirates on Jared Kushner and other Trump associates, including details of secret meetings" in which Mr. Broidy had "participated."[15]  The story then explained that "Qatari officials weighed speaking to Mueller [OSC] during a visit to Washington earlier this year, and

---

[11] Based on Mr. Broidy's various lawsuits against parties affiliated with the State of Qatar regarding the hack in question (which he has stated occurred in early 2018), there is substantial evidence indicating that the hacking operation and subsequent media blitz were carried out by parties sponsored by the State of Qatar.  The two suits he filed that were not dismissed on sovereign or diplomatic immunity grounds survived Motions to Dismiss.  His complaints in those suits connected Qatari IP addresses to the hack of Mr. Broidy's servers, and his filings have cited extensive calling activity from phone records connecting Qatari agents to the dissemination of the hacked materials.

[12] In a declaration, Richard W. Gates III stated that on March 18, 2018 and again two days later on March 20, he was shown emails and screenshots of WhatsApp messages from various communications between Mr. Broidy and numerous different individuals.  Several of the topics that the declaration states were discussed in the two March 2018 interviews related to content from Mr. Broidy's private communications that was not in the public domain and had not at that point been discussed in the media. Ex. D Declaration of Richard W. Gates III (Gates Decl.) *Broidy, et al. v. Global Risk Advisors LLC, et al.,* Case No. 19-cv-11861 [Dkt. No 131-1]

[13] *See* Application for a Search Warrant, submitted in the Eastern District of Virginia, April 18, 2018. **[filed under seal]**.

[14] With respect to any communications between Mr. Broidy and Mr. Gates, according to the declaration, DOJ had not accessed or reviewed such communications until after the March 18, 2018 meeting, but requested access to such materials shortly afterwards. See Ex. D Gates Decl., ¶¶20-21.

[15] https://www.nbcnews.com/politics/national-security/qataris-opted-not-give-info-kushner-secret-meetings-mueller-n855326

[*NBC News*] has now learned the information the officials wanted to share included details about… Broidy working with the UAE to turn the Trump administration against Qatar."[16]  The story about "secret" information that Qatar wanted to share with the OSC was published on March 12, 2018—or six days before the first OSC interview in question.

### E.  Materials Sought by Ms. Davis Are Relevant and Material to Current Motions

Crucially, the government is refusing to produce materials that relate to many of their assertions and representations, including but not limited to: (1) the FARA probe into Mr. Lowell being "civil" in nature; (2) what Mr. Keller and others at PIN knew about the FARA probe both before and during the plea negotiations with Mr. Lowell; (3) what the April 2020 FARA letter to Mr. Lowell actually said, given its central role in shaping what Mr. Lowell would have believed to be his potential criminal exposure from the FARA probe; (4) what role Mr. Keller and possibly others at PIN may have played in—and what knowledge that they have regarding—the warrantless search-and-seizure targeting Ms. Davis (while boarding an outbound flight at O'Hare Airport) less than one week before her Information was submitted to this Court, and during which my client witnessed Customs and Border Patrol agents reviewing and capturing screenshots of her attorney-client privileged communications; (5) the impact of Ms. Davis' potential or actual plea on PIN's

---

[16] *Id.*

prosecution of Mr. Broidy; (6) notes and memos regarding the Filter Team's discussion on August 26, 2020 with Mr. Lowell regarding the "bribery-for-pardon" matter, including a document about which the government made a false assertion in communications with undersigned counsel that was easily disproven by a basic forensic examination of the document's metadata (aka "Document Properties"); and (7) whether or not Mr. Lowell would have reason to believe that he currently faces potential criminal exposure from the Department of Justice pursuant to the FARA probe or some other inquiry, an issue which is particularly salient for determining whether or not his declaration to this Court could even be considered truly voluntary.

