CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Criminal Chief
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief
SEAN F. MULRYNE
Director of Enforcement & Litigation
Election Crimes Branch
NICOLE R. LOCKHART
Trial Attorney
Public Integrity Section

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 20-00068 LEK |
| | ) | |
| Plaintiff, | ) | GOVERNMENT SENTENCING |
| | ) | MEMORANDUM; CERTIFICATE |
| vs. | ) | OF SERVICE |
| | ) | |
| NICKIE MALI LUM DAVIS | ) | DATE: October 27, 2022 |
| | ) | TIME: 2:30 p.m. |
| Defendant. | ) | JUDGE: Leslie E. Kobayashi |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## SENTENCING MEMORANDUM

The defendant, Nickie Lum Davis, personally received over $10 million from

Jho Low, a foreign fugitive responsible for one of the largest embezzlement schemes

in history, to use backchannel influence to convince the then President of the United

1

States to drop a federal investigation into Low and to agree to the extrajudicial removal of a Chinese exile living in the United States. In exchange for $100 million in total, the defendant and her co-conspirators secretly worked at the direction of Low and the People's Republic of China ("PRC") disregarding the national security and foreign policy interests of the United States. The defendant played a prominent role in the conspiracy, repeatedly pushing the key influencer to lobby the White House and editing documents to be sent to the President and others.

The defendant pleaded guilty and admitted these facts under oath over two years ago. She then related these same facts under oath again when she testified before the grand jury on May 6, 2021. The defendant has since recanted the factual basis for her plea and minimized her criminal conduct, effectively nullifying her purported cooperation and initial acceptance of responsibility.

The defendant committed serious crimes for profit that had the potential to alter United States foreign policy toward Malaysia and the PRC and prosecution decisions in the largest kleptocracy case ever charged by the Department of Justice. The defendant's sentence should reflect the magnitude of her offense, her $10 million financial gain, and similar sentences imposed on defendants convicted of similar conduct. Based on a balancing of the factors under 18 U.S.C. § 3553(a), the government recommends that the Court sentence Lum Davis to 30 months' imprisonment.

I.      The Offense Conduct: The Defendant Worked for Profit to Influence the President and his Administration while Concealing that Low and the PRC Government were Behind the Scheme

The defendant's offense conduct is set forth in detail in the PSR, the factual basis for her guilty plea,[1] and in her testimony.[2]  In sum, the defendant agreed to work with Prakazrel Michel, *see United States v. Michel*, No. 19-cr-148-CKK, Superseding Indictment, ECF No. 84 at 23-37 (D.D.C. June 10, 2021), and Elliott Broidy, *see United States v. Broidy*, No. 20-cr-210-CKK, Plea Agreement & Statement of Offense, ECF Nos. 7 & 8 (D.D.C. Oct. 20, 2020), to influence the former President of the United States and his Administration to drop the investigation and future prosecution of Low for embezzling billions of dollars from a Malaysian sovereign wealth fund, 1MDB, and to send an influential Chinese businessman, Guo Wengui, back to China.  The defendant and her co-conspirators were paid approximately $100 million by Low and his proxies for these influence campaigns.  The co-conspirators concealed Low and the PRC government's direction of their efforts and agreed to evade registration under the Foreign Agents Registration Act.

---

[1] Plea Agreement, ECF No. 15 at 4-31.

[2] Davis Grand Jury Transcript and Exhibits, Gov. Ex. 1.  On October 17, 2022, The United States District Court for the District of Columbia issued an order authorizing the government to publicly disclose the defendant's grand jury testimony and related exhibits pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i).

In May 2017, the defendant traveled to Bangkok, Thailand, for a meeting with Low and her co-conspirators to discuss the 1MDB investigation and a backchannel influence campaign to resolve the matter. Roughly two weeks later, she traveled to Hong Kong and Shenzhen, China, where she and her co-conspirators met with Low again and Sun Lijun, the then Vice Minister of Public Security for the PRC, to discuss the extrajudicial removal of Guo from the United States. In furtherance of these schemes, the defendant and her co-conspirators agreed to lobby then government officials, President Donald Trump, Attorney General Jeff Sessions, Secretary of Homeland Security and later White House Chief of Staff John Kelly, Secretary of State Rex Tillerson, White House Chief of Staff Reince Priebus, and others with perceived access to, and influence with President Trump, including Rick Gates and Steve Wynn.

