McCORRISTON MILLER MUKAI MacKINNON LLP

WILLIAM C. McCORRISTON       #995-0
DAVID J. MINKIN              #3639-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai'i  96813
Telephone: 808.529.7300
Facsimile: 808.535.8056
E-Mail:    mccorriston@m4law.com; minkin@m4law.com

JAMES A. BRYANT (*pro hac vice*)
The Cochran Firm California
4929 Wilshire Blvd., Suite 1010
Los Angele, CA 90010
Telephone: 323-435-8205
Facsimile: 310-802-3829
E-mail:    jbryant@cochranfirm.com

Attorneys for Defendant
NICKIE MALI LUM DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | CR. NO. 20-00068 LEK |
|---|---|
| Plaintiff, | DECLARATION OF NICKIE MALI LUM DAVIS |
| vs. | |
| NICKIE MALI LUM DAVIS; | |
| Defendant. | |

## DECLARATION OF NICKIE MALI LUM DAVIS

I, NICKIE MALI LUM DAVIS declare and state the following:

1. Sometime in or around early 2018, I learned that the Department of Justice ("DOJ") out of Washington D.C. had reached out to Pras Michel ("Michel"), a business associate of mine, regarding our dealings with Malaysian businessman Lo Tak Jho ("Jho Lo").

2. Because I had been involved with Michel related to some of his dealings with Jho Lo, I felt it was prudent to retain an attorney in case the DOJ reached out to me. In deciding on counsel, I sought to retain Abbe Lowell ("Lowell") given his reputation as one of the best federal criminal defense attorneys in the country and a personal history with him.

3. Following the retention of Mr. Lowell's services, Mr. Lowell and his firm took the lead in addressing the DOJ's investigation into matters related to my dealings with Elliott Broidy ("Broidy"), Michel and Jho Lo.

4. By the end of the summer of 2019, I had participated in two proffers with the DOJ. However, following my second proffer in August of 2019 it would be almost an entire year before I would hear from the DOJ again.

5. During that same period, I had very minimal contact with Mr. Lowell as well.

6. On July 1, 2020, seemingly out of nowhere, Mr. Lowell contacted me to inform that Mr. Keller had reached out to him and informed him that the investigation was going to be moving forward once again.

7. Prior to Mr. Keller reaching out to Mr. Lowell on July 1st, Mr. Lowell had informed me that due to the fact that my involvement was so minimal and that I was on the low end of the totem pole, the government would likely be fairly generous in dealing with me if I was helpful and a cooperative witness.

8. Several days following my July 1st conversation with Mr. Lowell, he called to inform me that the government was seeking to enter into a plea agreement with me in exchange for my cooperation. However, I was completely taken aback when Mr. Lowell informed me that I would have to accept a one-count felony plea for violating Title 18 United States Code Section 2 (aiding and abetting) violations of Title 22, United States Code, Sections 612 and 618(a), aiding and abetting failure of another person to register as a foreign agent in violation of FARA. Further, Mr. Keller demanded that I needed to make an immediate decision on PIN's offer, and should I fail to accept the felony plea deal, the DOJ intended to file a criminal complaint against me alleging numerous criminal counts against me.

9. Based upon my prior discussions with Mr. Lowell regarding the possible outcomes of this investigation should I participate and cooperate with the government, never once was the idea of a felony ever presented as a real

possibility, so naturally when I was informed of the government's offer I was in complete shock.

10. Despite several weeks of protest, Mr. Lowell ardently pushed to get me to accept the felony plea for one count of aiding and abetting a FARA violation. I found his change in tone and tenor to be odd, given that nothing new had been revealed nor had there been any changes in the investigation as far as I was led to believe. However, at that point in time, given Mr. Lowell's reputation and given the fact that I had seemingly believed he had my best interest at heart, I believed that he had researched all facts that could be helpful to my case, and that he had exhausted all pre-indictment legal options available to me. I completely trusted Mr. Lowell's advice which would ultimately be to my detriment, as I would later learn. Nothing he said to me following the government initiating investigations into him were honest or true or in my best interest.

