## SECOND DECLARATION OF ABBE D. LOWELL

I am an attorney admitted to the state bars of New York, the District of Columbia and Maryland, as well as numerous federal trial and appellate courts and the United States Supreme Court.  I am providing this additional declaration (to the one I signed on June 2, 2020) following the Order of the U.S. District Court in the District of Hawaii dated May 25, 2022, USA v. Davis, Cr. No. 20-00068 LEK, Dkt. 65; Dkt. 66-1.

A.    Ms. Davis Was Not Initially Offered The Plea She Now Complains About; She Was Facing Multiple Felony Charges In Two Different Jurisdictions

1.    The entire premise of Ms. Davis' motion ("not once was the idea of a felony ever presented") and her declaration are false.  When the DOJ contacted me in July 2020, they did not approach me with a one count, aiding and abetting FARA violation offer for her as the starting position.  Instead, they made it clear and I conveyed to Ms. Davis that they planned to file multiple felony charges (among the crimes mentioned were conspiracy, money laundering, FARA violations, bank fraud and others) in two cases – one in Washington, D.C. and the other in Hawaii.  It was only through hard negotiations that I was able to get the DOJ to agree to a single aiding and abetting charge once Ms. Davis decided she did not want to face two trials with so many felony charges.  It was her exposure to many serious charges that caused her to decide to plead guilty.

2.    I had met Ms. Davis some time ago in Los Angeles.  In the spring of 2018, there were media inquiries to her and others about her activities with Elliot Broidy, Pras Michel, Jho Low and others.  Ms. Davis asked me to represent her as these issues appeared to grow and be under investigation.

3.    Ms. Davis' Hawaii house was searched in July 2018, and I spoke with prosecutors in Hawaii and Washington, D.C. when that happened to understand why, her status and what was going

to occur next.  During those calls, the prosecutors informed me they had concerns about Ms. Davis' activities on behalf of foreigners and a great deal of money she had received.  During the search, agents had seized tens of thousands of dollars in cash that were in bound stacks in her closet.  They indicated they were looking at these as the proceed of illegal conduct and as money laundering.  I conveyed all of this to Ms. Davis, who also was talking with two other attorneys who she knew and had worked with for some time – James Bryant (L.A.) and William McCorriston (Hawaii).

4. In February 2019, other reporters started to ask questions about campaign contributions Ms. Davis and her husband Larry Davis had made to Republican PACs and candidates and whether the contributions were conduits from foreign sources.  Ms. Davis asked if I could represent her husband, and I advised her it would be better for him and her if he had separate counsel.

5. Over time, the Department of Justice Criminal Division's Public Integrity Section (led by Deputy Chief John Keller) started contacting me and, during the first half of 2019, I and Mr. McCorriston continued to have communications with the prosecutors in both locations (Keller in Washington and Assistant U.S. Attorney Ken Sorenson in Hawaii) about the seized materials, the cash found in the closet, subpoenas issued for more information, and, ultimately, for an attorney "proffer" of what Ms. Davis might know.  The prosecutors indicated that they saw Ms. Davis as a less involved actor in their investigation of Low and others but still believed she had violated the law.

6. Once parameters for any proffer session with Ms. Davis were negotiated and worked out, meetings with the prosecutors and agents occurred in June and July 2019.  The prosecutors indicated their intent was to charge Ms. Davis and others with felonies (for Davis, cases were

2

being considered both in Washington and Hawaii), but they were willing to consider not filing multiple felonies in two jurisdictions.

7. After the proffer sessions in the summer, the DOJ and Hawaii U.S. Attorney's Office did not get back in touch with Ms. Davis or me until July 2020. In July 2020, Mr. Keller asked to re-engage with Davis, and, with the direction and consent of Ms. Davis, we did so. When Mr. Keller contacted me in July 2020, he said the prosecutors in both locations had developed a lot more information since we had met and now were soon going to file charges against Ms. Davis, Mr. Broidy, Mr. Michel, Mr. Low and were considering others as well. Mr. Keller and Mr. Sorenson said again they also believed there was evidence to support separate felony charges of Ms. Davis in Hawaii based on money and a mortgage she had received for her house there.

B. Ms. Davis Decided To Seek A Plea Agreement Solely Because Of The Serious Exposure She Faced

8. After the July 2020 call, I immediately contacted Ms. Davis and told her what Mr. Keller had said. In the various conversations that occurred in this period with Ms. Davis about the DOJ's position, I never raised the issue of Ms. Davis' daughter. Ever. It was Ms. Davis who said she was concerned that facing two trials with multiple felony counts could result in her being convicted and sentenced to jail and being separated from her family.

