# EXHIBIT 1

| | |
|---|---|
| **From:** | Lowell, Abbe |
| **To:** | nickielumdavis |
| **Cc:** | Man, Christopher; Porter, Jennie; "mccorriston@m4law.com" |
| **Subject:** | ATTORNEY CLIENT PRIVILEGE, ATTORNEY WORK PRODUCT |
| **Date:** | Friday, July 24, 2020 11:06:00 AM |
| **Attachments:** | Memo re July 23, 2020 Call with DOJ.DOCX |

Nickie and Mac,

Here is a file memo of our call yesterday.  Today Jennie and I spoke with and will speak again to DOJ to tell them orally our concerns with various paragraphs.  The time difference among us makes it difficult (as I am also trying to get some time off in the afternoons), but we need to catch up.

Abbe


## Abbe David Lowell
**Partner**

Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036

D: +1 202-282-5875

F: +1 202-282-5100

200 Park Avenue
New York, NY 10166-4193

D: +1 212-294-3305

F: +1 212-294-4700

VCard | Email | winston.com





North America   Europe   Asia

1901 L Street, NW
Washington, DC 20036
T +1 202 282 5000
F +1 202 282 5100

Internal Memorandum

**ATTORNEY-CLIENT PRIVILEGED**
**ATTORNEY WORK PRODUCT**

**To:**      Nickie Lum Davis File

**From:**  Jennie Porter

**Date:**   July 23, 2020

**Re:**      Call with DOJ re Plea Agreement and Information

On July 23, 2030, Abbe David Lowell ("Abbe"), Chris Man, and Jennie Porter of Winston & Strawn LLP (W&S) had a telephone call with attorneys from DOJ to discuss Nickie Lum Davis' ("Davis") plea agreement and draft information. On the call for the DOJ were John Keller (Deputy Chief of the Criminal Division's Public Integrity Section), Nikki Lockhart (Trial Attorney, Public Integrity Section), Sean Mulryne (Trial Attorney, Public Integrity Section), James C. Mann (Trial Attorney, Public Integrity Section). Ken Sorenson (Assistant United States Attorney, District of Hawaii) was also present.

## I.      Summary of the Call

Overall, the call was successful – the DOJ and W&S were able to find some common ground and conversations regarding the plea agreement will continue. A call was scheduled for tomorrow (July 24th) for W&S to give the DOJ specific feedback on which paragraphs of the draft information are unnecessary and should be removed or edited. Then the DOJ will send back a revised (shortened) information. Abbe committed to talking to Davis about some communications the DOJ raised that Davis had regarding a Chinese delegation around August and September of 2017. Abbe also committed to getting the DOJ a better recitation of the funds in Davis' possession and which were specifically related to Jho Low versus the entertainment venture with Pras.

## II.     Detailed Notes of the Call

Abbe started off the phone call stressing the importance of finding the point where Davis' conduct crossed the FARA line. He reiterated that her interest is to accept responsibility for that and provide cooperation, which has been completely consistent with what we have said about her throughout this whole process. Abbe then provided a summary of how we see the case after reviewing the draft information.

Abbe then let them know that we had reviewed the draft information and a number of things came up. First, figuring out when she crossed the line is very important, since the way the information is written it uses the word "conspiracy" and includes many acts attributable only to her "co-conspirators" – it is difficult to see where that line is for her. Second, the information makes clear

WINSTON
&STRAWN

July 23, 2020
Page 2

to us that Davis was the only one among Pras, Broidy, Robin, and Jho Low who was not double dealing on the others. There were all sorts of deals with Anicorn and funds she wasn't aware of - when Davis made an agreement, she lived up to it. Abbe explained that it is very difficult to advise her, given her role is at the lower end of the people involved, without understanding what is happening to everyone else. Then, Abbe addressed the "Guo part", which Keller had said was "non-negotiable. Abbe said comparing what Davis may have done after she got the call from Sun and then was asked by Broidy to be the person who connected Sun with Wynn is very different from Wynn talking to Brody, talking to Sun, talking to the President, and talking to the White House. He is not being prosecuted and you're asking her to be a felon, that is what is very hard for us to understand and address. The facts of what she did versus the others are not contestable. Broidy was looking for a way to gain more business, it is clear from his communications – things like: "make sure you mention me" "tell them I'm involved."

