# EXHIBIT 3

| | |
|---|---|
| **From:** | nickielumdavis |
| **To:** | William Mccorriston; mccorriston@m4law.com; Lowell, Abbe; Roualet, Jennie |
| **Subject:** | NICKIE redlined of ABBE most recent plea draft |
| **Date:** | Thursday, August 13, 2020 11:46:45 AM |
| **Attachments:** | REDLINED Davis Plea Agreement 2020.08.13  (14963125)  (1).docx |

pls see attached -
When can we discuss?


Sent with ProtonMail Secure Email.

sKENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email:ken.sorenson@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

JOHN D. KELLER
Principal Deputy Chief

SEAN F. MULRYNE
Deputy Director, Election Crimes
NICOLE R. LOCKHART
JAMES C. MANN
Trial Attorneys
Public Integrity Section

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OF PLEA |
| | ) | AGREEMENT |
| vs. | ) | |
| | ) | DATE: |
| NICKIE MALI LUM DAVIS, | ) | TIME |
| | ) | JUDGE: |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM OF PLEA AGREEMENT**

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the UNITED

STATES OF AMERICA, by its undersigned attorneys, and the defendant, NICKIE

MALI LUM DAVIS, and her attorney, William C. McCorriston, Esq. and Abbe David Lowell, Esq., have agreed upon the following:

### THE CHARGES

1.    The defendant acknowledges that she has been charged in an Information with violating Title 18 United States Code Section 2 (aiding and abetting) violations of Title 22, United States Code, Sections 612 and 618(a) (Foreign Agents Registration Act or FARA).

2.    The defendant has read the charge against her contained in the Information, and the charge has been fully explained to her by her attorneys.

3.    The defendant fully understands the nature and elements of the crime with which she has been charged.

### THE AGREEMENT

4.    The defendant agrees to waive indictment and enter a voluntary plea of guilty to an Information, which charges her with aiding and abetting violations of the Foreign Agents Registration Act, Title 22, United States Code, Sections 612 and 618(a), for her work on behalf of a foreign national and a foreign minister for the purpose of lobbying the Administration of the President of the United States and the United States Department of Justice to drop an investigation into the foreign national and arrange for the removal and return of a separate foreign national to a foreign nation.  The defendant is aware that she has the right to have this felony charge

2

asserted against her by way of grand jury indictment.    The defendant hereby waives this right and consents that this offense may be charged against her by way of the Information.    Additionally, the defendant understands that Count 1 of the Information may arguably charge more than one FARA offense.    The defendant has consulted with her counsel and knowingly waives any objection to the inclusion of more than one FARA offense in Count 1.    The defendant elects to have the Information include all of her FARA-related conduct in one count, as opposed to the inclusion of additional counts in the Information.    In return, the government hereby agrees to not prosecute the defendant for additional violations of federal law based on conduct now known to the government that is directly related to the offense conduct set forth in Paragraph 8 of this agreement.

> **Commented [ADL1]:** Global meant that anything current known (investigated) whether related to the offense or not, right?

5.    The defendant agrees that this Memorandum of Plea Agreement shall be filed and become part of the record in this case.

6.    The defendant enters this plea because she is in fact guilty of willfully aiding and abetting a lobbying campaign by unregistered agents of a foreign national and foreign minister, as charged in the Information, and she agrees that this plea is voluntary and not the result of force or threats.

## PENALTIES

7.    The defendant understands that the maximum penalties for the offense to which she is pleading guilty include:

3

a.    A term of imprisonment of up to 5 years and a fine of up to $10,000, plus a term of supervised release of not more than 3 years.

b.    In addition, the Court must impose a $100 special assessment as to each count to which the defendant is pleading guilty.   The defendant agrees to pay $100 for each count to which she is pleading guilty to the District Court's Clerk's Office, to be credited to said special assessments, before the commencement of any portion of sentencing.   The defendant acknowledges that failure to make such full advance payment in a form and manner acceptable to the prosecution will allow, though not require, the prosecution to withdraw from this Agreement at its option.

c.    Forfeiture of the proceeds realized by the defendant as a result of the offense conduct set forth in full detail in Paragraph 8 of this Agreement.

## **FACTUAL STIPULATIONS**

8.    The defendant admits the following facts and agrees that they are not a complete ~~detailed~~ recitation, but merely an outline of what happened in relation to the charge to which the defendant is pleading guilty:

a.   In the District of Hawaii and elsewhere:

1.    From no later than March 2017 to January 2018, the defendant agreed with Persons A and B to act as agents of Foreign National A in exchange for millions of dollars.   The defendant, Person A, Person B, and Foreign National A agreed that Person B would use his political connections to lobby the Administration

4

of the President of the United States ("the Administration") and the United States Department of Justice ("DOJ") to drop the investigation of Foreign National A for his role in the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia.   As part of their efforts, the defendant and Person B willfully failed to disclose to the Administration and DOJ officials that Person B was acting on behalf of Foreign National A.   Ultimately, the defendant and Persons A and B were unsuccessful in their efforts to have the 1MDB investigation dropped.

2.      During the same approximate period, the defendant also agreed with Persons A and B to aid their efforts to lobby the Administration and the DOJ to arrange for the removal and return of Foreign National B—a dissident of Country B living in the United States—all at the request of Foreign National A and Foreign Minister A of Country B.   Here too, the defendant and Persons A and B were ultimately unsuccessful.

3.      To further the interests of Foreign National A, the defendant aided Person B in facilitating a meeting between Prime Minister A and the President of the United States in September 2017, at least in part to allow Prime Minister A to raise the resolution of the 1MDB matter.

4.      The defendant, Person A, and Person B also met with Foreign National A and Foreign Minister A in Country B and Person B agreed that he would

5

use his political connections to lobby the Administration to return Foreign National B to Country B.   The defendant, Person A, and Person B, for the express purpose of providing Foreign Minister A an opportunity to discuss the removal of Foreign National B with high-level United States officials, also attempted to facilitate meetings between Foreign Minister A and top officials at DOJ and the United States Department of Homeland Security ("DHS"), during Foreign Minister A's visit to the United States in May 2017.

