```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,      ) CR 20-00068 LEK
 4                                   )
                Plaintiff,           ) Honolulu, Hawaii
 5                                   ) December 9, 2022
         vs.                         )
 6                                   ) VIDEOCONFERENCE.
      (1) NICKIE MALI LUM DAVIS,     ) [117] DEFENDANT'S MOTION TO
 7                                   ) WITHDRAW GUILTY PLEA AND
                Defendant.           ) MEMORANDUM OF PLEA AGREEMENT
 8    _____ )

 9
                      TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                  UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For the Government:      JOHN D. KELLER
                               NICOLE R. LOCKHART
14                             SEAN F. MULRYNE
                               United States Department of Justice
15                             Criminal Division, Public Integrity
                               Section
16                             1331 F Street NW, Suite 300
                               Washington, DC 20004
17
                               KENNETH M. SORENSON, AUSA
18                             Office of the United States Attorney
                               PJKK Federal Building
19                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
20
      For the Defendant:       JAMES A. BRYANT, ESQ.
21                             The Cochran Firm California
                               4929 Wilshire Boulevard., Suite 1010
22                             Los Angeles, California 90010

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:      WILLIAM C. MCCORRISTON, ESQ
                              McCorriston Miller Mukai MacKinnon, LLP
 3                            500 Ala Moana Boulevard Suite 5-400
                              Honolulu, Hawaii 96813
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21    Official Court Reporter:  Debra Read, RDR
                                United States District Court
22                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
23                              readit3949@gmail.com

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

1  FRIDAY, DECEMBER 9, 2022                        1:29 P.M.

2          THE COURTROOM MANAGER:  The public has been

3  connected as if they were in court for a -- as if they were in

4  court in the audience.  Who's got me on echo there?

5          I'll go ahead and start the recording and do a few

6  reminders and then I'll call the judge.

7          If you're an observer on the call, please keep your line

8  muted at all times.  All hearings are strictly prohibited from

9  being recorded or broadcast, in whole or in part, in any

10  fashion.  This hearing is being recorded and taken by a court

11  reporter.  To ensure we have a clear record, please identify

12  yourself before speaking and speak clearly and directly into

13  your microphone.  Please mute your microphone when you're not

14  speaking.  And if for some reason you get disconnected, please

15  follow the original instructions to rejoin the call.

16          Does anyone know who a Larry D. is?  Anybody?

17          MR. BRYANT:  It may be Ms. Lum Davis's husband.  Is

18  he trying to log into the public?

19          THE COURT:  There is no public video.  They were

20  supposed to be calling in.

21          MR. BRYANT:  Oh, okay.

22          THE COURT:  So he should not have received the link

23  unless he received permission prior.

24          MR. BRYANT:  He may have just seen his wife's email.

25  Would you mind, Madame Clerk, give me one second and I'll try

1    to get this resolved?

2              THE COURTROOM MANAGER:  Sure.

3              MR. BRYANT:  Thank you.  One second.  Sorry about

4    that, Madame Clerk.

5              THE COURTROOM MANAGER:  Thank you.  All right.  I'll

6    bring the judge in.

7          Hi, Your Honor.  Can you hear me?

8              THE COURT:  I can.  Please call the case.

9              THE COURTROOM MANAGER:  Thank you.

10         The United States District Court for the District of

11   Hawaii with the Honorable Leslie E. Kobayashi, United States

12   District Judge presiding, is now in session.

13         Criminal No. 20-00068 LEK, United States of America

14   versus Nickie Mali Lum Davis.

15         This matter is set on a Defendant's Motion to Withdraw

16   Guilty Plea.

17         Counsel, please make your appearances for the record,

18   starting with the government.

19             MR. KELLER:  John Keller on behalf of the

20   government, Your Honor.  And I have my colleagues Nicole

21   Lockhart and then Sean Mulryne here with me as well.

22             THE COURT:  All right.  Good afternoon to all of

23   you.

24         And, Mr. Sorenson, I know you are on the hearing as well.

25             MR. SORENSON:  That's correct, Your Honor.  Am I

UNITED STATES DISTRICT COURT

1  muted?  Let me see --

2        THE COURT:  No, you're not muted.

3        MR. SORENSON:  Okay.  Yes, Your Honor.

4     Ken Sorenson on behalf of the United States, along with

5  John Keller.

6        THE COURT:  All right.  Good afternoon to you.

7     Mr. McCorriston and Mr. Bryant.

8        MR. MCCORRISTON:  Go ahead, James.

9        MR. BRYANT:  Yeah, sure.  Good afternoon, Your

10  Honor.

11     James Bryant on behalf of Defendant Nickie Mali Lum

12  Davis.

13        THE COURT:  Good afternoon to you both.  And the

14  record will reflect the presence of Ms. Lum Davis.

15     All right.  So I've read through your submissions on the

16  motion, and is it Mr. Bryant or Mr. McCorriston who will be

17  arguing the motion on behalf of the movant?