The materials that Ms. Davis respectfully requests that the Court orders the Government to produce is detailed in **Exhibit E** (which undersigned counsel sent to PIN on June 13), as well as two other categories: 1) all documents and communications regarding an IRS investigation into Ms. Davis and her husband that evidently was initiated shortly after Ms. Davis submitted the OPR Complaint against Mr. Keller in November 2021, and 2) all documents and communications regarding DOJ's acquisition and/or usage of Mr. Broidy's hacked materials or any other materials or information provided to DOJ by the State of Qatar, its officials, its instrumentalities, representatives, and/or agents.

Additionally, because Mr. Lowell voluntarily inserted himself into this matter,[17] Ms. Davis and undersigned counsel also respectfully request that the Court orders Mr. Lowell to produce: 1) Unredacted versions of the documents that were attached as Exhibits supporting Mr. Lowell's June 6, 2022 declaration, to the extent that Government does not possess them; 2) Documents sufficient to establish how much he or his employers have been paid (for accounts on which Mr. Lowell worked) and when by Qatar and any affiliated parties, from January 1, 2018 until June 30, 2021; 3) all communications Mr. Lowell had with Qatar or any affiliated entities regarding the DOJ investigation or prosecution of Mr. Broidy; and 4) all communications that Mr. Lowell or his public relations associate, Peter Mirijanian,[18] had with or regarding reporters working on stories about Mr. Broidy, from January 1, 2018 through June 30, 2021.

## III.   Legal Argument

### A. *Government seeks to avoid its discovery obligations with partial production*

Generally, "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But

---

[17] The only evidence the Government has offered contending that Mr. Lowell's representation was not hindered by his conflicts was the declaration from Mr. Lowell himself. Yet Mr. Lowell swore on his Pro Hac Vice application, "I... have not been the subject of a criminal investigation known to the attorney or a criminal prosecution... in the past ten (10) years." *See* Dkt-6 at 2. This application was submitted on August 25, 2020—the very same day he learned of the bribery-for-pardon investigation, and more than four months after the FARA Unit alerted him to his criminal exposure on April 6, 2020.

[18] Mr. Mirijanian serves as communications representative for Mr. Lowell and his clients, including Ms. Davis, thus any communications he had with journalists regarding Ms. Davis' alleged co-conspirator while he and Mr. Lowell were representing Ms. Davis would ultimately have been done on *her* behalf, thus would be *her* work product.

'[o]nce a defendant has been afforded a *fair* trial and convicted of the offense for which he was charged, the presumption of innocence disappears.'" *DA's Office v. Osborne* (2009) 557 U.S. 52, 68-69 citing *Herrera v. Collins*, (1993) 506 U.S. 390, 399. Further, "[g]iven a *valid* conviction, the criminal defendant has been constitutionally deprived of his liberty." *Id.* [emphasis added]

However, post-conviction discovery is available in limited circumstances pursuant to Rule 6 of the Rules Governing 28 U.S.C. §2255 Proceedings, which allows defendants as well as the government to conduct discovery pursuant to the Federal Rules of Civil Procedure—but only with permission from the court. The rule gives the district court discretion to grant discovery requests "for good cause shown, but not otherwise." This Court has already recognized that although this is technically not a §2255 proceeding, the same legal principles related to vitiating privilege and the pursuant production of discovery, also apply to post-conviction proceedings prior to sentencing. As such, discovery of the relevant documents described above is appropriate for a motion to disqualify a prosecutor, as well as other post-conviction proceedings, including a motion to vacate a plea.

Local Rule 16.1 constitutes a Standing Order to the Government to produce all Brady material. *Brady v. Maryland*, 373 U.S. 83 (1963). In this context, though, Local Rule 16.1 should not even be necessary. The Government is required to disclose all "evidence that helps bolster the defense case or impeach the prosecutor's witnesses. [I]f doubt exists, it should be resolved in favor of the defendant and full disclosure

made." *United States v. Price*, 566 F.3d 900, 913, n.14 (9th Cir. 2009) (quoting

favorably *United States v. Acosta*, 357 F.Supp.2s 1228, 1239-40 (D. Nev. 2004)

(bracket and ellipses in Price)); citing favorably *United States v. Sudikoff*, 36 F. Supp.