The defendant and her co-conspirators' influence efforts included drafting a letter to be sent to Attorney General Sessions recommending a meeting with Sun regarding Guo; seeking a golf game and setting up a meeting between President Trump and the Prime Minister of Malaysia, Najib Razak, to address the 1MDB investigation; drafting a letter for President Trump in anticipation of the meeting with Razak and preparing Razak for the meeting in person; sending talking points to Secretary of State Tillerson in advance of an earlier meeting with Razak; joining Wynn for a direct call to President Trump to advocate for sending Guo back to the

PRC; and meeting directly with the President. The defendant was personally paid over $10 million for her role in the influence campaigns.

II.   The Defendant's Factual Objections to the PSR are Contradicted by her Own Testimony

The defendant has filed fifteen paragraphs of objections to the description of her offense in the PSR.[3]  She primarily contends that she was never "acting as an agent for the . . . PRC,"[4] that none "of the money received by Prakazrel Michel [] originated from Low Taek Jho,"[5] and that $7.5 million that she received from Michel shortly after he received a $10 million payment from Low was unrelated to 1MDB or Guo and "was for a legitimate investment opportunity within the entertainment field."[6]  All of these objections are contradicted by extensive evidence and the defendant's own testimony.

A. The Defendant was Working for the PRC on the Guo Matter

The defendant previously testified that during the co-conspirators' first meeting with Low in Bangkok, Thailand, in early May 2017, the group discussed 1MDB, Broidy's political influence, Low arranging to pay the conspirators through third parties, and "a fugitive who was in the United States that Jho Low mentioned,

_____

[3] Def. Sentencing Statement, ECF No. 97 at 2-6.
[4] *Id*. at 2.
[5] *Id*. at 3.
[6] *Id*. at 5.

you know, this guy who it seemed like China wanted sent back to China."[7]   The defendant further confirmed that shortly after their return from Thailand, Michel emailed the defendant an article regarding Guo, "a Chinese fugitive billionaire who was making claims about corruption in China."[8]   The defendant testified that in mid-May she returned to Asia with Michel and Broidy to meet again with Low and "somebody else who'll give us more information on that fugitive guy, Guo."[9]   The defendant explained that she, Broidy, and Michel flew to Hong Kong, were transported to Shenzhen, China, met briefly with Low, and then were told that they would be meeting with someone "in the security apparatus of China and that he was going to give us more information about the Guo situation.   He wanted to talk about it."[10]   The defendant testified that she and her co-conspirators then met with then Vice Minister of Public Security for the PRC, Sun Lijun, and that Sun explained why the PRC wanted Guo returned and set forth what the PRC government was willing to do to get Guo back.[11]

The defendant explained that in addition to 1MDB, Guo was another issue on which Low understood Broidy and the co-conspirators would exercise their political influence: "[I]t seemed like Pras and Jho Low has [*sic*] a pre-existing relationship or

---

[7] Gov. Ex. 1 at 37-38.
[8] *Id*. at 43.
[9] *Id*. at 49.
[10] *Id*. at 53.
[11] *Id*. at 56-57.

had somehow known Lijun or met Lijun before Elliott and I met him. . . . it seemed, in our mind at that point in time, like [Low] thought Elliott was very well connected and could be helpful to this issue."[12]

The defendant also testified that while she was still in China, shortly after the meeting with Sun, Michel said to her, "I have to put something on your computer. And then when we get back to America, give it to Elliott and, you know, Robin," and that he uploaded a document to her computer that contained "eight different cases that are pending [against Guo] or something."[13] The defendant confirmed that on their return flights, Broidy texted her, "I'll try to make this a big week with Jeff," referencing Attorney General Jeff Sessions and raising "both Jho Low and [] Guo."[14]