11. Mr. Lowell then informed me that while the government's threat to file numerous charges against me was meritless, the cost of his attorney's fees to simply defend against those frivolous claims would exceed well over $2 million dollars. Most importantly, Mr. Lowell then represented that if I decided to fight the case I would risk being taken away from my daughter if convicted. He then informed me that if I agreed to accept the government's proposed plea deal, the DOJ **would not** recommend anything more than probation, and that the Court

would likely follow this recommendation, due to the fact that there are no sentencing guidelines for this type of criminal act given that it has never been prosecuted.

12. Following this conversation, now having to face the prospect of being taken away from my daughter I was absolutely terrified.

13. On or about August 16, 2020, based upon Mr. Lowell's representation that in exchange for my cooperation against Elliott Broidy and others, the DOJ would not recommend any jail time, therefore avoiding the possibility of my daughter being taken away from me, and having believed that Mr. Lowell had exhausted all available options prior to encouraging me to enter into the plea, I agreed to sign the Memorandum of Plea Agreement ("MOPA").

14. Following the signing of the MOPA, the Court set an arraignment date for August 31, 2020. However, despite signing the MOPA, Mr. Lowell informed me that until I entered into a plea before the Court, I could rescind the plea agreement at any time.

15. On or about August 25, 2020, Mr. Lowell contacted me and informed me that the government was requesting that I sign a conflict-of-interest waiver related to Mr. Lowell's representation of two Chinese national's whom I had engaged with in the past. I remember that Mr. Lowell had briefly brought this up in August of 2019, when he drafted an email for me and asked me to send it back to

him regarding his representation of these Chinese nationals. Further, it was always my understanding based upon Mr. Lowell's representations that the conflict arose out of the fact that he represented all parties at one point or another, and due to that representation, the government needed to obtain a conflict wavier from me.

16. The following day, Mr. Lowell contacted me, and my local counsel William McCorriston and David Minkin, to inform us that he needed to have us all participate on a video call to discuss the conflict waiver.

17. During the video call Mr. Lowell's main focus of discussion was about his representation of the Chinese Nationals, how he came in contact with them, his relationship with them and how he received a FARA letter pertaining to them sometime in April 2020. The way in which Mr. Lowell presented the information would never have led one to believe that he himself was the target of any type of investigation.

18. I do not recall Mr. Lowell bringing up any other clients that may have posed a conflict during the video call, however, if he did it was without any substantive detail to the extent that it was certainly not memorable.

19. On that basis, I had no reservations nor did Mr. McCorriston or Mr. Minkin express any reservations about the conflicts waiver, as I assumed it was routine conflict waiver that attorneys periodically have clients sign when they represent more than one party that may have a relationship with one another.

However, it was only much later that I would discover what the true purpose of the conflict waiver was for and it was an absolute breach of my trust. It was hard for my to even comprehend Mr. Lowell's deceit, after I trusted him with my life.

20. At no point to date, has Mr. Lowell ever disclosed to me directly that he was possibly being investigated for criminal and or civil violations by either the National Security Division ("NSD") or PIN, during the same time that both PIN and the NSD were involved in the investigation and prosecution of the case involving me and Elliott Broidy. As stated above, Mr. Lowell had always represented to me that the conflicts were related to his representation of another client; he has never informed me that the conflict was with him, and that he was being investigated by PIN and the NSD.

21. The idea that Mr. Lowell was being investigated by criminal prosecutors relating to possible FARA violations of his own, having received a detailed letter about his dealings with the Chinese Nationals and possibly others, all while he was representing me in a case where I was being prosecuted for aiding and abetting a FARA violation is mind blowing. This was not as if he was being investigated for some state criminal statute in New York or federal tax evasion matter. Instead, he was literally being investigated on the basis of whether he was required to register under FARA, and failed to do so.

22. Further, I was shocked to learn that Mr. Lowell was also being investigated by PIN prosecutors for possible bribery and violations of the Lobbying Disclosure Act, during the exact same time I was being prosecuted by Mr. Keller and PIN prosecutors, and that these potential criminal acts included my alleged co-conspirator Elliott Broidy. In the many hours spent with Mr. Lowell and conversations during the course of his representation of me, he never once mentioned this prior to it being broken by the national news in December 2020 and even then I didn't understand the full scope of the investigation except from media reports.