9. Ms. Davis is again not accurate when she states that I "ardently pushed for her to accept a felony plea" or that I "got her to agree" to her plea. It is my long-standing practice never to do more with any client than to explain if they have a defensible case and to explain the sentencing guidelines for any outcome and then to allow a client to make a decision. I have tried over 25 cases in more than a dozen states and close to 20 districts (and I am in such a

criminal trial now in New York).  I was not in any way reluctant to try Ms. Davis' case(s) if she chose to do so.

10. I had no reason or motive or incentive to "push her to accept a felony plea."  Her previously stated theory was I was trying to curry favor with the prosecutors who were investigating me. My prior declaration and the documents already provided the Court make clear that was not the case.  *See* Dkt. 66-1 and 83 (Lowell June 2, 2020 Declaration and Exhibits). As Ms. Davis has stated, " [i]f in fact Mr. Lowell was unaware until speaking on August 25, 2020, with Mr. Keller and then the filter team, then there would have been no conflict of the probe because Mr. Lowell's conduct could not be altered by circumstances about which he was completely unaware." Dkt. 58, at 22. And as the DOJ has stated, "No one on either the prosecution team or the filter team initiated a criminal investigation of Mr. Lowell.  Ever." Dkt. 72-1, at p. 3,

11. When Ms. Davis realized her claim of some improper motive I allegedly had in July was proven false by the timing of the DOJ August 2020 call, Ms. Davis changed her story and now alleges my incentive to force her plea was because I was under a FARA criminal investigation.  Again, that is not true.  The April letter from the FARA Unit asked questions about my law firm's and my representation of two clients (who Ms. Davis misidentifies). The letter did not say there was any investigation but merely asked questions and raised the issue of registration.  I provided the FARA Unit with answers to the questions and was never asked to register or told there was any investigation. When Mr. Keller called me on July 1, 2020, he indicated that the matter had been resolved.  Again, there was nothing about the April letter that would or could affect my negotiations with a different DOJ section or my work for Ms. Davis at all.

12. On this matter, I explained to Ms. Davis that she had a defensible case on the potential FARA charge, but that the amount of money she received for doing virtually no work, the fact that the DOJ was prepared to show the money she received came from Jho Low, and the venue of the charge in Washington, D.C. would be challenging. In addition, Ms. Davis expressed great concern about being at the same defense table with Mr. Broidy and Mr. Michel, the people with whom she was dealing in assisting Mr. Low. In fact, Ms. Davis said repeatedly that she even wanted to sue Mr. Broidy and Mr. Michel once she found out during the investigation about side deals and other funds they had received and did not share with her. I had advised her the risks of bringing such suits under all the circumstances.

13. I did not advise her about the defensibility of charges to be filed in Hawaii because I did not know the details, and she had Mr. McCorriston there who knew the prosecutors and I understood knew of Ms. Davis' actions with respect to her house and financing.

14. Ms. Davis' claim that I told her that "the DOJ would not recommend anything more than probation" is false. While I tried hard to get the DOJ to accept a civil outcome or a misdemeanor or a plea which included an agreed-upon probation sentence, Mr Keller made it clear that was not an outcome the DOJ would accept, and he never said (and therefore I never conveyed) that probation was the agreed-upon sentence. The DOJ and the U.S. Attorney were firm that the various factors – two different investigations in different states, over $ 10 million she received in alleged criminal proceeds, the source of the funds she received, her use of those funds, her involvement with Jho Low, her mortgage application and other reasons  – resulted in their view that they would either get some felony plea agreement or bring the charges they described in two different cases. I negotiated to create a potential plea

in which no sentencing guidelines existed in an effort to maximize the possibility of probation, something the DOJ never promised to me and I would never promise to any client.