Abbe then said DOJ's view that Davis was in the Guo matter for financial gain, given what we've seen, is not consistent. Relatedly, whoever wrote the information wrote it with the idea of making her the principal or mastermind of the entire operation. For example, when someone asks her to type something, you write it as if she drafted it. When someone asks her to connect two people via the telephone, you use the verb "lobbied/assisted." Someone has turned this into way more than is fair. When Pras gives her a thumb drive and she takes it to pass on, that is characterized as drafting. Moreover, there are a number of times where "Person A" (Pras) is removed from the situation.  It is very clear from the way this group operated that Pras talks to Jho Low, then talks to Davis and Davis talks to Broidy - Davis never directly spoked to Jho Low.

Abbe explained that Davis has said she will admit to it once you figure out where the line was crossed. When she talks to Broidy to get involved to end the investigation into Jho Low – if Low hired Colfax to do it – that is very arguable hiring a lawyer for legal proceedings and then no one would be violating FARA. The DOJ's indication is that that changes, the question is when because it may not be the same for every person. The information as drafted attributes every one of Broidy's motives to Davis, which is not true.

Abbe said the gap between the proffer last summer and now makes sense because the DOJ must be getting some information from Broidy. One thing that is clearly wrong is that Davis told Broidy to erase all of his messages. Her house was searched 8 days before. She did not speak to Broidy after that. The information does not cite to a text or email for this, so it is clear there isn't one. Last summer we had a lot of momentum and there was some idea that we may find some common ground, now we understand why it was delayed. Sometime last summer, we sent you the 22 U.S.C. § 618(h), which talks about contingency for success in a political arena. We understand it is a misdemeanor, which you're not interested in, but it is what happened. Davis had some expectation of financial gain for the Jho Low part, if they were successful.

Abbe said we also need to talk about forfeiture – the idea that every cent of the $10.5 million needs to come back. He said maybe the DOJ doesn't believe that she had an entertainment deal with Pras, but that is what she is going to say and believes. A lot of the $10.5 is for that deal and some is clearly derivative what was given to Broidy of Colfax. There are provisions in the information

WINSTON & STRAWN

July 23, 2020
Page 3

that say Jho Low sent money to Anicorn or directs that it would be sent, but she had no idea. Pras told her it was coming from Pheng. Abbe said we have an intention of cooperating, but there are a lot of issues to resolve.

Keller responded by saying in the interest of being as productive as possible, the DOJ sees the facts differently and the role of Davis differently. He said he is not sure that the differences are irreconcilable. He said they are open to trimming the factual basis in the information and to eliminating paragraphs from which she had no knowledge of and making specific reference that she was designated as an intermediary early on. However, in terms of shifting things so that Pras is listed in all of these paragraphs because Davis says every time she texted something from Jho Low/Sun it was coming from Pras; they have no evidence of that. What they do have are text messages from Davis saying these things. He said the DOJ got very few emails and documents from Davis, the vast majority of documents are from others and they show Davis acting at the direction of foreign principals. Keller said Abbe is saying "it was Pras, she was a secretary" – but they don't have evidence of that other than her "self-serving statement".

Keller said there is a reason the paragraphs are drafted the way they are and they are trying to avoid allowing the charges to be framed by the defendant's own characterization. He did say on smaller points; they would be open to using a phrase like "transmitted" instead of "drafted". He said we may never know the answer to what really happened, but they are open to making modifications like that when both Davis and Abbe are adamant that she had no involvement in the content of a document.

He said he took Abbe's overall point to be that Davis is being portrayed as someone who had a prominent role in this scheme, when she had a minor role – but that is not the story the evidence tells based on their investigation. At this point, he is not sure if we can get past that or not. He said you are not going to convince us she was a mere pawn or administrative assistant doing bidding of others; she is more intelligent and more involved and being paid to do more than that. With respect to the money and side deals, he is not sure how directly relevant it is, but she was not cut out of any of the money that Broidy got paid. She got over $3 million from the $9 million he got from Lucky Mark. On the other hand, Broidy didn't get a penny of the $10 million that when to Pras and Davis got $7.5 of that for "strategic consulting" - which clearly implicates the Guo matter. Davis was in the middle of some of the "side deals" and profited exorbitantly.

Abbe responded that we can go through each dollar for each deal. Broidy got money from Davis for things that had nothing to do with this, she was repaying a debt he said was owed to her. As far as the deal with Pras, the information says Anicorn was established to work on the strategic consulting agreement. Davis had no idea. DOJ's understanding is that the flow of funds is Guo-related, she isn't going to be able to agree to that fact. Abbe said he is not sure if that is dispositive of working together or not. Abbe said we have to deal with the money and it has to do with what you want the penalty to be.