> **Commented [ND2]:** Can this read, "for, amongst other issues, providing . . .

5.      As part of their efforts, Person B initially falsely assured the defendant that their work could consist of formal legal representation and would not require them to register under FARA or otherwise disclose that they were working on behalf of Foreign National A.   No later than in or about May 2017, after it became clear that their lobbying efforts did not constitute such legal representation and required registration and disclosure, the defendant deliberately and consciously avoided revisiting FARA, and the defendant, Person A, and Person B willfully failed to register under FARA while continuing to work on behalf of Foreign National A and Foreign Minister A.

6.      The defendant was and is a United States citizen, businesswoman, and consultant with personal and business relationships with Persons A and B.

7.      Person A was a United States citizen, businessperson, and

entertainer with international ties, including ties to Foreign National A.

8.      Person B served as Deputy Finance Chair of a national political committee from approximately April 2016 to April 2018.   In that capacity, Person B raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle.   After the election, Person B continued in his role as Deputy Finance Chair and maintained access to, and contact with, high-ranking officials in the Administration, including the President.   Over the same period, Person B owned and operated several domestic and international businesses and worked as a political consultant.

9.      Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

10.     Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A to pay Person B for his lobbying efforts.   The defendant was not involved in the formation of Company A and was unaware that it was created for this specific purpose.

11.     George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ.   On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a

7

one-count Information charging conspiracy to make false statements to a financial institution based on Higginbotham's agreement with Person A to misrepresent the purpose and source of international wire transfers sent at the direction of, and from accounts associated with, Foreign National A to pay Person B to lobby the Administration and DOJ to drop the 1MDB investigation and to remove Foreign National B to Country B as alleged above and below.

12.     Law Firm A was a law firm operated by Person C, over which Person B exercised some control.

13.     Foreign National B was a dissident of Country B, living in the United States on a temporary visa.   The government of Country B, including Foreign Minister A and President B, were seeking the removal of Foreign National B from the United States back to Country B.

14.     In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme.   In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds.   On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices Act by paying bribes to various foreign officials.

8

Campaign to Resolve 1MDB Civil Forfeiture Cases

15.     After being approached by Person A to seek help on behalf of Foreign National A, in or about March 2017, the defendant told Person B that she had a possible client in Country A who could "use help with the forfeiture."

16.     At the request of Person B, on or about March 5, 2017, the defendant emailed Person B a copy of a civil forfeiture complaint related to 1MDB. That same day, the defendant emailed Person B a Bloomberg article titled "[Foreign National A] Trusts Ask to File Late Claims in Forfeiture Lawsuits," and texted Person B, "Your email has the court filing[.]"   Person B responded, "Thx.   Will review."   The defendant replied, "Call me when u can- thank you[.]"   Person B responded again, "Yes. 5 min[.]"

17.     Person A requested that the defendant send him Person B's biography describing Person B's relationship with high-level officials in the Administration and photographs of Person B and the President.   On or about March 7, 2017, Person B's assistant, at the defendant's request, emailed photographs to the defendant featuring Person B and the President.   Person A said that he wanted the photographs so that Person A could highlight Person B's close access to the Administration.

18.     On or about March 8, 2017, the defendant texted Person B, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?"

9

Person B responded, "I think so.  Let's speak later."  Later that same day, the defendant sent Person B additional text messages to set up the meeting among Person B, Person A, and the defendant.

19.    On or about March 12, 2017, Person B's assistant and the defendant exchanged emails to set up a meeting for the next day to include Person B, Person A, and the defendant.

20.    At the direction of Person B, on or about March 13, 2017, the defendant forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A.  The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days.  The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings.  In actuality, Person A, Person B, Law Firm A, the defendant, and Person C provided no litigation services or legal advice to Foreign National A.  The true purpose of the retention agreement was to secure Person B's services to lobby the Administration and DOJ on Foreign National A's behalf based on Person B's political connections.

21.    On or about March 13, 2017, Person B met with Person A and the defendant to discuss Foreign National A and his legal issues.  At the meeting,

10

Person A described his relationship with Foreign National A to Person B, and asked if Person B and Person C could help with the civil forfeiture cases involving Foreign National A.   Person A said he would speak with Foreign National A about the possibility of Person B helping with the civil forfeiture cases.   That same day, Person B texted the defendant in part, "I'm excited about our business prospects."

22.     On or about March 15, 2017, in reference to Foreign National A, Person B texted the defendant, "Anything new on . . . [Person A's] Associate?" That same day, the defendant responded, "[Person A] mtg in person tomorrow w the 'promoter' and they hope to travel within the next few week[.]"

23.     On or about March 22, 2017, the defendant emailed Person B and his assistant about setting up another meeting among Person B, Person A, and the defendant.

24.     On or about April 13, 2017, in reference to the business opportunity with Foreign National A, Person B texted the defendant, "Any word from [Person A]?"   That same day, the defendant responded by suggesting that they talk on a phone call.

25.     At all times relevant to the charge herein, the defendant, Person A, and Person B were aware of FARA and its prohibition on unregistered representation of foreign principals.

26.     Despite their knowledge of the requirement to register as agents

11

of a foreign principal, at no time did the defendant, Person A, or Person B register with the FARA Unit in DOJ regarding their work as agents of Foreign National A.

<u>Meeting with Foreign National A in Bangkok</u>

27.    In or about April 2017, Person A asked Person B to travel to Bangkok, Thailand to meet with Foreign National A.   Person B said he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds.

28.    On or about April 26, 2017, the defendant texted Person B, "Just tried to call u.   Looks good w [Person A].   Call me[.]"   Person B and the defendant then exchanged text messages about reaching one another via a phone call.

29.    On or about April 28, 2017, Person B texted the defendant advising, "I would like the funds to go to [Law Firm A.]"   The defendant responded, "Ok[.]"

30.    On or about April 29, 2017, Person B and the defendant exchanged text messages regarding their upcoming meeting with Foreign National A and Person A.   Among those text messages, Person B asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?"   The defendant responded, "Call me when u can talk[.]"