18        MR. BRYANT:  Your Honor, it's going to be myself,

19  James Bryant, who will be making the argument.

20        THE COURT:  All right.  I'll hear your argument.

21  And I do note that it is, of course, your burden to show that

22  there is a fair and just reason for requesting the withdrawal.

23        MR. BRYANT:  Thank you so much, Your Honor.  And,

24  Your Honor, I'm going to be addressing the points that the

25  Court had raised in the November 10th order denying the motion

1    for an evidentiary hearing given the fact that the Court had

2    presumed, at least for the purposes of this motion, that there

3    was a conflict of interest.

4         So there are two very important points that address the

5    Court's question:  Would Ms. Davis have done anything different

6    had she known certain information that she discovered later?

7    And the answer is quite simple:  Absolutely.  She would have

8    never agreed to enter into this plea agreement.

9         And there's going to be two points that I make, and the

10   first point I'm going to start off to avoid having to backtrack

11   on this issue subsequently after the argument with regard to

12   the conflict of interest.

13        But the first point is this:  Mr. Lowell represented to

14   Ms. Davis such a grossly inaccurate estimate as to what the

15   probability would be for the government and a potential

16   sentencing recommendation that she would never have ever agreed

17   to this particular plea.

18             THE COURT:  And that might be -- I would assume for

19   purposes of the motion that that was -- representation was

20   made.  But then it flies in the face of the actual document of

21   the Memorandum of Plea Agreement which specifically states that

22   there is a risk of a period of incarceration and my own

23   colloquy with her with regard to the fact that I am not bound

24   by any agreement between the parties and that there is a risk

25   of a period of incarceration.

UNITED STATES DISTRICT COURT

1           MR. BRYANT:  We understand that, Your Honor, and I
2    understand the colloquy as well as the MOPA.  I think that
3    what's important, especially as it relates to the case *U.S. v.*
4    *Davis* which I cite at 428 F.3d 802 and then it's discussed
5    between 805 and 808, the big issue is this:  It is what was
6    represented to the client by the attorney.
7           And in this particular instance, despite the Court --
8    that the Court did have the colloquy or the discussion with
9    Ms. Davis at the plea hearing, and despite that the Memorandum
10   of Plea Agreement said certain things that it stated, it was
11   always represented to Ms. Davis that the government would never
12   ever, ever recommend jail time, and that was a very critical
13   point in making her decision as to whether or not she should
14   enter into this agreement.
15          THE COURT:  Okay.  So she didn't read the agreement;
16   she didn't understand what I asked her during the colloquy?
17   You're just saying all she focused on was allegedly what her
18   attorney, Mr. Lowell, told her?
19          MR. BRYANT:  Yes.  And I think that the reason why
20   she focused on that specific point was this, and it's pretty
21   simple.  She reposed great trust in him.  When she was informed
22   that there had actually been an agreement, despite the fact
23   that perhaps it may not have been in the MOPA, she had never
24   been in this situation before like this.  When it was
25   represented to her that the government would recommend

1   probation and nothing more, and on that basis -- although the

2   judge has a decision to do whatever the judge wants to do, the

3   judge -- given the fact that she's cooperated in securing the

4   prosecution of Elliott Broidy and given the fact that the

5   prosecution would be -- would be recommending this, on that

6   basis for her she has no reason to believe that Mr. Lowell is

7   making anything other than a truthful representation.

8          And I think what's also important is this.  Given the

9   fact that you have a criminal complaint lodged against

10  somebody, the only person that a defendant typically trusts is

11  going to be their lawyer.  So when their lawyer not only -- and

12  this is important -- he not only didn't properly provide an

13  accurate estimation, it was an outright mistruth.  And it was

14  an outright mistruth and that was discovered later on and that

15  would have been in a meeting that myself, Mr. McCorriston,

16  Mr. Keller, Mr. Mulryne and others were involved in where it

17  had been come out that there was never any discussion about the

18  possibility that there would have been some form of agreement,

19  whether formal or informal, with PIN prosecutors for the fact

20  that there wouldn't be a recommendation for anything greater

21  than probation.

22         And in a subsequent conversation that I had with

23  Mr. Keller, following that call, Mr. Keller, you know, candidly

24  told me, "Look, PIN has a policy that we do not ever agree

25  to -- unless there's some exception -- that we don't agree to

1    have those types of agreements with defendants.  We just don't

2    do that."

3            THE COURT:  Right.  And that's why the Memorandum of

4    Plea Agreement clearly states that there is a possibility of

5    imprisonment up to five years and that's why in my questioning

6    of your client we go over that.

7        So what you're asked me -- asking me to accept wholesale

8    is I should only determine her reasons for pleading guilty

9    based on conversations with her attorney, and that can't be the

10   truth of what a court is going to rely, otherwise why have the

11   colloquy with the defendant to make sure that they understand

12   the potential risks and benefits of pleading guilty?

13       Your client is also a very sophisticated person, highly

14   educated.  We're not dealing with someone who may be of

15   questionable intelligence or limited experience in reading

16   legal documents or documents that set forth things like rights.