2d 1196 (C.D.CA 1999); accord *United States v. Olsen*,704 F.3d 1172, 1183, n.3 (9th

Cir. 2013). The Government's duty to disclose Brady material is the same, whether or

not the defendant requests such evidence, either generally or specifically. *Kyles v.*

*Whitley*, 514 U.S. 419, 433 (1995). Id. (citing *United States v. Bagley*, 473 U.S. 667

(1985)). Moreover, the Constitution, and "[t]he prosecutor's oath of office, not the

command of a federal court, should . . . compel[] the government to produce any

favorable evidence. . . ." *United States v. Cadet*, 727 F.2d 1453, 1467 (9th Cir. 1984).

By initiating production in May of this year, PIN has effectively placed this

matter in a *Brady* posture.  The rationale behind *Brady* and its progeny is that

discovery is at the heart of the Constitutional protections inherent in criminal

proceedings.  Inherent to the Motion to Disqualify before this Court is the bedrock

Constitutional principle of the right to conflict-free counsel when facing a government

investigation and prosecution.  Ms. Davis' Sixth Amendment rights deserve no less

than the protections of transparency afforded by the production of relevant

information uniquely in the possession and control of the Government.

In providing at least partial production regarding several categories of relevant

information, the Government has tacitly acknowledged that it owes a duty of

discovery production to Ms. Davis in this matter. What the Government cannot do,

however, is to withhold other relevant information—particularly relating to the Government's own claims or misconduct.  Partial production is an anathema to transparency, as it creates the facade of disclosure, while providing little to nothing about the information being withheld.

Because of the nature of the information relevant to this matter, all remaining information related to assertions and representations made by the government and its witnesses is almost exclusively still in the possession and control of the government.

As such, the "government's hand is stacked with cards the defense lacks." *U.S. v. Abello-Silva* (10th Circuit 1995). Although the Court in *Abello-Silva* admonished, "With this power comes the government's responsibility to use it fairly," PIN has exploited its sole control over key information by making a litany of false and misleading claims. It is bitterly ironic that the saving grace for Ms. Davis has been that PIN also chose to offer provably false statements, such as the false claim that Mr. Lowell's FARA probe was handled by a "civil FARA unit" that didn't exist during the relevant time frame.

But the government should not be rewarded—and Ms. Davis certainly should not be punished—because PIN has repeatedly opted to present egregious misrepresentations, rather than sticking to smaller, less flagrantly inaccurate claims.

## I.     Conclusion

Mr. Keller and PIN have made numerous misrepresentations and presented outright falsehoods regarding key issues in this matter, from the discussions regarding

the Conflict Waiver to various aspects surrounding the nature and scope of both the

bribery-for-pardon investigation and the FARA probe into Mr. Lowell.  But those

untruths have only been exposed because of the Government's partial production—

and the only discernible reason why the Government abruptly halted production when

it did is that Ms. Davis's requests stemming from the new revelations were likely to

unearth even more damning evidence of prosecutorial misconduct.

New evidence indicating that Mr. Lowell still faces criminal FARA exposure

simply reinforces why partial production does not serve the interests of justice—

particularly when the prosecutors whose conduct is at issue are the ones arbitrarily

choosing the end point.  Full production is necessary for the record to be complete,

and it is likely to generate highly relevant evidence that—like what was evidenced

already—the DOJ "did not exercise its discretionary function in an even-handed

manner" and that "[Mr. Keller's and PIN's] zeal was not born of objective and

impartial consideration of the merits of this case."

For the foregoing reasons, Ms. Davis respectfully requests that this motion to

compel discovery be granted.

DATED:  Los Angeles, CA, August 4, 2022.

<div style="margin-left:40%">

*/s/ James A. Bryant*
JAMES A. BRYANT
WILLIAM C. McCORRISTON
DAVID J. MINKIN
Attorneys for Defendant
NICKIE MALI LUM DAVIS

</div>