The defendant further explained that when Vice Minister Sun traveled to the United States for meetings regarding Guo: "I was caught off guard when he called me saying that he was already in the United States. And he called me directly on my mobile phone. . . . It fell outside the protocol, right? Because he shouldn't be calling me directly."[15] The defendant testified that Sun "referred to Mr. Broidy as my boss. And he said was your boss able to set up a meeting with Sessions or any meetings for me; I'm here in the United States."[16] The defendant testified that she

---

[12] *Id.* at 58-59.
[13] *Id.* at 61.
[14] *Id.* at 64-65.
[15] *Id.* at 65.
[16] *Id.* at 67.

then called Broidy and confirmed that "[Broidy] supposedly had sent over the information that had been put on my computer that I had forwarded to him and Robin. He had forwarded that to Attorney General Sessions, he said, along with a memo" and that "[Broidy] was trying to meet with Attorney General Sessions for drinks."[17] The defendant then emailed Broidy "a copy of the letter that had been sent over to Attorney General Sessions from the Chinese Embassy requesting meetings"[18] and that "[Michel] went to go meet with Sun Lijun and his delegation since they knew each other. . . . They wouldn't let him take a picture of it. . . But he read, out loud to me . . . the response they received from Attorney General Jeff Sessions."[19] The defendant testified that the response denied the request for a meeting with Sun but included "issues that, like, are very important to the United States. And one of them being the hostages—three American hostages. And in particular, one of the hostages is pregnant. And we want her to be released as soon as possible because soon she won't be able to travel."[20]

The defendant explained that the efforts to set up a meeting between Sun and then Secretary of Homeland Security John Kelly were unsuccessful but that Broidy met with "the Vice Minister," and that "Pras, me, and Elliott decided before that

---

[17] *Id.* at 68.
[18] *Id.* at 69.
[19] *Id.* at 70.
[20] *Id.* at 70-71.

meeting that Elliott should ask the Vice Minister to, in good faith, even though all of his meetings were canceled, to at least release the woman who was pregnant."[21] The defendant then texted Broidy, "[l]et's focus on other thing. Distract and redirect our client," and the defendant confirmed during her testimony that she meant that "the meetings didn't work out for Lijun, but let's try and work on the Malaysian Prime Minister-Trump meeting; maybe we can keep our client happy that way[.]"[22]

On June 30, 2017, the defendant texted Broidy, "Can we get proof today about revoke?" "From RP?" "Can we get proof today about revoke?" "Are you on a flight?"[23] Broidy responded, "Spoke to RP at length. Call me when you can."[24] The defendant explained that the messages were "about Guo. It was like revoking his visa."[25] The defendant further confirmed that "RP" was then White House Chief of Staff Reince Priebus.[26]

The events cited above reflect just some of the efforts undertaken by the defendant and her co-conspirators at the direction of Sun and the PRC regarding the removal of Guo. The defendant's testimony detailing this activity is corroborated by contemporaneous text messages and emails.[27] For Guo, Low was the nominal

---

[21] *Id.* at 73.

[22] *Id.* at 74.

[23] *Id.* at 78.

[24] *Id.*

[25] *Id.* at 79.

[26] *Id.*

[27] Gov. Ex. 1, Grand Jury Exs. 2-20.

paying client, but the defendant and her co-conspirators understood that they were working for Sun and the PRC.

B. The Defendant Knew that the Payments for the Influence Campaigns were Coming from Low

The defendant has also objected to the PSR claiming that none "of the money received by Prakazrel Michel [] originated from Low Taek Jho."[28] Again, the defendant's own sworn testimony disproves her claim. From the "first face-to-face meeting between Pras, Elliott, and myself," the defendant understood that the purpose was "to bring Jho Low on as a client[.]"[29] The defendant also explained that the co-conspirators contemplated from the beginning how to avoid seizure of payments from Low: "[Low] had a friend or friends who were helping him to pay for his legal bills because of his financial issues."[30] The defendant confirmed that "the implication was if the money was coming from Jho Low's friend instead of coming from Jho Low directly, then it wouldn't be subject to seizure[.]"[31] The defendant testified that the parties drew up a contract for Low to pay an $8 million retainer and a $75 million success fee for the influence efforts related to 1MDB and that the defendant would receive 25%.[32] The defendant further testified that during