23. I had put great trust into Mr. Lowell. The idea that he did not disclose plainly the fact that he was being investigated by the NSD for his possible failure to register under FARA, and that he was also being investigated by PIN for possible bribery and LDA violations, which included Mr. Broidy (who could have served as an adverse witness against Mr. Lowell, a co-conspirator or both), is incredulous and the idea that I would have forgotten he disclosed that type of information from me is beyond the pale of reason.

24. Had Mr. Lowell disclosed to me these actual conflicts, prior to my August 31, 2020 arraignment and plea hearing, I WOULD HAVE NEVER proceeded with Mr. Lowell as my attorney, because there is simply no way that I

could have trusted that the plea that he had been pushing me so hard to agree to was in my best interest rather than his.

25. Further, given the fact that his potential criminal conduct involved Elliott Broidy, I would have immediately questioned if he was essentially giving me up to the government in order to get a better outcome for his own personal issues with the DOJ. Even Mr. Keller in his August 26, 2020 email to Mr. Lowell (only seen recently during our motions to dismiss the prosecutor in the Spring of 2022) where Mr. Keller demanded that Mr. Lowell obtain my waiver in order to avoid the appearance that Mr. Lowell "delivered" me to the government, for a more favorable outcome related to his investigations as evidenced by <u>Exhibit A</u> below iterates the same thought by Mr. Keller himself.

| From: | Keller, John (CRM) |
|---|---|
| To: | Lowell, Abbe |
| Subject: | RE: Conflict Provision |
| Date: | Tuesday, August 25, 2020 9:51:00 PM |

I'm not—I'm not involved with the FARA piece. Feel free to edit the draft language. But we need to place on the record something to reflect the potential for you to be inclined to assist the government through facilitating Lum Davis's cooperation in this matter in order to gain favor in your other unrelated dealings with the Department.

Ex. A

26. On that basis, I would have rescinded the MOPA, and sought new counsel with a specialization in FARA matters to provide me with a second opinion whether entering into a plea at that time would have made sense. However,

under no circumstances would I have entered a guilty plea on August 31, 2020 with such absolutely disturbing knowledge.

27. Mr. Lowell's lies and deceit did not stop there I found. Following a February 2021 call between my attorneys and PIN prosecutors, I was taken aback by the fact that during this call not only did Mr. Keller state that the government never agreed (that in exchange for my cooperation) they would limit their sentencing recommendation to probation, and I was appalled to discover that Mr. Lowell had never even approached Mr. Keller with such a proposal during plea negotiations despite representing to me that he had reached an agreement to do so. Mr. Lowell got me to agree to the plea by saying it would keep me out of jail and with my daughter.  He knew how much my daughter meant to me and that was the one thing he knew I could not refuse or argue.  Uncovering this final lie was the catalyst for me terminating Mr. Lowell's services shortly thereafter. Being informed that significant jail time was not off the table, despite my cooperation and Mr. Lowell's representations to me served as an absolute betrayal of my trust. Mr. Lowell had lied to me to get me to agree to the plea because he knew my weakness as a mother was my daughter and that is sickening.

28. Finally, at no time did Mr. Lowell ever advise me at any point that I had an option to appeal the matter to the Office of the Deputy Attorney General prior to me entertaining a guilty plea. Being that I was the first person in U.S.

history to ever be prosecutor for aiding and abetting a FARA violation for a foreign individual not associated with a foreign government, while numerous others were allowed to back register under FARA who were engaged in the same work was greatly upsetting. It could not have hurt to make an attempt to argue that the case against me could have been resolved in less penal ways. While Mr. Broidy's counsel went through this process, Mr. Lowell did not even propose it as a possibility.

    I, Nickie Mali Lum Davis, do declare under penalty of law that the foregoing is true and correct.

    DATED:  Los Angeles, California, October 22, 2022.

*/s/ Nickie Mali Lum Davis*
Nickie Mali Lum Davis