15. With respect to her allegation that I did not advise her of her ability to seek a meeting with the Deputy Attorney General, she misstates the conversation we had as well. She asked if we could seek any further review of the plea offer and, of course, I told her we could. I used the term "up the chain." I explained the chain was the head of the Public Integrity Section, the Assistant Attorney General for the Criminal Division and then the Deputy or Attorney General. I told her Mr. Keller had told me his decision had already been approved by the Section Chief and the Assistant Attorney General. Ms. Davis asked if I had ever been successful in getting such an approval to prosecute reversed by the Deputy Attorney General or Attorney when the Section Chief and Assistant Attorney General had approved it. I told her that, under those circumstances, I had not. I again mentioned that she was not just facing felony charges based on her conduct with Mr. Low, but that she also was facing charges in Hawaii which would likely still have to be addressed even if the D.C. charges were never filed. She and I (and presumably Mr. McCorriston to whom I had spoken and sent memoranda of my DOJ calls) decided that a meeting was not likely to change the result. That was why no further appeal "up the chain" was made. Ms. Davis points now to the fact that Mr. Broidy's counsel (a former Deputy Attorney General himself) got a meeting with the ODAG but does not point out that, following that meeting, Mr. Broidy was still going to be indicted for multiple felonies and then decided himself to plead to the more serious felony of conspiracy.

C.  Ms. Davis And Mr. McCorriston Were Actively Involved In Deciding The Plea Agreement

16. Ms. Davis and her other counsel indicated they were minimally involved in the plea negotiations in July.  That is not true.  July was when negotiations occurred.  I conveyed the details of the calls I was having with the DOJ to Ms. Davis and Mr. McCorriston including a critical call on July 23.   Indeed, on July 24, I sent a seven-page, single-spaced memorandum that recounted all that was being said in the calls with the DOJ.  Exhibit 1.  I also advised her of the details of negotiations on August 7, 2020 by sending another (this time five single-spaced page) memo about a call with the DOJ.  Exhibit 2.  After that, I had additional calls with Ms. Davis and Mr. McCorriston, and Ms Davis herself began providing line edits (copying Mr. McCorriston) to the drafts of the plea documents that were sent by the DOJ.  E.g., Exhibits 3 and 4.  These emails and memoranda contradict the assertions about their knowledge of and involvement in the process.

D.  Ms. Davis' Final Agreement And Aftermath

17. After numerous calls and correspondence (the COVID pandemic was in full throttle and there were no in-person meetings), the DOJ made its final offer (only one aiding and abetting of others' FARA violations and no other charges in Hawaii or Washington and a reduction of forfeiture from $10.5 million and/or potentially her Hawaii house to $ 3 million).  They also agreed that there would be no campaign contribution or other charges against her or any family member (one of whom had also received some of the funds sent from Thailand). The government agreed to bring Ms. Davis' cooperation to the attention of the Court and for her to get credit for that.  They also agreed that there were no sentencing guidelines applicable to the offense, and that was part of our request to the prosecutors so that we could argue that Ms. Davis should get probation.

18. In this period of the negotiations, I successfully arranged for Ms. Davis to travel internationally for a business trip and for the DOJ to agree that Ms. Davis would have personal recognizance and several other non-restrictive conditions of release after her plea.

19. As my prior declaration and the exhibits (that have specific references to the "FARA letter" and the" taint team") demonstrate, I disclosed all I had understood about the FARA letter and taint team to Ms. Davis and Mr. McCorriston.  Her plea was negotiated before the August 26 call, and the conversations had no impact on her decision to plead guilty.

20. Ms. Davis was completely satisfied with her plea agreement, especially when Mr. Broidy pled guilty in October to a more serious charge.  All that changed in January 2021.  After her plea, Ms. Davis said she wanted to pursue a presidential pardon, and she asked me to assist her.  I told her I could not do so because I was advising a person in the administration who was involved in the executive clemency process.  Ms. Davis expressed extreme disappointment and displeasure in my declining to help in that matter.  The issues which are now being litigated started only after Mr. Broidy was able to use his advisors to obtain a last-minute pardon from President Trump on January 20, 2021, and Ms. Davis was not.

21. Even after that, I continued to press hard for the DOJ to allow Ms. Davis to withdraw her plea and change the resolution to a civil matter or misdemeanor in light of the unfairness involved in the principal getting a pardon and Ms. Davis not receiving one.  Mr. McCorriston and Mr. Bryant were involved in those efforts and heard my conversations (often heated) with Mr. Keller, the person Ms. Davis and her counsel allege I was seeking to please.

22. As the facts demonstrate, I zealously advocated on her Ms. Davis' behalf and achieved a very good result for her and her family.  I had no conflicts at the time of her plea negotiations, her

agreement, or afterwards.  I advised her of her options and possible outcomes, and I advised

her of any information provided to me by the DOJ about issues in which I was involved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 24, 2022                                    ___/s/ Abbe David Lowell_____
                                                                              Abbe David Lowell