Abbe further raised the issue of the way they characterize Davis' conduct in the information. They include texts and emails that go from Davis to Broidy, but don't include the antecedent that is from

WINSTON & STRAWN

July 23, 2020
Page 4

Pras to Davis. He said if they were to review the cell phone records, they could probably find some proof. He said what they have seen are no communications between Davis and Jho Low because that is not how this group operated – the absence of that is significant. Unless Davis is on the phone or in the room, they were probably not seeing any communications between Pras and Broidy. He also said Davis did not have a clue Rick Gates was involved, but the way the information is drafted – she's pleading to that. Further, the notion of her telling Broidy to erase texts is bizarre. And the way the information is drafted, it tries to make it appear that she has inside information, but it is clear from the earlier texts between Broidy and Davis that she was reading the news. It tries to make it appear that she is the recipient of secret information from China and paints her in unnecessary way.

Abbe also said he has never said Davis was a "mere pawn," but we all agreed she was less involved than any of the other principals. He still believes that to be the case, but that is not the way this was written. Abbe asked the DOJ if they were in our shoes, how do would they call up a client and tell them to plead to felony FARA. Then when the client asks what is happening to Broidy, Pras, and Wynn. And you have to respond, Wynn is off the radar, Pras has his campaign issues, and Broidy giving them information that is inaccurate. Abbe said he is not trying to go one for one, but he has to raise some of what they said back. He has made arrangements where both sides never 100% agree on the facts, but they are able to come to common ground. Abbe said we've commented on the information and we're happy to send it to you, so you can see what we thought was problematic and hopefully will help us get to the core of the issue.

Abbe asked what they thought the moment she crossed the FARA line. Keller said Bangkok.

Abbe asked what the difference is between what she did and if he started lobbying up the chain in DOJ and finally going to the President of the United States. If he takes it out of the DOJ and goes to the White House, does that no longer make it part of a legal proceeding? When does the DOJ think it became not about Broidy and Colfax preventing Jho Low from being charged?

Keller said the difference is they made a concealed agreement to lobby, not engage in legal practices. Keller said Abbe is a lawyer and if he reaches out on behalf of a client, it is very different than entering into a concealed agreement to use whatever political connections someone has to create a back channel solution to a problem.

Abbe said that was Broidy though. Keller said yes, but Davis' help.

Abbe said the secret agreement is for Broidy to use his political contact and clout to help Jho Low. DOJ's theory is subterfuge, that they're doing it through Colfax to avoid something – like FARA. Keller said yes.

Abbe said one of the things we need to continue discussing is whatever conversation Davis had with Broidy about FARA and when it applies versus when it doesn't. If the DOJ thinks Broidy is using subterfuge, we need to discuss Davis' knowledge of it. Abbe then asked when Davis crossed the line with Guo?

WINSTON
&STRAWN

July 23, 2020
Page 5

Keller said in Shenzhen. He then said that this is the least productive our conversation has ever been. Abbe should understand DOJ's theory very well now and putting forward a theory that may be used at trial to mitigate your client's culpability is not that worthwhile. He said the DOJ is happy to take factual disagreements under consideration and get the information down to factual basis that he can live with, but they are not going to litigate whether she actually committed a FARA violation at this point.

Abbe said he believes this conversation has actually been productive because it helps clarify the issues for us. To get back to the issues the DOJ has raised though, Abbe said for the purposes of settlement negotiation – we can see there is a point that she might be "willfully blind" to being engaged by Broidy and Colfax does not make it a legal proceeding. However, what we cannot see is the possibility of her doing that related to Guo. She was concerned about the American hostages, not financial gain. Abbe said the most important part is if we come to an agreement and she's cooperative, we want to talk about the guidelines and what her cooperation is worth. If the DOJ tries to impoverish her, that is enough to push her to trial.

Keller said that Abbe has raised twice the July 2018 direction from Davis to delete messages to Broidy. He said he does not find it all that hard to believe given that July 4, 2017 she texted him to clear his phone. Abbe said the difference is the FBI in her living room. Keller said the reference to the July 2018 direction is an "on or about date" and he doesn't find it that implausible that she gave him that direction.

Abbe then moved on to say he can see where we can find common ground on where the line gets crossed in in the Jho Low matter, but that there is still more that needs to be done to dissuade them on Guo. He said he can see payments from Colfax and Broidy that would be subject to penalty and fitting into FARA, but then we need to talk about how the guidelines and cooperation are going to be used.