31.    On or about April 30, 2017, the defendant emailed Person B's assistant regarding a flight itinerary for travel to Bangkok.   In the email, the

12

defendant wrote in part:  "Please call me if you have questions -- It's 2 one way tickets – since we need to leave from a different country[.]   We don't need to worry about hotels yet . . . "

32.    On or about May 1, 2017, the defendant emailed Person B and his assistant a link to the Shangri-La Hotel in Bangkok.   That same day, the defendant emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation.   Person A responded, "[Foreign National A] is booking our hotel," and later followed up with, "Also send me [Person B's] wire info."   The defendant replied by providing the wire information for an account in the name of Law Firm A.   The same day, in response to a question from Person B's assistant about whether she should cancel Person B's hotel room reservation, the defendant emailed Person B's assistant, "Yes all rooms are booked by [Person A] already."

33.    On or about May 2, 2017, the defendant emailed Person B stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

34.    On or about May 2, 2017, the defendant, Person A, and Person B arrived in Bangkok.   During the trip, the defendant, Person A, and Person B met with Foreign National A in a hotel suite.   Person B and Foreign National A spoke about the 1MDB investigation and civil forfeiture actions.   Foreign National A

13

agreed to pay Person B an $8 million retainer and wanted Person B to contact the Attorney General to attempt to end the 1MDB investigation.   Person B agreed to lobby the Administration and DOJ for a favorable result for Foreign National A. With respect to payment, Person B stated that the money should not come directly from Foreign National A and should be "clean."   Foreign National A identified a friend who could pay Person B and others.   Person A, Person B, and the defendant agreed that the money would first be routed through Person A and then be paid to Person B through Law Firm A.   Person B and the defendant agreed that Person B would pay the defendant a thirty percent commission on what Person B received. Person A, who had other business agreements with the defendant for which funds were owed, also agreed to pay the defendant a percentage of the funds that Person A received as a commission for the defendant's efforts on behalf of Foreign National A.   Person A told Person B and the defendant that Person A's friend, Higginbotham, was verifying the legitimacy of the funds.   Higginbotham did not actually perform any such review.

<u>Payments from Foreign National A to Defendant and Others</u>

35.    Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong.   That same

14

day, Person A directed $1 million in deposits into Law Firm A's account.

36.   On or about May 8, 2017, the defendant texted Person B, "Both wires in [Law Firm A] are from [Person A].   The remaining balance was dropped to your office 20 minutes ago -."   The defendant added, "702 total cashier check[.]"

37.   On or about May 9, 2017, Person A caused Company A to transfer $250,000 to a company controlled by a family member of the defendant for the defendant's benefit.

38.   On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company.   That same day, Person A transferred $3 million from Company A to Law Firm A.

39.   On or about May 17, 2017, Person B and the defendant exchanged text messages regarding the payments from Foreign National A to Person B through Person A and Person B's payment of a percentage to the defendant. Among the text messages, the defendant asked, "Did you get it?"   Person B responded, "Yes.   Sent you Wickr[.]   Sending wire to you in morning."   Wickr is a messaging application that allows for end-to-end encryption and content expiration.   Person B later added, "Did you get 2nd confirm?"   The defendant responded, "When Asia opens. . . . Baby steps at least moving forward now." Person B responded, "Yes.   Hammer them for the next 2 wires."   Person B later added in part, "Assuming second 3 is in and confirmation that last 2 is being sent.

15

Please ask [Person B's assistant]."

40.     On or about May 18, 2017, Law Firm A transferred $900,000 to a business account controlled by the defendant representing her thirty percent commission.

41.     On or about May 23, 2017, the defendant texted Person B the links to multiple articles about Foreign National A.

42.     On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million.   On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A.   That same day, $600,000 was transferred from Law Firm A's account to a business account associated with the defendant representing the defendant's commission.

Person B Facilitates Meetings for Prime Minister A and Works to Resolve the 1MDB Case

43.     The defendant understood that throughout May, June, July, and August 2017, Person B was attempting to use his access and perceived influence with the Administration to set up a visit between Prime Minister A and the President.

44.     On or about June 5, 2017, at the request of Person A, the defendant sent Person B text messages regarding Foreign National A.   Among those messages, the defendant wrote, based upon information conveyed to her by Person

16

A, "Please call before u go to bed in ISRAEL if possible… [Foreign National A] keeps calling for news[.]"   Person B responded, "Yes.   Will call you.   I am heading to D.C.   Tonight to work on [Foreign National A] and Asian country[.]"

45.   On or about June 13, 2017, Person B and the defendant exchanged messages scheduling a call regarding Person A and Foreign National A.

46.   On or about June 15, 2017, at the request of Person A, the defendant texted Person B, "Hey he'd like to speak w you this evening.   Are u able?"   The defendant added, "Principal", which was a reference to Foreign National A.   That same day, Person B responded, "Yes[.]"

47.   On or about June 16, 2017, Person B and the defendant exchanged text messages regarding 1MDB and the seizure of jewelry from a person associated with Foreign National A.

48.   On or about June 17, 2017, Person B and the defendant discussed Prime Minister A and Person B's efforts to arrange a golf game between Prime Minister A and the President.   Person B said, and the defendant believed, that this would please Foreign National A and would allow Prime Minister A to attempt to resolve the 1MDB matter.   Person B also hoped to secure additional business with the government of Prime Minister A and hoped that arranging the golf outing would further his business interests.

49.   On or about June 19, 2017, the defendant texted Person B a link

17

to an article about the Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

50.     On or about June 25, 2017, the defendant texted Person B a link to an article about Prime Minister A and the 1MDB forfeiture action involving Foreign National A.  That same day, Person B responded, "Weird article.  What can we do?"  The defendant replied, "Call pls.  Got news[.]"  The defendant followed up stating that she had sent Person B a "What's app request."

51.     In late June and early July 2017, Person B contacted high-ranking officials in the Administration in an effort to arrange the golf outing between Prime Minister A and the President.

52.      On or about July 4, 2017, the defendant texted Person B, "Call me asap" and then "Clear your phone – erase messages[.]"