17   Your client, you know, owns and has bought and sold real

18   property, I'm assuming has read contracts and so forth.

19       So, you know, it's very difficult for me to find, even if

20   I assume that there was a conflict -- I assume Mr. Lowell made

21   those affirmative representations to her -- that at the change

22   of plea hearing she wouldn't have said, "Whoa, wait a minute.

23   This is very different from, you know, what was told to me."

24           MR. BRYANT:  Well, I think the response to that,

25   Your Honor, and I think I tried to make this point and I'll be

1    clear and more clear on this specific point, despite the fact

2    that, yes, it may have said specifically in this plea agreement

3    and, yes, despite the fact that the Court said Hey, it's a

4    possibility -- right? -- we understand that.

5          I think that's what's important when you have to -- when

6    you're putting yourself in the mind of the defendant in this

7    particular situation.  She's been given enough assurances that

8    just if the government recommends that there will -- that

9    they're -- is only going to recommend probation, then the judge

10   is likely going to agree with that given the fact that you have

11   been very cooperative in securing the biggest person that they

12   wanted to convict in this particular case.

13         And I think that when you -- again, when you're looking

14   at Davis, the Davis case is essentially saying what did the

15   client rely on?  And, yes, there's always going to -- or

16   typically there's a colloquy and typically you're going to have

17   a plea agreement that's going to be written, but the bigger

18   issue is what did she believe was actually going to happen?

19   And if her attorney says, "Don't worry about that" -- which was

20   said multiple times -- "Don't worry about what this might say.

21   Don't worry about what that might say.  This is what's going to

22   happen," it is the estimation.  And as, you know --

23              THE COURT:  I understand your argument.  Do you have

24   anything else that you'd like to present to the court?

25              MR. BRYANT:  Yes, yes.  So the second part of it and

UNITED STATES DISTRICT COURT

1  the reason why we wanted to address that issue first in the

2  event the Court had these questions --

3           THE COURT:  Yes.

4           MR. BRYANT:  -- the second most important thing is

5  this.  The other issue is would Ms. Davis have entered into the

6  plea agreement had she known that Mr. Lowell had the type of

7  conflicts that he had?  And the first response is no, she would

8  never have agreed to that.

9       And the first issue is she wouldn't have agreed to that

10  because she couldn't trust, you know, that her attorney was

11  looking at her best interests as opposed to his own.  This is

12  not like he was being potentially looked at by, you know,

13  again, like you see some examples, the tax division, right?

14  You're talking about NSD and PIN were both looking at him at

15  both potential criminal and civil violations.

16       And as a result, had Ms. Davis known that, she would have

17  immediately withdrawn from counsel.  And why is that important?

18  Because she would have gotten unconflicted counsel and they

19  would have been able to go through and explain to her the

20  elements of what it took in order to convict somebody for a

21  FARA violation.

22       Now, mind you, Mr. Lowell was quite clear what that was.

23  Even in the conversation between him and Mr. Keller where

24  Mr. Keller had said, "Hey, look, you know, we don't know if you

25  might be giving Ms. Davis up to curry favor.  You have a

1  criminal -- potential criminal conduct here," and

2  Mr. Keller -- Mr. Lowell responds, "Well, you know what?  I

3  haven't done anything that's willful," Ms. Davis was never told

4  that that was a critical element.

5       And I showed three separate communications with Ms. Davis

6  and her counsel where she continues to push back on this

7  particular element that relates to willfulness.  She had no

8  idea why it was there, and that's a critical point.  If

9  Mr. -- if Mr. Lowell is pushing her to accept a plea and he has

10  his own conflicts, this is the quintessential reason why you

11  don't have an attorney continue to represent somebody.  So --

12          THE COURT:  So I understand, but you have to show

13  more that there's a conflict.  Even if I assume that there's a

14  conflict, you have to show that his conduct fell below the

15  standard of reasonableness, and you haven't.

16          MR. BRYANT:  That his conduct -- well, Your Honor, I

17  would disagree.  I would say in this particular instance the

18  reasonableness here is Mr. Lowell tells Ms. Davis to basically

19  say things that she's opposed to.  She has no idea -- now, the

20  question is this:  The Court is asking would she have done

21  anything different if there was a conflict of interest?  And

22  the answer --

23          THE COURT:  No.  I'm asking --

24          MR. BRYANT:  Oh.

25          THE COURT:  -- how did his conduct fall below the

1    standard of reasonableness?  What did he fail to do?  Just

2    assume that there's a conflict of interest.  That by itself

3    doesn't mean that she can withdraw her plea.

4              MR. BRYANT:  Correct.

5              THE COURT:  She's saying, "Well, if I knew it, I

6    wouldn't have continued on with him as an attorney."  Okay.