---

[28] ECF No. 97 at 3.
[29] Gov. Ex. 1 at 15-16.
[30] *Id*. at 19.
[31] *Id*.
[32] *Id*. at 21-23.

the co-conspirators' first meeting with Low in Bangkok, Broidy pitched his connections and abilities to influence the administration on 1MDB, and "Elliott raised the issue of you've had so many of your assets forfeited, so how are you going to pay? And Jho Low said I have a friend who's helping me to pay for my bills."[33]

In describing the first wire transfer that followed the meeting with Low in Bangkok in May 2017, the defendant testified, "this is the first amount of money that actually came from Jho Low's associate into -- it would've gone to Pras first. . . . [I]t was somewhere around 2 million dollars," and that she and Broidy exchanged texts "for me to hammer Pras so that Pras could then pressure whoever he needed to, to have wires sent [for the full 8 million dollars]."[34] The defendant further confirmed that "money continue[d] to come in over the course of the spring and the summer. . . . eventually . . . the full 8 million came in. . . . And Mr. Broidy paid [the defendant] [her] percentage of that, which ended up being roughly 3 million."[35] The defendant also testified that Low's proxy was "Pheng Laogumnerd . . . . a Thai businessman."[36] Laogumnerd signed sham contracts with Michel's companies on behalf of Lucky Mark (HK) Trading Limited—a shell entity owned by Laugomnerd—in attempt to justify the payments for the influence campaigns.[37]

---

[33] *Id*. at 37.

[34] *Id*. at 47.

[35] *Id*. at 87-88.

[36] *Id*. at 90.

[37] *See, e.g.*, Gov. Ex. 2 at 11.

The defendant knew that Low was directing money to be paid to her co-conspirators through proxies in the spring and summer of 2017 and that the co-conspirators themselves had requested that the payments be made indirectly to conceal Low as the source of the money. This included multi-million-dollar wires from Lucky Mark that began within days of the co-conspirators' return from their first meeting with Low in Bangkok.[38] There is no question that the payments from Lucky Mark were directed by Low for the unregistered influence campaigns regarding 1MDB and Guo and that the defendant and her co-conspirators knew it.

### C. The Defendant Knew that the Final $7.5 Million that She Received was Related to the Influence Campaigns

The defendant's final factual objection to the PSR relates to the August 2017 payment from Michel. The defendant claims that the $7.5 million payment was unrelated to the Guo and 1MDB influence campaigns and "was for a legitimate investment opportunity within the entertainment field."[39] But the defendant previously testified that "[w]ay back in May, actually, when I first went to Thailand, Pras had said to me on that trip that, hey, the bigger picture is I got one of Jho Low's business associates to agree to invest in my entertainment fund."[40] The defendant explained that "[Michel] told me that he hadn't gotten the guy to sign off on a

---

[38] *See* Gov. Ex. 3 at 13.
[39] ECF No. 97 at 5.
[40] Gov. Ex. 1 at 88.

contract yet to, like, solidify it" and that she understood that whatever "would be beneficial that would deliver results on 1MDB, on the Malaysian Prime Minister's visit, on Guo . . . could help satisfy Jho Low and maybe help [Michel] just build a good relationship with Jho Low and the potential investor into the entertainment venture."[41] The defendant identified the "investor" as "Pheng Laougumnerd" and confirmed that she knew that Laougumnerd "was also the person that was sending the money for the Broidy work – for the Guo and 1MDB work -- or for the 1MDB work."[42] The defendant received $7.5 million from Michel's entity, Artemus, on September 5, 2017,[43] approximately two weeks after Michel received roughly $10 million from Lucky Mark[44] pursuant to a contract for "strategic communications, crisis management, and consultancy" with an agreed-upon fee of approximately $10 million.[45] This transfer was made within days of Michel and another co-conspirator, George Higginbotham, traveling to Macau to meet with Low regarding the work on 1MDB and Guo and coming up with "cover stories to explain the movement of money." *United States v. Higginbotham*, No. 18-cr-343-CKK, Factual Basis, ECF No. 13 at 5 (D.D.C. Nov. 19, 2018).