Keller said on Guo he said several responses: 1) Higginbotham talks about at a minimum, that he and Pras (and by extension the other co-conspirators) were contemplating financial benefit from Guo from beginning and they all saw this as a way to get more money from Jho Low; 2) Bearing that out, before getting the last $7.5 million, Pras sends Jho Low a contract for "strategic communications and crisis management" – to them that has nothing to do with an entertainment venture. He said given timing and similarities with Jho Low contract, it seems directly to implicate the work that they were doing on Guo piece at that time. In addition, the work they were doing ramped up in August/Sept. and then Pras gets $10m and turns around and gives Davis $7.5m.

Abbe said okay, Higginbotham said that, but has he ever had a conversation with Davis? We don't know what he said about co-conspirators, but it is very clear from these events that Broidy has an ability to figure out his own financial gain in any transaction. Broidy may have had all of those intentions, but it does not mean those were Davis'. She had no idea – do you have any evidence that Davis was aware that Pras doing that contract with Guo? Pras was telling her they had an

entertainment deal with Pheng and that is where the money was coming from, which is what her understanding was done.

Keller said they get paid to draw inferences form the evidence. He understands Abbe can point to the lack of direct evidence on this point, but Keller does have evidence that strongly implies what was going on. He thinks Davis being completely ignorant is a stretch, but we can negotiate on the bottom line figure. Keller asks that we break out the transactions and say if it is related to Jho Low or Guo. He did point out that the $3 million that came for Jho Low and the $7.5 million after came from the same entity. It was Lucky Mark to Pras to Davis.

Abbe said she did not know that. Davis believes to this day Pras owes her money. If the DOJ is saying she has to admit that she was in the Guo deal for money and she knew where the money was coming from, we are not going to be able to bridge that gap.

Keller said he does not think that is necessary and we can bridge the gap. He said that Abbe should talk to Davis about other communications she was having with people from China during this time (Aug./Sept.) when the efforts on Guo were continuing. There was a delegation from China and they had issues getting their visas and this is all right when the money came through the United States.

Abbe said he will explore these other connections.

Keller said the Chinese delegation was having meetings about Guo. Abbe keeps returning to Davis' value as a cooperator, but if she is going to come in and say she had no expectation of any financial gain from their "extreme efforts" on the Guo front (which were more extreme than Jho Low), it does not make her a helpful cooperator. It is not credible. The idea that she was just doing all of this to be a benevolent citizen when you look at the evidence, timing and circumstantial evidence of their intent, it is not credible that she was disconnected. If your position is that all the others were in this for the money, but she wasn't – it is not credible. This is why the DOJ views this as non-negotiable.

Abbe said as we said prior, she may have understood that helping Jho Low on one thing may help/grease/secure/confirm money on a different issue. She was just trying to help keep someone happy who was funding her on a different issue.

Keller said he views it as two separate issues: (1) whether Davis can admit some financial interest and/or future financial benefit, which is a separate issue from (2) getting money specifically for helping on the Guo issue.

Abbe said we can get to number one. Keller said he was glad there was some common ground.

Abbe then said that there may have been more activity on Guo than Jho Low because if you were very motivated to get a pregnant woman out of jail, you might be more frantic working on that

rather than helping Jho Low keep his yacht. Abbe said we can agree on a financial aspect as long as it is phrased in the right way and doesn't diminish her other reasons. If you try to contribute every motive or act of this group to her, then she will be destroyed on the stand.

Keller said he understands. In terms of going forward, he is concerned about receiving a redline from us because it may be discoverable later. Abbe understood and agreed to set up a call for tomorrow, July 24th.

Abbe then asked if we do end up with a plea agreement, what type of cooperation would they be expecting. Abbe said we're going to try to put Davis in a position that a Judge says, we appreciate all the cooperation you've given and you're not going to jail. We have to make sure she doesn't plead to the wrong thing.

Keller said he understands and he included a line in the plea agreement that both parties agree the guidelines don't' apply and there are no sufficiently analogous guidelines that should be applied.

Abbe then asked why this was drafted in the District of Hawaii?

Keller said they thought it would be more convenient there. They usually provide this accommodation for people when they plead to be sentenced in their home district and the district of Hawaii has been involved in the investigation.

Ken Sorenson said they thought the District of Hawaii had enough equity in the case that they wanted to do this out there. There are also other investigations of money laundering going on.

Abbe summarized the call by saying a smaller portion of this group will have a call tomorrow to discuss Winston's thoughts on the draft information, then Abbe will talk to Davis about the other communications the DOJ raised and Abbe will get the DOJ a better recitation of tracing the funds in Davis' possession. Abbe said he hopes to show them that the inferences they're drawing do not need to be the case.

Ken Sorenson also added that he thinks they can make available some information that might alter the positions Abbe is taking factually. He believes they will help give him more perspective surrounding the Guo issue.