53.     On or about July 11, 2017, relaying a message from Person A, the defendant texted Person B, "Wickr[.]  It's 5pm … I think we need to make a move.  Date and otherwise.  We're getting killed."  These messages referred to confirming a date for Prime Minister A's golf outing and Foreign National A's displeasure because no date had been confirmed.   Relaying urgency from Person A, the defendant continued, "Please call because we need to strategize – I'm getting inundated[.]"  Person B responded, "See wikr[.]"  The following day, Person B texted the defendant, "Send me text on wikr.  I'm taking off and need to get to

18

WH[.]   Taking off.   Need now[.]"   The defendant responded, "Done[.]"   Person B responded, "Got it.   Thx[.]   Trying to get [Person F] to do call asap[.]"   Person F was then a high-ranking official on the National Security Council.

54.   On or about July 13, 2017, the defendant texted Person B, "Please call when u can so we can talk- we gotta handle this so pls pls go to D.C. And sit at WH until u get it.   I will keep u company if u worry about being lonely!"

55.   On or about July 15, 2017, Person B texted the defendant, "Working on getting meetings for tomorrow."

56.   On or about July 17, 2017, again conveying urgency expressed by Person A, the defendant texted Person B, "[Person E, a high-ranking official in the White House] needs to give u this date now and ask him for update on other thing.   We look impotent[.]"   This text referred both to setting up a meeting for Prime Minister A with the Administration and to the matter involving Foreign National B.   Person B responded, "Agree.   Hammering away[.]"

57.   On or about July 18, 2017, Person B and the defendant exchanged several text messages about setting up a meeting between the Administration and Prime Minister A.   Among the messages, relaying information from Person A, the defendant wrote, "Can u check Wikr[.]   Really really need that date.   It's been crazy for me all day w this.   He's panicking[.]"   The defendant followed up with, "This date is mandatory today- we're getting creamed."

19

According to Person A, Foreign National A was panicking because no meeting had yet been scheduled.   Person B responded, "Calling [Person E] now[.]"   The defendant replied in part, "Call everyone so they know u are raging mad[.]   Call [Person G] too.   We need this today[.]"   Person G was an administrative assistant to the President.   Person B replied, "Doing it now."

      58.   On or about July 19, 2017, the defendant texted Person B in reference to scheduling a date for a meeting between Prime Minister A and the President, "Secondly we need this date bad[.]"   Person B responded the following day, "Please bear with me.   Getting some info on mtg[.]"   In the ensuing days, Person B confirmed that he had spoken to officials in the Administration and a golf game between Prime Minister A and the President had been scheduled.

      59.   On or about July 29, 2017, relaying information she received from Person A, the defendant texted Person B in reference to the meeting between Prime Minister A and the President, "They were told 12 sept is mtg.   That's day that un general assembly stars- it's a Tuesday???? No golf??"   The defendant immediately followed by texting "Wickr[.]"   Person B responded, "May be two mtgs.   Amb should ask.   Golf at Bedminster on Sat and tues at WH?"

      60.   On or about August 7, 2017, Person B sent his assistant an email with the subject, "Malaysia Talking Points *Final*", with talking points intended for an upcoming meeting between the Secretary of State of the United States and Prime

Minister A.   The defendant received the talking points from Person A—who provided them on behalf of Foreign National A—and relayed them to Person B, intending that Person B would then provide them to the Secretary of State as background for the meeting.   The talking points mentioned, among other things, Person B's ongoing relationship and work with [Country A], and identified 1MDB as a "[p]riority[.]"   The talking points noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]"

61.     On or about August 9, 2017, Foreign National A caused a Hong Kong company to transfer approximately $12.8 million to Company A.   Person A then transferred $3 million to Law Firm A.   Person A also transferred $833,333 to a business account controlled by the defendant, representing a commission payment from Person A.   On or about August 10, 2017, Law Firm A transferred $900,000 to a business account associated with the defendant, representing a commission payment from Person B.

62.     On or about August 15, 2017, the defendant texted Person B in part, "What time should [Person A] meet us tomorrow afternoon?"

63.     On or about August 16, 2017, Person B and the defendant exchanged text messages to set up a meeting and a phone call.   Among the messages, the defendant wrote, "[Person A] really wants to see u today if possible

21

since u leave Friday[.]"

64.     On or about August 18, 2017, Person B and the defendant exchanged text messages setting up a phone call.   Among the messages, the defendant wrote, "Call me pls.   [Person A] wants to conference in[.]"   At that time, as the defendant understood, Person B was still attempting to arrange a golf game between Prime Minister A and the President.

65.     On or about August 21, 2017, the defendant wired $375,000 in funds received as a commission from Person A to the spouse of Person B.   The defendant's payment to Person B's spouse was in satisfaction of a prior, unrelated debt.

66.     On or about September 11, 2017, the defendant typed a letter at Person B's instruction to be sent from Person B to the President in anticipation of Prime Minister A's meeting with the President.   The letter included several positive developments in the relationship between Country A and the United States.   The letter was never provided to the President.

67.     On or about September 12, 2017, Prime Minister A met with the President at the White House, due in part to the assistance provided by the defendant in Person B's efforts to facilitate the meeting.   Although Person B contacted high-ranking officials in the Administration to arrange a golf meeting between the President of the United States and Prime Minister A, no golf game between Prime

Commented [ND3]: TYPO – should be AND

22

Minister A and the President took place.

68.    On or about October 6, 2017, Person B met with the President at the White House.   Person B represented to Person A, the defendant, and Foreign National A that he had raised the 1MDB investigation at the meeting.

69.    On or about January 5, 2018, Person B drafted talking points related to 1MDB to demonstrate to Foreign National A the efforts that Person B had undertaken on his behalf.   Among other things, the talking points provided:   "1. We are working with the DoJ to counter the previous Administration's case against 1MDB in [Country A].   I have put a strategy in place to contact parties both at DoJ and the NSC to find a resolution to this issue.   2. I am in the process of scheduling a meeting with the assistant attorney general [] who has the oversight for the [] case. She is a [presidential] appointee and can be helpful. . . . 3. As I informed you earlier, in my discussion with the President, he committed to getting this issue resolved.   It is important that I take his lead but will continue to communicate the importance of this issue."   Despite his representations, Person B did not actually further lobby officials at DOJ or the National Security Council or the President.