7    But that doesn't mean that she wouldn't have pled guilty.

8              MR. BRYANT:  That was the point I was trying to get

9    to, Your Honor.  Had Ms. Davis actually retained unconflicted

10   counsel and he had that counsel, Mr. -- here's where he falls

11   below the reasonable standard.  He never explains to her what

12   the elements of this case is.  He never explains to her what

13   the government has to prove.

14             THE COURT:  Well, we did that at the colloquy.  We

15   did that at -- in the Memorandum of Plea Agreement, so she got

16   that information.

17        So what is it that Mr. Lowell did that fell below the

18   standard of reasonableness?

19        One of the arguments you made was that he failed to

20   submit an internal appeal to the Office of the Deputy Attorney

21   General on her behalf to avoid an indictment and guilty plea.

22             MR. BRYANT:  That is correct, Your Honor.

23             THE COURT:  That's one of the arguments that you

24   make in your moving papers.

25             MR. BRYANT:  Yes.

1          THE COURT:  But I have a problem with that because

2    that's very unique.  I mean, nobody else has been able to

3    secure that, so --

4          MR. BRYANT:  Mr. Broidy did, Your Honor.

5    Mr. Broidy --

6          THE COURT:  Well, but he got a presidential pardon,

7    didn't he?

8          MR. BRYANT:  Well, no.  So what happened was prior

9    to this -- and you'll see it's part of the other -- the other

10   motions that we've had -- you'll see it's where there was a

11   conflict of interest and where we were saying that, you know,

12   he's -- he's discussing where there's a mutual agreement

13   between these two different parties, the joint defense

14   agreement, Mr. Lowell is now talking about, you know, what the

15   other side is doing, which would have been a violation of that

16   agreement.

17          What they were talking about at that time was they were

18   presenting an appeal before ODAG on a number of different

19   issues related to this particular matter, and they hadn't

20   secured, meaning the government hadn't secured, the go-ahead to

21   move forward with Mr. -- with any sort of prosecution of

22   Mr. Broidy, and that was critical to get Ms. Davis to basically

23   make this statement that she was acting willful.

24          Now, here's the issue.  The issue, Your Honor, is that

25   that is actually for unique situations like this.  That has

UNITED STATES DISTRICT COURT

1    never happened before.  This is one of the most unique cases as
2    it relates to FARA, so that is why it would have been prudent
3    at that particular point in time to bring this to ODAG and say,
4    "Look, no one's ever been prosecuted for this before.  Where
5    does the government really stand?  We oppose this and we think
6    charges should not be brought based on this particular
7    situation and this set of circumstances."
8         THE COURT:  But that's a very novel and untested
9    approach.  So you have to show that there is a failure -- you
10   know, lawyers can try novel and untested approaches, but that
11   doesn't mean that I conclude that there's neglect as a result
12   of that with regard to your client.
13        So I don't see that as a basis to find that there is a
14   just reason to have her withdraw her guilty plea, quite
15   frankly.
16        MR. BRYANT:  So I think the -- well, the Court had
17   asked -- the next question is okay, if there's a conflict --
18   right? -- what would Ms. Davis have done different, right?
19   What would have been the issue?  The issue here is --
20        THE COURT:  No, not what she would have done
21   different.  If there's a conflict, what is the failure of
22   Mr. Lowell as her attorney in terms that caused her harm --
23   that caused her harm with regard to it?
24        MR. BRYANT:  And the failure, Your Honor, and I
25   think I'll reiterate this once again --

UNITED STATES DISTRICT COURT

1            THE COURT:  Right.

2            MR. BRYANT:  -- and that's why I brought up before

3    the initial problem, which is Mr. Lowell is doing two things.

4    He is telling Ms. Davis, "You need to accept this plea or

5    you're going to be taken away from your family," specifically

6    her daughter.  So that puts her in a compromising position.

7            Secondly, Mr. Lowell doesn't advise Ms. Davis as to what

8    it is that constitutes the elements of this particular plea.

9    He doesn't do that and he doesn't give her a full understanding

10   and approach to that.

11           He just simply says, "Look, we haven't looked at any of

12   the real evidence.  We don't really know what's going on.  Why

13   don't you just take the plea?"

14           And she keeps saying --

15           THE COURT:  All right.  I understand what your

16   argument is.  I think we're going round and round on this whole

17   thing because you want to ignore the Memorandum of Plea

18   Agreement and you want to ignore my colloquy with her.  And

19   again, she's a very highly educated, sophisticated person who

20   clearly understood.  In her responses there was no indication

21   that she said, "Wait a minute.  This is different," once the

22   government goes through the elements, "Man, this is different

23   than what was told me.  I need to have a conference.  I'm not

24   sure I want to go forward."  None of that happened.

25           All right.  Let me hear from the government and then I'll

UNITED STATES DISTRICT COURT

1    give you another opportunity to address.

2        Who'll be arguing for the government?

3        MR. KELLER:  John Keller on behalf of the

4    government, Your Honor.