---

[41] *Id*. at 89.
[42] *Id*. at 90.
[43] Gov. Ex. 4 at 4.
[44] Gov. Ex. 5 at 2-3.
[45] Gov. Ex. 6 at 2, 4.

The defendant understood that at a minimum, the "investment" for entertainment ventures would not have been made without the work that she and her co-conspirators performed on the Guo and 1MDB influence campaigns. The defendant knew that the $7.5 million payment from Michel came from money paid for the illegal influence campaigns. The concept of the "entertainment ventures" was nothing more than a thinly designed cover for the defendant's receipt of millions of dollars to fund her participation in the corrupt influence scheme.

III.     Sentences Imposed in FARA Cases

As part of the plea agreement in this matter, the parties have agreed that because the "Sentencing Guidelines do not contain a guideline for a FARA violation," and because "there is no sufficiently analogous guideline," "the factors set forth in 18 U.S.C. §3553(a) shall control for this offense, except that any guidelines and policy statement that can be applied meaningfully shall remain applicable."[46] Because no guideline applies in this case, other sentences imposed in cases involving similar conduct are instructive.

- *United States v. Imaad Zuberi*, Nos. 2:19-cr-642 & 2:20-cr-155 (C.D. Cal. 2019 & 2020): In 2021, Imaad Shah Zuberi was sentenced to 60 months on a FARA charge and ordered to pay a $1 million fine for the FARA count after pleading guilty to violating FARA, committing tax evasion, making illegal foreign contributions, and obstructing justice. Zuberi's FARA conduct and the payments he received for the illicit lobbying are comparable to the defendant's and her co-conspirators' efforts on behalf of Low and the PRC and their compensation:

---

[46] ECF No. 15 at 32.

- "Between November 28, 2013 through March 5, 2014, defendant met with high-ranking officials of the Government of Sri Lanka ("Sri Lanka") and negotiated an agreement . . . [to] engage in lobbying and public relations efforts to rehabilitate Sri Lanka's image in the United States. . . . In return, Sri Lanka-WR contract required the payment of $8,500,000. . . . Defendant solicited, on behalf of Sri Lanka, Members of the U.S. Congress to accept all-expense-paid trips to Sri Lanka, authored emails and wrote proposals for Sri Lanka . . . and coordinated and participated in a series of meetings in Washington, D.C., between a [] delegation and members of U.S. Congress and their staff." *United States v. Zuberi*, No. 2:19-cr-642, Factual Basis for Plea Agreement, ECF No. 5 at 62 (C.D. Cal. 2019).

- *United States v. Paul Manafort*, No. 17-cr-201, (D.D.C. 2017): In 2018, Manafort was sentenced to 73 months' imprisonment for two conspiracies, including 60 months for his conspiracy to violate FARA. Manafort's unregistered lobbying on behalf of Ukraine, while more extensive, was analogous to the defendant's and her co-conspirators' unregistered lobbying efforts, and Manafort and Broidy used the same lobbyist, former Trump campaign advisor Rick Gates, for their influence efforts:

  - "From 2006 until 2015, Manafort led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine. . . . Manafort hired numerous firms and people to assist in his lobbying campaign in the United States. . . . These companies and law firm were paid the equivalent of over $11 million for their Ukraine work. . . . Filing under the Foreign Agents Registration Act would have thwarted the secrecy Manafort sought in order to conduct an effective campaign for Ukraine to influence both American leaders and the American public." *United States v. Manafort*, No. 17-cr-201, Statement of Offense, ECF No. 423 at 2-3 (D.D.C. 2018).

- *United States v. Tongsun Park*, No. 1:05-cr-59 (S.D.N.Y. 2005): In 2007, Tongsun Park was initially sentenced to 60 months' imprisonment after

being convicted at trial for conspiracy to violate FARA, 18 U.S.C. § 951, and to commit money laundering in connection with a scheme to lobby for easing United States and United Nations sanctions on Iraq and to corruptly influence the award and conditions of Oil for Food contracts. The court subsequently reduced Park's sentence to 37 months after a substantial assistance motion was filed by the government. *See United States v. Park*, 619 F. Supp. 2d 89, 91 (S.D.N.Y. 2009).