Campaign to Remove Foreign National B from the United States

70.    In or about May 2017, following the trip to Bangkok, Person B agreed to travel to Hong Kong to meet again with Foreign National A.   Prior to the trip, the defendant and Person B discussed that it was important to Foreign National

23

A that Foreign National B be deported from the United States.   The purpose of the

trip to Hong Kong was to meet with Foreign National A and a foreign government

official of Country B to discuss Foreign National B.

> **Commented [ND4]:** Wasn't this changed to PERSON B told DEFENDANT

71.    On or about May 15, 2017, the defendant emailed Person B's

assistant regarding travel arrangements and the itinerary for the trip to Hong Kong.

The same day, the defendant also emailed Person B and Person C banking

information for the defendant's company.

72.    On or about May 18, 2017, Person A, Person B, and the

defendant traveled to Hong Kong and were transported to Shenzhen, China, where

they met with Foreign National A and Foreign Minister A in a hotel suite.   Foreign

Minister A spoke to Person B about Foreign National B and his alleged crimes, and

stated that Country B wanted Foreign National B to be returned to Country B.

Foreign Minister A asked Person B to use his influence with high-ranking United

States government officials to advocate for Foreign National B's removal and return

to Country B.   Foreign Minister A also stated that he would be visiting Washington,

D.C. soon and was having trouble scheduling meetings with certain high-ranking

United States officials.

Person B Lobbies Top U.S. Officials for the Removal of Foreign National B

73.    On or about May 20, 2017, during the return trip from China,

Person B texted the defendant, "I'll try to make this a big week for us with [the

24

Attorney General.]"   The defendant understood that Person B was then attempting to use his access and perceived influence to arrange a meeting with the Attorney General to discuss the removal of Foreign National B.

74.   Following the trip, Person B drafted a memorandum addressed to the Attorney General regarding law enforcement cooperation between the United States and Country B, which included a request for the removal of Person B from the United States and his return to Country B.   The content of the memorandum had been provided to Person B by the defendant, who had received the information on a thumb drive from Person A during the May 2017 trip to China.   The content of the memorandum originated from Foreign Minister A and Foreign National A.

75.   In the memorandum, with the defendant's knowledge, Person B misrepresented the reason for the trip to China and the circumstances leading to the meeting with Foreign Minister A.   The memorandum did not mention Person B's contact with Foreign National A or his role in setting up the meeting between Person A, Person B, the defendant, and Foreign Minister A.   Nor did it mention the $4 million that Person B had been paid by Foreign National A over the two weeks preceding the meeting in Shenzhen with Foreign Minister A.   Person B also did not disclose that his lobbying efforts with respect to Foreign National B were, at least in part, pursuant to his financial arrangement with Foreign National A and could potentially result in additional payment.

25

Formatted: Highlight

Commented [ND5]:

Formatted: Highlight

Commented [ND6]:

Commented [ADL7]: She did not review it

76.    In the memorandum, Person B stated, "I was told by [Foreign Minister A] that [Country B] would like to significantly increase bi-lateral cooperation with the US with respect to law enforcement including cyber security." Person B wrote about Foreign Minister A's upcoming trip to Washington, D.C., in which Foreign Minister A and his delegation planned to meet with several high-ranking United States government officials.   Person B advocated for the Attorney General to meet with Foreign Minister A.   Person B also noted several items that Country B, according to Foreign Minister A, would be willing to do to improve law enforcement relations between the United States and Country B.   Person B then added:

> According to my conversation with [Foreign Minister A], the one request [Country B] will make is that [Country B] national, [Foreign National B], who [Country B] alleges has conspired with others who have been arrested and charged with violations of numerous criminal laws of [Country B] (including kidnapping and significant financial crimes be deported (his Visa ends within the next month or so) or extradited (Interpol has issued a Red Notice with respect to him which is attached for your reference) as soon as possible from the US to [Country B] so he can be charged with these violations and go through regular criminal proceedings in [Country B] with regard to these allegations.

Person B appended an Interpol Red Notice for Foreign National B to the memorandum.

77.    In May 2017, the defendant understood that Person B was using his access and perceived influence with the Administration to set up meetings

26

between Foreign Minister A and high-level officials at DOJ and DHS.

78.     As part of his efforts to obtain information to pass on to Foreign National A, Foreign Minister A, and representatives of Country B regarding Foreign National B, Person A indicated to the defendant that he would meet with special agents of the FBI and disclose his access to representatives of Country B and some of the efforts to coordinate meetings for Foreign Minister A while attempting to confirm Foreign National B's precise location.   Subsequently, Person A did in fact meet with special agents of the FBI and lobbied for the return of Foreign National B to Country B and sought to confirm Foreign National B's precise location.

79.     In May 2017, without solicitation, Foreign Minister A contacted the defendant.   On or about May 30, 2017, relaying information from Foreign Minister A and Person A regarding Foreign Minister A's meeting with United States government officials, the defendant texted Person B, "Check Wickr- all clear now for meetings[.]"   Person B responded, "Yes.  All set[.]"   The defendant replied, "He got his Mtgs reinstated[.]"   In May 2017, the defendant relayed a request from Person A asking Person B to meet with Foreign Minister A in Washington, D.C.

80.     On or about May 30, 2017, Person B met with Foreign Minister A at a hotel in Washington, D.C.

81.     On or about May 31, 2017, the defendant texted Person B with respect to Foreign Minister A's purported meeting:   "In principal [Secretary of

27

DHS] us ok- just a schedule issue?"   Person B responded, "Just a short notice scheduling issue.   Still might hear in next hour or so.   There is no issue with [Foreign Minister A]."   Person B later continued, "Please pass along my good wishes to the VM.   Wait a little while longer."   The defendant responded, "Yes, I'm telling him that."   Person B replied, "Tell him I'm telling WH and [Attorney General] what happened."   The defendant then texted, "Isn't [Secretary of DHS] scheduled to be in Haiti this afternoon?"   Person B responded, "Scheduler did not mention this??   Are you sure?   Neither did [Attorney General']s people[.]"   The defendant responded, "It's on the DHS website[.]   He's there for the afternoon[.] Just spoke to VM and he sounded like he was crying[.]"   Person B responded, "Terrible.   What a mess.   Bottom line not our fault.   Normally their Amb would handle.   This is a cluster f[*]ck."   The defendant replied, "Wickr."