5        THE COURT:  Okay.  Mr. Keller.

6        MR. KELLER:  So I'll start with the conflict of

7    interest issues.  So as the Court is aware, in order for

8    Ms. Davis to show a fair and just reason to withdraw her plea,

9    she's got to show more than just a conflict of interest, which

10   the Court has presumed for the purposes of this hearing.  She's

11   got to show an actual conflict of interest that adversely

12   affected her counsel's performance.

13       And so here, if we presume that the -- that the filter

14   team's notification to Mr. Lowell that his conduct was subject

15   of a crime fraud pleading, that that raised a conflict of

16   interest for Mr. Lowell.

17       Then we have to ask, well, did that conflict of interest

18   adversely affect his representation?  And the Ninth Circuit has

19   said, you know, an example of adverse effect is essentially

20   abandoning some plausible alternative defense strategy due to

21   the conflict.  So there would be separate tactics or strategies

22   available and defense counsel choosing to forego certain viable

23   strategies or tactics because of the conflict.  And that's in

24   Hovey v. Ayers, 458 F.3d 892 which is --

25       THE COURT:  Right.  So help me.  The only thing that

UNITED STATES DISTRICT COURT

```
 1   they've identified that they're saying as a result of this
 2   conflict of interest what he failed to do is to go down this
 3   road that we talked about where he would appeal to the Office
 4   of Deputy Attorney General on her behalf to avoid an indictment
 5   and guilty plea -- that's in Mr. McCorriston's declaration at
 6   paragraphs 18 to 20 -- and Mr. McCorriston -- and because only
 7   she and Elliot Broidy have ever been prosecuted for
 8   representing a foreign nongovernment individual and failing to
 9   register under FARA while representing the interests of a
10   foreign nongovernment individual, so they're saying, oh, he
11   could have, you know, filed an appeal on her behalf and so
12   forth.  But that seems to me to be a very unique and unusual
13   tactic.
14        So, you know, as you've mentioned, case law says, listen,
15   he can't give up a viable defense or a viable, you know,
16   defense tactic because he has this conflict.  But I don't see
17   what they're postulating in terms of the harm that he didn't
18   pursue this appeal to DAGS as really being a viable defense
19   tactic or a defense.
20        MR. KELLER:  Agreed, Your Honor.  And just to
21   clarify the record, Mr. Broidy's counsel did seek an appeal to
22   the Deputy Attorney General before he was charged, and
23   they -- my understanding is they did have a meeting with the
24   Deputy Attorney General and Mr. Broidy was still charged.
25   Those charges were still proved.
```

1           So I'm not sure that -- that Mr. Lowell's determination

2    that that would not be viable or not be worthwhile could be

3    characterized as an unreasonable one or one that was -- well,

4    but more importantly, I don't think it can be characterized as

5    one that resulted from a conflict because even by defense

6    counsel's own admission in their pleading, any conflict here

7    didn't arise until August 26th.  The -- Mr. Lowell's decision

8    not to seek an audience with the Deputy Attorney General would

9    have occurred, you know, far -- long before that when he was

10   negotiating with the government about the -- about the

11   operative terms of the plea agreement and finalizing the

12   documents.

13          The Seventh Circuit addressed a somewhat similar factual

14   situation where counsel for a defendant was passed a note from

15   a witness and asked to deliver it to the defendant's parents,

16   and counsel did so.  And the note turned out to be an

17   extortion -- an attempted extortion.  It asked for payment in

18   exchange for the witness's testimony.

19          So then on appeal, the defendant claimed, well, my

20   attorney was at least exposed to possibly, you know, being

21   complicit in this extortion scheme and so he must have pulled

22   his punches at my trial in order to gain favor with the

23   government because he was scared that he was going to be

24   charged because the judge and the prosecutor had found out

25   about this -- about this note.

1          And the Seventh Circuit said -- it was Judge Posner for

2    the Seventh Circuit in United States v. Montana -- "The mere

3    fact of being under investigation by the prosecutors does not

4    create a fatal conflict.  An actual fear of retaliation must be

5    shown.  It was not shown here and anyway the lawyer was not

6    under investigation.  He may have feared that he would be

7    investigated if he didn't pull his punches, but this is pure

8    speculation which the defendant has made no effort to

9    substantiate."

10         And similarly here not only do we have no evidence that

11   Mr. Lowell pulled his punches after August 26th, there were no

12   punches left to be pulled.  He had already negotiated the terms

13   of this agreement and nothing changed.  Nothing changed from

14   his tactics and strategy leading up to August 26th to what

15   occurred in the days that followed August 26th leading up to

16   the defendant's plea several days later.

17         And so there's just no evidence in the record that

18   Mr. Lowell did anything different after learning -- after being

19   informed of the potential conflict by the -- by the filter

20   team.  There's no evidence he did anything, let alone

21   different, let alone that he -- that he engaged in some kind of

22   deficient performance or that the conflict adversely affected

23   his representation.

24         So I think there's just a lack of evidence, even

25   presuming a conflict here, which is hotly contested by the

1    parties.  But even presuming a conflict here, there's just a

2    lack of evidence of any adverse impact on his representation.