Like the defendants in the cases listed above, the defendant and her co-conspirators agreed to lobby on behalf of a foreign principal, Low, and a foreign government, the PRC, in exchange for millions of dollars. They sought to end a Department of Justice investigation into the largest foreign embezzlement scheme ever charged, and they sought the extrajudicial removal of a Chinese businessman in exile with no regard for due process or the ramifications for U.S. foreign policy or national security.

The defendant and her co-conspirators traveled internationally to meet with Low and Sun; they kept Low and Sun informed of their work; they met with Sun in Washington, D.C. to assist him in his efforts to meet with high-level United States officials; they met with the Malaysian Prime Minister in D.C. to prepare him for a meeting with the President of the United States; they successfully enlisted others with ties to the administration, including Gates and Wynn, to assist in their influence efforts; and on behalf of their foreign sponsors, they drafted and/or sent correspondence to top government officials, including the Attorney General, the Secretary of State, the White House Chief of Staff, and the President of the United

States. In return, the defendant was paid over $10 million, and the co-conspirators were paid $100 million in total.

The defendant's scheme is one of the most far-reaching, well-compensated FARA schemes in history. While the defendant herself was not the principal lobbyist, she played a pivotal role as demonstrated by her nearly constant communication with the key influencer, Broidy, and her persistent urging that Broidy increase his influence efforts.[47] Moreover, the defendant served as an indispensable member of the conspiracy by connecting Broidy with Michel and their foreign benefactors and by gathering updates and information to relay to Low and Sun concerning the co-conspirators' ongoing efforts. Her sentence should reflect the scope and reach of this FARA conspiracy, especially in light of the sentences imposed for similar conduct committed by other defendants as referenced above.

The PSR recommends a sentence of three month's imprisonment and notes probationary sentences imposed in *United States v. Samuel Patten*, *United States v. Nisar Chaudhry*, and *United States v. Abdel Azim El-Siddiq*.[48] In *Patten*, the defendant was a cooperator and the government moved to reduce his sentence based on his substantial assistance. In *Chaudry*, while the relevant docket entries are sealed, it appears that the circumstances may have been the same. In *El-Siddiq*, the

---

[47] Gov. Ex. 1, Grand Jury Ex. 14.
[48] Final PSR, ECF No. 106 at 52.

defendant received little to no compensation for his work and facilitated payments of $75,000 to another individual acting as an agent of a foreign principal. *United States v. Abdel Azim El-Siddig*, no. 07-cr-87, Plea Agreement, ECF No. 538 at 2-4 (W.D. Mo. 2010). None of these cases involve lobbying at the levels accomplished by the co-conspirators here or profits commensurate with those that the defendant and her co-conspirators received. Further, the defendant disputes the factual basis for her plea, minimizes her culpability, and has recanted her prior testimony, thereby nullifying her initial cooperation with the government. Sentences imposed on genuine cooperators after government motions for sentencing reductions do not provide analogous examples for comparison.

IV.   Forfeiture

In her plea agreement, the defendant has agreed to forfeit $3 million, which represents the minimum net proceeds of her offense. The defendant has refused to sign a preliminary order of forfeiture. The government requests that the Court sign and enter a final order of forfeiture which the government will present at sentencing requiring the forfeiture of the $3 million in proceeds from the offense.

V.   Cooperation & Acceptance of Responsibility

The defendant ceased cooperating fully in late 2021. She has recanted portions of her factual basis and undermined her credibility and any usefulness she could have to the government in related cases. The defendant's incomplete

cooperation and denial of facts that she has previously admitted under oath in multiple federal proceedings do not demonstrate genuine cooperation or acceptance of responsibility. The government's sentencing recommendation does reflect Lum Davis's initial guilty plea and cooperation, distinguishing her to some extent from a defendant who proceeds to trial and offers no cooperation. But the defendant's subsequent denial of the factual basis underlying her plea makes her "an unreliable and unusable witness." *United States v. Hyatt*, 207 F.3d 1036, 1039 (8th Cir. 2000) (affirming denial of a motion for substantial assistance and noting "the court opined that the Government would be remiss if it tried to use [defendant] as a witness, in light of the false testimony he had offered."). In the absence of the defendant's initial plea and cooperation, the government would recommend a more substantial sentence commensurate with those imposed on defendants convicted of similar conduct as discussed above.