82.   On or about June 9, 2017, the defendant texted Person B a news article titled "[Country B]-cranks-up-heat-on-exiled tycoon-[Foreign National B.]"

83.   On or about June 27, 2017, Person B and the defendant exchanged several text messages regarding Foreign National B.

84.   In June 2017, the defendant understood that Person B asked Person H, an internationally successful businessman and frequent contributor to political campaigns with close access to the President, to lobby the Administration for the removal of Foreign National B.

28

85.   On or about June 29, 2017, Person B and the defendant exchanged text messages regarding Foreign National B's visa application.   Person B asked, "Is rejection or acceptance letter already generated?"   The defendant responded, "I have no idea."   Person B replied, "Sorry always generated.   In others words each applicant eventually re wives a yes or no in writing[?]   Sorry receive a yes or no in writing[?]"   The defendant responded, "Yes[.]   Check Wickr[.]"

86.   On or about June 30, 2017, in reference to their efforts to facilitate the removal of Foreign National B and the potential return of United States citizens held in Country B, the defendant texted Person B, "Wickr.   You are the man right now.   They are going to give you the President's medal of freedom award after what you will accomplish for this country by this July 4th[.]"   Person B responded, "I am going to slam until it's done[.]"   The defendant replied, "Let's make sure part 1 happens today.   And date for m[.]   Don't leave that dude until we do it."   Person B responded, "Agree."   The defendant continued, "Let him know – if we get the letter confirming the denial today by close of business (as u need workers to generate that letter) then we will get the 2 Americans home by July 4[.]   After other phase 2- we can do the 60 take back[.]"   Person B responded, "Sounds good.   [Person H] calling me back shortly.   On a call."

87.   On or about June 30, 2017, Person B and the defendant exchanged several text messages about Foreign National B.   Person B texted,

29

"Heard from [Person H].   He reiterated to POTUS."   Person B followed up with,

"Separately, [Person E] texted me that he got tied up but is on top of it."   That same

date, the defendant replied, "Can we get proof today about revoke?"   The defendant

later specified, "From [Person E]?"

88.    On or about July 1, 2017, Person B texted the defendant, "Spoke

to [Person E] at length.   Call me when you can[.]"   Person B did not speak with

Person E but had exchanged text messages with him about Foreign National B's visa

application.   Similar to the representations Person B made in the memorandum that

he prepared for the Attorney General and his communications with Person H, Person

B did not disclose the true nature of his relationship with Foreign Minister A to

Person E.

89.    On or about July 2, 2017, Person B and the defendant exchanged

text messages regarding Foreign National B and his visa application.   With

information she learned from public reporting, the defendant texted, "There is a call

Scheduled for today Sunday with [President B of Country B] about n Korea.   He

can ask and confirm about package.   He can even say he heard from [Person H]."

90.    On or about July 3, 2017, again with information discerned from

public reporting, the defendant texted Person B: "[President] leaves D.C.

Wednesday for Europe[.]"   The defendant then followed up:   "July 5.   Scheduled

to meet in person w [President B][.]"

30

91.     In or about July 2017, Person B asked the defendant to connect Foreign Minister A and Person H.   On or about July 18, 2017, Person B emailed the defendant the contact information for Person H.   The defendant connected multiple calls between Foreign Minister A and Person H in furtherance of the lobbying campaign to remove Foreign National B.

92.     On or about July 26, 2017, Person B and the defendant exchanged text messages regarding Foreign National B and his removal from the United States to Country B.   Among the messages, the defendant wrote, "Really need confirm it was officially transmitted.   At this point – he says no[.]"   Person B responded, "Asked 3 different people to follow up[.]"   Person B later added, "Called [Person E].   Seeing [Person H] in an hour."

93.     On or about July 27, 2017, Person B and the defendant exchanged text messages regarding Foreign National B.   The defendant texted Person B, "Any word on embassy??"   The defendant later added, "Hey any update about formal notice?"   Person B responded, "I'm dealing with people in NSC.   Emailing directly.   Awaiting response[.]"

> **Commented [ND8]:** I don't know if this matters – but this text referred to Malaysia And the mtg date

94.     On or about August 19, 2017, Person B texted the defendant several times.   Among those messages, Person B wrote, "Urgent.   Call me.   Good news[.]"   Person B later added, "im with [Person H].   have break thru opportunity[.]"

31

95.     On or about September 13, 2017, Person B texted the defendant, "Please text me asylum article.   And other article[.]"   That same day, the defendant texted Person B links to articles about Foreign National B.

96.     On or about October 2, 2017, Person B texted the defendant a link to article about Foreign National B.

97.     On or about January 5, 2018, Person B texted the defendant, "Send me more info on [Foreign National B] involved in funding Dem politicians, . . . ASAP[.]"

9.     Pursuant to CrimLR 32.1(a) of the Local Rules of the United States District Court for the District of Hawaii, the parties agree that the charge to which the defendant is pleading guilty adequately reflects the seriousness of the actual offense behavior and that accepting this Agreement will not undermine the statutory purposes of sentencing.

**SENTENCING STIPULATIONS**

10.     With respect to FARA, the defendant and the Government agree that the Sentencing Guidelines do not contain a guideline for a FARA violation, but call for the use of the most analogous guideline.   U.S.S.G. §§ 2B1.2(a) and 2X5.1. Under the facts of this case, the parties agree that there is no sufficiently analogous guideline for.   Thus, the factors set forth in 18 U.S.C. §3553(a) shall control for this

32

offense, except that any guidelines and policy statement that can be applied meaningfully shall remain applicable. U.S.S.G. § 2X5.1.