3         So then moving to the -- moving to the ineffective

4    assistance of counsel claim, essentially, for the gross

5    mischaracterization of the government's sentencing

6    recommendation, in the case cited by Mr. Bryant, United States

7    v. Davis, there the guideline range that was called for

8    contemplated a sentence of about eight years and there was no

9    cooperation agreement.

10        And here not only did the resolution involve a plea to a

11   single offense with a five-year maximum, a five-year statutory

12   maximum with no applicable guideline, but also there was a

13   cooperation agreement.  Not only was there a cooperation

14   agreement, but Mr. Lowell understood and I think the parties

15   all anticipated that Ms. Lum Davis would have an opportunity

16   to -- to earn a substantial recommendation by the government of

17   a reduction in her sentence based not only on her cooperation

18   against Mr. Broidy, but her potential cooperation against

19   additional defendants, like Mr. Michel, who is still pending

20   trial.

21        She did testify in the grand jury and then later recanted

22   that testimony and has accused the government of planting false

23   facts and a factual basis and since she rendered herself

24   useless as a cooperator, but at the time that Mr. Lowell,

25   assuming that he made this representation that the government

UNITED STATES DISTRICT COURT

1    would recommend probation -- or home confinement I think is

2    what they say in their papers -- assuming that he made that

3    representation, at the time he made that representation all the

4    parties were contemplating that Ms. Lum Davis would be

5    receiving a significant recommendation by the government for a

6    reduced sentence based on cooperation.

7         And so at that time it's nothing like the

8    mischaracterization in Davis where there's an eight-year

9    guideline range and counsel says, "Well, I think you're likely

10   to end up with probation."  Here there's no guideline range and

11   there's a -- there is a meaningful cooperation provision and

12   opportunity for the defendant to earn substantial credit.

13        And so if Mr. Lowell did make that statement, it wasn't a

14   gross mischaracterization of the possible outcomes here.  It's

15   just that based on the defendant's own conduct, she has -- she

16   has made that an impossibility essentially.  But she can't now

17   say that because of that, because of circumstances that she

18   has -- that she has created, that that renders her counsel's

19   original prediction ineffective assistance.

20        So that does not -- that also does not provide a basis

21   for Ms. Lum Davis to withdraw her plea.

22             THE COURT:  All right.  Thank you.

23             MR. KELLER:  Sorry, just one more point for the

24   record.  The Court has referenced several times the plea

25   colloquy and defense counsel's motion and affidavits,

UNITED STATES DISTRICT COURT

1    declarations stress both this promise or this guarantee that

2    the government would recommend probation, and also stresses

3    that Mr. Lowell was constantly pressuring the defendant,

4    pushing her, pushing her to plead against her will essentially.

5         And at -- at page 12 of the transcript of the defendant's

6    plea colloquy, the Court asks the defendant specifically, "Has

7    anyone attempted to threaten you or pressure you in any way in

8    order to force you to plead guilty?"

9         The defendant says, "No."

10        Just above that the Court asked, "Has anyone made

11   any -- or is this plea agreement the only and entire

12   understanding that you have with the government?"

13        The defendant says, "Yes.'

14        "Has anyone made any other or different promises or

15   assurances of any kind in order to get you to plead guilty?"

16        The defendant says, "No."

17        So I just -- the record belies these self-serving

18   statements years later that she was being actively pressured

19   and that the government had this kind of side deal with her

20   attorney.

21        THE COURT:  All right.  Thank you very much.

22        Mr. Bryant, I'll give you the last word.

23        MR. BRYANT:  Thank you, Your Honor.

24        So just the first point I wanted to address was that the

25   August discussion between the filter team and Mr. Lowell was

UNITED STATES DISTRICT COURT

1    not the first issue or the first conflict.  The first conflict

2    started way before that and that would have been April when NSD

3    contacted him and they had submitted a very lengthy letter

4    about potential FARA violations that he had to address.  I

5    think that was the very first time that he begins to feel this

6    pressure that there was a potential problem here.

7          And I think that there are emails that reflect that

8    Mr. Keller was in contact with the NSD regarding Mr. Lowell's

9    current situation in June of that year, just a couple months

10   after that April file -- or that April letter that Mr. Lowell

11   received.

12         And what is most important about these different

13   conflicts from these different divisions that are looking -- or

14   sections that are looking into Mr. Lowell is this:  The Court

15   asks, All right, well, what did Mr. Lowell do that would have

16   potentially, you know, caused a defense or some sort of

17   strategy to not have moved forward?  The key here is this:  It

18   was the defense that Ms. Davis wasn't willful.  I mean, that

19   is -- that is -- where was the evidence that she -- that there

20   was any willfulness?  And that is what he waived for her.

21         And when he had -- when he had his own pressures, and

22   this is, again, we're going back to the conflict here, his own

23   particular conflict, the one that Mr. Keller himself points out

24   and says, "Hey, you know, it may look like because of your

25   issues, you could be looking to give up Ms. Davis to curry

1    favor," that is exactly what he did.