### VI.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Section 3553(a) of Title 18 of the United States Code governs sentencing in federal criminal cases and provides that the Court shall consider, in relevant part: "the offense . . . the history and characteristics of the defendant . . . respect for the law . . . just punishment . . . adequate deterrence . . . the sentencing range . . . and the need to avoid unwarranted sentencing disparities," all in imposing a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

The defendant's offense conduct is serious. The defendant and her co-conspirators worked on behalf of Low and the PRC government to illegally influence the President and his Administration to take actions that were contrary to our national interests: dropping a massive kleptocracy case and accommodating a request from the PRC for the extrajudicial removal of a vocal political critic. To fully exploit their influence, the defendant and her co-conspirators hid that they were working on behalf of Low and the PRC government. As stated by the sentencing judge in *Manafort*, "[t]his deliberate effort to obscure the facts, this disregard for truth undermines our political discourse and it infects our policy making. If the people don't have the facts, democracy can't work." *United States v. Manafort*, No. 17-cr-201, Transcript of Sentencing, ECF No. 554 at 63:17-20 (D.D.C. Mar. 19, 2019).

FARA plays a fundamental role in our democracy. The purpose of FARA is disclosure "to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in . . . [political] activities for or on behalf of foreign governments . . . and other foreign principals so that the Government and the people of the United States may be informed." 22 U.S.C. § 611, note on Policy and Purpose, 56 Stat. 248-49 (1942). In short, FARA protects the integrity of the American political system by enabling Americans to consider and evaluate the identity of foreign persons behind certain efforts to

influence our government. The defendant undermined that integrity for personal profit, and her motives were not benevolent. She sought to help one of the largest international fraudsters in history avoid prosecution and sought to assist the PRC government in seizing one of its nationals from the United States without due process of law.

Finally, the defendant has not demonstrated contrition, respect for the law, or acceptance of responsibility. The defendant has minimized her conduct and contradicted her factual basis in her sentencing statement, and she has made false, manufactured claims of misconduct in an effort to avoid the consequences of her crime. This sequence, much like the sequence observed by the court in *Manafort*, "suggest[s] that [the defendant] was trying to get the benefit of the plea without the obligation . . . . [and] minimize[d] h[er] conduct . . . in ways that . . . were intentionally false. And it's all very problematic . . . because court is one of those places where facts still matter." *Manafort*, ECF No. 554 at 68:9-17.

The facts are clear and they should matter. The defendant committed a serious offense; she has denied responsibility and sought to delay and distort these proceedings for her advantage; and other defendants convicted of similar crimes have faced 60-month sentences for violations of FARA. The Court's sentence should ensure just punishment and provide adequate deterrence for others seeking to profit from their relationships with government insiders or officials by secretly

selling their services to promote foreign agendas contrary to our national interests.

The defendant should be sentenced to 30 months' imprisonment.

DATED: October 21, 2022, at Honolulu, Hawaii.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

*/s/ John D. Keller*

By: JOHN D. KELLER
Principal Deputy Chief
Sean F. Mulryne
Director of Enforcement & Litigation,
Election Crimes Branch
Nicole R. Lockhart
Trial Attorney
Public Integrity Section

*/s/ Kenneth M. Sorenson*

KENNETH M. SORENSON
Chief, Criminal Division

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

<u>Served Electronically through CM/ECF</u>:

     William McCorriston, Esq.
     James Bryant, Esq.

Attorneys for Interested Party
NICKIE MALI LUM DAVIS

DATED:  <u>October 21, 2022</u>

                                   *Sean F. Mulryne*
                                   Sean F. Mulryne