11.    The parties agree that notwithstanding the parties' Agreement herein, the Court is not bound by any stipulation entered into by the parties but may, with the aid of the presentence report, determine the facts relevant to sentencing.   The parties understand that the Court's rejection of any stipulation between the parties does not constitute a refusal to accept this Agreement since the Court is expressly not bound by stipulations between the parties, including the parties' agreement that the Guidelines do not apply to the offense of conviction.

12.    The parties represent that as of the date of this Agreement there are no material facts in dispute.

### **APPEAL/COLLATERAL REVIEW**

13.    The defendant is aware that she has the right to appeal her conviction and the sentence imposed.   The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, her conviction and any sentence within the statutory maximum as determined by the Court at the time of sentencing, and any lawful restitution order imposed, or the manner in which the sentence or restitution order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement.   The

33

defendant understands that this waiver includes the right to assert any and all legally waivable claims.

a.     The defendant also waives the right to challenge her conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

b.     If the Court determines an applicable guideline range despite the parties' agreement that the Guidelines do not apply to this offense, the defendant and the government retain the right to appeal the sentence and the manner in which it was determined and the defendant retains the right to challenge her sentence in a collateral attack.

c.     The prosecution retains its right to appeal the sentence and the manner in which it was determined on any of the grounds stated in Title 18, United States Code, Section 3742(b).

## FINANCIAL DISCLOSURE

14.     In connection with the collection of restitution or other financial obligations that may be imposed upon her, the defendant agrees as follows:

34

a.      The defendant agrees to fully disclose all assets in which she has any interest or over which she exercises control, directly or indirectly, including any assets held by a spouse, nominee, or third party.   The defendant understands that the United States Probation Office (USPO) will conduct a presentence investigation that will require the defendant to complete a comprehensive financial statement.   To avoid the requirement of the defendant completing financial statements for both the USPO and the government, the defendant agrees to truthfully complete a financial statement provided to the defendant by the United States Attorney's Office.   The defendant agrees to complete the disclosure statement and provide it to the USPO within the time frame required by the United States Probation officer assigned to the defendant's case.   The defendant understands that the USPO will in turn provide a copy of the completed financial statement to the United States Attorney's Office. The defendant agrees to provide written updates to both the USPO and the United States Attorney's Office regarding any material changes in circumstances, which occur prior to sentencing, within seven days of the event giving rise to the changed circumstances.   The defendant's failure to timely and accurately complete and sign the financial statement, and any written update thereto, may, in addition to any other penalty or remedy, constitute the defendant's failure to accept responsibility under U.S.S.G § 3E1.1.

35

b.     The defendant expressly authorizes the United States Attorney's Office to obtain her credit report.   The defendant agrees to provide waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the financial information, such releases to be valid for a period extending 90 days after the date of sentencing.   The defendant also authorizes the United States Attorney's Office to inspect and copy all financial documents and information held by the USPO.

c.     Prior to sentencing, the defendant agrees to notify the Financial Litigation Unit of the United States Attorney's Office before making any transfer of an interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.

**Commented [ADL10]:** We just need to have an understanding that paying for normal things from a check account for services, etc. does not trip this requirement.

## FORFEITURE

15.    The defendant agrees to a forfeiture money judgment in the amount of $3 million, reflecting the minimum net proceeds from the offense set forth above, pursuant to a payment schedule to be set no later than the date of sentencing.

16.    The defendant agrees that the proffer of evidence supporting her guilty plea is sufficient evidence to support this forfeiture.   The defendant agrees that the Court may enter a Preliminary Consent Order of Forfeiture for this property at the time of her guilty plea or at any time before sentencing.   The defendant agrees that

36

this Order will become final as to her when it is issued and will be a part of her sentence pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

17.   The defendant agrees that this Agreement permits the government to seek to forfeit any of her assets, real or personal, that are subject to forfeiture under any federal statute, whether or not this Agreement specifically identifies the asset. Regarding any asset or property, to satisfy the forfeiture in paragraph 15., the defendant agrees to forfeiture of all interest in: (1) any property, real or personal, which constitutes or is derived from proceeds traceable to the violations in Count 1, to which the defendant is pleading guilty; (2) any substitute assets for property otherwise subject to forfeiture. *See* Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p).

18.   The defendant agrees that the government may choose in its sole discretion how it wishes to accomplish forfeiture of the property whose forfeiture she has consented to in this Agreement, whether by criminal or civil forfeiture, using judicial or non-judicial forfeiture processes.   If the government chooses to effect the forfeiture provisions of this Agreement through the criminal forfeiture process after the period set by the payment schedule referenced above has expired, the defendant agrees to the entry of orders of forfeiture for such property and waives the requirements of Federal Rule of Criminal Procedure 32.2 regarding notice of the

37

**Formatted:** Highlight

forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.   The defendant understands that the forfeiture of assets is part of the sentence that may be imposed in this case, and she waives any failure by the Court to advise her of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time of her guilty plea.

19.    The defendant agrees to take all necessary actions to identify all assets over which she exercises or exercised control, directly or indirectly, at any time since January 2017, or in which she has or had during that time any financial interest. The defendant agrees to take all steps as requested by the government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant.   The defendant agrees to provide and/or consent to the release of her tax returns for the previous five years.   The defendant agrees to take all steps as requested by the government to pass clear title to forfeitable interests or to property to the United States and to testify truthfully in any judicial forfeiture proceeding.

20.    The defendant agrees to waive all constitutional and statutory challenges in any manner (including, but not limited to, direct appeal) to any forfeiture carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

Commented [ND11]: This should be only from 2017

## **IMPOSITION OF SENTENCE**

21.    While the parties agree that the Sentencing Guidelines do not apply to the offense of conviction, the defendant understands that the District Court in imposing sentence will consider the provisions of the Sentencing Guidelines.   The defendant agrees that there is no promise or guarantee of the applicability or non-applicability of any Guideline or any portion thereof, notwithstanding any representations or predictions from any source.

22.    The defendant understands that this Agreement will not be accepted or rejected by the Court until there has been an opportunity by the Court to consider a presentence report, unless the Court decides that a presentence report is unnecessary. The defendant understands that the Court will not accept an agreement unless the Court determines that the remaining charge adequately reflects the seriousness of the actual offense behavior and accepting the Agreement will not undermine the statutory purposes of sentencing.