2        So when a defendant as smart as Ms. Davis may be, when

3    you're put under a very, very tough situation such as she was

4    put in, you have one of the best attorneys in the country on

5    these particular matters representing you, you're listening and

6    trusting everything that they're saying, and when your attorney

7    waives your biggest argument, your biggest defense, and says

8    you need to move forward despite the fact that she told him

9    multiple times -- not really understanding that this intent

10   issue was the biggest issue -- multiple times, "Hey, you know,

11   that particular part's not accurate," and he continues to say,

12   "You need to do this," that is where an attorney breaks down

13   and that is where an attorney is completely negligent in that

14   particular situation because, again, there's no way he can put

15   his own interests outside of hers.

16       And so therefore what did he -- what is the biggest thing

17   that some -- an attorney does that has a conflict of interest

18   in this particular situation when both -- when both sections

19   are looking into both himself and his client and their

20   co-conspirator -- and her alleged co-conspirator?  It's waiving

21   all of your defenses and instead saying, "Take a deal.  Take a

22   deal."

23       And I think that is one of the critical parts that I just

24   want to make sure the Court understands.  What did she waive or

25   what defenses did he basically throw away?  Her strongest

1    defense.  Her strongest defense was to make the government

2    prove that Ms. Davis has willfulness, that she willfully

3    violated or conspired to violate the -- or aided and abetted

4    Mr. Broidy in violating FARA, and that is the critical part.

5         And that is why you can't just separate in this

6    particular instance that conflict.  It is a very different

7    conflict than just having a normal conflict.  This is a

8    conflict that involved all of the parties, including himself,

9    including the prosecutor.

10        And so by August -- by August, the end of August when he

11   finds out from the filter team, that's just more pressure

12   that's put on him to ensure that this -- that this deal is

13   done, despite the fact that he has essentially told Ms. Davis

14   all of these things that have led her to believe, okay, well,

15   look, I'm just trusting my attorney; he knows what he's doing.

16        But in fact, again, had she known this, she would have

17   been able to get competent counsel who would have sat there and

18   told her, "Ms. Davis, no, you should not take this deal, and

19   you have to understand why.  Here are your defenses.  Your

20   biggest defense is the government needs to prove willfulness,"

21   and based upon what I know, they wouldn't have been able to do

22   that given the evidence.

23        So I think that that is one of the critical parts, and I

24   think why it kind of gets conflated with the -- with the

25   conflict of interest part because it is actually a very

UNITED STATES DISTRICT COURT

1    critical part in this case.  It's not simply did he go to ODAG;

2    it is what is her main defense.  And that was essentially like,

3    "Don't worry about that main defense.  Just take this deal."

4         And unless the Court has any further questions, Your

5    Honor, I will submit on that.

6         THE COURT:  All right.  Thank you very much.  I

7    appreciate the briefing as well as the oral arguments of

8    counsel.

9         The court having considered both, the court denies

10   Defendant's Motion to Withdraw Guilty Plea and Memorandum of

11   Plea Agreement filed October 21, 2022.  A written order will

12   follow.

13        We'll now set the matter for sentencing.  I believe the

14   date of January 18th, 2023, at 1:30 P.M. is available.

15        Is that correct, Ms. Elkington?

16        THE COURTROOM MANAGER:  That's correct, Your Honor.

17        THE COURT:  All right.  So we'll set the sentencing

18   date and time for that date and time.  I believe the

19   presentence investigation report has been completed and all of

20   the sentencing statements have been filed.

21        Is that correct, Mr. Keller?

22        MR. KELLER:  Yes, Your Honor.

23        THE COURT:  Is that correct, Mr. Bryant?

24        MR. BRYANT:  Yes, Your Honor.

25        THE COURT:  Okay.  So we'll hold the sentencing on

1   that date and time in the courtroom, and I will see you at that

2   point.

3       Anything further on behalf of the government, Mr. Keller?

4       MR. KELLER:  Yes, Your Honor.  The government would

5   request that based on the Court's ruling today that the Court

6   deny the Motion to Disqualify Government Counsel and the Motion

7   to Compel which are Docket Nos. 47 and 91 with prejudice at

8   this point.  The Court had previously denied them without

9   prejudice providing leave to refile pending the outcome of the

10  motion to withdraw her plea.

11      And the government also requests that the Court reject

12  the factual allegations of prosecutorial misconduct or a

13  conspiracy between the government and Mr. Lowell, and I'm

14  prepared to present argument and evidence on that if the Court

15  would like to hear it.

16      THE COURT:  All right.  Thank you.

17      Mr. Bryant, any response to Mr. Keller's request?

18      MR. BRYANT:  Yes, Your Honor.  I mean, I think at

19  this point I would just ask that the Court deny that request at

20  this particular point in time, and if it becomes something that

21  needs to be addressed possibly at sentencing, maybe we'll do it

22  there.  But I'm not prepared to make these arguments right now.