## **WAIVER OF TRIAL RIGHTS**

23.    The defendant understands that by pleading guilty she surrenders certain rights, including the following:

        a.    If the defendant persisted in a plea of not guilty to the charges against her, then she would have the right to a public and speedy trial.   The trial could be either a jury trial or a trial by a judge sitting without a jury.   The defendant

39

has a right to a jury trial.   However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the prosecution, and the judge all must agree that the trial be conducted by the judge without a jury.

        b.     If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random.   The defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges.   The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.   The jury would be instructed that the defendant is presumed innocent, and that it could not convict her unless, after hearing all the evidence, it was persuaded of her guilt beyond a reasonable doubt.

        c.     If the trial is held by a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he or she was persuaded of the defendant's guilt beyond a reasonable doubt.

        d.     At a trial, whether by a jury or a judge, the prosecution would be required to present its witnesses and other evidence against the defendant.   The defendant would be able to confront those prosecution witnesses and her attorney would be able to cross-examine them.   In turn, the defendant could present witnesses and other evidence on her own behalf.   If the witnesses for the defendant

would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

e.     At a trial, the defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify.

24.     The defendant understands that by pleading guilty, she is waiving all of the rights set forth in the preceding paragraph.   The defendant's attorney has explained those rights to her, and the consequences of the waiver of those rights.

## USE OF PLEA STATEMENTS

25.     If, after signing this Agreement, the defendant decides not to plead guilty as provided herein, or if the defendant pleads guilty but subsequently makes a motion before the Court to withdraw her guilty plea and the Court grants that motion, the defendant agrees that any admission of guilt that she makes by signing this Agreement or that she makes while pleading guilty as set forth in this Agreement may be used against her in a subsequent trial if the defendant later proceeds to trial. The defendant voluntarily, knowingly, and intelligently waives any protection afforded by Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence regarding the use of statements made in this Agreement or during the course of pleading guilty if the guilty plea is later withdrawn.   The *only* exception to this paragraph is where the defendant fully

41

Formatted: Highlight

complies with this Agreement but the Court nonetheless rejects it.   Under those circumstances, the United States may not use those statements of the defendant for any purpose.

26.    The defendant understands that the prosecution will apprise the Court and the USPO of the nature, scope, and extent of the defendant's conduct regarding the charges against her, related matters, and any matters in aggravation or mitigation relevant to the issues involved in sentencing.

### COOPERATION

27.    The defendant agrees that she will fully cooperate with the United States.

a.    The defendant agrees to testify truthfully at any and all trials, hearings, or any other proceedings at which the prosecution requests her to testify, including, but not limited to, any grand jury proceedings, trial proceedings involving co-defendants and others charged later in the investigation, sentencing hearings, and related civil proceedings.

b.    The defendant agrees to be available to speak with law enforcement officials and representatives of the United States Attorney's Office at any time and to give truthful and complete answers at such meetings, but she understands she may have her counsel present at those conversations, if she so desires.

42

c.      The defendant agrees she will not assert any privilege to refuse to testify at any grand jury, trial, or other proceeding, involving or related to the crimes charged in this Information or any subsequent charges related to this investigation, at which the prosecution requests her to testify, other than the attorney-client privilege as it applies to privileged communications with undersigned counsel or counsel with whom they work in this matter.

d.      The defendant agrees that her sentencing date may be delayed based on the government's need for the defendant's continued cooperation, and agrees not to object to any continuances of the defendant's sentencing date sought by the United States.

e.      In the event that the defendant does not breach any of the terms of this Agreement but the Court nonetheless refuses to accept the Agreement after the defendant has made statements to law enforcement authorities or representatives of the United States Attorney's Office pursuant to this Agreement, the prosecution agrees not to use said statements in its case-in-chief in the trial of the defendant in this matter.   The defendant understands that this does not bar the use of information and evidence derived from said statements or prohibit the use of the statements by the prosecution in cross-examination or rebuttal.

28.    Pursuant to Guidelines § 5Kl.1 and Rule 35(b) of the Federal Rules of Criminal Procedure, the prosecution may move the Court to depart from any

43

applicable Guidelines range determined by the Court and to seek consideration by the Court of the cooperation if Guidelines are not used on the ground that the defendant has provided substantial assistance to authorities in the investigation or prosecution of another person who has committed an offense.   The defendant understands that:

a.     The decision as to whether to make such a request or motion is entirely up to the prosecution but such motion will not be withheld in bad faith.

b.     This Agreement does not require the prosecution to make such a request or motion but such motion will not be withheld in bad faith.

c.     This Agreement confers neither any right upon the defendant to have the prosecution make such a request or motion, nor any remedy to the defendant in the event the prosecution fails to make such a request or motion unless such motion is withheld in bad faith.

d.     Even in the event that the prosecution makes such a request or motion, the Court may refuse to depart from the Guidelines or to impose a sentence below the minimum level established by statute.

29.     The defendant and her attorney acknowledge that, apart from any written proffer agreements, if applicable, no threats, promises, agreements, or conditions have been entered into by the parties other than those set forth in this Agreement, to induce the defendant to plead guilty.   Apart from any written proffer

44

agreements, if applicable, this Agreement supersedes all prior promises, agreements, or conditions between the parties.

30.    To become effective, this Agreement must be signed by all signatories listed below.

31.    Should the Court refuse to accept this Agreement, it is null and void and neither party shall be bound thereto.

DATED:   Honolulu, Hawaii, _____.

45

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

_____

By: JOHN D. KELLER
Principal Deputy Chief
Sean F. Mulryne
Deputy Director, Election Crimes
Nicole R. Lockhart
James C. Mann
Trial Attorneys
Public Integrity Section

_____

MICHAEL NAMMAR
Chief, Criminal Division
District of Hawaii

_____

KENNETH M. SORENSON
Chief, National Security
District of Hawaii

_____

NICKIE MALI LUM DAVIS
Defendant

_____

ABBE DAVID LOWELL, Esq.
Counsel for Defendant

_____

WILLIAM C. MCCORRISTON, Esq.
Counsel for Defendant

46