23      THE COURT:  Okay.  Well, let's I think break it into

24  two parts.  I think, as I understand, and I may be

25  misunderstanding, Mr. Keller, based on the Court's prior

UNITED STATES DISTRICT COURT

1  ruling, the denial without prejudice based on waiting for the

2  court's decision on the motion to withdraw, I denied it without

3  prejudice, and now the government's asking me to deny it with

4  prejudice, which I think is appropriate.

5       But you're objecting to that because you want to

6  argue -- submit arguments or --

7            MR. BRYANT:  I think at this point, Your Honor, I

8  think it should remain denied without prejudice.  If for

9  whatever reason the issue comes up, you know, for whatever

10 reason something else is filed, which again is not likely, then

11 I would just simply say wait for that -- for a motion to be

12 filed.  But at this point I don't know if it matters or if the

13 issue is moot currently.

14           THE COURT:  All right.  And having heard argument

15 with regard to that, I do grant Mr. Keller's requests.  So the

16 minutes will reflect that those motions are denied with

17 prejudice based on the court's ruling on Defendant's Motion to

18 Withdraw Guilty Plea and Memorandum of Plea Agreement filed

19 October 21, 2022, Docket No. 117.

20           Now, with regard to a specific finding with regard to

21 prosecutorial misconduct, I think, Mr. Keller, and conflict, I

22 think I'm not clear what specifically you want me to find with

23 regard to that; that the denial of these motions to find

24 conflict and so forth would be -- would not be sufficient?  So

25 maybe in that respect you'd have to file something so I can

1  take a look at it.

2            MR. KELLER:  I'd be happy to file a proposed order

3  if that would be helpful or proposed -- proposed factual

4  findings.  The concern is that if -- as I understand it,

5  largely the Court's at least discussion with the parties about

6  that motion and in this motion has decided both motions on

7  legal grounds without resolving the underlying factual

8  allegations.  And if those factual allegations are left

9  hanging, I'm concerned that they'll be the subject of future

10 litigation and that -- and that a court of appeals on 2255 no

11 one will have the benefit of this Court's assessment of those

12 facts.  And so -- and that's the reason why I raise it.  So --

13            THE COURT:  Right.  So I think I would have to have

14 an evidentiary hearing then for me to make those factual

15 findings.

16            MR. KELLER:  Well --

17            THE COURT:  Oh, you just want me to do it -- base it

18 on the declarations that are submitted?

19            MR. KELLER:  I believe the declarations and also at

20 least the core allegations that were the subject of the motion

21 to disqualify have been categorically disproven on the record

22 before the Court right now.  And I'm happy to again provide

23 proposed findings of fact with citations for the record.

24            THE COURT:  That would be helpful.  And then I'll

25 give Mr. Bryant and Mr. McCorriston an opportunity to file any

1    rebuttal to that, and then I'll take it under advisement.

2          When would you like to submit that to the Court?  And did

3    you want to have the briefing done before the sentencing?  If

4    so, then I think we have to push back the sentencing.

5          MR. KELLER:  Your Honor, we could -- we could

6    provide this to the Court in a week, by next Friday, the 16th.

7          THE COURT:  Okay.

8          MR. KELLER:  And then --

9          THE COURT:  Okay.  Then I can do that and then we'll

10   give them till -- a little bit more time since it runs into the

11   Christmas holiday -- we'll give them until the 27th.

12         Is that sufficient, Mr. Bryant?

13         MR. BRYANT:  Of December?

14         THE COURT:  Yeah.  They'll get their proposed

15   findings of fact by December 16th, and then I would give you

16   till the 27th to file any objections or your counterproposal

17   for findings of fact, and that would give me time to take a

18   look at it and issue it before the sentencing hearing.

19         MR. BRYANT:  Would the Court have any opposition to

20   the 28th as opposed to --

21         THE COURT:  No.  Mr. Keller, any objection?

22         MR. KELLER:  No, Your Honor, that's fine.

23         THE COURT:  Okay.  So government's proposed findings

24   of fact January -- December 16th, and then defense's response

25   and/or counterproposal for the findings of fact December 28th.


UNITED STATES DISTRICT COURT

1          MR. BRYANT:  Okay, Your Honor.

2          THE COURT:  Okay.  Very good.  Anything else,

3   Mr. Bryant, that we need to address on behalf of your client?

4          MR. BRYANT:  Nothing at this point, Your Honor.

5          THE COURT:  All right.  Very good.  Then I wish all

6   of you a very good day and weekend.

7       We stand in recess.  Good day.

8          THE COURTROOM MANAGER:  All rise.  This Honorable is

9   now in recess.

10          (Proceedings concluded at 2:12 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    COURT REPORTER'S CERTIFICATE

2

3            I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10            DATED at Honolulu, Hawaii, December 9, 2022.

11

12

13                    */s/ Debra Read*

14            DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT